UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

JOSE ACOSTA,

                              Plaintiff,

                                                          9:16-cv-0890
v.                                                        (LEK/TWD)

JUSTIN THOMAS, et al.,

                              Defendants.
———————————————————————————

APPEARANCES:                          OF COUNSEL:

JOSE ACOSTA
08-A-0290
Plaintiff, pro se
Wyoming Correctional Facility
P.O. Box 501
Attica, NY 14011

HON. LETITIA JAMES                    JOSHUA E. McMAHON, ESQ.
Attorney General of the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**REPORT-RECOMMENDATION AND ORDER**

I.    **INTRODUCTION**

        Plaintiff Jose Acosta, an inmate in custody of the New York State Department of

Corrections and Community Supervision ("DOCCS"), has commenced this civil rights action

under 42 U.S.C. § 1983 for violation of his constitutional rights.  (Dkt. No. 1.)  Defendants and

claims surviving initial review under 28 U.S.C. §§ 1915(e) and 1915A are: (1) Eighth

Amendment medical indifference claims against Defendants Dr. Krishna Vadlamudi, Dr. Carl J.

Koenigsmann, Superintendent Justin Thomas, and audiologist Joseph Gullo; and (2) First

Amendment retaliation claim against Dr. Vadlamudi.  (Dkt. No. 7.)

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure (Dkt. No. 98) on the grounds that: (1) Plaintiff's First and Eighth Amendment

claims fail as a matter of law; (2) Plaintiff's claims against Dr. Koenigsmann and Superintendent

Thomas should be dismissed for lack of personal involvement; and (3) Defendants are entitled to

qualified immunity.  (Dkt. No 98-1.)  Plaintiff has responded to the motion.  (Dkt. Nos. 103,

116.[1])  For reasons explained below, the Court recommends that Defendants' summary judgment

motion be granted.

## II.    FACTUAL BACKGROUND

### A.    Deliberate Indifference Claims

Plaintiff's claims arise from his confinement at Marcy Correctional Facility ("Marcy")

from approximately December 18, 2015, to April 11, 2016.  (Dkt. No. 1 at 11, 15.[2])  Construed

---

[1]  By Text Order entered May 24, 2019, Plaintiff was *sua sponte* granted permission to file a
supplemental response to Defendants' motion for summary judgment because Defendants never
served Plaintiff with all exhibits to the pending motion until May 23, 2019.  (Dkt. No. 113; *see
also* Dkt. Nos. 107, 108, 109, 110, 111, 112.)  Plaintiff has timely filed his supplemental
response, which the Court has considered.  (Dkt. No. 116.)  Notably, Counsel for Defendants
avers Plaintiff has been served with complete copies of all exhibits submitted in support of
Defendants' pending motion for summary judgment, including the documents previously and
erroneously submitted to the Court for "in camera" review.  (Dkt. No. 112; *see also* Dkt. Nos.
98, 107, 108, 112.)  Accordingly, Plaintiff's request that the Attorney General's Office be
ordered to provide Plaintiff with "all copies of the 'in camera' review only documents" and that
Defendants be sanctioned for same (Dkt. No. 116 at 9) is hereby denied as moot.  Further, the
Court finds Defendants' error, while not condoned, was not attributable to bad faith, nor was
Plaintiff materially prejudiced.
[2]  Page references to documents identified by docket number are to the page numbers assigned
by the CM/ECF docketing system maintained by the Clerk's Office.  Paragraph numbers are
used where documents identified by the CM/ECF docket number contain consecutively
numbered paragraphs.  Unless noted, excerpts from the record are reproduced exactly as they
appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

liberally, Plaintiff claims Dr. Vadlamudi was deliberately indifferent to his serious medical needs because he discontinued his prescription for Neurontin, a pain medication, without prescribing another course of treatment for his severe pain, denied his request to see an audiologist, and otherwise denied him medical treatment and/or treated him inhumanely. *Id*. at 11, 17, 33-39. Plaintiff alleges Mr. Gullo failed to offer him a more sophisticated hearing aid and failed to inform him of the results of his hearing tests. *Id*. at 25-27, 29-30. Plaintiff also brings supervisory liability claims against Superintendent Thomas and Dr. Koenigsmann claiming they knew about the alleged deficiencies in his medical care and failed to remedy or address his concerns. *Id*. at 6-10.

### 1.    Dr. Vadlamudi

Dr. Vadlamudi is a board certified general surgeon, duly licensed and registered to practice medicine in the State of New York. (Dkt. No. 98-4 at ¶ 1.) At all relevant times, Dr. Vadlamudi was employed by DOCCS as the Facility Health Services Director ("FHSD") at Marcy and was responsible for providing medical care to the inmates and supervising medical staff. *Id*. at ¶ 3. Dr. Vadlamudi oversaw Plaintiff's medical care from approximately December 18, 2015, until his retirement in December of 2016. *Id*. at ¶ 9.

Plaintiff arrived at Marcy on or about December 18, 2015. (Dkt. No. 98-2 at ¶ 6.[3]) Plaintiff's medical conditions and medications were noted in his Ambulatory Health Record. (Dkt. No. 108-2 at 50-51.) On December 21, 2015, a nurse reviewed Plaintiff's medical chart. *Id*. at 49. It was noted Plaintiff was prescribed Neurontin[4] 600 mg, twice a day for headaches

---

[3] References to undisputed facts are to Defendants' statement pursuant to Rule 7.1(a)(3). (Dkt. No. 98-2.)

[4] Neurontin is an anti-epileptic medication, also called an anticonvulsant. (Dkt. No. 98-4 at ¶ 12.) The generic name for Neurontin is Gabapentin. *Id*. Gabapentin affects chemicals and nerves in the body that are involved in the causes of seizures and some types of pain. *Id*.

and spine issues—"neuropathic pain of unclear etiology, per a pain clinic consult" on June 12, 2015. *Id.* The prescription was authorized for up to one year. *Id.* Plaintiff claims he was told by nursing staff at Marcy that his prescription for Neurontin would be discontinued based upon a directive from "Albany." (Dkt. No. 1 at 11.)

On December 22, 2015, Plaintiff was examined by Dr. Vadlamudi for an initial evaluation. (Dkt. No. 98-2 at ¶ 15.) Plaintiff reported he had undergone a craniotomy procedure in May of 2003 and had a past history of seizures, nerve damage, back pain, complete hearing loss in his left ear, and partial hearing loss in his right ear alleviated through the use of a hearing aid. *Id.*[5] Upon examination, it was noted Plaintiff ambulated well, moved all extremities well, and his pupils were equal and reactive to light and accommodation. *Id.* at ¶ 16. During this examination, Dr. Vadlamudi discussed a treatment plan with Plaintiff designed to lower his dosage of Neurontin in order to taper him off and, ultimately, discontinue the medication. *Id.* at ¶ 18. According to Dr. Vadlamudi, when offered alternative pain medication in the form of Motrin or Tylenol, Plaintiff indicated he "had no pain." (Dkt. No. 98-4 at ¶ 21.) Following Plaintiff's appointment, Dr. Vadlamudi noted Plaintiff would be monitored for any seizures or other medical indications for Neurontin for thirty days. (Dkt. No. 98-2 at ¶ 20.)

During a December 24, 2015, sick call visit, Plaintiff reported being upset that his Neurontin was being tapered off and he wanted his complaint noted in his chart. *Id.* at ¶ 24. On December 31, 2015, Plaintiff requested, among other things, to see a doctor for complaints of

---

Neurontin is used to treat nerve pain caused by herpes virus or shingles and to treat seizures in adults. *Id.* at ¶ 13.

[5] Plaintiff's medical records indicate a past history of craniotomy excision tumor schwannoma of the 5th nerve, left side in May 2003. (Dkt. No. 98-4 at ¶ 19.) Fluid collection in the ventricle required a stent that was later removed. *Id.* Plaintiff's medical records evince that Plaintiff had never been witnessed having a seizure. (Dkt. No. 98-2 at ¶ 17.)

lower back pain, neck pain, and facial tics.  *Id*. at ¶ 25.  Plaintiff returned to sick call on January 5, 2016, complaining of hearing loss in his right ear and requested to see a doctor for tendonitis and cervical neck pain.  *Id*. at ¶ 27.

During a January 9, 2016, appointment, Dr. Vadlamudi told Plaintiff "there was no medical reason for prescribing Neurontin given its side effects and that alternative medications were available." (Dkt. No. 98-4 at ¶ 26.[6])  It was noted Plaintiff had reported his last seizure to have been in October 2015, and Dr. Vadlamudi "determined that the treatment plan of December 22, 2015, was the proper course of treatment and the Neurontin would be discontinued." (Dkt. No. 98-2 at ¶ 31.)  Plaintiff claims Dr. Vadlamudi terminated the appointment because Plaintiff could not hear due to the loud background noise and asked to either move closer to Dr. Vadlamudi or be permitted to close the door.  (Dkt. No. 1 at 12.)  Plaintiff claims he "left without being treated for the severe pain."  *Id*.

On or about January 12, 2016, Dr. Vadlamudi entered a referral for Plaintiff to see an audiologist.  (Dkt. No. 98-2 at ¶ 32.)  Plaintiff was scheduled to follow up with Dr. Vadlamudi on January 20, 2016.  (Dkt. No. 98-4 at ¶ 27.)

During the January 20, 2016, appointment, Dr. Vadlamudi reviewed Plaintiff's seizure tracking and noted that no seizures were witnessed in the recent past.  *Id*. at ¶ 29.  He noted in

---

[6]  Plaintiff admits this statement except "as to the part of the statement which states, 'given its side effects and that alternative pain medication were available.'" (Dkt. No. 103 at ¶ 30.) According to Dr. Vadlamudi, Neurontin is a "highly addictive medication with severe side effects." (Dkt. No. 98-4 at ¶ 14.)  Side effects include, but are not limited to, mood or behavior changes, anxiety, depression, hostility, and thoughts of suicide.  *Id*.  Dr. Vadlamudi states patients who are prescribed Neurontin "should only take the medication for a short period of time."  *Id*. at ¶ 15.  In his opposition submission, Plaintiff attaches what appears to be a one page copy of the "Complete Guide to Prescription & Nonprescription Drugs" for Gabapentin, brand name Neurontin.  (Dkt. No. 103-1 at 5.)  Highlighted under "Basic Information" is the following: "Habit forming?  No."  *Id*.

Plaintiff's chart that there was no need for seizure medication and that they were still waiting on an audiology follow up. *Id*. Dr. Vadlamudi advised Plaintiff to continue going to sick call to address his concerns as needed. (Dkt. No. 98-2 at ¶ 34.) According to Plaintiff, during this appointment Dr. Vadlamudi stated, "I will not be prescribing neurotin for seizures lets see what happens, that is all." (Dkt. No. 1 at 12.)

The next day, Plaintiff complained of pain in his neck and lower back during sick call. (Dkt. No. 108-2 at 37.) Plaintiff told the nurse Dr. Vadlamudi "threw him out" of the infirmary on January 20, 2016, "because he could not hear [] from all the noise." *Id*. Plaintiff requested to discuss his pain issues with a different doctor. *Id*.

Plaintiff next saw Dr. Vadlamudi on January 27, 2016. (Dkt. No. 98-2 at ¶ 35.) Plaintiff complained of pain in his neck, back, and head. *Id*. Dr. Vadlamudi noted Plaintiff's operation scar was clean and that he moved his neck well with no stated or apparent discomfort. (Dkt. No. 98-4 at ¶ 31.) Upon examination, it was noted that his "LS spine was negative and no neurological deficit was noted." *Id*. Plaintiff reported numbness on the left side of his face with an occasional feeling of electric shock. *Id*. Dr. Vadlamudi did not witness any physical signs of such pain and "advised [him] to come to sick call as needed to get Motrin for pain." (Dkt. No. 98-2 at ¶ 38.) Plaintiff responded that Motion did not relieve his pain and advised he was going to write a letter to Dr. Koenigsmann. (Dkt. No. 98-2 at ¶ 39.)

Between January 28, 2016, and April 4, 2016, Plaintiff was seen at sick call for, among other things, complaints of pain on nine occasions. *Id*. at ¶40. During each sick call visit, Plaintiff was given either Tylenol or Motrin for his pain. *Id*. at ¶ 41.

On March 1, 2016, Plaintiff presented to Mr. Gullo for an audiometric evaluation. (Dkt. No. 98-2 at ¶ 101.) The next day, Dr. Vadlamudi saw Plaintiff to discuss the results of the

audiology test. *Id*. at ¶ 42. Dr. Vadlamudi advised Plaintiff the audiologist had reported the test results were unreliable and that no further follow-up was recommended at that time. *Id*. at ¶ 43. He also advised Plaintiff to continue using his hearing aid in his right ear as recommended by the audiologist. *Id*. at ¶ 44.

During sick call visits on April 4, 2016, and April 5, 2016, Plaintiff requested, among other things, consultations with the doctor and audiologist. (Dkt. No. 108-2 at 32.) On April 11, 2016, Dr. Vadlamudi met with Plaintiff to again discuss the results of the March 1, 2016, test. (Dkt. No. 98-2 at ¶ 45.) At that appointment, Dr. Vadlamudi "made clear to Plaintiff that the audiology test results were unreliable as reported by the audiologist." *Id*. at ¶ 46. Thereafter, between April 19, 2016, and June 13, 2016, Plaintiff presented to sick call on seven occasions and was provided with, among other things, Tylenol for his pain. *Id*. at ¶¶ 47-48.

Plaintiff was next seen by Dr. Vadlamudi on June 15, 2016, complaining of "worsening hearing over the past few months." *Id*. at ¶ 49. Dr. Vadlamudi referred Plaintiff to audiology for a second opinion. *Id*. at ¶ 50. Between June 20, 2016, and July 14, 2016, Plaintiff was seen at sick call on five occasions and was issued, among other things, Tylenol for his pain. *Id*. at ¶ 51.

On July 11, 2016, Plaintiff underwent an auditory brainstem response ("ABR") test at the Harrison Center. *Id*. at 52. The test results were deemed unreliable and the audiologist requested a repeat ABR under light sedation. *Id*. On July 15, 2016, Dr. Vadlamudi requested referrals for Plaintiff to be seen by audiology for a repeat ABR and for a follow up appointment with the Harrison Center. *Id*. at ¶ 54.

On July 27, 2016, Plaintiff was seen for a history and physical evaluation prior to his ABR test.  *Id*. at ¶ 55.[7]  Dr. Vadlamudi did not treat Plaintiff after July 27, 2016, and he retired in December of 2016.  (Dkt. No. 98-4 at ¶¶ 2, 58.)

As discussed more fully below, between December 23, 2015, and April 13, 2016, Plaintiff filed four grievances regarding his medical care (MCY-19994-15, MCY-20056-16, MCY-20217-16, and MCY-20394-16) at Marcy.  *Id*. at ¶¶ 85-88; Section II.C, *infra*.  Additionally, between April 22, 2015, and May 6, 2016, DOCCS received at least thirteen letters from Plaintiff concerning his medical care.  (Dkt. No. 98-2 at ¶ 108; Section II.D, *infra*.)

In his declaration, Dr. Vadlamudi explains he "had seen and treated [P]laintiff multiple times throughout his incarceration at Marcy and was very familiar with his medical conditions. His pain issues were always addressed and I entered him to see the specialist when medically indicated."  *Id*. at ¶ 92.  Dr. Vadlamudi continues, "I always explained the plan of care with him, discussed his medical conditions appropriately, and provided him with adequate treatment in complaints with community standards, as is demonstrated by his medical records."  *Id*.

## 2.    Mr. Gullo

Mr. Gullo is a New York State licensed audiologist.  (Dkt. No. 98-5 at ¶ 1.)  He is a member of the American Speech Language Hearing Association and American Academy of Audiology.  *Id*.  He began contracting with DOCCS in approximately 1997.  *Id*. at ¶ 2.  At all relevant times, he was the audiologist specialist for Marcy.  *Id*.  He currently is the audiologist specialist for the Walsh, Elmira, and Wende Correctional Facilities.  *Id*.

---

[7]  The parties dispute whether Dr. Vadlamudi personally examined Plaintiff on July 27, 2016. (See Dkt. Nos. 98-2 at 55; 103 at ¶ 55, 98-4 at ¶ 58; 103-1 at ¶¶ 16, 17.)

On August 21, 2012, prior to his transfer to Marcy, Plaintiff treated with Mr. Gullo. (Dkt. No. 98-2 at ¶ 56.[8]) At that appointment, Plaintiff reported being unhappy with the "canal type hearing aid" fitted by audiologist John Serhan[9] and requested an "over the ear type hearing aid" ("OTE"). *Id.* Mr. Gullo cleaned and checked Plaintiff's hearing aid. *Id.* at ¶ 57. He recommended that Plaintiff be fitted with an OTE type aid and scheduled him for the audiology clinic. *Id.*

On October 9, 2012, Mr. Gullo fitted Plaintiff with a right ear OTE instrument. *Id.* at ¶ 60. The OTE instrument was chosen based, in part, upon audiometric findings made by Mr. Serhan, and because it met DOCCS and New York State Medicaid standards. *Id.* at ¶ 61. Between November of 2012 and January of 2015, Plaintiff saw Mr. Gullo on nine occasions. *Id.* at ¶¶ 62-84. At each appointment, Mr. Gullo cleaned, modified, and repaired Plaintiff's hearing aid as necessary. *Id.*

On February 17, 2015, Mr. Gullo conducted an audiometric evaluation on Plaintiff. *Id.* at ¶¶ 86, 87. Upon examination, otoscopy revealed that Plaintiff's ear canals were clear and the eardrum was easily visualized. *Id.* at ¶ 87. Tympanometry revealed normal middle ear pressure and acoustic reflexes at ipsilateral stimulation were absent. *Id.* at ¶ 88. After performing tune audiometry, Mr. Gullo found the results were inconclusive and unreliable. *Id.* at ¶ 89.[10] As

---

[8] Plaintiff notes he was first referred to Mr. Gullo in 2008. (Dkt. No. 103-at ¶ 56; Dkt. No. 103-1 at 14-18.)

[9] Plaintiff's Eighth Amendment deliberate indifference claim against Mr. Serhan was dismissed on initial review. (Dkt. No. 7 at 14.)

[10] Mr. Gullo's determination was based upon, among other things, Plaintiff's inability to consistently respond when he heard a tone. (Dkt. No. 98-2 at ¶ 90.) Mr. Gullo noted Plaintiff had a difficult time repeating his responses, which meant that he could not consistently indicate when he heard a tone. *Id.* at ¶ 91. In addition, Plaintiff's Most Comfortable Listening ("MCL") level was determined to have been less than his Pure Tone Average ("PTA"). *Id.* at ¶ 92. The results of the evaluation revealed that Plaintiff's PTA, or the average decibel level of responses provided to tones at 500 Hz, 1000 Hz, and 2000 Hz, was 65 db. *Id.* at ¶ 93. These results, Mr.

such, Mr. Gullo determined the best course of treatment was for Plaintiff to continue wearing his hearing aid.  *Id*. at ¶ 96.

Between April and August of 2015, Mr. Gullo saw Plaintiff on four more occasions, in part, because Plaintiff lost his hearing aid during an altercation with another inmate and needed to be fitted for a new hearing aid.  (Dkt. No. 98-2 at ¶¶ 97-100.)

On October 27, 2015, Plaintiff underwent an ABR test at the Arnot Health Center.  *Id*. at ¶ 52.  The results of the ABR test were "abnormal, suggestive of bilateral mid to upper brainstem dysfunction affecting auditory pathways."  *Id*. at ¶ 52 n.1.  Plaintiff claims he was transferred to Marcy on or about December 18, 2015, without having the results of the October 27, 2015, test explained to him.  (Dkt. No. 1 at 28.)

On March 1, 2016, Mr. Gullo performed a second audiometric evaluation on Plaintiff.  (Dkt. No. 98-2 at ¶ 101.)  The results of this test were also unreliable and, since Plaintiff possessed an appropriate, functioning hearing device, Mr. Gullo determined no further testing was necessary.  *Id*. at ¶ 102.  Mr. Gullo has not treated Plaintiff for the conditions at issue in the lawsuit since this March 1, 2016, appointment.  *Id*. at ¶ 103.

Plaintiff was next seen for an audiology consultation on September 28, 2016, at Upstate University Hospital for a repeat ABR test.  (Dkt. No. 108-2 at 67-69.)  The audiologist recommended that Plaintiff be seen by an ear, nose, and throat specialist or have a neuro-otology consultation.  *Id*. at 69.

---

Gullo explained, indicated Plaintiff could not hear frequencies or tones that were softer than 65 dB.  *Id*. at ¶ 94.  However, the test also revealed that Plaintiff's MCL, or the volume Plaintiff reported he was comfortably receiving in his headphones from Mr. Gullo's audiometers, was 55 dB.  *Id*. at ¶ 95.

At his deposition, Plaintiff testified he commenced this action, in part, so he could "be moved to a prison where [he would] get the help [he] needed for [his] hearing loss. That has since happened . . . I'm in the dorm for the guys that are deaf. I'm here. So that's moot. That's already taken care of. The only issue now is my pain." (Dkt. No. 98-3 at 19-20.) Plaintiff is incarcerated at the Wyoming Correctional Facility. (Dkt. No. 39.)

### 3.    Superintendent Thomas

Superintendent Thomas is employed by DOCCS and is responsible for the overall supervision and management of Marcy. *Id.* at ¶ 3. (Dkt. No. 98-7 at ¶¶ 1, 2, 3.) He is not, however, directly involved in all aspects of daily operations. *Id.* at ¶ 5. Rather, there are three Deputy Superintendents at Marcy, one each for security, programs, and administration. *Id.* at ¶ 6. Each is responsible for the overall management and supervision of his or her respective department. *Id.* In addition, each DOCCS facility has a designated Medical Director that is responsible for the overall management and supervision of the medical department. *Id.* at ¶ 7.

Plaintiff testified he "added [Superintendent Thomas as a Defendant] because he was just rubber stamping the decision" made on Plaintiff's grievances. (Dkt. No. 98-2 at ¶ 109.) Relevant to this action, Plaintiff filed four grievances concerning his medical care at Marcy. (Dkt. No. 98-4 at 22, 31, 47, 56.)

On or about December 23, 2015, Plaintiff filed a grievance (MCY-19994-15) requesting to be seen by an audiologist based on his abnormal results of a hearing test that was conducted on October 27, 2015. *Id.* at 22. On January 14, 2016, Superintendent Thomas issued the following response:

> Subject states that he has requested to see an audiologist based on
> the abnormal results of a hearing test that was conducted on
> 10/27/15. He states he is unable to hear the television,
> announcements over the PA, or hear while on the telephone. His

> current hearing classification does not afford him reasonable
> accommodations to alleviate these issues. Grievant is requesting
> that he be seen by an audiologist to be re-classified so that he may
> receive reasonable accommodations.
>
> Investigation returned by Nurse Administrator (C) reveals that
> current care is appropriate. His chart has been reviewed by Doctor
> (V) and outside evaluation is not needed at this time. Grievant is
> advised to address ongoing issues at sick call.
>
> Grievant is further advised that medical staff has the sole authority
> to determine medical protocol and treatment. Further, IGRC does
> not have the authority to assess and determine medical protocol.
>
> Grievance is denied.

*Id*. at 22.

On or about January 11, 2016, Plaintiff filed a grievance (MCY-22056-16) claiming that

Dr. Vadlamudi "threw him out" of his January 10, 2016, appointment because he was unable to

hear what the doctor was saying. *Id*. at 31. Plaintiff requested to be seen by another physician,

who was not biased against him, and requested a consultation with an audiologist. *Id*. On

February 5, 2016, Superintendent Thomas issued the following response:

> Subject claims that Doctor (V) terminated a sick call visit because
> the grievant was unable to hear what Doctor (V) was saying.
> Grievant is requesting that he be seen by another doctor.
>
> Investigation returned by Nurse Administrator (C) reveals that an
> audiology consultation has been scheduled, wherein the grievant's
> hearing issues will be addressed.
>
> Grievance is accepted to the extent that the subject will be seen by
> an audiologist.

*Id*. at 37. Plaintiff appealed the Superintendent's decision to the Central Office Review

Committee ("CORC"), stating, "It was not a sick call visit. It was a doctor's appointment to deal

with my seizures and pain issues which as of yet have not been dealt with leaving me in extreme

neck/back/face pain." *Id*.

On or about March 14, 2016, Plaintiff filed a grievance (MCY-20271-16) claiming, *inter alia*, Mr. Gullo failed to advise Plaintiff during the March 1, 2016, appointment how the "abnormal ABR test impacts his hearing." *Id*. at 47. On April 5, 2016, Superintendent Thomas denied Plaintiff's grievance:

> Subject states that he was taken to Walsh CF on 3/1/16 for a hearing test. Upon completion of these tests, Doctor (G) did not provide an explanation of the results. Grievant is requesting that he be given an explanation of the aforementioned tests.
>
> Investigation returned by Doctor (V) reveals that the tests the inmate underwent at Walsh CF have no significance. Grievant is advised to follow up with medical staff at Marcy CF.
>
> Grievant is advised that medical staff has the sole authority to determine medical protocol and treatment. Further, IGRC does not have the authority to assess and determine medical protocol.
>
> Grievance is denied.

*Id*. at 48. Plaintiff appealed Superintendent's Thomas' deicison to CORC:

> My grievance was due to Dr. (G) not notating on the audiology report the results of 2 of the 3 tests taken that day, the audiology report is incomplete and for not explaining the significant of the "abnormal" ABR test results. Dr. (V) idea of follow up was to tell me on April 11, 2016, "The audiologist determined that the results were unreliable, you can leave now!" I am being treated inhumanely and no one is doing anything. Please help me!

*Id*.

On or about April 13, 2016, Plaintiff filed a grievance (MCY-20394-16) regarding his April 11, 2016, appointment with Dr. Vadlamudi pertaining to grievance MCY-20271-16. *Id*. at 56. Plaintiff claims Dr. Vadlamudi treated him inhumanely by denying him an explanation regarding Mr. Gullo's diagnosis and discontinued and denied him medication for his seizures, arthritis, and displaced left nerve root. *Id*. As relief, Plaintiff requested that Dr. Vadlamudi cease to treat him inhumanely. *Id*. Superintendent Thomas issued the following decision:

Subject states that when he went to sick call to follow up on his audiology test results, Doctor (V) failed to provide a satisfactory explanation. Grievant is requesting that Doctor (V) provide him with adequate treatment.

Investigation returned by Nurse Administrator (C) reveals that Doctor (V) has evaluated and discussed these issues with the grievant. Current level of care is appropriate. Grievant is advised to address ongoing issues at regular sick call.

Grievant is advised that medical staff has the sole authority to determine medical protocol and treatment. Further, IGRC does not have the authority to assess and determine medical protocol.

Grievance is denied.

*Id.* at 62.

### 4.    Dr. Koenigsmann

Dr. Koenigsmann is a duly licensed physician in the State of New York and is employed by DOCCS as the Deputy Commissioner/Chief Medical Officer. (Dkt. No. 98-6 at ¶¶ 1, 3.) His responsibilities include policy development and implementation of medical policies and practices related to the medical care to more than 50,000 inmates in DOCCS custody. *Id.* at ¶ 4. As Chief Medical Officer, Dr. Koenigsmann does not personally provide medical care to individual inmates, make medical decisions as to the appropriate treatment for individual inmates, or resolve disputes between individual inmates and their doctors as to appropriate medical treatment. *Id.* at ¶ 5. According to Dr. Koenigsmann, decisions regarding each inmate's medical care and treatment are left to the professional medical judgment of the physicians at each facility. *Id.*

Dr. Koenigsmann's office receives several thousand letters per year. *Id.* at ¶ 6. Due to the high volume of correspondence, Dr. Koenigsmann relies on officials within the Division of Health Services to investigate and respond appropriately to the letters. *Id.* The normal and

ordinary procedure of Dr. Koenigsmann's office is for administrative staff to review incoming

correspondence and, based upon its content, determine the particular Division of Health Services

official to whom the correspondence should be forwarded for appropriate action, if any.  *Id.* at ¶

7.  Based upon a review of his records, Dr. Koenigsmann's office received thirteen letters from

Plaintiff between April 22, 2015, and May 6, 2016.  *Id.* at ¶ 8.[11]

On January 11, 2016, Dr. Koenigsmann's office received two letters from Plaintiff dated

December 23, 2015, and December 25, 2015.  (Dkt. No. 98-6 at ¶ 10.)  In his December 23,

2015, letter Plaintiff, *inter alia*, requested a consultation with audiology and that his prescription

for Neurontin be reinstated as prescribed prior to his arrival at Marcy.  (Dkt. No. 108 at 30-31.)

By letter dated December 25, 2015, Plaintiff indicated that after only being housed at Marcy for

five full days, his prescription for Neurontin was discontinued.  *Id.* at 34-35.

On January 20, 2016, Dr. Koenigsmann's office received a copy of Plaintiff's letter dated

January 8, 2016.  (Dkt. No. 98-6 at ¶ 10.)  In that letter, Plaintiff claimed Dr. Vadlamudi denied

him medical attention during an appointment earlier that same day.  (Dkt. No. 108 at 25-27.)

Plaintiff explained that he "firmly believed that [Dr. Vadlamudi's] actions are in reprisal of

writing to you and filing a grievance."  *Id.* at 26-27.  Plaintiff further stated:

> Dr. Koenigsmann, I truly need your help in seeing an audiologist
> and in being prescribed Gabapentin due to it being the only
> medication that helps alleviate all of the residual symptoms of
> having a 5th nerve Schwannoma brain tumor removed on May 30,
> 2003, almost 13 years ago, so I am living on borrowed time!
>
> I neglected to note the symptom of seizures as one of the many
> reasons for being prescribed Gabapentin, as of this date I have not
> been given anything for seizures or my neck/low back pain to

---

[11]  According to Plaintiff, he wrote sixteen letters to Dr. Koenigsmann.  (Dkt. No. 103 at ¶ 108.)
The Court notes Plaintiff has not attached copies of the additional letters nor described their
content and/or relevancy to this action.  (Dkt. No. 103 at ¶ 108.)

which I continue to complain about at sick call.

*Id*. at 27.

On February 19, 2016, Dr. Koenigsmann's office received letters from Plaintiff dated January 10, 2016, and February 5, 2016, along with copies of his letters that were previously received.  (Dkt. No. 98-6 at ¶ 10.)  In the January 10, 2016, letter, Plaintiff claimed Dr. Vadlamudi was "completely biased" against him because he had filed a grievance against the doctor.  (Dkt. No. 108 at 47-48.)  Plaintiff again explained that upon his arrival at Marcy in December of 2015, his pain and seizure medication was discontinued.  *Id*. at 47.  Plaintiff also noted he was forced to leave Dr. Vadlamudi's office before his medical issues were addressed during a January 10, 2016, appointment because he asked to move closer to the doctor since he could not hear due to the loud background noise.  *Id*. at 48.

In his February 5, 2016, letter, Plaintiff explained, in relevant part:

> I arrived at Marcy and less than a week later, I was taken off Neurontin and have not been given anything in replacement for the pain.  The doctor tells me to go to sick call for pain meds.
>
> As for seizures, he told me "we will see what happens!"
>
> Dr. Vadlamudi's treatment is inhumane and is clearly deliberate indifference to my serious health issues.  The dr. is acting in this matter due to me writing to you and submitting formal complaints (grievances).  I should not be denied humane treatment because I utilize said processes that are in place for instances such as mine.
>
> I tried to explain the need for Neurontin, that it (Neurontin) helps me with all of my ailments, that it helps me to cope with the pain and discomfort and he stated, "I see no need for Neurontin."  I then asked for relief from the pain and he stated, "Go to sick-call!"
>
> Dr. Vadlamudi knows that I am suffering pain, yet chooses to do nothing.  He knows that a seizure could really hurt me, yet he chooses to do nothing.

*Id.* at 36-37.  Plaintiff's letters were assigned to Health Services Administrator Stephen M. Ash

for a response.  (Dkt. No. 98-6 at ¶ 10.)  Mr. Ash responded to Plaintiff's correspondences on

March 14, 2016.  (Dkt. No. 108 at 24.)

On March 29, 2016, Dr. Koenigsmann's office received from Governor Cuomo's Office,

a letter from Plaintiff dated March 7, 2016.  (Dkt. No. 98-6 at ¶ 12.)  In his March 7, 2016, letter,

Plaintiff, among other things, informed the Governor that Dr. Vadlamudi discontinued his

prescription shortly after being transferred to Marcy and told Plaintiff, "I don't believe that it is a

good for you to be on Neurontin."  (Dkt. No. 108 at 71-75.)  Plaintiff informed the Governor that

Dr. Vadlamudi had not "prescribed any type of replacement medication, leaving [him] to wallow

an[d] suffer in pain without any recourse but to use medication that causes [him] side effects

(Tylenol—constipation; Motrin—severe stomach pain)."  *Id.* at 71-72.  This letter was assigned

to Health Services Administrator Megan E. Yaiser to prepare a response.  (Dkt. No. 98-6 at ¶

12.)

On April 5, 2016, a letter dated March 29, 2016, from Plaintiff was forwarded to Dr.

Koenigsmann's office from Acting Commissioner Anthony Annucci.  *Id.*  In his March 29, 2016,

letter addressed to Mr. Ash, Plaintiff stated he was:

> not being treated humanly, being forced to suffer and wallow in
> pain because the doctor absolutely refuse to prescribed pain
> medication due to me complaining and filing complaints
> (grievances) against him due to his lack of care and concern to my
> over all health[.]

(Dkt. No. 108 at 95.)  Plaintiff also described the inadequate medical care and "inhumane"

treatment he was subjected to by Dr. Vadlamudi during the three appointments in January of

2016.  *Id.* at 95-97.  By letter dated April 11, 2016, Dr. Koenigsmann responded as follows:

> Governor Cuomo and Acting Commissioner Annucci have asked
> me to respond to your recent letter regarding your healthcare.

> The Division of Health Services has investigated your concerns with the Health Services staff at Marcy Correctional Facility. I have been advised that the issue to which you refer is being addressed as a grievance submitted at your facility. Please be advised that Directive # 4040 Inmate Grievance Program (IGP), provides offenders with an orderly, fair and simple method of resolving grievances pursuant to Correction Law. The directive makes no provision for an offender to refer grievances directly to Central Office.
>
> It is suggested that you continue to bring your medical concerns to the attention of the health care staff using the existing sick call procedure. I am sure they will make every effort to address your needs.

*Id*. at 68.

On April 29, 2016, Dr. Koenigsmann's office received from DOCCS, Office of the Counsel, a copy of a Plaintiff's letter dated March 25, 2016, describing, *inter alia*, Plaintiff's claims in this action. (Dkt. No. 98-6 at ¶ 13.) The letter was assigned to Health Services Administrator Megan E. Yaiser for a response. *Id*. On May 6, 2016, Dr. Koenigsmann's office received a letter from Plaintiff dated April 25, 2016, responding, in part, to Dr. Koenigsmann's letter dated April 11, 2017. *Id*. at ¶ 14. That letter was also assigned to Ms. Yaiser for a response. *Id*. Ms. Yaiser responded to Plaintiff on May 16, 2016. *Id*.

### B.    First Amendment Retaliation Claim

Plaintiff claims Dr. Vadlamudi retaliated against him by providing inadequate medical care due to several grievances and letters of complaint he filed against him. (Dkt. No. 1 at 37-39.) In his declaration, Dr. Vadlamudi states that "Plaintiff's grievances in no way affected the medical care I provided to him. I made no decision based on or influenced by the grievances. Rather, my care and decisions were motivated by medical considerations." (Dkt. No. 98-4 at ¶ 90.)

III.    APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and quotation marks omitted). A verified complaint, as Plaintiff has filed in this case (Dkt. No. 1 at 40), is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." To defeat summary judgment, nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999[12]) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

---

[12] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

## IV.    DISCUSSION

### A.    Eighth Amendment Deliberate Indifference Claims

#### 1.    Legal Standard

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (quotation marks and citations omitted) (alteration in original).  This standard contains objective and subject elements.  *Id*.  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind.  *Id*. at 184 (citing, *inter alia*, *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *accord Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009).

To satisfy the objective element, the alleged deprivation must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Determining whether a deprivation is sufficiently serious also involves two inquiries.  *Id*.  The first question is whether the plaintiff was actually deprived of adequate medical care.  *Id*.  Prison officials who act "reasonably" in response to the inmate's health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care."  *Id*. (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious."  *Id*. at 280.  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff.  *Id*. (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)).  If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is

"sufficiently serious." *Id*. (citing *Smith*, 316 F.3d at 185-86). However, where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id*.

Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted); *see also Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain").

Thus, the Court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id*. at 280.

To satisfy the subjective element, the plaintiff must demonstrate that defendants had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . . the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id*.; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective

recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40). Therefore, "the defendant's belief that his conduct posed no risk of serious harm 'need not be sound so long as it is sincere,' and 'even if objectively unreasonable, a defendant's mental state may be nonculpable.'" *Wright v. Genovese*, 694 F. Supp. 2d 137, 154-55 (N.D.N.Y. 2010) (Kahn, D.J.) (quoting *Salahuddin*, 467 F.3d at 281).

Disagreements over medication, diagnostics, forms of treatment, and the need for specialists are not adequate grounds for a § 1983 claim, since those issues implicate medical judgment and at worst negligence constituting malpractice. *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001). Stated another way, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *accord Hill*, 657 F.3d at 123; *see also Smith*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

### 2.    Analysis

Defendants assume, without conceding, that Plaintiff's medical conditions were objectively serious. (Dkt. No. 98-1 at 6-7.) However, the Court finds no reasonable jury could find Plaintiff was actually deprived of adequate medical care or that Defendants acted with deliberate indifference to his serious medical needs.

As to the first inquiry of the objective prong, the Court finds no reasonable jury could find Plaintiff was "actually deprived of adequate medical care." *Salahuddin*, 467 F.3d at 276. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations

under the Eighth Amendment when the care provided is 'reasonable.'" *Jones v. Westchester Cty. Dep't of Corrs. Med. Dep't*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (quoting *Salahuddin*, 467 F.3d at 280). Here, the record evidence demonstrates Plaintiff's various medical conditions, including but not limited to severe pain, seizures, and hearing deficiencies, were reasonably treated and monitored at all relevant times. *See, e.g.*, *Gray v. Kang Lee*, No. 9:13-cv-258 (GLS/DEP), 2015 WL 1724573, at *3 (N.D.N.Y. Apr. 15, 2015) (finding prisoner could not satisfy objective requirement where he was frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist); *Nowinski v. Rao*, No. 6:14-CV-06559 (MAT), 2018 WL 2303780, at *5-6 (W.D.N.Y. May 21, 2018) (granting summary judgment to the defendants where record evidence showed the plaintiff was not deprived of adequate care where, *inter alia*, the inmate was provided with extensive care for his knee problems, including multiple surgeries, physical therapy, medications, and accommodations).

Even assuming Plaintiff could satisfy the objective element, the Court finds no reasonable factfinder could conclude Defendants acted with deliberate indifference.

### a. Dr. Vadlamudi

Plaintiff avers Dr. Vadlamudi refused to provide him with Neurontin, despite having a prescription for it from another facility and taking the medication for many years, that the non-prescription medication he was provided with at sick call was ineffective, and that, as a result, he suffered extreme pain. (Dkt. No. 1 at 11, 17, 33-39.) Plaintiff also claims Dr. Vadlamudi denied him referrals to audiology, denied him treatment, and otherwise treated him "inhumanely." *Id.*

Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds*, 151 F. Supp. 2d at 311 (citations omitted). A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Id.*

24

Thus, the fact that a plaintiff might have preferred an alternative treatment or believes he did not

get the medical attention he wanted does not rise to the level of a constitutional violation.  *Id.*

Indeed, an inmate does not have the right to treatment of his choice.  *Dean v. Coughlin*, 804 F.2d

207, 215 (2d Cir. 1986).  As such, disagreements over medications, diagnostic techniques, forms

of treatment, the need for specialists, and the timing of medical intervention implicate medical

judgment and do not rise to the level of a constitutional violation.  *Sonds*, 151 F. Supp. 2d at 312

(citing *Estelle*, 429 U.S. at 107); *see also Washington v. Westchester Cty. Dep't of Corr.*, No. 13

Civ. 5322 (KPF), 2014 WL 1778410, at *6 (S.D.N.Y. Apr. 25, 2014) ("The law is clear that the

medication a doctor selects to treat the patient's conditions is a medical judgment and does not

rise to the level of deliberate indifference."); *Wright*, 694 F. Supp. 2d at 160 ("Differences in

opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do

not support a claim that the doctor was deliberately indifferent to the inmates' 'serious' medical

needs.") (collecting cases); *Adams v. Smith*, No. 9:15-CV-913 (BKS/DJS), 2018 WL 1363495, at

*4 (N.D.N.Y. Mar. 16, 2018) ("Courts have repeatedly rejected medical indifference claims

based upon a failure to provide stronger pain medication.") (collecting cases).

      Here, as set forth in his declaration, Dr. Vadlamudi discontinued Plaintiff's prescription

because he believed there "was no medical reason for prescribing Neurontin given its side effects

and that alternative pain medications were available."  (Dkt. No. 98-4 at ¶ 26.)  "[C]ourts have

repeatedly declined to find that a medical provider was deliberately indifferent to an inmate's

medical needs" when a plaintiff challenges "the type and quantity of pain medication."  *Williams*

*v. Williams*, No. 13-CV-3154, 2015 WL 568842, at *5 (S.D.N.Y. Feb. 11, 2015) (collecting

cases); *see also Hill*, 657 F.3d at 123 (holding that an inmate failed to state a claim for deliberate

indifference where he alleged that stronger pain medication was necessary to treat his medical

condition); *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) ("Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment.") (citations omitted), *aff'd*, 178 F. App'x 39 (2d Cir. 2006); *Rush v. Fischer*, 09 Civ. 9918, 2011 WL 6747392, at *3 (S.D.N.Y. Dec. 23, 2011) ("The decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs."); *Harris v. Westchester Cty. Med. Ctr.*, No. 08 Civ. 1128 (RJH), 2011 WL 2637429, at *3 (S.D.N.Y. July 6, 2011) ("The failure to provide stronger pain medication does not constitute deliberate indifference.").  Further, the record evidence demonstrates Plaintiff routinely utilized sick call and was provided with non-prescription pain medication.  (Dkt. No. 98-2 at ¶¶ 40, 41, 47, 48, 51.)

That Dr. Vadlamudi's prescribed course of treatment—non-prescription pain medication—differed with Plaintiff's previous and later medical providers (*see* Dkt. No. 103 at 13-23), is not evidence of deliberate indifference.  "Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."  *Adams*, 2018 WL 1363495, at *4 (finding no deliberate indifference where, *inter alia*, the inmate's treating physician refused to provide him with Baclofen, a muscle relaxer, despite having a prescription for it from another facility, and where the inmate claimed the non-prescription medication he was subsequently provided was ineffective and caused him to suffer "extreme pain"); *see, e.g.*, *Thomas v. Westchester Cty.*, No. 12 Civ. 6718(CS), 2013 WL 3357171, at *5 (S.D.N.Y. July 3, 2013) ("treating pain with over-the-counter, as opposed to prescription, medication is a disagreement over treatment that does not rise to the level of deliberate indifference") (internal

citation omitted); *Wright*, 694 F. Supp. 2d at 15-9-60 (finding prison doctor was not deliberately indifferent where, *inter alia*, he determined based upon his medical judgment to prescribe Naprosyn to manage the inmate's pain even though outside specialist recommended Percocet); *Nowinski v. Rao*, 2018 WL 2303780, at *6 ("Nor is [the plaintiff's] belief that he should have been prescribed stronger pain medication evidence of a culpable state of mind by [the] [d]efendants.").

Further, it is undisputed that on or about January 12, 2016, Dr. Vadlamudi entered a referral for Plaintiff to see an audiologist. (Dkt. No. 98-2 at ¶ 31.) Subsequently, on March 1, 2016, Plaintiff underwent an audiometric evaluation performed by Mr. Gullo. (Dkt. No. 98-5 ¶ 27.) On March 2, 2016, Dr. Vadlamudi saw Plaintiff for a follow up visit to discuss the results of the March 1, 2016, test. (Dkt. No. 98-2 at ¶ 42.) Dr. Vadlamudi advised Plaintiff the audiologist had reported that the results of the tests were unreliable and that no further follow up was recommended at that time. *Id*. at ¶ 43. He also advised Plaintiff to continue using his hearing aid in his right ear as recommended by the audiologist. *Id*. at ¶ 44. Thereafter, on June 15, 2016, Dr. Vadlamudi referred Plaintiff to audiology for a second opinion after complaining of "worsening hearing" over the "past few months." *Id*. at ¶¶ 49, 50. Thus, the record belies Plaintiff's claim.

To the extent Plaintiff is asserting a deliberate indifference claim against Dr. Vadlamudi based on two encounters in January of 2016, there is no evidence in the record establishing deliberate indifference. It is undisputed that on January 20, 2016, Dr. Vadlamudi noted Plaintiff had experienced no seizures in the recent past and that he believed there was no need for Neurontin. (Dkt. No. 98-2 at ¶ 33.) Dr. Vadlamudi also informed Plaintiff that he was still waiting to hear back on the audiology referrals, and advised Plaintiff to continue going to sick

call to address his concerns as needed.  *Id*. at ¶ 34.  On January 27, 2016, Plaintiff saw Dr.

Vadlamudi and complained of pain in his neck, back, and head.  *Id*. at ¶ 36.  Although Plaintiff

reported numbness on the left side of his face with an occasional "electric shock feeling," Dr.

Vadlamudi examined Plaintiff, did not witness any physical signs of such pain, and advised

Plaintiff "to come to sick call as needed to get Motrin for pain."  *Id*. at ¶ 38.

In sum, the record evidence demonstrates Dr. Vadlamudi examined Plaintiff on several

occasions, reviewed his complete medical file, determined a treatment plan to address his various

medical conditions, referred him to audiology in January of 2016, discussed the results of the

tests with him, referred him to audiology for a second opinion in June of 2016, and requested a

referral for a repeat ABR in July of 2016.  (Dkt. No. 98-4 at ¶¶ 19, 20, 21, 22, 26, 28, 29, 31, 42,

50, 56, 58.)  Moreover, Dr. Vadlamudi has sworn he provided Plaintiff adequate and appropriate

medical care in compliance with community standards during his incarceration at Marcy.  *Id*. at

¶¶ 8, 92.

Lastly, even if Dr. Vadlamudi's medical decisions caused Plaintiff unintended harm,

tortious conduct is not actionable under § 1983.  *See Burroughs v. Petrone*, 138 F. Supp. 3d 182,

211 (N.D.N.Y. 2015) (Hurd, D.J.) ("Deliberate indifference requires more than negligence but

less than conduct undertaken for the very purpose of causing harm."); *Kucharczyk v. Westchester

Cty.*, 95 F. Supp. 3d 529, 537 (S.D.N.Y. 2015)  ("[M]ere negligence is not enough to state a

claim for deliberate indifference."); *Smith*, 316 F.3d at 184 (2d Cir. 2003) ("Because the Eighth

Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state

tort law, not every lapse in prison medical care will rise to the level of a constitutional

violation.").

In light of the foregoing, the Court finds no reasonable factfinder could conclude Dr. Vadlamudi was deliberately indifferent to Plaintiff's serious medical needs. Therefore, the Court recommends granting summary judgment to Dr. Vadlamudi on the deliberate indifference claim.

### b.    Mr. Gullo

Liberally construed, Plaintiff claims Mr. Gullo failed to offer him a more sophisticated hearing aid and failed to inform him of the results of his hearing tests. (Dkt. No. 1 at 25-27, 29-30.) Defendants argue summary judgment is warranted because the record is devoid of any evidence whatsoever that Mr. Gullo was deliberately indifferent to Plaintiff's serious medical needs. (Dkt. No. 98-1 at 11-15.) The Court agrees and notes Plaintiff has not responded to this contention. (*See generally* Dkt. No. 103.)

Relevant to this action, Mr. Gullo treated Plaintiff from August 21, 2012, through March 1, 2016. (Dkt. No. 98-2 at ¶¶ 56, 103.) At each appointment, Mr. Gullo cleaned, modified, and repaired Plaintiff's hearing aid as necessary. *Id*. at ¶¶ 57, 60, 62, 66, 68, 70, 72, 73, 76, 81, 84, 86, 97, 98, 99, 101.) At the request of Plaintiff, Mr. Gullo replaced Plaintiff's hearing aid in 2012 and again in 2017. *Id*. at ¶¶ 60, 97. Mr. Gullo performed audiometric evaluations on February 17, 2015, and March 1, 2016. *Id*. at ¶¶ 86-88, 101. Based upon the results of these tests, Mr. Gullo determined the best course of treatment was for Plaintiff to continue wearing his current hearing aid. *Id*. at ¶¶ 96, 102.

Further, Mr. Gullo has sworn he provided Plaintiff with adequate and appropriate audiology care in compliance with community standards while under his care. (Dkt. No. 98-5 at ¶ 8.) Moreover, even if Mr. Gullo's care amounted to negligence or malpractice, which the Court seriously doubts, neither is actionable under § 1983. *See Burroughs*, 138 F. Supp. 3d at 211; *Kucharczyk*, 95 F. Supp. 3d at 537; *Smith*, 316 F.3d at 184.

In light of the foregoing, the Court finds no reasonable factfinder could conclude Mr. Gullo deliberately indifferent to Plaintiff's serious medical needs. *See Gonzalez v. Coughlin*, No. 9:94-CV-1111 (LES), 2008 WL 2385948, at *8 (N.D.N.Y. June 9, 2008) (no deliberate indifference where "plaintiff was evaluated and treated for hearing loss and ear pain complaints on numerous occasions"); *Alster v. Goord*, 745 F. Supp. 2d 317, 334-35 (S.D.N.Y. 2010) (same). Therefore, the Court recommends granting summary judgment to Mr. Gullo.

### c.    Superintendent Thomas

Plaintiff brings a supervisory liability claim against Superintendent Thomas because he "was just rubber stamping the deicison" made on Plaintiff's grievances and failed to remedy the alleged constitutional violations. (Dkt. Nos. 1 at 6-8; 98-2 at 109.) Defendants argue Plaintiff's claim against Superintendent Thomas fails for lack of personal involvement. (Dkt. No. 98-1 at 15-20.) The Court agree and notes Plaintiff has not responded to this argument. (*See* Dkt. No. 103.)

"[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. Prior to *Iqbal*, the Second Circuit held that supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on

information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).[13]

Significantly, and fatal to this claim, "[f]or a supervisor to be liable under [§] 1983, there must have been an underlying constitutional deprivation." *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1990). Here, Plaintiff's claim against Superintendent Thomas fails because, as explained above, Dr. Vadlamudi and Mr. Gullo were not deliberately indifferent to Plaintiff's serious medical needs. Consequently, Superintendent Thomas cannot be held liable for failing to remedy a constitutional violation which never occurred. *See Ramos v. Artuz*, No. 00 Civ. 0149, 2003 WL 342347, at *11 (S.D.N.Y. Feb. 14, 2003) ("Plaintiff's claim of supervisor liability cannot survive here because . . . there was no constitutional violation.").

Therefore, based on the finding above, the Court recommends granting summary judgment to Superintendent Thomas.

### d.    Dr. Koenigsmann

Plaintiff argues Dr. Koenigsmann knew about the alleged deficiencies in his medical care but failed to remedy or address Plaintiff's concerns. (Dkt. No. 1 at 9-10.) Defendants contend Plaintiff's claim against Dr. Koenigsmann fails for lack of personal involvement. (Dkt. No. 98-1 at 15-20.) In his response, Plaintiff argues Dr. Koenigsmann created and implemented policies to terminate Plaintiff's prescription for Neurontin and established procedures within his office to ensure that his letters of complaint never personally reached him. (Dkt. No. 103-1 at 4-5.)

---

[13] The Second Circuit has not yet addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. *See Grullon*, 720 F.3d at 139 (noting that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the Warden's personal involvement even under *Colon*").

As discussed above, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *Iqbal*, 556 U.S. at 676; *Farrell v. Burke*, 449 F.3d 470, 474 (2d Cir. 2006).

Here, to the extent Plaintiff purports to bring a supervisory claim against Dr. Koenigsmann, inasmuch as the Court has found there was no underlying constitutional claim, Dr. Koenigsmann was not personally involved in any violation and, therefore, is not liable. Thus, notwithstanding the numerous letters received by Dr. Koenigsmann's office, at least two of which Dr. Koenigsmann personally responded to, there was no constitutional violation to be remedied. *See Ramos*, 2003 WL 342347, at *11 (finding the plaintiff's "claim of supervisory liability cannot survive here because . . . there was no constitutional violation").

Furthermore, the record is devoid of any evidence that, during the relevant time, Dr. Koenigsmann was personally involved with Plaintiff's medical care. In fact, Plaintiff faults Dr. Koenigsmann for never examining him nor providing him with any treatment, or directing Dr. Vadlamudi to provide certain medical care. (Dkt. No. 98-3 at 19.) However, as set forth in Dr. Koenigsmann's Declaration, as the Chief Medical Officer he does not personally provide medical care to individual inmates, make medical decisions as to the appropriate treatment for individual inmates, or resolve disputes between individual inmates and their doctors as to appropriate medical treatment. *Id*. at ¶ 5. Rather, decisions regarding each inmate's medical care and treatment are left to the professional medical judgment of the physicians at each facility. *Id*.

Additionally, the summary judgment record belies Plaintiff's claim that Dr. Koenigsmann and Dr. Vadlamudi "created policies and implemented them to terminate Plaintiff's pain

prescription." (Dkt. No. 103-2 at 2, 4). Plaintiff argues, in wholly speculative fashion, that Dr. Vadlamudi's decision to discontinue Neurontin "was not made based on any individualized assessment of Plaintiff's condition, but rather, upon a Department wide policy regarding medications with abuse potential." *Id*. The Court finds this argument to be without merit.

As discussed above, "to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based on 'personal knowledge.'" *Goldston v. Albany Sheriff Dep't*, No. 9:02-CV-1004 (TJM), 2006 WL 2595194, at * 4 (N.D.N.Y. Sept. 11, 2006). "An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere 'information and belief' or 'hearsay.'" *Id*. "In addition, the affidavit (or verified complaint) must not be conclusory. An affidavit (or verified complaint) is conclusory if, for example, its assertions lack any supporting evidence or are too general." *Id*. Thus, Plaintiff's claim that, prior to his first appointment with Dr. Vadlamudi on December 22, 2015, he was "told by the nursing staff on numerous occasions" that his prescription for Neurontin would be "discontinued" because of "Albany" is inadmissible hearsay. (Dkt. No. 1 at 11.)

To be sure, *after* Plaintiff commenced this lawsuit, DOCCS implemented a statewide initiative to significantly reduce inmate's prescriptions for medications with abuse potential—a category to which Neurontin belongs. (Dkt. No. 98-6 at ¶ 18.) Indeed, pursuant to DOCCS Medications with Abuse Potential Policy ("MWAP"), effective June 1, 2017, each such prescription requires a DOCCS Regional Medical Director's approval. *Id*. A copy of the policy is attached as Exhibit G to Dr. Koenigsmann's Declaration. (Dkt. No. 98-6 at 38-40.[14]) Relevant to this action, however, the undisputed evidence demonstrates Plaintiff's prescription

---

[14] To the extent Plaintiff's opposition submission could be construed as a challenge to the MWAP policy and his subsequent medical care, such issues are not before this Court. (*See* Dkt. No. 103-2 at 1-5, 9-33.)

for Neurontin was discontinued on or about December 22, 2015, well before the MWAP

effective date, *and* after Dr. Vadlamudi examined Plaintiff, reviewed his medical history, and

determined there "was no medical reasons for prescribing Neurontin given its side effects and

that alternative pain medications were available." (Dkt. No. 98-4 at ¶ 26; Dkt No. 98-2 at ¶¶ 30,

31.)

Based on the foregoing, the Court recommends granting summary judgment to Dr.

Koenigsmann.

### B.    First Amendment Retaliation Claim

#### 1.    Legal Standard

To state a First Amendment retaliation claim, an inmate must demonstrate (1) he engaged

in constitutionally protected activity or speech; (2) the defendant took adverse action against

him; and (3) there was a causal connection between the protected activity and the adverse action.

*Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492

(2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema*, 534 U.S. 506 (2002)); *see*

*also Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002).

The plaintiff bears the initial burden of showing the conduct at issue was constitutionally

protected and a substantial motivating factor in the action.  *Gayle v. Conyea*, 313 F.3d 677, 682

(2d Cir. 2002).  It is well-settled that filing a grievance is constitutionally protected conduct.

*Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001); *Graham v. Henderson*, 89 F.3d 75,

80 (2d Cir. 1996).

"The Second Circuit has defined 'adverse action' in the prison context as 'retaliatory

conduct' that would deter a similarly situated individual of ordinary firmness from exercising . . .

constitutional rights."  *Adams v. Rock*, No. 9:12-CV-1400 (GLS/ATB), 2015 WL 1312738, at

*10 (N.D.N.Y. Mar. 24, 2015) (quoting *Gill*, 389 F.3d at 381). "[C]ourts have found that 'denial of medical evaluation, treatment, and adequate pain medication' can suffice to establish adverse action under a First Amendment retaliation analysis." *Castro v. Heath*, No. 9:12-CV-01250 (MAD/DEP), 2013 WL 5354241, at *10 (N.D.N.Y. Sept. 23, 2013) (quoting *Burton v. Lynch*, 664 F. Supp. 2d 349, 366 (S.D.N.Y. 2009)); *see also Benitez v. Parmer*, No. 9:12-CV-0448 (GTS/DEP), 2013 WL 5310245, at *8 (N.D.N.Y. July 8, 2013).

To satisfy the causal connection prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes, *inter alia*, the temporal proximity between the protected activity and the alleged retaliatory act. *Colon v. Coughlin*, 58 F.3d at 872-73. Direct evidence is not required and a plaintiff may meet this burden by presenting "sufficiently compelling" circumstantial evidence of a retaliatory motive. *Bennett v. Goord*, 343 F.3d 133, 138-39 (2d Cir. 2003). If the plaintiff carries this initial burden, the burden then shifts to the defendants to show they would have taken the same action absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d at 79 (citing, *inter alia*, *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994)).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon*, 58 F.3d at 872 (citation omitted); *Dawes*, 239 F.3d at 491("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.").

### 2.    Analysis

Plaintiff claims Dr. Vadlamudi retaliated against him by providing inadequate medical care due to several grievances and letters of complaint he filed against him. (Dkt. No. 1 at 37-

39.)  However, as discussed above, there is no evidence that Plaintiff was ever deprived of

adequate medical care.  *See* Section IV.A., *supra*.  "A retaliation claim that asserts a deprivation

of medical care as the adverse action should be dismissed if it established that there was no

deprivation of medical care."  *Ross v. Koenigsmann*, No. 9:1-CV-1321 (GTS/DJS), 2016 WL

11480164, at *18 (N.D.N.Y. Sept. 8, 2016) (citing *Vail v. Lashway*, No. 9:12-CV-1245

(GTS/RFT), 2014 WL 4626490, at *19 (N.D.N.Y. Sept. 15, 2014), *report-recommendation*

*adopted by* 2016 WL 5408163 (N.D.Y.Y. Sept. 28, 2016)); *see also Tatta v. Wright*, 616 F.

Supp. 2d 308, 320 (N.D.N.Y. 2007) (denying plaintiff's claim that he was denied adequate

medical care in retaliation for filing grievances where plaintiff failed to establish the denial of

adequate medical care); *Goros v. Pearlman*, No. 9:03-cv-1303 (TJM), 2007 WL 1423718, at *3

(N.D.Y. May 10, 2007) (same); *see also Cole v. Levitt*, No. 07-CV-00767 (M), 2009 WL

4571828, at *10 (W.D.N.Y. Dec. 4, 2009) ("Having concluded that Dr. Levitt was not

deliberately indifferent to plaintiff's medical needs, I likewise conclude that there is no

evidentiary basis to conclude that her conduct was retaliatory.").

Inasmuch as the Court has found Dr. Vadlamudi was not deliberately indifferent to

Plaintiff's serious medical needs, Plaintiff's First Amendment retaliation claim against Dr.

Vadlamudi likewise fails.  Moreover, the Court finds summary judgment is warranted for the

following reasons.

As an initial matter, Plaintiff's deposition testimony contravenes the notion that Dr.

Vadlamudi's decision to discontinue Neurontin was retaliatory in nature.  Specifically, Plaintiff

testified that Dr. Vadlamudi discontinued his prescription "for no reason."  (Dkt. N. 98-3 at 16.)

Later, Plaintiff testified "the first time I seen [Dr. Vadlamudi] was like two days after I got to

Marcy.  He told me I feel there's no medical necessity for Neurontin."  *Id.* at 17.  Further, the

alleged adverse action cannot be retaliatory where it predated the protected conduct. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 368 (S.D.N.Y. 2011). In this case, Dr. Vadlamudi discontinued Neurontin prior to Plaintiff filing any grievance at Marcy. (Dkt. No. 98-4 at ¶ 85.) Thus, the Court agrees with Defendants that the decision to discontinue Neurontin cannot serve as the adverse action. (Dkt. No. 98-1 at 18-19.)

While Plaintiff admits that "some" of Dr. Vadlamudi's conduct predated his grievances including the decision to discontinue Neurontin, he argues Dr. Vadlamudi "made statements and engaged in behavior that clearly evinces retaliatory motivation" *after* he filed the grievances. (Dkt. No. 103-2 at 6.) *Id.* Even resolving all ambiguities and drawing all reasonable inferences against Defendants, Plaintiff has not demonstrated Dr. Vadlamudi's medical judgments were motivated by a retaliatory animus. To the extent Plaintiff claims Dr. Vadlamudi retaliated against him by refusing to reinstate his prescription medication, the Court finds Defendants have satisfied their burden of demonstrating that Dr. Vadlamudi had a legitimate non-retaliatory reason for taking such action. (*See* Dkt. No. 98-4 at ¶¶ 25-27.)

Additionally, to the extent Plaintiff claims Dr. Vadlamudi threatened to withhold treatment in retaliation for filing grievances against him or otherwise treated him "inhumanely," the evidence demonstrates Dr. Vadlamudi continued to adequately treat Plaintiff during the relevant period and Plaintiff routinely utilized sick call for pain management. (Dkt. No. 98-2 at ¶¶ 40, 41, 47, 48, 51.) Lastly, Dr. Vadlamudi has sworn that Plaintiff's grievances "in no way affected the medical care I provided him. I made no deicison based on or influenced by the grievances. Rather, my care and decisions were motivated by medical consideration." (Dkt. No. 98-4 at ¶ 89.) The Court finds Plaintiff's conclusory and speculative allegations to the contrary fail to raise a material issue of fact.

In light of the foregoing, the Court recommends granting summary judgment to Dr. Vadlamudi on Plaintiff's First Amendment retaliation claim.

### C.    Qualified Immunity

Defendants also seek dismissal of Plaintiff's claims on qualified immunity grounds. (Dkt. No. 98-1 at 19-20.)  Inasmuch as the Court is recommending that Defendants' motion for summary judgment be granted, it finds it unnecessary to reach Defendants' qualified immunity argument.  *See Demoret v. Zegarelli*, 451 F.3d 140, 148 (2d Cir. 2006) ("If no constitutional or statutory right was violated . . . we need not conduct further inquiries concerning qualified immunity.").

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 98) be **GRANTED**; and it is further

**ORDERED** that Plaintiff's request that Defendants be ordered to provide Plaintiff with "all copies of the 'in camera' review only documents" and that Defendants be sanctioned for same (Dkt. No. 116 at 9) is **DENIED AS MOOT**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[15]  Such objections shall be filed with the Clerk of the

---

[15]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: June 21, 2019
       Syracuse, New York

                                      Thérèse Wiley Dancks
                                        United States Magistrate Judge

---

Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day
that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33 35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048 49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249 50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

1999 WL 983876

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347 48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.

1   In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1724573
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dwaine GRAY, Plaintiff,

v.

Doctor KANG LEE, Defendant.

No. 9:13–cv–258 (GLS/DEP).
|
Signed April 15, 2015.

**Attorneys and Law Firms**

Dwaine Gray, Malone, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, The Capitol, Christopher W. Hall, Assistant Attorney General, of Counsel, Albany, NY, for the Defendant.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Dwaine Gray commenced this action against defendant Doctor Kang Lee, pursuant to 42 U.S.C. § 1983, alleging that Lee was deliberately indifferent to Gray's serious medical needs in violation of the Eighth Amendment.[2] (*See generally* Compl., Dkt. No. 1.)

[1]     Gray also named Ms. Vonda L. Johnson as a defendant, (Compl.), but she has since been dismissed from this action, (Dkt. No. 10 at 6 7, 9).

[2]     In his complaint, Gray also asserted claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 12213, and the Rehabilitation Act, 29 U.S.C. §§ 701 796*l*, (Compl.), but those claims have been dismissed, (Dkt. No. 10 at 5 6, 9).

On August 12, 2014, Lee filed a motion for summary judgment, (Dkt. No. 32), which Gray opposed, (Dkt. No. 40). In a Report and Recommendation (R & R) issued on March 9, 2015, Magistrate Judge David E. Peebles

recommended that Lee's motion for summary judgment be granted and Gray's remaining Eighth Amendment claim be dismissed. (Dkt. No. 43.) Pending are Gray's objections to the R & R. (Dkt. No. 44.) For the reasons that follow, the R & R is adopted in its entirety.

### II. *Background*[3]

[3]     Gray specifically objects to Judge Peebles' recommendation that the court deem admitted all properly supported facts contained in Lee's statement of material facts. (Dkt. No. 43 at 3 n. 1; Dkt. No. 44 at 2.) The court reviews this portion of the R & R *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan.18, 2006). Under this District's Local Rules, the moving party must submit a statement of material facts, which "set[s] forth, in numbered paragraphs, each material fact about which the moving party contends there is no genuine issue. N.D.N.Y. L.R. 7.1(a)(3). The opposing party must file a response to the statement of material facts, which must "mirror the movant's s]tatement of m]aterial f]acts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. *Id.* If the opposing party fails to comply, " t]he c]ourt shall deem admitted any properly supported facts set forth in the s]tatement of m]aterial f]acts that the opposing party does not specifically controvert,  and, where the opposing party is *pro se,* the moving party must advise the pro se litigant about the consequences of his failure to respond. *Id.* Here, while Gray filed a response opposing Lee's summary judgment motion, (Dkt. No. 40), he did not file anything that even remotely resembles a response to Lee's statement of material facts, despite receiving notice of the consequences of his failure to do so, (Dkt. No. 32 at 3). In his defense, Gray argues that he "submitted various pieces of evidence annexed to his opposition to summary judgment, showing that  Lee]' s narrative was self serving,  and that he "introduced to the c]ourt documentary evidence that  Lee] obviously did not have a planned course of medical treatment, as  Lee] routinely came to contradictory conclusions, and would often ignore  Gray's] needs.  (Dkt. No. 44 at 2.) However, "a district court has no duty to perform an independent review of the record to find proof of a factual dispute even if that nonmoving party is proceeding pro se,  and an individual's pro se status does not relieve him of the ramifications

associated with the failure to comply with the court's local rules. *Davis v. City of Syracuse,* No. 5:12 CV 0276, 2015 WL 1413362, at *12 (N.D.N.Y. Mar.27, 2015). Therefore, the court adopts Judge Peebles' recommendation to deem admitted all properly supported facts set forth in Lee's statement of material facts. Accordingly, unless otherwise noted, the facts are not in dispute.

Gray is an inmate in the custody of the Department of Corrections and Community Supervision (DOCCS) and, during the time relevant to his claims, was incarcerated at Clinton Correctional Facility. (Def .'s Statement of Material Facts (SMF) ¶¶ 1, 9, Dkt. No. 32, Attach. 1.) Prior to entering Clinton, Gray suffered a shoulder injury, for which he was prescribed Naproxen. (*Id.* ¶ 8.) After arriving at Clinton in or around April 2012, Gray met with Lee, a clinical physician, who asked Gray if he wished to continue taking Naproxen. (*Id.* ¶¶ 3, 10.) Gray declined the medication, claiming that it did not work. (*Id.* ¶ 10.) One month later, Lee again met with Gray, at which time Gray complained of continued shoulder pain and requested stronger pain medication. (*Id.* ¶ 11.) Lee obliged Gray's request and prescribed Flexeril, a muscle relaxer used to relieve acute pain, but not suitable for long-term use. (*Id.* ¶¶ 11, 12.)

Over the Summer of 2012, Gray frequently met with medical staff, including Lee and various nurses at Clinton. (*Id.* ¶¶ 13 17.) During those meetings, Gray continued to complain of pain in his right shoulder, reiterated his refusal of Naproxen, and requested stronger pain medications-including a continuation of Flexeril and/or a narcotic analgesic. (*Id.* ¶¶ 13 17.) Also during those examinations, Lee consistently found that Gray had a good range of motion in his shoulder, despite Gray's complaints that he was unable to move it. (*Id.* ¶¶ 15, 16.)

At the end of September 2012, Lee ordered an x-ray of Gray's right shoulder, which was completed in early October. (*Id.* ¶¶ 18, 19.) Lee discussed the results with Gray, which indicated that there was "early osteoporosis ... present" and "a large spur arising from the inferior aspect of the acromion," ordered a magnetic resonance imaging (MRI) for further testing, and prescribed Motrin for Gray's pain. (*Id.* ¶¶ 19, 20; Dkt. No. 32, Attach. 2 at 4.) The MRI was completed in January 2013, and, once the radiologist's report was received, Lee referred Gray to an orthopedic specialist, as the MRI suggested that Gray may have a tendon tear. (Def.'s SMF ¶¶ 21, 23, 24.) During the time that Gray was waiting for his consultation with

the specialist, Gray continued to meet with medical staff at Clinton, and Lee continued to prescribe Motrin for Gray's pain. (*Id.* ¶ 25.) Ultimately, in April 2013, Gray was transferred to Franklin Correctional Facility, where he now resides, and whose medical staff is now charged with his care. (*Id.* ¶ 26.)

### III. *Standard of Review*

**\*2** Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at *3, *5 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at *45.

### IV. *Discussion*

In his R & R, Judge Peebles recommended dismissal of Gray's Eighth Amendment deliberate indifference claim. (Dkt. No. 43 at 12 21.) Specifically, Judge Peebles first noted that Gray failed to satisfy the objective requirement of this cause of action because Gray's medical records reflect that he was provided with frequent treatment, and, therefore, "no reasonable factfinder could conclude that ... Lee's treatment of [Gray]'s shoulder condition was inadequate or, to the extent it could be construed as inadequate, that it was sufficiently serious." (*Id.* at 16 19.) Judge Peebles further reasoned that, given the extensive treatment that Gray received, including frequent examinations, prescriptions for pain medications, x-rays, MRI testing, and referrals to orthopedic specialists, Gray also failed to prove the subjective component of a deliberate indifference claim. (*Id.* at 19 20.)

Here, Gray raises several objections to the R & R. First, Gray specifically objects to Judge Peebles' findings that Gray received consistent and adequate medical care and that Lee did not act with deliberate indifference.

(Dkt. No. 44 at 3 6.) Gray argues that Lee "often times came to different conclusions based on the same medical information" and failed to comply with both "accepted medical practice" and DOCCS policy by prescribing Motrin for long periods of time, which caused Gray stomach pains.[4] (*Id.*) The court reviews these objections *de novo. See Almonte,* 2006 WL 149049, at *3, *5.

[4]  The court notes that this is the first time that Gray has incorporated Lee's long term prescription of Motrin as part of his Eighth Amendment claim. Indeed, both his complaint and response to Lee's motion for summary judgment are devoid of these allegations. (*See generally* Compl.; Dkt. No. 40.)

A prisoner's claim that he was provided insufficient medical care is analyzed under the Eighth Amendment's prohibition of cruel and unusual punishment. *See Estelle v. Gamble,* 429 U.S. 97, 101 03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.* at 104 (internal quotation marks and citation omitted). "To show that he has been subjected to cruel and unusual punishment, a prisoner must satisfy a standard that includes both objective and subjective components." *Taylor v. Goorde,* 548 F. App'x 696, 697 98 (2d Cir.2013). The objective component asks whether the prisoner was actually deprived of adequate medical care and whether the denial in care was "sufficiently serious." *Id.* at 698 (internal quotation marks and citation omitted). The subjective component concerns the defendant's mental state, and requires a showing that the defendant acted "with deliberate indifference to inmate health"-"a mental state equivalent to subjective recklessness," which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006).

**\*3** Here, Gray has failed to satisfy both the objective and subjective components. In short, because Gray was frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist, he was not actually deprived of adequate treatment-the objective component-and, further, this extensive treatment and care is evidence that Lee did not act with deliberate indifference-the subjective component. The fact that Gray was not prescribed the precise pain medication of his choosing is of no moment; " 'a prisoner

does not have the right to choose his medical treatment as long as he receives adequate treatment.' " *Hanrahan v. Mennon,* 470 F. App'x 32, 33 (2d Cir.2012) (quoting *Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011)). Similarly, Gray's contentions that Lee violated DOCCS policy and "accepted medical practice" by prescribing Motrin for long-term use are equally without merit. First, a failure to comply with DOCCS policy directives or regulations is not a constitutional violation. *See Sanders v. Gifford,* No. 9:11 CV 0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov.4, 2014). Second, Gray alleges, at best, a negligence or medical malpractice claim, which also does not give rise to an Eighth Amendment violation. *See Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). Accordingly, the court adopts Judge Peebles' findings that Gray was provided with adequate medical care, and that Lee did not act with deliberate indifference.

Second, Gray objects to Judge Peebles' findings of fact that Gray "could not be in severe pain because he worked at the Clinton ... mess hall" and that Gray ultimately "secured a less strenuous work detail at the facility mess hall for reasons other than [his] severe pain." (Dkt. No. 44 at 3 (referring to Dkt. No. 43 at 16 17, 16 n. 4.) Because these proposed findings of fact are not central, or even particularly relevant, to Judge Peebles' ultimate recommendation to dismiss Gray's complaint, the court construes these as general objections, which warrant review only for clear error. *See Almonte,* 2006 WL 149049, at *4 5.

At the outset of his analysis, Judge Peebles noted that the undisputed facts did not support a finding that Gray's pain was severe. (Dkt. No. 43 at 16 17.) Judge Peebles observed that Gray's continued work as a server in the mess hall, and his testimony that he was relieved of certain work duties not because of his injury, but because he was friendly with the corrections officer who assigned job responsibilities, undermined his claims of severe pain. (*Id.* at 16 n. 4.) These facts, however, were but a few of the facts that Judge Peebles considered in determining that Gray's pain was not severe. (*Id.* at 16 17 (noting that Gray's medical records also did not support a finding of severe pain, as medical personnel often discerned no acute distress, and further noting that Gray's voluntary discontinuation of Naproxen also belied his claims of severe pain.)) In any event, notwithstanding the severity, or lack thereof, of Gray's pain, Judge Peebles concluded that Gray's claim should be dismissed because he was

provided with adequate medical care. (*Id.* at 16 19.) Accordingly, the court finds no clear error in either this portion of the R & R or the remainder of the R & R, and it is adopted in its entirety.

**\*4** Finally, the court notes that, in his objections to the R & R, Gray takes issue with Judge Peebles' denial of his motion to appoint counsel, arguing that, had he been appointed counsel, "summary judgment would not have been granted," and the failure to appoint counsel "may even rise to a violation of [Gray]'s right to Equal Protection." (Dkt. No. 44 at 6 7.) However, Gray's motion to appoint counsel was denied before the R & R was even issued, (Dkt.Nos.35, 37), and, therefore, Gray's dissatisfaction with the disposition of his motion to appoint counsel cannot appropriately be construed as an objection to the R & R at all. To the extent that Gray seeks to renew his motion to appoint counsel in his objections, that request is denied.

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David E. Peebles' March 9, 2015 Report and Recommendation (Dkt. No. 43) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Lee's motion for summary judgment (Dkt. No. 32) is **GRANTED;** and it is further

**ORDERED** that Gray's complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that Gray's renewed motion to appoint counsel (Dkt. No. 44 at 6 7) is **DENIED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum Decision and Order to the parties.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

In this civil rights action, commenced pursuant to 42 U.S.C. § 1983, *pro se* plaintiff Dwaine Gray, a New York State prisoner, alleges that defendant Dr. Kang Lee, a prison physician, was deliberately indifferent to his serious medical needs by failing to provide him with proper pain medication and treatment for a shoulder injury suffered prior to his arrival at the correctional facility where defendant Lee was employed during the relevant time period. As relief, Gray seeks recovery of compensatory damages in the amount of $300,000, as well as injunctive relief directing the defendant to refer him for outside orthopedic consultation and prescribe for him appropriate pain medication.

Now that discovery in the action is closed, defendant has moved for summary judgment dismissing plaintiff's claim against him. In his motion, defendant Lee argues that plaintiff's claim represents little more than his disagreement with the course of treatment prescribed. For the reasons set forth below, I recommend that defendant's motion be granted.

### I. *BACKGROUND*

1    Although plaintiff has opposed defendant's motion for summary judgment, he did not file a response to defendant Lee's statement of undisputed material facts, submitted pursuant to rule 7.1(a)(3) of the local rules of practice for this court. By its terms, local rule 7.1 provides, in part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced a non movant's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99 CV 0611, 2000 WL 1264122, at \*1 (N.D.N.Y. Aug.22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96 CV 0169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998) (Pooler, J.,

*adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment. *Latouche v. Tompkins,* No. 09 CV 0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011)* (Mordue, J.). Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's statement of undisputed material facts, *Dkt. No. 32 at 3,* and he has failed to do so, I recommend that the court deem the facts contained in defendant Lee's statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's statement of undisputed material facts, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally Dkt. No. 1.* While he is currently confined elsewhere, at the times relevant to his claims in this action, Gray was incarcerated at the Clinton Correctional Facility ("Clinton") located in Dannemora, New York. *Id.*

**\*5** In January 2012, while detained at the Westchester County Jail, Gray slipped and fell in the shower, injuring his right shoulder. *Dkt. No. 1 at 4; Dkt. No. 32 2 at 1.* Plaintiff entered into DOCCS's custody two months later, on or about March 2, 2012, and was initially designated to the Downstate Correctional Facility ("Downstate"). *Dkt. No. 32 3 at 16,* 20. On March 16, 2012, while Gray was at Downstate, an x-ray taken of his right shoulder revealed "no fracture, dislocation, soft tissue calcification or significant arthritic change. Large enthesophyte extending from anteroinferior port of acromium measuring about 1.5 cm." *Id.* at 20; *Dkt. No. 32 2 at 57.* The impression stated on the x-ray report by the attending roentgenologist was "NO ACUTE BONE INJURY IDENTIFIED RIGHT SHOULDER STUDY. NO DJD. LARGE ENTHESOPHYTE EXTENDING FROM INFERIOR PORTION OF ACROMIUM. THIS CAN CONTRIBUTE TO SHOULDER IMPINGEMENT SYNDROME IN PROPER CLINICAL SETTING. NO PRIOR STUDY." *Dkt. No. 32 2 at 57.* According to the plaintiff's

health records, a physician at Downstate met with Gray on March 20, 2012, at which time he discussed the x-ray results with plaintiff and prescribed 500 milligrams of Naproxen twice daily for thirty days. [2] *Dkt. No. 32 2 at 55; Dkt. No. 32 3 at 20 21*

[2]      Naproxen is a non steroidal anti inflammatory drug used to treat pain and inflammation associated with various medical conditions. *Dorland s Illustrated Medical Dictionary,* 1251 (31st ed.2007).

Plaintiff was transferred into Clinton on April 10, 2012. *Dkt. No. 32 3 at 19.* While at Clinton, his medical care was overseen by defendant Kang Lee, M.D., a prison physician employed at that facility. *Dkt. No. 32 2 at 1.*

Defendant Lee first met with Gray on April 13, 2012. *Dkt. No. 32 2 at 3, 5 52.* Plaintiff refused defendant Lee's offer to continue Naproxen at that time because, according to plaintiff, it did not help his pain. *Dkt. No. 32 2 at 3; Dkt. No. 32 2 at 51.*

Defendant Lee met with plaintiff again on May 31, 2012. *Dkt. No. 322 at 3,* 50. During that visit, plaintiff continued to complain of right shoulder pain. *Id.* Defendant Lee observed that Gray had a good range of motion and responded to his request for stronger pain medication with a short term prescription of Flexeril (cyclobenzaprine), a muscle relaxer commonly used to relieve skeletal muscle spasms and pain associated with acute musculoskeletal conditions. *Id.; see also Dorland's Illustrated Medical Dictionary,* 463, 725. During subsequent meetings with facility nurses on June 3, 2012 and June 26, 2012, Gray persisted in his refusal of Naproxen and indicated a desired to continue receiving Flexeril instead. *Dkt. No 321 at 3; Dkt. No. 32 2 at 3,* 49.

On June 29, 2012, defendant Lee examined plaintiff's shoulder, again finding good range of motion. *Dkt. No. 32 2 at 3,* 48. According to defendant Lee, during this appointment, plaintiff requested a prescription for a narcotic analgesic. *Id.* Discerning no need for it, defendant Lee denied plaintiff's request. *Id.*

Plaintiff was next seen by defendant Lee on August 13, 2012. *Dkt. No. 32 2 at 4,* 47. At that time, despite plaintiff's claim that he could not move his right shoulder, defendant Lee continued to find that he had a good range of motion. *Id.*

**\*6**  During plaintiff's visit with medical staff at Clinton on September 4, 2012, he was not in acute distress, did not ask for pain medicine, and was observed having full range of motion in his right shoulder. *Dkt. No. 32 2 at 4*, 46. On September 8, 2012, medical personnel attended to plaintiff for complaints about a twisted ankle, and notes from that visit do not include any indication that plaintiff complained of shoulder pain or requested pain medication. *Id.*

On September 29, 2012, defendant Lee ordered a second x-ray of Gray's right shoulder. *Dkt. No. 32 2 at 4*, 45. The x-ray, which was taken on October 4, 2012, was interpreted by the attending radiologist as follows:

> EARLY OSTEOPOROSIS IS PRESENT AT THE GLENOHUMERAL JOINT. THERE IS A LARGE SPUR ARISING FROM THE INFERIOR ASPECT OF THE ACROMION. THIS MAY CONTRIBUTE TO IMPINGEMENT. CONSIDER CORRELATION WITH MRI EXAM.

*Id.* at 70. During his appointment with plaintiff on October 15, 2012, defendant Lee discussed the results of the x-ray and prescribed Motrin for plaintiff's pain. *Id.* at 4, 44.

Defendant Lee met with plaintiff again on November 8, 2012, at which time he referred Gray for magnetic resonance imaging ("MRI") testing. *Dkt. No. 32 2 at 4*, 42. The MRI testing, conducted on January 11, 2013, resulted in the following findings, rendered by the attending radiologist:

> FINDINGS: Abnormal signal is present in the anterior aspect of the supraspinatus portion of the rotator cuff tendon consistent with a tear. There is also a suggestion of extension to the center portion of the supraspinatus tendon. Abnormal signal in the subscapularis portion of the rotator cuff tendon suggests a tear. Glenoid labrum is intact. There is abnormal signal in the superolateral

aspect of the head of the right humerus consistent with bone edema. The acromioclavicular joint is intact.

> IMPRESSION: FINDINGS SUGGESTING A TEAR TO THE ANTERIOR ASPECT OF THE SUPRASPINATUS PORTION OF THE ROTATOR CUFF TENDON. THESE ABNORMALITIES ARE LOCATED ADJACENT TO PROMINENT CORTICAL SPUR ON THE UNDERSURFACE OF THE RIGHT ACROMION. POSSIBLE SUBSCAPULARIS TENDON TEAR.

*Dkt. No. 32 2 at 72*.

After receiving the MRI report, defendant Lee commenced the process for referring the plaintiff to an outside orthopedic specialist on January 31, 2013. *Dkt. No. 32 2 at 5*, 38, 73 74. While Gray awaited his orthopedic consultation, he met with medical staff at Clinton on several occasions, and defendant Lee continued to prescribe Motrin for plaintiff's pain. *Dkt. No. 32 2 at 5*, 33 37.

Plaintiff was transferred out of Clinton and into the Franklin Correctional Facility on April 25, 2013. *Dkt. No. 32 2 at 5; Dkt. No. 33 3 at 31*. At that point, defendant Lee's responsibility for plaintiff's medical treatment was transferred to the medical staff at the new facility. *Dkt. No. 32 2 at 5*.

In general, plaintiff does not dispute the above-described facts. Instead, plaintiff complains that defendant Lee swiftly terminated each appointment without undertaking any examination of him and failed to refer him to an outside specialist. *See, e.g., Dkt. No. 1 at 5 6* ("Upon seeing [defendant Lee in April 2012,] I explained that I try to move my arm, my statement to him was it hurts whenever I try to move it, he then summoned for the officer that for [sic] me to leave.... Upon seeing him, never once did he look in my medical records, all he did was ask me my name, then he said that I'm done.... [Defendant] Lee acted deliberately to deny treatment, and or [sic] to make specialty care[ ] referrals[.]"); *Dkt. No. 32 3 at 50* ("[E]very time I went to [defendant Lee's] office, it was like maybe 30 seconds, I'd been there for 30 seconds."); *Dkt. No. 40 at 3* ("[Defendant Lee] routinely ignored [plaintiff]'s complaints and medical needs and provided only cursory examinations without reviewing his medical file.").

## II. *PROCEDURAL HISTORY*

**\*7** Plaintiff commenced this action on or about March 8, 2013. *Dkt. No.* 1. Although plaintiff's complaint names two defendants, Dr. Kang Lee and Ms. Vonda L. Johnson, the medical supervisor at Clinton, the claims asserted against defendant Johnson were dismissed by Chief Judge Gary L. Sharpe in a decision and order dated September 13, 2013. *Id.* at 1‑2; *Dkt. No. 10.* Judge Sharpe's order, issued pursuant to 28 U.S.C. §§ 1915(e) and 1915A, also granted plaintiff's application to proceed in the action *in forma pauperis* and dismissed plaintiff's claims asserted under the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.,* and section 504 of the Rehabilitation Act, 29 U.S.C. § 794, without prejudice. *Dkt. No. 10 at 8‑9.*

Plaintiff's Eighth Amendment deliberate medical indifference claim asserted against defendant Lee survived Judge Sharpe's initial order, and is the subject of defendant Lee's pending motion for summary judgment, filed on August 12, 2014. *Dkt. No. 10 at 9; Dkt. No. 32.* In his motion, defendant Lee argues that no reasonable factfinder could conclude he was deliberately indifferent to plaintiff's serious medical needs. *See generally Dkt. No. 32‑4.* Plaintiff responded in opposition to defendant's motion on September 26, 2014. *Dkt. No. 40.*

Defendant's motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82‑83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see*

*also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

**\*8** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137‑38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507‑08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Plaintiff's Deliberate Medical Indifference Claim*

In his complaint, plaintiff alleges that defendant Lee was deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, by failing to conduct a full examination, refer him to outside specialist, and prescribe pain medication. *See generally Dkt. No. 1.* Defendant Lee, however, contends that his care and treatment of plaintiff was appropriate, and no reasonable factfinder could conclude otherwise based on the record evidence. *See generally Dkt. No. 32‑4.*

### 1. *Legal Standard Governing Deliberate Medical Indifference Claims*

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102‑03, 97 S.Ct.

285, 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100 01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169 73, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y.2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care.... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

**\*9** *Salahuddin v. Goord,* 467 F.3d 263, 279 80 (2d Cir.2006) (citations omitted).

The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter,* 316 F.3d 178, 185 86 (2d Cir.2003). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain ." *Salahuddin,* 467 F.3d at 280 (quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J .); *Waldo v. Goord,* No. 97 CV 1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839 40). [3]

[3]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. Editor's Note: Attachments of Westlaw case copies deleted for online display.]

### 2. *Analysis*

Addressing first the objective element of the governing test, I note that the record evidence demonstrates defendant Lee and other DOCCS medical personnel at Clinton provided plaintiff with frequent treatment for his shoulder condition. *Dkt. No. 32 2 at 33 57.* Plaintiff's medical records, while indicating complaints of pain, do not support his claims that he suffered severe pain, and, indeed, in some instances, medical personnel treating plaintiff discerned no acute distress. *See, e.g., id.* at 46. Moreover, despite plaintiff's allegations that he suffered severe pain, the evidence before the court reflects that he was able to work as a server in the facility mess hall for three hours per day, seven days a week, from approximately June 2012 until August of that year, when he began ASAT programing. *Dkt. No. 32 3 at 33 37.* In his job at the mess hall, plaintiff would fill pitchers with water, clean the tables, or disburse bread to inmates.[4] *Id.* at 34. The record also reflects that plaintiff voluntarily discontinued taking the pain medication Naproxen in or about the beginning of June 2012. *Dkt. No. 32 2 at 51; Dkt. No. 32 3 at 21.* At that time, rather than ignoring plaintiff's complaints of pain altogether, defendant Lee provided a prescription for Flexeril, a muscle relaxer, for two weeks. *Dkt. No. 32 3 at 23.* Thereafter, plaintiff was prescribed Percocet, an analgesic comprised of oxycodone hydrochloride and acetaminophen, and over-the-counter medications for his pain. *Dkt. No. 32 2 at 33 47; Dorland's Illustrated Medical Dictionary,* 1377, 1429. Defendant Lee also thereafter ordered repeat x-rays of plaintiff's shoulder in September 2012, and ordered an MRI in January 2013, based on the x-ray results. *Id.* at 42, 45, 77 78. Based upon these circumstances, it is doubtful that a reasonable factfinder could conclude that defendant Lee did not provide plaintiff with consistent and appropriate care.

[4]     At his deposition in connection with this matter, plaintiff first stated that he was removed from "table top duty, involving filling water pitchers and cleaning table tops, due to the pain in his shoulder. *Dkt. No. 32 3 at 34.* Later, however, plaintiff testified that he began disbursing the bread not "because his] shoulder was hurting him, but because he knew the corrections officer assigning jobs. *Id.* at 42.

**\*10** Even if the court assumes, for purposes of this motion, that plaintiff's allegations are true, including that defendant Lee's examinations of plaintiff were superficial and short in duration, and that defendant Lee failed to prescribe the pain medication plaintiff requested, I find that no reasonable factfinder could conclude that defendant Lee's treatment of plaintiff's shoulder condition was inadequate or, to the extent it could be construed as inadequate, that it was sufficiently serious. The Eighth Amendment does not afford prisoners a right to medical treatment of their choosing. The question of what diagnostic techniques   including x-rays and MRIs    and treatments should be administered to an inmate are "classic example[s] of a matter for medical judgment," and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998). In this case, plaintiff's claim is based on his desire to be examined in a specific manner and provided specific pain medications. This constitutes a disagreement regarding the course of treatment, which does not give rise to a constitutional right or sustain a claim under section 1983. *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir.1970) (citation omitted).

As described above, plaintiff's medical records reflect that he was seen by defendant Lee on four occasions between April 2012 and August 2012, before defendant Lee ordered x-rays of plaintiff's shoulder in September 2012. *Dkt. No. 32 2 at 45,* 47, 48, 50, 52. In between his visits with defendant Lee, other medical personnel at Clinton monitored plaintiff's shoulder condition. *Id.* at 33 57. When a provider callout was requested, defendant Lee timely responded with an examination of plaintiff. *Id.* at 47 49. Within six months of plaintiff's arrival at Clinton, and because plaintiff's pain persisted, defendant Lee ordered x-rays, thereafter ordered MRI testing, and then initiated a process for referral of the plaintiff to a specialist. *Id.* at 38, 45, 73 74, 77 78. Under these circumstances, even taking into consideration plaintiff's allegations, I find that no reasonable factfinder could conclude that defendant Lee's treatment of plaintiff's shoulder condition was sufficiently serious to satisfy a deliberate medical indifference claim under the Eighth Amendment.

Similarly, based on defendant Lee's declaration submitted in support of the pending motion and the treatment afforded plaintiff by defendant Lee as documented in plaintiff's medical records, I find that no reasonable

factfinder could conclude that defendant Lee acted with deliberate indifference to a serious medical condition. The record reflects that on each occasion he was seen by defendant Lee, plaintiff's range of motion was observed and medication consistent with defendant Lee's professional judgment was prescribed. *Dkt. No. 32 2 at 47,* 48, 50, 52. When plaintiff's shoulder pain persisted, a new x-ray was ordered and, based upon the findings of that x-ray, MRI testing was arranged. *Id.* at 45, 77 78. Upon receipt and review of the MRI report, defendant Lee referred Gray to an outside orthopedic specialist. *Id.* at 38, 73 74. Simply stated, based upon a careful review of the record, I find nothing to suggest that defendant Lee turned a blind eye to plaintiff's condition or failed to act while aware of a substantial risk of harm to plaintiff's health or safety.

**\*11** Accordingly, because I find that the record evidence does not reflect a genuine dispute of material fact with respect to either the objective or subjective element of plaintiff's medical indifference claim, I recommend defendant Lee's motion for summary judgment be granted. [5]

[5]     Plaintiff's response in opposition to defendant Lee's summary judgment motion reflects his belief defendant Lee was negligent in providing him with treatment and liable for medical malpractice. *See generally Dkt. No. 40.* For example, in his memorandum of law, plaintiff states the following:

It is clear from Plaintiff's original claim, his response above and comprehensive exhibits that he presents a viable claim that Dr. Lee did not use reasonable care or best judgment in applying the knowledge and skill ordinarily possessed by practitioners in the field and that he deviated from accepted standards of medical practice, and that deviation was the proximate or aggravating cause of the injuries or damage to Petitioner.

*Dkt. No. 40 at 8 9.* Claims of negligence and medical malpractice, however, are not cognizable under 42 U.S.C. § 1983. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ( " D]eliberate indifference describes a state of mind more blameworthy than negligence. ); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is ... insufficient to support an Eighth Amendment claim unless

the malpractice involves culpable recklessness. ); *Morris v. Hoke,* No. 87 CV 7812, 1992 WL 310792, at *2 (S.D.N.Y. Oct.21, 1992) (" T]he plaintiff's allegations] would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 U.S.C.1983. ). Accordingly, I recommend that, to the extent plaintiff's complaint could be construed as asserting state law negligence and medical malpractice claims, the court declines to exercise supplemental jurisdiction over those claims in the event my recommendation is accepted and plaintiff's federal claim against defendant Lee is dismissed.

## IV. *SUMMARY AND RECOMMENDATION*

Based upon a careful review of the evidence now before the court, including excerpts of plaintiff's medical records and the transcript of plaintiff's deposition, I conclude that no reasonable factfinder could find plaintiff can satisfy either the objective or subjective element of the governing test for establishing a deliberate medical indifference claim under the Eighth Amendment. Accordingly, it is therefore respectfully

RECOMMENDED that defendant Lee's motion for summary judgment (*Dkt. No. 32* ) be GRANTED, and that plaintiff's remaining deliberate indifference claim be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed March 9, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1724573

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.     10

2018 WL 2303780
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Spencer NOWINSKI, Plaintiff,

v.

M.D. RAO, R.H.S. Administrator Eileen Dinisio,
M.D. Kooi, Mthulisi Nyoni, R.N. D. Graft, M.D.
Carl Koenigsmann, and M.D. Dolan, Defendants.

6:14-CV-06559 (MAT)
|
Signed 05/21/2018

**Attorneys and Law Firms**

Spencer Nowinski, Romulus, NY, pro se.

Bernard F. Sheehan, NYS Attorney General's Office
Department of Law, Rochester, NY, for Defendants.

**DECISION AND ORDER**

HON. MICHAEL A. TELESCA, United States District
Judge

**I. Introduction**

 **\*1**  *Pro se* plaintiff Spencer Nowinski("Plaintiff"),
a prisoner currently incarcerated at the Five Points
Correctional Facility ("Five Points"), commenced the
instant action on September 24, 2014, alleging a violation
of his Eight Amendment rights pursuant to 42 U.S.C.
§ 1983 ("§ 1983"). Currently pending before the Court
is a motion for summary judgment (Docket No. 50)
filed by defendants M.D. Rao ("Dr. Rao"), R.H.S.
Administrator Eileen Dinisio ("Administrator Dinisio"),
M.D. Kooi ("Dr. Kooi"), Mthulisi Nyoni ("PT Nyoni"),
R.N. D. Graft ("PA Graf"   ), M.D. Carl J. Koenigsmann
("Dr. Koenigsmann"), and M.D. Dolan ("Dr. Dolan")
(collectively "Defendants"). For the reasons discussed
below, the Court grants the pending summary judgment
motion and orders that the case be closed.

1    The record reflects that the individual referred to by
     Plaintiff as "R.N. D. Graft   is actually physician s
     assistant ("PA ) Deborah Graf. The Court has
     accordingly referred to her PA Graf.

**II. Factual Background**

The following facts are taken from the statement of facts,
declarations, and exhibits submitted by Defendants, as
well as the docket in this matter. Plaintiff did not submit
any papers in opposition to Defendants' motion, despite
having been specifically warned of the repercussions of
failing to do so. Accordingly, this Court has accepted
Defendants' Rule 56 Statement of Undisputed Facts
(which was submitted in accordance with the Local Rules
of Civil Procedure) as undisputed "to the extent that
[the facts set forth therein] are supported by admissible
evidence and are not controverted by the record." *Brooks
v. Piecuch*, 245 F. Supp. 3d 431, 434 (W.D.N.Y. 2017).

Plaintiff's complaint alleges that, sometime in 2002, he
tore his anterior cruciate ligament ("ACL"). In February
2002, Plaintiff was arrested and jailed in the Cattaraugus
County Jail, where he complained about his knee injury.
Over the next nine years of incarceration, Plaintiff alleges
that he was given various forms of treatment, including
knee surgery in 2003 and multiple prescriptions for pain
medication. Nevertheless, Plaintiff contends, his knee pain
continued to increase over time.

In 2011 and 2012, Plaintiff was housed at the Attica
Correctional Facility ("Attica"). During this time, because
of Plaintiff's ongoing complaints and his history of knee
pain, it was recommended that Plaintiff under a total
knee replacement. Dr. Rao, who is now retired but was at
that time employed by the New York State Department
of Corrections and Community Supervision ("DOCCS")
and assigned to Attica, reviewed this recommendation,
which was ultimately approved by DOCCS officials in
Albany.

On October 26, 2011, Plaintiff underwent a total knee
replacement of his right knee. Tissues and bone fragments
taken during the surgery indicated that the condition
of his right knee was consistent with arthritis. Plaintiff
stayed in the hospital until October 31, 2011, whereafter
he was returned to Attica. To help with post-surgery pain,
Plaintiff was prescribed Tylenol with codeine.

 **\*2**  Plaintiff was discharged to his cell in good condition
on November 1, 2011. Dr. Rao saw Plaintiff on November
14, 2011. Plaintiff indicated he was in pain, so Dr. Rao
renewed his pain medication for an additional five days.
Plaintiff requested follow-up for his knee surgery, and
Dr. Rao informed Plaintiff that he was waiting for a

note from the physician who had performed the surgery. Beyond that, Dr. Rao indicated that he was not able to answer questions about the surgery because he was not an orthopedic surgeon. Plaintiff claims to have sent letters to Dr. Rao, but Dr. Rao does not recall receiving such letters. Dr. Rao noted in the system that Plaintiff had requested to see a doctor to follow up on his surgery.

Registered Nurse Eileen Drankhan ("Nurse Drankhan"), who was employed by DOCCS at Attica, saw Plaintiff on November 28, 2011. She noted that Plaintiff was ambulating without difficulty and that he had returned his crutches. Plaintiff told Nurse Drankhan that he was able to walk "okay," but that he was not bending his right knee much. Nurse Drankhan encouraged Plaintiff to bend his knee and gave him 12 packs of ibuprofen. She also instructed him regarding simple exercises he could do to increase his knee's range of motion and minimize his pain.

Plaintiff was next seen by Attica medical staff on March 20, 2012, after he was involved in an altercation with another inmate. No complaints about his knee were noted at that time.

On July 1, 2012, Plaintiff sent a letter to Dr. Koenigsmann, DOCCS Chief Medical Officer, complaining about the medical department at Attica. Plaintiff's letter was referred to Administrator Dinisio, who was at time a regional health services administrator for DOCCS. Administrator Dinisio investigated Plaintiff's complaint and discovered that Plaintiff had recently been evaluated by his primary care provider, that he had been able to ambulate without difficult following his surgery, and that he had an appointment scheduled for July 30, 2012. Administrator Dinisio sent Plaintiff a letter setting forth those facts and encouraging him to discuss his concerns with his primary care provider.

On July 30, 2012, Plaintiff was seen by Attica medical staff and complained that his knee was not bending well and was slightly swollen. Plaintiff was given Motrin and was put on callout for a physician to review.

PA Graf then saw Plaintiff on September 11, 2012. Plaintiff told PA Graf that he had not received physical therapy after his knee surgery, that he was not experiencing relief from nonsteroidal anti-inflammatory drugs ("NSAIDs"), and that he was unable to ambulate short distances or climb stairs. PA Graf noted that

Plaintiff's right knee had limited flexion and that his gait was antalgic. She referred Plaintiff to physical therapy and prescribed him Voltaren, which is an anti-inflammatory medication, for his pain and swelling.

Dr. Rao reviewed PA Graf's referral for physical therapy, which was subsequently approved by DOCCS officials in Albany. An initial physical therapy session was scheduled for September 24, 2012. However, prior to that date, Plaintiff was transferred to the Auburn Correctional Facility ("Auburn").

On October 1, 2012, shortly after his transfer to Auburn, Plaintiff was seen on sick call. Plaintiff reported that he had swelling in his right knee and that he was waiting for physical therapy. Based on this report, Dr. Kooi, who was at that time the Facility Health Services Director at Auburn, recommended that Plaintiff be scheduled for physical therapy, and an initial physical therapy appointment was scheduled for October 18, 2012.

PT Nyoni, a licensed physical therapist, saw Plaintiff on October 18, 2012. PT Nyoni would eventually see Plaintiff for physical therapy for his knee 16 times in 2012 and 2013, with Plaintiff failing to report for his physical therapy appointments on five occasions. The goals of this physical therapy were for Plaintiff to decrease his pain, improve his gait, increase his range of motion, and increase the strength in his legs. PT Nyoni employed a variety of techniques in treating Plaintiff, including the use of moist heat, range of motion exercises, and manipulation of Plaintiff's knee.

**\*3** Dr. Dolan, who was a DOCCS physician assigned to Auburn during the relevant time period, first saw Plaintiff on November 19, 2012. Plaintiff complained of right knee pain and a poor range of motion following his surgery. Dr. Dolan saw Plaintiff again one week later. Dr. Dolan noted that Plaintiff had started physical therapy on October 18, 2012, and that he had had four physical therapy sessions scheduled with two no-shows. Dr. Dolan further noted that Plaintiff's right knee had poor strength and a poor range of motion and that there signs of atrophy in his right leg. Based on Plaintiff's complaints of pain, Dr. Dolan ordered an x-ray to see whether Plaintiff's knee appliance might be loose. Dr. Dolan noted that Plaintiff should see him again after the x-ray was performed. An x-ray of Plaintiff's knee was taken on November 30, 2012,

and showed that his knee prosthesis was in place without subsidence or loosening.

Dr. Dolan saw Plaintiff again on March 20, 2013. Plaintiff noted that Plaintiff's physical therapy had been somewhat irregular since his surgery and that he had a limited range of motion and pain in his right knee. Dr. Dolan suspected that there might be adhesions in Plaintiff's knee that were affecting his range of motion. Dr. Dolan recommended further physical therapy for Plaintiff, which was approved by DOCCS officials in Albany. Dr. Dolan further noted that it might ultimately be necessary for an orthopedic surgeon to manipulate Plaintiff's knee under anesthesia to address possible adhesions. Dr. Dolan ordered additional x-rays and blood tests of Plaintiff, and prescribed acetaminophen for his pain. Dr. Dolan did not refuse to refer Plaintiff to a specialist, but instead felt that physical therapy should be tried first, to see if Plaintiff's range of motion could be improved.

Three months later, in June 2013, PT Nyoni recommended that Plaintiff see a physician because he was showing minimal improvement in his range of motion through physical therapy. Dr. Kooi saw Plaintiff on June 27, 2013. Dr. Kooi noted that Plaintiff could walk but occasionally had a limp. Based on PT Nyoni's notes and recommendation and his own evaluation of Plaintiff, Dr. Kooi then referred Plaintiff for a consultation with an orthopedic surgeon, and the referral was approved by DOCCS officials in Albany. Dr. Kooi also prescribed Plaintiff Naprosyn for his pain.

Dr. Kooi saw Plaintiff again on July 12, 2013. Dr. Kooi discontinued the Naprosyn and prescribed Neurontin for pain. He further advised Plaintiff to be active to help with his numbness and range of motion. On August 23, 2013, Dr. Kooi saw Plaintiff and increased his Neurontin dosage from 300 mg to 600 mg.

Plaintiff was seen by orthopedic surgeon Dr. Eldridge Anderson ("Dr. Anderson") on September 10, 2013. Dr. Anderson indicated that Plaintiff should continue with physical therapy and that a consultation with a revision specialist might be appropriate.

Dr. Kooi saw Plaintiff on September 12, 2013. He discussed Dr. Anderson's findings and recommendations with Plaintiff. Plaintiff indicated that he did not believe further physical therapy would be helpful.

On January 17, 2014, Plaintiff was seen by orthopedic surgeon Dr. Mitchell Rubinovich ("Dr. Rubinovich") to discuss possible revision surgery. That same day, Dr. Rubinovich sent a letter to Dr. Daniel Weinstock ("Dr. Weinstock"), a DOCCS physician at Auburn, in which he recommended that Plaintiff be provided a cane. Dr. Rubinovich also indicated that he wanted to further review Plaintiff's imaging results and to discuss the matter with his medical partner. Dr. Rubinovich stated that he would contact Dr. Weinstock after he spoke with his partner.

Dr. Weinstock called Dr. Rubinovich's office on February 10, 2014, and was told that Dr. Rubinovich had been away for two weeks, but would be returning on February 17, 2014, and would call Dr. Weinstock back. Dr. Weinstock subsequently reported on March 3, 2014 that no revision surgery was possible at that time and that Plaintiff should be considered and evaluated for a cane.

**\*4** Dr. Kooi saw Plaintiff on April 3, 2014. Dr. Kooi approved the recommendation that Plaintiff be given a cane and ordered a cane for Plaintiff. Plaintiff received his cane on April 8, 2014. Dr. Kooi subsequently approved Plaintiff's permit for a cane on at least three occasions.

Plaintiff was thereafter transferred to Five Points. He ultimately had knee revision surgery on November 17, 2016. Additional physical therapy was recommended by an orthopedic surgeon, but Plaintiff refused to attend. Plaintiff has been given a handicapped cell with shower access and has a permit to walk with a cane.

## III. Discussion

### A. Legal Standard

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the moving party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the party against whom summary judgment is sought. *See Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014). If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *See Scott*

*v. Harris*, 550 U.S. 372, 380 (2007), citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). A party opposing a motion for summary judgment " 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-87).

**B. Failure to Exhaust Administrative Remedies**
As a threshold matter, Defendants contend that Plaintiff failed to exhaust his administrative remedies with respect to all of his claims related to events in 2011, 2012, "early 2013," and after August 20, 2013. The Court agrees.

Pursuant to the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [§ 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). DOCCS "maintains a three-tiered administrative review and appeals system for prisoner grievances." *Torres v. Carry*, 672 F. Supp. 2d 338, 343 (S.D.N.Y. 2009). In particular, "[f]irst, an inmate may file an inmate grievance complaint form or a written grievance, if forms are not available, with the Inmate Grievance Resolution Committee ("IGRC"). Second, if the inmate is dissatisfied with the IGRC decision, he may appeal to the prison superintendent. Finally, [DOCCS] permits an inmate to appeal the superintendent's written decision to the CORC [Central Office Review Committee]." *Id.* (internal citations omitted). An inmate must exhaust all three levels of review before he or she can bring a claim under § 1983. Moreover, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006).

**\*5** In this case, DOCCS has submitted uncontroverted evidence that Plaintiff fully exhausted only one grievance related to his medical care following his knee surgery. That grievance was filed on August 20, 2013. The IGRC investigated and granted Plaintiff's grievance to the extent that it agreed his future health care needs should be tended to in a timely fashion. Plaintiff appealed to the superintendent, who agreed with the findings of the IGRC and noted that Plaintiff had an upcoming appointment

with an orthopedic surgeon. Plaintiff appealed to CORC, and on February 12, 2014, CORC issued a decision granting Plaintiff's request in part. In particular, CORC found that Plaintiff's complaints regarding his medical concerns in 2011, 2012, and "early 2013" were untimely. CORC further found that, with respect to the timely aspects of Plaintiff's grievance, there was no evidence to substantiate any claims of improper medical care or malfeasance by DOCCS staff. CORC encouraged Plaintiff to address his medical concerns via sick call.

CORC's conclusion that Plaintiff failed to timely grieve his complaints from 2011, 2012, and early 2013 is well-founded. Under DOCCS' system for inmate grievances, grievances must be filed "within 21 calendar days of an alleged occurrence." N.Y. Comp. Codes R. & Regs. § 701.5. In this case, Plaintiff did not file his grievance until August 20, 2013. Accordingly, his complaints related to any events occurring before July 30, 2013 were untimely. Plaintiff therefore failed to exhaust his administrative remedies with respect to such complaints.

Plaintiff also failed to exhaust his administrative remedies as to events occurring after August 20, 2013, the date of the only grievance he appealed to completion. Plaintiff never filed a grievance related to these later events, and under the PLRA, may not maintain a § 1983 claim based upon them. Moreover, there is no evidence in the record from which the Court could conclude that Plaintiff was unable to comply with DOCCS' grievance procedures. To the contrary, the fact that Plaintiff filed and appealed to completion his August 20, 2013 grievance demonstrates that grievance procedures were available to him. Accordingly, to the extent Plaintiff's claims are based on events occurring before July 30, 2013 or after August 20, 2013, Defendants are entitled to judgment in their favor.

**C. Plaintiff Cannot Show a Violation of His Eight Amendment Rights**
Plaintiff's claims are based on his Eight Amendment right to be free from cruel and unusual punishment. "The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). However, the Second Circuit has made it clear that "not every lapse in medical care is a constitutional wrong." *Id.* Instead, to demonstrate an Eighth Amendment violation,

Plaintiff is required to meet two separate requirements. "The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Id.* (internal quotation omitted). Determining whether a deprivation was objectively serious in turn involves two inquiries: "The first inquiry is whether the prisoner was actually deprived of adequate medical care.... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* at 279-80.

The second requirement to show an Eighth Amendment deprivation of medical care claim "is subjective: the charged official must act with a sufficiently culpable state of mind." *Id.* at 280. In particular, "[i]n medical-treatment cases not arising from emergency situations," the party claiming constitutional violation must show that a defendant "acted with deliberate indifference to inmate health." *Id.*

In this case, even taking into account events before July 30, 2013 and after August 20, 2013, it is clear that no rational factfinder could hold that either of these requirements were met. Turning to the first requirement, there is simply no evidence that Plaintiff was deprived of adequate medical care. To the contrary, the record shows that Plaintiff was provided with extensive care for his knee problems, including multiple surgeries, physical therapy, medication, and accommodations such as a cane and a handicapped cell. *See Gray v. Kang Lee*, No. 9:13-CV-258 GLS/DEP, 2015 WL 1724573, at *3 (N.D.N.Y. Apr. 15, 2015) (prisoner could not satisfy objective requirement where he was "frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist").

**\*6** With respect to the second, subjective requirement, once again there is no evidence from which a rational factfinder could hold in Plaintiff's favor. It is apparent that Defendants made reasonable efforts to provide Plaintiff with appropriate medical care. The medical staff at both Attica and Auburn took Plaintiff's knee complaints seriously, providing him with

a wide variety of pain medications, referring him for physical therapy, and seeking the advice of outside orthopedic surgeons. Plaintiff's disagreement with his providers' medical judgment regarding the advisability of ongoing physical therapy is insufficient to demonstrate deliberate indifference to his medical needs. *See Green v. Khrisnaswamy*, 134 Fed.Appx. 465, 466 (2d Cir. 2005). Nor is Plaintiff's belief that he should have been prescribed stronger pain medication evidence of a culpable state mind by Defendants. "While prisoners have a right to medical care, they do not have a right to chose a specific type of treatment. Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment." *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (internal citations omitted).

Based on the record, Plaintiff is unable to "demonstrate that any of the Defendants was aware of but consciously disregarded a substantial risk to his health." *Day v. Lantz*, 360 Fed.Appx. 237, 239 (2d Cir. 2010). To the contrary, in this case shows that Plaintiff's providers actively attempted to address Plaintiff's medical concerns. As such, summary judgment in favor of Defendants as to all of Plaintiff's claims is warranted.

### III. Conclusion

For the reasons set forth above, the Court grants Defendants' motion for summary judgment (Docket No. 50). The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *See Coppedge v. United States*, 369 U.S. 438 (1962). The Clerk of the Court is instructed to enter judgment in favor of Defendants and to close the case.

**ALL OF THE ABOVE IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 2303780

2014 WL 1778410
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Darrell WASHINGTON, Plaintiff,

v.

WESTCHESTER COUNTY DEPT. OF
CORRECTION, et al., Defendants.

No. 13 Civ. 5322(KPF).
|
Signed April 25, 2014.

*OPINION AND ORDER*

KATHERINE POLK FAILLA, District Judge.

[1]   Doug Giannantonio, a third year student at Columbia Law School and an intern in my Chambers, provided substantial assistance in researching and drafting this Opinion.

**\*1**  In early 2013, Plaintiff Darrell Washington, who is proceeding *pro se* and is currently incarcerated, received medical treatment for a severe bacterial infection he experienced while incarcerated at the Westchester County Jail. On July 29, 2013, Plaintiff initiated this action under 42 U.S.C. § 1983 against Defendants Westchester County Department of Correction and Correct Care Solutions, LLC, alleging deliberate indifference to his medical needs in violation of the Eighth Amendment. Defendants now move to dismiss the Complaint for failure to state a claim. For the reasons discussed herein, that motion is granted in part, and Plaintiff is granted leave to file an amended complaint within 30 days.

**BACKGROUND** [2]

[2]   The facts alleged herein are drawn from Plaintiff's Complaint ("Compl.  (Dkt.# 2)), and are assumed true for the purposes of this Opinion. For convenience, Defendants' opening brief in support of the instant motion (Dkt.# 15) will be referred to as "Def. Br.  ; Plaintiff's opposition affirmation (Dkt.# 23) as "Pl. Opp.  ; and Defendants' reply brief (Dkt.# 24) as "Def. Reply.

Prior to the filing of Defendants' motion to dismiss, Plaintiff submitted to the Court what he alleges to be the relevant medical records. (Dkt.# 9, 10). However, those materials were not submitted along with the Complaint; they were not referred to in the Complaint; and they were not submitted in connection with the briefing of this motion. Accordingly, the Court may not consider these documents in the context of a motion to dismiss. *See generally Kalyanaram v. American Ass'n of University Professors at New York State Institute of Technology, Inc.,* 742 F.3d 42, 44 n. 1 (2d Cir.2014) (discussing circumstances under which courts can consider outside materials in resolving motions to dismiss). Yet to the extent the Court is permitted to review all papers submitted by a *pro se* plaintiff in order to raise the strongest arguments those papers suggest, the Court has reviewed these records, and notes that they facially support the factual allegations discussed herein.

**A. Plaintiff's Incarceration and MRSA Infection**
Plaintiff was arrested on or about January 23, 2013. (Compl.3). Prior to his arrest, Plaintiff had been prescribed a medication called Doxycycline, as well as an ointment, "for MRSA." (*Id.*) . [3] Accordingly, at the time Plaintiff was arrested, he had on his person both the Doxycycline and "some type of ointment." (*Id.*). Plaintiff does not actually allege that he had a MRSA infection prior to his incarceration, or that he suffered any symptoms of that infection, only that he had been prescribed and was taking medication "for MRSA." (*Id.*). [4]

[3]   MRSA is an acronym for Methicillin resistant Staphylococcus aureus, a bacterium that can cause serious infections.

[4]   Plaintiff alleges in opposition that he "did not enter the facility with the deadly disease,  and that he "caught  MRSA while at the Jail. (Pl.Opp.1  3). This statement is facially contradictory with Plaintiff's allegation in the Complaint that he was undergoing treatment for MRSA prior to his incarceration. The Court ordinarily may not consider factual allegations contained in opposition papers to a motion to dismiss unless they are consistent with those contained in the complaint. *See Friedl v. City of New York,* 210 F.3d 79, 83  84 (2d Cir.2000). This is not the case here, and for this reason, the Court disregards the inconsistent factual allegations in Plaintiff's opposition papers.

During the relevant time period, Plaintiff was incarcerated at the Westchester County Jail (the "Jail"), in Valhalla, New York. (Compl.3). The Jail is operated by Defendant Westchester County Department of Correction (the "County"). Defendant Correct Care Solutions, LLC ("Correct Care") provides medical care to prisoners at the Jail.

According to Plaintiff, upon his arrival at the Jail on January 23, 2013, Plaintiff informed a correctional officer and a doctor on staff that Plaintiff was on medication for MRSA. (Compl.3). The doctor informed Plaintiff that he could no longer take his prescribed medications, but that Plaintiff would be prescribed new medication. (*Id.*). In fact, Plaintiff was never prescribed any new medication, and the Doxycycline and ointment were locked up with Plaintiff's property at the Jail. (*Id.*).

On or about March 17, 2013, Plaintiff developed a large lump on his leg. (Compl.3). The lump worsened and "turned into a 2 inch hole." (*Id.*). Plaintiff's leg was "[highly] infected," and he "was in a lot of pain." (*Id.*). In response to Plaintiff's complaint, a doctor performed a blood test, measured the size of the lump, and placed Plaintiff in quarantine for approximately one week. (*Id.*).

The diagnostic test results subsequently revealed that Plaintiff was infected with MRSA. (Compl.3). Accordingly, a doctor prescribed antibiotics and painkillers to Plaintiff, which he took for approximately three weeks. (*Id.*). Plaintiff does not take issue with his medical treatment in connection with his March 2013 infection, but avers that he "feel[s] the doctors [at the Jail] are hiding something." (*Id.*).

 **\*2** Plaintiff alleges that his medical issues are ongoing due to "the medication/MRSA." (Compl.5). Perhaps relatedly, Plaintiff contends that on or about June 14, 2013, he developed "a very bad rash" on his arm. (*Id.* at 3). It is unclear, however, whether this "bad rash" is related in any way to Plaintiff's MRSA infection; Plaintiff does not provide any further details about this rash or its treatment.

**B. The Instant Action**
On June 19, 2013, Plaintiff served a Notice of Claim, dated June 14, 2013, on the Westchester County Attorney, indicating that Plaintiff planned to pursue a claim against the County and Correct Care under Section 50 e of the New York General Municipal Law. (Def.

Br. 3; Dkt. # 18 1 at 2 3). The Westchester County Attorney subsequently rejected Plaintiff's Notice of Claim as untimely. (Def. Br. 3; Dkt. # 18 1 at 1, 4).

On July 29, 2013, Plaintiff initiated the instant action against Defendants (Dkt.# 2), seeking $1 million in damages to "pay for any further medical bills and also for pain and suffering." (Compl.5). The allegations contained in Plaintiff's Complaint mirror those in his previously-filed Notice of Claim. (Def. Br. 3; *compare* Compl. 3, *with* Dkt. # 18 1 at 2).

To date, Plaintiff concededly has not filed a grievance with the Jail   or with any other jail, prison, or correctional facility for improper medical treatment in relation to the events described in the Complaint. (Compl.4). Instead, Plaintiff contends that he does not know whether the Jail has a grievance procedure and "do[es]n[']t know how to file a grievance." (Compl.4).

The case was assigned to the undersigned on August 6, 2013. Pursuant to the briefing schedule set forth at the October 23, 2013 pre-motion conference (Dkt. # 11), Defendants moved to dismiss on November 22, 2013 (Dkt.# 13). Plaintiff filed his opposition on December 17, 2013 (Dkt.# 23), and the motion was fully briefed as of the filing of Defendants' reply on December 24, 2013 (Dkt.# 24). The Court now considers Defendants' motion to dismiss.

## DISCUSSION

**A. Applicable Law**
When considering a motion under Rule 12(b)(6), the Court should "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." Fed.R.Civ.P. 12(b)(6); *Faber v. Metropolitan Life,* 648 F.3d 98, 104 (2d Cir.2011) (internal quotation marks omitted) (quoting *Selevan v. N. Y. Thruway Auth.,* 548 F.3d 82, 88 (2d Cir.2009)). A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line

from conceivable to plausible." (internal quotation marks omitted) (citing *Twombly,* 550 U.S. at 570)). The Court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Hennenman,* 517 F.3d 140, 149 (2d Cir.2008) (quoting *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002)).

**\*3** "[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted) (citing *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)); *accord McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). That said, the liberal pleading standard accorded to *pro se* litigants "is not without limits, and all normal rules of pleading are not absolutely suspended." *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980).

## B. Analysis

Plaintiff alleges that his Eighth Amendment rights were violated when Defendants acted with deliberate indifference to his serious medical needs. He brings this claim under Section 1983, which establishes liability for deprivation, under the color of state law, "of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Plaintiff's claim is best understood as a claim for two separate instances of alleged deliberate indifference to serious medical need: first, Defendants' decision to discontinue Plaintiff's medications upon his admission into the Jail, and second, Defendants' treatment of Plaintiff's leg infection in March 2013.

### 1. Defendant County's Affirmative Defense of Exhaustion Is Denied Without Prejudice

Preliminarily, the County raises, as an affirmative defense, Plaintiff's failure to exhaust his administrative remedies, in violation of the Prison Litigation Reform Act of 1995 ("PLRA"), Pub.L. No. 104 134, Title VIII, § 803(d), 110 Stat. 1321 71 (1996) (codified as amended at 42 U.S.C. § 1997e). The PLRA requires prisoners to exhaust all "available" administrative remedies prior to filing a claim in federal court. Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in

any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that this requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (internal citation omitted); *see also Cruz v. Jordan,* 80 F.Supp.2d 109, 111 (S.D.N.Y.1999) ("I hold that an action alleging deliberate indifference to medical needs is an action 'brought with respect to prison conditions,' requiring exhaustion[.]").

The purpose of the exhaustion requirement is to promote efficiency by reducing the quantity and improving the quality of prisoner litigation. *Porter,* 534 U.S. at 516; *see also Woodford v. Ngo,* 548 U.S. 81, 89 (2006) ("Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." (internal citation omitted)). Further, "[e]xhaustion gives an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court,' and it discourages 'disregard of [the agency's] procedures.' " *Woodford,* 548 U.S. at 89 (internal citation omitted).

**\*4** The Second Circuit has held that there are three exceptions to the PLRA's "mandatory" exhaustion requirement:

> [W]hen (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such [a] way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

In light of this case law, Plaintiff's admitted failure to exhaust his administrative remedies is not dispositive. (*See* Compl. 4). Instead, the Court must determine whether, as relevant here, those administrative remedies were available to Plaintiff in the first place. Plaintiff contends that he did not know how to file a grievance. (*Id.*). Courts within this District are uniform in holding that "[administrative] remedies are not available where prisoners are not informed of their existence." *Smith v. City of New York,* No. 12 Civ. 3303(CM), 2013 WL 5434144, at *8 (S.D.N.Y. Sept. 26, 2013) (internal citation omitted); *see also Rivera v. New York City,* No. 12 Civ. 760(DLC), 2013 WL 6061759, at *4 5 (S.D.N.Y. Nov. 18, 2013) (same).

Specifically, "[a]n institution keeps an inmate ignorant of the grievance procedure [and thus administrative remedies are 'unavailable'] when correctional officials either fail to inform him of the procedure altogether or fail to provide him with access to materials which could otherwise educate him about the use of that process." *Arnold v. Goetz,* 245 F.Supp.2d 527, 538 (S.D.N.Y.2003) (internal citation omitted). At the same time, however, " 'correctional officials are entitled to the benefit of § 1997e(a) as long as the institution has made a reasonable, good faith effort to make the grievance procedure available to inmates; an inmate may not close his eyes to what he reasonably should have known.' " *Id.* at 537 38 (internal citation omitted). The availability of those remedies is adjudged not by whether the Plaintiff was unaware of them, but instead by whether " 'a similarly situated individual of ordinary firmness' " would have deemed them available. *Hemphill v. New York,* 380 F.3d 680, 688 (2d Cir.2004) (internal citation omitted). This is a question of fact. *Arnold,* 245 F.Supp.2d at 538.

The record here is devoid of any facts from which such a determination could be made. Most cases in this District considering the topic have explored, in detail, whether the correctional officers provided the inmate with a handbook explaining the grievance procedure, and whether officers explained the grievance procedure prior to the alleged incident; the record before the Court is understandably, at this procedural juncture silent as to this information. *See, e.g., Smith,* 2013 WL 5434144, at *10 ("Receipt of such a handbook generally indicates that the inmates were informed of the grievance procedure so as to make that procedure 'available' to them. It alone is not, however, dispositive." (internal citation omitted));

*Arnold,* 245 F.Supp.2d at 539 ("The defendants allege that the 'behavior booklet' provided to an inmate upon his 'entrance to the corrections system' outlines the available grievance procedures." (internal citation omitted)).

**\*5** Failure to comply with the PLRA's exhaustion requirement is an affirmative defense, on which the defendant bears the burden of proof. *Jenkins v. Haubert,* 179 F.3d 19, 28 29 (2d Cir.1999); *Hallett v. New York State Dep't of Corr. Servs.,* 109 F.Supp.2d 190, 196 (S.D.N.Y.2000). The County has failed to carry its burden on this affirmative defense; however, its claim in this regard is denied without prejudice to raising such a defense at a later date, upon a more complete record. [5] *See Arnold,* 245 F.Supp.2d at 538 39 ("Since the nonmoving party is proceeding *pro se,* we are obligated to resolve existing doubts in the plaintiff's favor and to read his [ ] Complaint as raising the strongest argument it suggests (namely, that his lack of sufficient knowledge about the procedure is attributable to correctional officials rather than to himself). Giving the plaintiff the benefit of the doubt in this manner despite his failure to clarify his statements comports with the principle that the defendants bear the burden of proving that he failed to satisfy the PLRA's exhaustion requirement.").

[5]     Though the Court does not reach this issue here, it notes that Defendant Correct Care has not also raised the affirmative defense of Plaintiff's failure to comply with the PLRA's exhaustion requirement and, for that reason, may have forfeited this defense. *See Arnold,* 245 F.Supp.2d at 532 (noting that failure to exhaust is an affirmative defense and thus " 'may be waived by a defendant, or forfeited by failure to raise the defense " (internal citation omitted)).

### 2. The Complaint Fails to Allege Defendants' Deliberate Indifference to a Serious Medical Need

The Court next turns to the merits of Plaintiff's constitutional claim. To sufficiently plead a violation of the Eighth Amendment for deliberate indifference to a serious medical need, a plaintiff must allege that (i) the alleged deprivation results in a serious medical condition; and (ii) the defendant, in depriving plaintiff of medical treatment, acted with deliberate indifference. *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009).

#### a. Plaintiff Has Alleged a Serious Medical Condition

2014 WL 1778410

A serious medical condition requires the existence of "a condition of urgency, one that may produce death, degeneration, or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (internal citation omitted); *see also Jones v. Vives,* 523 F. App'x 48, 49 (2d Cir.2013) (summary order).

Defendants do not dispute that MRSA constitutes a serious medical condition that may produce death, degeneration, or extreme pain. (Def.Br.7). *See generally Gaines v. Armor Health Care, Inc.,* No. 12 Civ. 5663(JS) (WDW), 2013 WL 6410311, at *5 (E.D.N.Y. Dec. 9, 2013) (noting that MRSA was a sufficiently serious medical condition); *McNulty v. Yaneka,* No. 11 Civ. 8320(ER), 2013 WL 684448, at *7 n. 2 (S.D.N.Y. Feb. 25, 2013) (same). Accordingly, Plaintiff has satisfied the first element of his Eighth Amendment claim.

### b. Plaintiff Has Failed to Allege that Defendants Acted with the Requisite Deliberate Indifference

#### i. Applicable Law

Plaintiff must also allege, however, that Defendants acted with "a sufficiently culpable state of mind," equivalent to criminal recklessness. *Hathaway,* 99 F.3d at 553 (internal citation omitted); *see also Cole v. Fischer,* 416 F. App'x 111, 113 (2d Cir.2011) (summary order). Such a state of mind " 'entails something more than mere negligence[, but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Hathaway,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)).

*6  Mere allegations of medical malpractice are generally insufficient to state a claim of deliberate indifference to a serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 105–06 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Rather, " 'the charged official must act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result.' " *Bell v.. Jendell,* No. 12 Civ. 6666(KMK), 2013 WL 5863561, at *4 (S.D.N.Y. Oct. 31, 2013) (quoting *Salahuddin,* 467 F.3d at 280) (emphasis in *Bell* ); *see also Farmer,* 511 U.S. at 837 ("[T]he official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Similarly, "not every lapse in medical care is a constitutional wrong." *Salahuddin,* 467 F.3d at 279 (internal citation omitted). A constitutional wrong requires deliberate indifference, and it is well-settled that the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference. *See Ross v. Correct Care Solutions LLC,* No. 11 Civ. 8542(DLC), 2013 WL 5018838, at *4 (S.D.N.Y. Sept. 13, 2013) (" '[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.' " (internal citation omitted)). Lastly, the law is clear that the medication a doctor selects to treat the patient's conditions is a medical judgment and does not rise to the level of deliberate indifference. *Thomas v. Westchester Cnty.,* No. 12 Civ. 6718(CS), 2013 WL 3357171, at *5 (S.D.N.Y. July 3, 2013) ("treating pain with over-the-counter, as opposed to prescription, medication is a disagreement over treatment that does not rise to the level of deliberate indifference" (internal citation omitted)); *see also Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011) ("Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking." (internal citation omitted)).

#### ii. The January 2013 Suspension of Medication

Plaintiff's first claim of deliberate indifference stems from his allegation that he had been prescribed medication for MRSA at the time of his arrest, but that Defendants discontinued those medications and failed to prescribe him new ones, despite their promise to do so. (Compl.3). Plaintiff does not allege that he was suffering from any symptoms of a MRSA infection at the time, nor that he had actually been diagnosed as having MRSA (as opposed to being prescribed medications for the condition, perhaps prophylactically). However, within weeks of Defendants' decision to cease Plaintiff's medication and failure to prescribe new medication, Plaintiff developed a large lump that resulted from a MRSA infection. Accordingly, Plaintiff contends that he should have been prescribed new medication for treatment of MRSA long before the March 17 incident.

**\*7** Delay in providing medication can rise to the level of deliberate indifference, but only where a plaintiff's allegations indicate that the defendants, for instance, "deliberately delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for [a period of time], or delayed major surgery for over two years." *Demata v. New York State Correctional Dep't of Health Servs.,* 198 F.3d 233 (2d Cir.1999) (internal citations omitted); *cf. Ross,* 2013 WL 5018838, at \*5 (denying motion to dismiss a deliberate-indifference claim where defendant "was informed about [the plaintiff's] sleep apnea" but *"deliberately refused* to provide him with medical treatment ... on account of his prior complaint and lawsuits" (emphasis added)).

Plaintiff fails to allege any facts demonstrating that Defendants deliberately withheld his medication as a form of punishment, or discontinued his medication while being aware that serious, life-threatening consequences could result therefrom. Instead, Plaintiff's allegations indicate that Defendants agreed to prescribe him new medication, but simply failed to do so; this is insufficient to state a claim for deliberate indifference. *See Ferguson v. Cai,* No. 11 Civ. 6181(PAE), 2012 WL 2865474, at \*6 (S.D.N.Y. July 12, 2012) (dismissing Eighth Amendment claim where plaintiff failed to allege that the defendant "actually disregarded any such known risks," but simply that the defendant " 'forgot to call,' " which fell "well short of the high threshold for deliberate indifference"); *Bell,* 2013 WL 5863561, at \*4 6 (same); *Baskerville v. Blot,* 224 F.Supp.2d 723, 735 36 (S.D.N.Y.2002) (dismissing claim based on prison nurse's "failure to obtain a refill of [plaintiff's] ... medication" where plaintiff's "assertions [did] not show that [the nurse] acted intentionally to withhold from him his prescribed medication or was in any way responsible for the delay in obtaining a refill").

In short, Plaintiff has failed to plead deliberate indifference in connection with the discontinuance of his medications, and Defendants' motion to dismiss as to this claim must be granted. The remaining issue, however, is whether such dismissal should be with or without prejudice. Here, too, the Court must construe the record so broadly in favor of Plaintiff's claims as the facts will permit. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (" 'A *pro se* complaint is to be read liberally. Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any

indication that a valid claim might be stated.' " (internal citation omitted)). After reviewing the record, the Court concludes that more particularized pleading specifically, if Plaintiff were able to allege more details concerning (a) whether he was diagnosed with MRSA prior to his incarceration; (b) whether he was in pain or exhibited symptoms of a MRSA infection at the time of his arrest; (c) whether Defendants were aware that Plaintiff had MRSA and had symptoms of MRSA at the time of his incarceration; and (d) whether Defendants ignored such symptoms or deliberately withheld medication could cure the deficiencies in Plaintiff's Complaint. Accordingly, Defendants' motion to dismiss is granted without prejudice, and Plaintiff is granted leave to file an amended complaint. *See Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 96 (2d Cir.1999) (granting leave to amend a *pro se* complaint where "a liberal reading of the complaint [indicates] that a valid claim might be stated' " (citation omitted)). [6]

[6]     Plaintiff does not allege whether the doctor's decision to discontinue his medication was the result of any official policy or practice, such that liability would attach for the County. Section 1983 " 'extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation. ' " *Okin v. Village of Cornwall on Hudson Police Dep t.,* 577 F.3d 415, 439 (2d Cir.2009) (internal citation omitted). Because the Court is permitting Plaintiff to amend his complaint with regard to his Eighth Amendment claim, and because Defendants failed to brief this issue or move upon this ground in their motion to dismiss, the Court declines to reach the issue of whether the Complaint adequately states a claim for municipal liability against the County.

### iii. The March 2013 MRSA Infection

**\*8** Plaintiff also fails to plead sufficiently that Defendants acted with the requisite state of mind with respect to Plaintiff's March 2013 MRSA infection. Plaintiff avers that a large lump was present on his leg on or about March 17, 2013, and that Jail medical staff responded immediately by conducting a blood testing, placing Plaintiff in quarantine, and prescribing him antibiotics and pain medication. (Compl.3). Critically, Plaintiff's only complaint with the treatment of his March infection is his belief that the doctors were "hiding something" from him. (*Id.*). This does not rise to the level of deliberate indifference, rather, Plaintiff's Complaint

paints a picture of an attentive medical staff responding proactively to Plaintiff's infection.

As an initial matter, medical providers have wide discretion in treating inmate patients and their determinations "are given a 'presumption of correctness.' " *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 12 (S.D.N.Y.2001) (internal citation omitted). Here, Plaintiff does not indicate that he was denied medically necessary treatment, or even that he disagrees with the medical treatment he received. Rather, Plaintiff simply alleges that he distrusts the doctors. It is well-settled that a mere disagreement between the inmate and doctor concerning the appropriate treatment or medication does not constitute deliberate indifference. *See Hill,* 657 F.3d at 123 (a "prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment" (internal citation omitted)); *Crique v. Magill,* No. 12 Civ. 3345(PAC)(GWG), 2013 WL 3783735, at *3 (S.D.N.Y. July 9, 2013) ("The mere fact that an inmate feels that he did not receive adequate attention ... does not constitute deliberate indifference." (internal citation omitted)). Simply put, a doctor's determination of the appropriate treatment is a medical judgment and does not in and of itself amount to deliberate indifference or a violation of the Eighth Amendment.

Plaintiff similarly does not allege any facts related to the rash he developed in June 2013 and, more specifically, whether it was related to his MRSA infection, much less does he plead facts indicative of deliberate indifference to his medical needs. Plaintiff does not plausibly allege that Defendants acted with the requisite state of mind necessary to demonstrate deliberate indifference to a serious medical need. Defendants' motion to dismiss as to this claim must also be granted.

Again, the Court must consider whether the dismissal should be with or without prejudice. "Although pro se plaintiffs are generally given leave to amend a deficient complaint, a district court may deny leave to amend when amendment would be futile because the problem with the claim 'is substantive and better pleading will not cure it.' " *Thomas v. Westchester Cnty.,* 12 Civ. 6718(CS), 2013 WL 3357171, at *7 (S.D.N.Y. July 3, 2013) (quoting *Cuoco,* 222 F.3d at 112). Plaintiff's allegations establish that Defendants responded expeditiously and appropriately to his MRSA infection; additional allegations would not

change this fact. Plaintiff's claim in connection with his March 2013 MRSA infection is dismissed with prejudice.

### 3. Plaintiff's State Law Claims Are Dismissed as to Defendant County

**\*9** Plaintiff's allegations could also conceivably be construed as state-law tort claims for medical negligence. However, Plaintiff indisputably did not comply with the requirements of Section 50 e of the New York General Municipal Law, and his state law claims brought against Defendant County must be dismissed for that reason.[7]

[7]   N.Y. Gen. Mun. Law § 50 e states in relevant part:
In any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action or special proceeding against a public corporation, as defined in the general construction law, or any officer, appointee or employee thereof, the notice of claim shall comply with and be served in accordance with the provisions of this section within ninety days after the claim arises.

"[I]n a federal court, state notice-of-claim statutes apply to state-law claims." *Hardy v. N.Y.C. Health & Hosp. Corp.,* 164 F .3d 789, 793 (2d Cir.1999) (internal citations omitted). Section 50 e "has been described by both the New York Court of Appeals and the Second Circuit as a 'condition precedent' as opposed to a 'statute of limitations.' " *Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co., Inc.,* No. 13 Civ. 6705(DLC), 2014 WL 241739, at *9 (S.D.N.Y. Jan. 22, 2014) (internal citations omitted). "Federal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim." *Dingle v. City of New York,* 728 F.Supp.2d 332, 348 49 (S.D.N.Y.2010) (internal citation omitted). "The burden is on the plaintiff to demonstrate compliance with the Notice of Claim requirement." *Horvath v. Daniel,* 423 F.Supp.2d 421, 423 (S.D.N.Y.2006) (internal citation omitted).

The Westchester County Attorney rejected Plaintiff's Notice of Claim as untimely, and the Court is unable to excuse or overlook Plaintiff's failure to comply with Section 50 e. Accordingly, Defendant County's motion to dismiss Plaintiff's New York State law claims is granted.[8]

8     Defendant Correct Care has not moved to dismiss the New York State law claims brought against it; accordingly, those remain.

## CONCLUSION

For the reasons discussed herein, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Clerk of Court is directed to terminate Docket Entry 13.

Specifically, Defendant County's motion is DENIED without prejudice with respect to the County's affirmative defense for failure to exhaust administrative remedies.

Defendant County's motion is GRANTED with prejudice with respect to Plaintiff's New York State law claims.

Defendants' motion is GRANTED with prejudice with respect to Plaintiff's Eighth Amendment claim relating to his March 2013 MRSA infection.

Defendants' motion is GRANTED without prejudice with respect to Plaintiff's Eighth Amendment claim relating to Defendants' decision to discontinue his medication in January 2013. Plaintiff is granted leave to file an amended complaint within 30 days from the date of this Order.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1778410

---

**End of Document**
© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1363495
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert ADAMS, III, Plaintiff,
v.
Nancy SMITH, et al., Defendants.

9:15-CV-913 (BKS/DJS)
|
Signed 03/16/2018

**Attorneys and Law Firms**

Robert Adams, III, 07-B-1611, Wende Correctional Facility, P.O. Box 1187, Alden, NY 14004, Plaintiff, pro se

Keith J. Starlin, Esq., Hon. Eric T. Schneiderman, Office of New York State Attorney General, The Capitol, Albany, NY 12224, Attorney for Defendants

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge

**I. INTRODUCTION**

 **\*1**  Plaintiff pro se Robert Adams, III brought this action under 42 U.S.C. § 1983 alleging that Defendants Vijay Kumar Mandalaywala, M.D. and Nurse Administrator Nancy Smith were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment, while he was confined at Upstate Correctional Facility. (Dkt. Nos. 1, 73). On June 9, 2017, Defendants filed a motion for summary judgment. (Dkt. No. 115). Plaintiff opposed the motion (Dkt. Nos. 124, 125). On December 5, 2017, United States Magistrate Judge Daniel J. Stewart issued a Report-Recommendation and Order ("R & R") recommending that the Court grant Defendants' motion for summary judgment and dismiss this action. (Dkt. No. 134). After thoroughly reviewing the facts and the law, Magistrate Judge Stewart found that even if Plaintiff satisfied the first prong of the deliberate indifference analysis by showing that his medical need was sufficiently serious, he failed to present evidence showing that Defendants acted with a sufficiently culpable statement mind. (Dkt. No. 134). Specifically, Magistrate Judge Stewart noted that "[a] disagreement about the proper course of treatment is insufficient to establish a

deliberate indifference claim."   (Dkt. No. 134, at 13). Magistrate Judge Stewart informed the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections and that the failure to object would preclude appellate review. (Dkt. No. 134, at 14). Plaintiff filed objections to the R & R on December 21, 2018. (Dkt. No. 138).

[1]     As Magistrate Judge Stewart decided the motion for summary judgment on the merits, he did not address Plaintiff's alleged failure to exhaust his administrative remedies or whether Defendants were personally involved in the alleged deprivation. (Dkt. No. 134, at 9 10).

**II. BACKGROUND**

The Court presumes the parties' familiarity with Plaintiff's factual allegations which are thoroughly set forth in the R & R. (Dkt. No. 134, at 2 9). Plaintiff's deliberate indifference claim arises from his confinement at Upstate from February 1, 2013 to April 25, 2013.

Plaintiff claims that on or about January 2013, while he was confined at Sing Sing Correctional Facility, he began suffering severe back pain following an assault. (Dkt. No. 124-2, at 1). X-rays revealed "involuntary muscle spasms and a straightened lordosis." (*Id.*). On January 25, 2013, a nurse at Sing Sing advised Plaintiff that he would be referred to physical therapy and receive a thirty-day prescription for Baclofen, a muscle relaxant. (*Id.* at 3). Plaintiff received Baclofen twice a day from January 25, 2013 through January 30, 2013. (*Id.*).

On January 31, 2013, prior to his transfer to Upstate, a facility nurse completed a "Medication Administration Form" indicating that Plaintiff had received Baclofen at 8:00 a.m. that day and that Baclofen had been ordered on January 25, 2013 "thru" February 23, 2013. (Dkt. No. 124-2, at 4; Dkt. No. 124-4, at 17). Plaintiff contends this form is used "to apprise a transferred inmate's receiving facility, of his/her prescription medication" and that the nurse who completed it placed it in his Ambulatory Health Record, which went with him to Upstate. (Dkt. No. 124-2, at 5).

 **\*2**  On February 1, 2013, Plaintiff arrived at Upstate, where a nurse "medically screened him." (Dkt. No. 124-2, at 6). Plaintiff reported "his diagnosed conditions (spasms)" and that he had been prescribed Baclofen and

Adams v. Smith, Not Reported in Fed. Supp. (2018)

2018 WL 1363495

Case 9:16-cv-00890-LEK-TWD    Document 117    Filed 06/21/19    Page 68 of 219

was to receive physical therapy. (*Id.* at 6). Plaintiff claims that when he asked the nurse making medication rounds that night for his medication because he was in "extreme physical pain, suffering from muscle spasms," the nurse replied that he had no medications for Plaintiff and advised him to sign up for sick call. (Dkt. No.73, ¶ 24).

On February 6, 2013, Dr. Mandalaywala, whom Plaintiff contends was his primary care physician at Upstate, conducted an initial review of Plaintiff's medical records. (Dkt. No. 115, 9, ¶ 8). The parties dispute whether the medical records Dr. Mandalaywala reviewed that day included any indication that Plaintiff had been prescribed Baclofen. (*Id.*, at ¶¶ 22 and 24; Dkt. No. 138, at 8 9; Dkt. No. 124-4, at 17). In his declaration, Dr. Mandalaywala states that he "decided the best course of treatment for plaintiff at that time, in regard to his reported back symptoms, was for him to continue activity," mitigate pain with "a non-prescription pain reliever" (Tylenol), and attend physical therapy. (Dkt. No. 115-9, ¶ 22).

Plaintiff continued to complain, via sick call, to nurses he spoke with at the facility, and in a February 11, 2013 letter to the nurse administrator, Nurse Administrator Smith, of his extreme physical pain and muscle spasms, that he needed Baclofen, and that the non-prescription pain relievers that he had been given at the facility were "ineffective." (Dkt. No. 124-2, at 6 8; Dkt. No. 115-12, ¶ 26). Nurse Administrator Smith responded the next day that Plaintiff "need[ed] to sign up for sick call" and that Baclofen was "approved for short course only" and noted that he was scheduled for physical therapy and had "access to pain medication daily on sick call." (Dkt. No. 115-13, at 3).

On February 24, 2013, Plaintiff "engaged Defendant Smith in a conversation regarding the systematic deprivation of his prescription pain medication," told her that he was in constant pain, and requested a tube of muscle cream. (Dkt. No. 124-2, at 12). Nurse Administrator Smith denied his request for muscle cream and told him: "This is the Box, not a massage parlor; I'm not here to 'cater' to you. If you are in pain, sign up for sick call; I'm not giving you any relaxants; you don't need it." (*Id.*). In response to Plaintiff's complaints of pain, Defendant Smith said: "if you keep crying like a girl, I'll give you some ESTROGEN; you should've thought about your pain, before you did what you did, to come to the Box." (*Id.*).

Despite multiple sick call visits, complaints of pain, spasms, and leg numbness, Plaintiff received only non-prescription pain medication and physical therapy during the entirely of his time at Upstate (February 1, 2013 to April 25, 2013).

## III. STANDARD OF REVIEW

This Court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue,* 2 F.Supp.3d 223, 228-29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.*

## IV. DISCUSSION

### A. Procedural and Factual Objections

Plaintiff contends that his response to Defendants' statement of material facts, while imperfect, nonetheless clearly sets forth his arguments in opposition to Defendants' motion and was properly supported by citations to the evidence in the record, and asserts that Magistrate Judge Stewart improperly "disregard[ed] plaintiffs [sic] sworn statements," including his affidavit. (Dkt. No. 138, at 3). Magistrate Judge Stewart noted that Plaintiff's response was "inconsistent" with Local Rule 7.1(a)(3), (Dkt. No. 134, at 3 n.2), but nonetheless considered Plaintiff's arguments as well as Plaintiff's Second Amended Complaint, and deposition testimony. (Dkt. No. 134, at 2 9) (referring to the factual assertions in the Second Amended Complaint, Plaintiff's deposition, and Plaintiff's arguments). The Court has recounted the sworn statements in Plaintiff's affidavit, supra, but concludes, for the reasons that follow, that they fail to raise a material issue of fact.

**\*3** The Court has reviewed all of Plaintiff's specific factual objections de novo. [2] Based upon the evidence in the record, the Court credits the following objections and finds as follows: Defendant Mandalaywala was, as Plaintiff asserts, Plaintiff's primary care physician and decision-maker during his confinement at Upstate. (Dkt. No. 138, at 5 8; Dkt. No. 124-5). Defendant Mandalaywala was aware of and discontinued Plaintiff's prescription for Baclofen. (Dkt. No. 138, at 8; Dkt. No. 124-4, at 11, 17).

Adams v. Smith, Not Reported in Fed. Supp. (2018)

2018 WL 1363495

[2]  Plaintiff also objects to Magistrate Judge Stewart s failure to bind Defendant Smith to her "Rule 36 F.R.C.P. Admissions. (Dkt. No. 138, at 12; Dkt. No. 124 5, 22 40). This appears to refer to a Decision and Order issued by Magistrate Judge Stewart on April 12, 2017 concerning a discovery issue. (Dkt. No. 104). In it, Magistrate Judge Stewart granted Defendant Smith s motion to withdraw her admissions to Plaintiff s notices to admit. (Dkt. No. 104, at 40). Plaintiff did not appeal that Order, and here is no indication that Magistrate Judge Stewart overlooked any of Defendant Smith s remaining admissions.

The Court rejects Plaintiff's assertion that Magistrate Judge Stewart incorporated the Declaration of Valerie Monroe into the R & R. (Dkt. No. 138, at 26). Magistrate Judge Stewart specifically excluded the Monroe Declaration at Plaintiff's request. (Dkt. No. 134 n.3).

After considering the remainder of Plaintiff's factual and procedural objections, the Court has found them to be unsupported or immaterial to the legal issues pending before the Court. With the minor exceptions set forth above, and any additions contained in Section II., the Court therefore adopts and incorporates into this decision the thorough recitation of facts set forth in the Report-Recommendation.

### B. Objections to Legal Analysis

Plaintiff asserts that Defendants Dr. Mandalaywala and Nurse Administrator Smith failed to give him Baclofen, despite an existing prescription, thus causing him extreme pain. To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The standard for deliberate indifference includes an objective component and a subjective component. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

"The objective component requires that 'the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.' " *Id.* (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). Subjectively, the official charged with deliberate indifference must act with a "sufficiently culpable state

of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). "That is, the official must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must both draw the inference.' " *Id.* (alteration in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

It is well established that "a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Id.* at 123. For this reason, "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)). The "essential test is one of medical necessity and not one simply of desirability." *Id.* (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)).

**\*4** Plaintiff avers that Dr. Mandalaywala and Nurse Administrator Smith refused to provide him with Baclofen, despite having a prescription for it from another facility, that the non-prescription medication they provided was ineffective, and that, as a result, he suffered extreme pain. Courts have repeatedly rejected medical indifference claims based upon a failure to provide stronger pain medication. *See, e.g., Rush v. Fischer*, 09 Civ. 9918, 2011 WL 6747392, at \*3, 2011 U.S. Dist. LEXIS 148080, at \*8 (S.D.N.Y. Dec. 23, 2011) ("The decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs."); *Harris v. Westchester Cty. Med. Ctr.*, No. 08 Civ. 1128 (RJH), 2011 WL 2637429, at \*3, 2011 U.S. Dist. LEXIS 72566, \*9 (S.D.N.Y. July 6, 2011) ("The failure to provide stronger pain medication does not constitute deliberate indifference."); *Wright v. Genovese*, 694 F.Supp.2d 137, 160 (N.D.N.Y. 2010) ("Differences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs."); *Veloz v. New York*, 339 F.Supp.2d 505, 525 (S.D.N.Y. 2004) ("Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a

Case 9:16-cv-00890-LEK-TWD   Document 117   Filed 06/21/19   Page 70 of 219
Adams v. Smith, Not Reported in Fed. Supp. (2018)
2018 WL 1363495

disagreement over a treatment plan and does not implicate the Eighth Amendment").

Here, Plaintiff fails to raise a question of fact indicating that Dr. Mandalaywala knew that his prescribed course of treatment physical therapy and non-prescription pain medication was medically inadequate, or that he had in improper motive in not continuing Plaintiff's Baclofen prescription. That Dr. Mandalaywala differed with the Sing Sing medical providers as to the proper course of treatment for Plaintiff is not evidence of deliberate indifference. "Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference." *Cole v. Goord*, No. 04 CIV. 8906GEL, 2009 WL 1181295, at *8 n.9, 2009 U.S. Dist. LEXIS 37088, at *23 n.9 (S.D.N.Y. Apr. 30, 2009), *aff'd*, 379 Fed.Appx. 28 (2d Cir. 2010) (citing *Estelle v. Gamble*, 429 U.S. 97, 97, 97 (S.Ct. 285, 50 L.Ed.2d 251 1976)).

Nor does the evidence before the Court raise a question of fact as to whether Nurse Administrator Smith acted with a sufficiently culpable mind in refusing to provide Baclofen or in failing to "refer[ ] the matter" to Dr. Mandalaywala. (Dkt. No. 138, at 18 19). Even crediting Plaintiff's assertion that on February 24, 2013, in response to his complaints of extreme pain, spasms, and paresthesia and request for Baclofen, Nurse Administrator Smith told him that he did not "need" Baclofen, she would not give him "any relaxants" and that he "should've thought about [his] pain, before [he] did what [he] did, to come to the Box," (Dkt. No. 124-2, at 12; Dkt. No. 73, ¶ 82), no reasonable fact finder could conclude that she was deliberately indifferent to Plaintiff's medical needs on the basis that she failed to procure Plaintiff's preferred medication. Indeed, even under Plaintiff's version of the facts, subjectively, Nurse Administrator Smith, relying on the course of treatment Dr. Mandalaywala had recommended,[3] did not believe that Plaintiff needed a muscle relaxant. *See Veloz*, 339 F.Supp.2d at 525 (finding medical providers' decision not to prescribe stronger pain medication than Tylenol to address prisoner's back condition did not state a claim for deliberate indifference, explaining that "[t]he Eighth Amendment is not implicated by prisoners' complaints over the adequacy of the care they received when those claims amount to disagreement over the appropriateness of a particular prescription plan."); *Hill*, 657 F.3d at 123

("Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking."). The Court has considered Plaintiff's remaining objections and finds them without merit. Accordingly, the Court concludes that there are no material issues of fact requiring trial and that Defendants are entitled to summary judgment.

[3]     Nurse Administrator Smith states that she did not "examine or treat Plaintiff while he was housed at Upstate. (Dkt. No. 115 12, ¶ 26). In her declaration, she avers that when she received Plaintiff s February 11, 2013 letter concerning a prescription for Baclofen, she, as was her practice when receiving an inmate letter, would have requested "that the nurse caring for the inmate ... provide pertinent information, so that she can respond] to the inmate. (*Id.*, at ¶ 27). In her declaration, Nurse Administrator Smith outlines Plaintiff s medical records, including his complaint of "LBP lower back pain] chronic, the recommendation for physical therapy, and Dr. Mandalaywala s determination not to issue any "new orders, or prescription medication, (*id.* at ¶¶ 38 39), and states that she based her response to Plaintiff s letter denying his request for Baclofen on the information in his medical records. (*Id.* at ¶ 42). Further, although Nurse Administrator Smith states she has "no memory of having ever personally spoken with plaintiff, (*id.* at ¶ 58), assuming, as Plaintiff asserts, that they spoke on February 24, 2013, she would have been aware of his medical record, and that his current treatment plan did not contain a prescription for a muscle relaxant.

## V. CONCLUSION

**\*5 ORDERED** that Magistrate Judge Stewart's Report-Recommendation (Dkt. No. 134) is **ADOPTED** in all respects; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 115) is **GRANTED** and this action is **DISMISSED**; and it is further

**ORDERED** that the Clerk is directed to close this case; and it is further

**ORDERED** that the Clerk serve this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**Adams v. Smith, Not Reported in Fed. Supp. (2018)**
Case 9:16-cv-00890-LEK-TWD   Document 117   Filed 06/21/19   Page 71 of 219
2018 WL 1363495

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1363495

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Williams v. Williams, Not Reported in F.Supp.3d (2015)

2015 WL 568842

2015 WL 568842
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Thomas WILLIAMS, Plaintiff,
v.
Rhondina WILLIAMS and Kelly Keane, Defendants.

No. 13–CV–3154 (RA).
|
Signed Feb. 11, 2015.

*OPINION AND ORDER*

RONNIE ABRAMS, District Judge.

**\*1** Plaintiff Thomas Williams, proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 against Defendants Kelly Keane and Dr. Rhondina Williams, both of whom work at the medical clinic at Sing Sing Correctional Facility, where Plaintiff was incarcerated at all times relevant to this case. Plaintiff alleges that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment when they were deliberately indifferent to his serious medical needs by delaying treatment of his broken finger. Plaintiff filed an amended complaint on March 7, 2014. (Dkt.51.) Defendants each moved to dismiss the amended complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim on which relief may be granted or, alternatively, based on the doctrine of qualified immunity. (Dkt. 59 and 61.) For the reasons that follow, the Court finds that Plaintiff has failed to state a claim on which relief may be granted and, accordingly, Defendants' motions are GRANTED.

[1]     Although Plaintiff named Matt Keane as a defendant in his original complaint, this individual was never served and Plaintiff removed him as a defendant in his amended complaint.

## I. BACKGROUND

For purposes of this motion, the Court accepts as true all facts alleged by Plaintiff. *See Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir.2007). In determining whether Plaintiff states a claim on which relief may be granted, the Court considers facts alleged in his amended complaint, his opposition to Defendants' motions to dismiss, and the medical records attached to his opposition. [2]

[2]     Generally, " c]ourts in this Circuit have made clear that a plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss . *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria,* 265 F .R.D. 106, 122 23 (S.D.N.Y. Jan. 26, 2010) (*citing Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir.1998)). Nevertheless, "the policy reasons favoring liberal construction of *pro se* complaints permit a court to consider allegations of a *pro se* plaintiff in opposition papers on a motion where ... those allegations are consistent with the complaint. *Rodriguez v. McGinnis,* 1 F.Supp.2d 244, 246 47 (S.D.N.Y.1998) (collecting cases); *see also Walker v. Schult,* 717 F.3d 119, 122 n. 1 (2d Cir.2013) (noting that although a court should generally refrain from considering matters outside the pleadings when reviewing a 12(b)(6) motion to dismiss, " a] district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion ).

As noted above, Plaintiff was incarcerated at Sing Sing at all times relevant to his complaint. He alleges that on May 20, 2010, while he was in the clinic awaiting a physical therapy appointment for his spinal problems, he suffered "serious pains throughout his back and neck" that caused him to fall against the wall. (Am. Compl. at 5 ¶ 2.) [3] Plaintiff injured the middle finger on his left hand when he tried to break his fall. (*Id.*) He signed up for sick hall to address, among other concerns, his "left-hand middle finger that swelled up and the bone was poking up under the skin and causing [him] serious pain." (*Id.* ¶ 5.) Although Plaintiff attended morning sick hall the next day, he began to experience "intense" pain and dizziness while he waited to see a nurse and had to return to his cell because he was "unable to sit or stand anymore." (*Id.* ¶ 7.) Plaintiff returned to emergency sick hall that afternoon after a correctional officer saw him in pain in his cell and signed him up. (*Id.* at 6 ¶ 9.)

[3]     For ease of reference and consistency, any citations to specific pages of the Amended Complaint and Plain tiff's Memorandum of Law in Opposition reflect page

number designations made by the Court's Electronic Case Filing system.

Nurse Keane saw Plaintiff in the medical clinic that afternoon Friday, May 21, 2010. He alleges that Nurse Keane was "verbally rude" to him, stating that "she just saw [him] the other day. She can't do anything for [him], [and that] she'll put [him] down to see [his medical provider]." (*Id.* ¶ 11.) She then ordered him to leave the clinic. (*Id.*) Plaintiff alleges that Nurse Keane refused to look at his finger despite his efforts to show her and that she did not note any of his concerns in his medical records. (*Id.* ¶ 13.) There is no record of this visit in the medical records that Plaintiff submitted, which appear to cover his clinic visits and physical therapy sessions between April 29, 2010 and October 21, 2010. (Pl. Opp'n, Exh. A at 17 27.) According to Plaintiff, Nurse Keane "lied about putting [him] in to see [his] medical provider" and never actually made such a referral. (*Id.* at 50, 52.) Although Plaintiff saw a doctor the following business day, he contends that "[t]his appointment was not 'triggered' by any actions on behalf of Nurse Keane. There is no medical report of referral in Plaintiff's medical records reflecting [that] [N]urse Keane ever [saw] plaintiff on May 21, 2010, or scheduled plaintiff to see Dr. Williams on May 24, 2010." (*Id.* at 49.) In his May 21 Inmate Grievance Complaint filed against Nurse Keane, Plaintiff alleges that "at this time, I was in serious pain with [the] wrong low dosage of pain medication of 50 m.g. when I[was] suppose[d] to have 100 m.g. twice a day." (Am. Compl. at 12.) Plaintiff asserts that he returned to his cell in "serious pain" earlier that day, after Nurse Keane intentionally denied him any medical attention or pain medication. (*Id.* at 6 ¶ 15.)

**\*2** Plaintiff was seen by Dr. Williams in the medical clinic on Monday, May 24, at which time he informed her of his finger injury, the serious pain that he was in, and the "swelling and bone sticking up under the skin of [the] finger." (*Id.* at 7 ¶ 18.) Dr. Williams asked whether he could move his finger, to which he responded, "a little." (*Id.* ¶ 19.) She then visually inspected his hand and told him that "there was nothing wrong with [his] finger." (*Id.*) Plaintiff alleges that Dr. Williams did not provide him with any medical treatment, including X-rays or pain medication, for his finger on that day. (*Id.* ¶ 20.)

Plaintiff saw Dr. Williams again 21 days later, on June 14, and informed her that he continued to experience serious pain and injury to his finger. (*Id.* ¶¶ 21 22.) She conducted

a "hands on examination" of his finger and ordered an X-ray of his left hand, which was conducted two days later. (*Id.* ¶ 23.) On June 21, Dr. Williams informed him that the X-ray revealed that his finger was broken and placed a splint on his finger. (*Id.* at 7 8 ¶¶ 25 27.) She also referred Plaintiff to physical therapy for his finger, which he attended from August 30 through October 21. (*Id.* at 8 ¶¶ 28 29.) A report from an X-ray conducted on July 14 indicates that Plaintiff's finger was 70 percent healed after the splint was applied (Pl. Opp'n, Exh. A at 21), and his physical therapy records indicate that his finger was healed upon his discharge on October 21 (*id.,* Exh. B at 38 39). He alleges that Dr. Williams' intentional failure to order an X-ray on May 24 and to increase his pain medication contributed to the serious pain in his finger. (Am. Compl. at 8 ¶ 30.)

Plaintiff alleges that Defendants intentionally deprived him of medical care to treat his broken finger and the resulting pain, and that this deprivation constitutes a deliberate indifference to his serious medical need in violation of the Eighth Amendment. (*Id.* at 3.) Plaintiff alleges that he experiences "present pain and suffering and loss of full strength in [his] left hand." (*Id.* at 3.) He is seeking compensatory and punitive damages in the amount of $500,000. (*Id.* at 9.)

## II. STANDARD OF REVIEW

On a Rule 12(b)(6) motion, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in Plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). "This rule applies with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se." Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002) (*quoting Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Where the plaintiff is *pro se,* his complaint "must be construed liberally with special solicitude and interpreted to raise the strongest claims

that it suggests. Nonetheless, a *pro se* complaint must state a plausible claim for relief." *Hogan v. Fischer,* 738 F.3d 509, 515 (2d Cir.2013) (internal quotation marks and citation omitted). A pleading, whether *pro se* or not, that offers "labels and conclusions" or only provides "naked assertion[s]" devoid of "further factual enhancement" is insufficient to state a claim. *Twombly,* 550 U.S. at 555, 557.

### III. DISCUSSION

#### A. Legal Standards Governing Eighth Amendment Claims of Deliberate Indifference to Serious Medical Needs

**\*3** The Cruel and Unusual Punishment Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates "receive adequate ... medical care." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Significantly, however, "not every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). Rather, Plaintiff must show a "deliberate indifference to [his] serious medical needs," *Estelle v. Gamble,* 429 U.S. 97, 104 (1976), which is understood as the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). A prison official only violates the Eighth Amendment when both the objective and subjective prongs of the test enunciated in *Farmer* are met. Specifically, a prisoner must allege both that (1) he suffered an "objectively, 'sufficiently serious' " deprivation of medical care and (2) the official who caused the harm acted or failed to act with "a sufficiently culpable state of mind," that is, with "deliberate indifference to inmate health or safety." *Farmer,* 511 U.S. at 834.

To determine whether an alleged deprivation is "sufficiently serious" under the objective prong, the Court is required "to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280 (citing *Helling v. McKinney,* 509 U.S. 25, 32 33 (1993)). The inquiry "must be tailored to the specific circumstances of each case." *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003); *see also Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (offering a non-exhaustive list of factors that assist in determining whether a serious medical condition exists). Generally, however, a deprivation is sufficiently serious when it presents "a condition of urgency, one that may produce death,

degeneration, or extreme pain." *Nielsen v. Rabin,* 746 F.3d 58, 63 (2d Cir.2014) (*quoting Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

Where the claim concerns the inadequacy of treatment, as opposed to its complete denial, the seriousness inquiry is "narrower," *Salahuddin,* 467 F.3d at 280, and focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." *Smith,* 316 F.3d at 185. The Second Circuit has found that a delay in medical care constituted a constitutional violation in only limited circumstances, such as where officials deliberately delayed care as a form of punishment, *see Archer v. Dutcher,* 733 F.2d 14, 16 17 (2d Cir.1984), where officials ignored a "life-threatening and fast-degenerating" condition for three days, *see Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) *overruled on other grounds by Caiozzo v. Koreman,* 581 F.3d 63 (2d Cir.2009), and where officials delayed major surgery for over two years, *see Hathaway v. Coughlin,* 841 F.2d 48, 50 51 (2d Cir.1988).

**\*4** With respect to *Farmer* 's subjective prong, a plaintiff must establish that "the charged official act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin,* 467 F.3d at 280. Therefore, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw such an inference.' " *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (*citing Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). An "inadvertent failure to provide adequate medical care" does not constitute deliberate indifference. *Estelle,* 429 U.S. at 105 06. "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim." *Id.* at 106.

#### B. Plaintiff' Deliberate Indifference Claims

Plaintiff alleges that Defendants violated the Eighth Amendment by delaying treatment of his broken finger. His claims are grounded in his allegations that (1) Nurse Keane refused to treat his broken finger during sick hall on May 21, 2010, resulting in a three-day delay in his being seen by medical staff; (2) Dr. Williams failed to order X-rays of his finger during his medical appointment on May 24, 2010, resulting in, at most, a 28 day delay before a splint was applied; and (3) Dr. Williams did not

Case 9:16-cv-00890-LEK-TWD Document 117 Filed 06/21/19 Page 75 of 219
Williams v. Williams, Not Reported in F.Supp.3d (2015)
2015 WL 568842

increase his pain medication to specifically address the "serious pain" to his finger. (*See* Am. Compl. at 6 8.) Taken together, these allegations are insufficient to state a plausible deliberate indifference claim under the Eighth Amendment.

### 1. Plaintiff fails to allege facts showing that he suffered an objectively, sufficiently serious deprivation of medical care

Plaintiff does not allege facts showing that the alleged deprivation in medical care was "sufficiently serious," and he therefore fails to satisfy the objective prong of a deliberate indifference claim. *Salahuddin,* 467 F.3d at 280.

Although the Court is sympathetic to the difficulties Plaintiff faced in obtaining care for his broken finger, along with the swelling, decreased range of motion and "serious pain that accompanied it, this condition cannot support a failure-to-treat deliberate indifference claim. "Courts in this Circuit, as well as in other jurisdictions, consistently have found that a broken finger is not sufficiently serious as a matter of law." *Colon v. City of New York,* No. 08 CV 3142 (HB), 2009 WL 1424169, at *6 (S.D.N.Y. May 21, 2009) (collecting cases); *Rivera v. S.N. Johnson,* No. 95 CV 0845 (JTE), 1996 WL 549336, at *2 (W.D.N.Y. Sept. 20, 1996) ("A broken finger, without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection.").[4] Indeed, Plaintiff recognizes as much in his opposition to Dr. William's motion. (*See* Pl. Opp'n at 7 8; *see also id.* at 50 52.)[5]

[4]   The Court is only aware of one case in this Circuit where a broken finger was found to be sufficiently serious to state a claim. *See Leacock v. New York City Health and Hosp. Corp.,* No. 03 CV 5440 (RMB) (GWG), 2005 WL 1027152 (S.D.N.Y. May 4, 2005). As Magistrate Judge Gorenstein was careful to note in *Leacock,* however, that case involved "involved an allegation that surgery was required due to the lack of proper initial treatment of an injured finger, which distinguished it from the earlier cases where surgery was not at issue. *Id.* at *4, n. 2. Plaintiff here makes no allegation that his condition warranted surgery, nor does he allege any other facts that suggest his condition is outside the realm of those considered in the earlier cases.

[5]   Plaintiff nevertheless contends that the "serious pain he experienced "should be deemed serious for Eighth Amendment purposes pursuant to *Brock.* (Pl. Opp'n at 50 (*citing Brock,* 315 F.3d at 162 63).) *Brock* concerned an inmate whose facial scar was alleged to be "a source of chronic pain that interfere d] with his ability to conduct tasks associated with daily living. 315 F.3d at 163. While the plaintiff in *Brock* was denied any medical care whatsoever for his chronic pain, Plaintiff's allegations of continuing pain here arise in the context of a delay in receiving adequate medical care (*see* Pl. Opp'n at 9 10). As such, they are more appropriately considered under the rubric articulated in *Smith,* which is discussed below.

**\*5** To the extent Plaintiff complains of a delay in receiving medical care, rather than a complete denial of medical care, he fails to satisfy the objective prong because he does not allege that he suffered any "particular risk of harm" due to the delay in receiving medical treatment. *Smith,* 316 F.3d at 186. In considering a delay-in-treatment claim, the Court must focus on the harm or risk of harm caused by the delay in treating his finger, rather than on the severity of the harm in itself. *Id.* Plaintiff does not allege nor do his medical records indicate that the delay in diagnosing and treating his broken finger exacerbated his medical condition, caused infection, or otherwise subjected him to an increased risk of harm. *See id.* at 187 (noting that "the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm").

The primary consequence that Plaintiff identifies as having resulted from the delay in diagnosing and treating his finger was the pain that accompanied his broken finger before he was discharged from physical therapy. (*See* Pl. Opp'n at 7.) These allegations are simply insufficient to support a deliberate indifference delay-in-treatment claim.[6] He does not allege, for example, that the delay substantially risked aggravating his existing condition. *See Smith,* 316 F.3d at 186 87 (noting that plaintiff may state an Eighth Amendment claim for the delay in treating "an otherwise insignificant wound ... if the wound develops signs of infection, creating a substantial risk of injury in the absence of appropriate medical treatment," but will fail to state a claim "where the alleged lapses in treatment [of an admittedly serious medical condition] are minor and inconsequential").

6    Furthermore, Plaintiff was not completely without pain relief during this time since he was on between 50 and 100 m.g. of pain medication. (Am. Compl. at 12.; *see also* Pl. Opp'n at 3, n. *.) Indeed, although his broken finger was not properly diagnosed until June 14 (Am. Compl. at 6 7 ¶¶ 25 27), his medication dosage was increased on May 24 (Pl. Opp'n at 3, n *).

Finally, to the extent that Plaintiff challenges the failure to alter his prescription for pain medication to specifically address the pain associated with his finger injury as opposed to the pain associated with his pre-existing back injury, this claim also fails. In cases challenging the decision regarding the type and quantity of pain medication, courts have repeatedly declined to find that a medical provider was deliberately indifferent to an inmate's medical needs. *See Hill v. Curcione,* 657 F.3d 116 (2d Cir.2011) (holding that an inmate's claim that he needed stronger pain medication did not state a claim for deliberate indifference); *Harris v. Westchester Cnty. Med. Ctr.,* No. 08 CV 1128 (RJH), 2011 WL 2637429, at * 3 (S.D.N.Y. July 6, 2011) (noting that the failure to provide stronger pain medication does not constitute deliberate indifference); *Veloz v. New York,* 339 F.Supp.2d 505, 525 (S.D.N.Y.2004) ("Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment."), *aff'd,* 178 F. App'x 39 (2d Cir.2006); *Fernandez v. Fed. Bureau of Prisons,* No. 99 CV 4944 (VM), 2001 WL 913929, at *2 3 (S.D.N.Y. Aug. 13, 2001) (holding that plaintiff's claim that defendants "ignor[ed] his pleas for medical care for the pain he was experiencing; and [ ] fail[ed] to provide him with adequate pain medication" "cannot satisfy both prongs for establishing deliberate indifference to his medical needs").

  **\*6** In sum, Plaintiff fails to satisfy the objective prong of the deliberate indifference standard because he does not allege facts showing that he suffered from a "serious medical condition" or that he faced a serious risk of harm by the delay in diagnosing and treating his broken finger.

### 2. Plaintiff fails to allege facts showing that Defendants acted with a subjectively "culpable state of mind"

Plaintiff similarly fails to allege facts suggesting that Nurse Keane or Dr. Williams acted or failed to act with a "sufficiently culpable state of mind," and is thus also unable to satisfy the subjective prong of a deliberate indifference claim. *See Farmer,* 511 U.S. at 834.

Plaintiff alleges that Nurse Keane was "verbally rude" to him, and told him that "she can't do anything for [him], she'll put [him] down to see [his medical provider] and ordered him to leave." (Am. Compl. at 6 ¶ 11.) He further alleges that she "refused to look a[t] my lefthand middle finger [when] plaintiff tr[i]ed to show her the swelling and bone sticking up under the skin." (*Id.* ¶ 12.) Nurse Keane's inaction, Plaintiff claims, was "fueled by her feelings that plaintiff was a nuisance to her," which she exhibited by stating that "she just saw [him] the other day." (Pl. Opp'n at 52 53.) Her culpable state of mind, he asserts, is further demonstrated by her failure to note his May 21 clinic visit in his medical records. (*Id.* at 53.) These allegations, while portraying Nurse Keane as ill-mannered, if not insensitive, are insufficient to demonstrate that she was "aware of facts from which the inference could be drawn that a substantial risk of serious harm existed" as a result of Plaintiff's finger injury and that she "dr[e]w [such an] inference." *See Hemmings,* 134 F.3d at 108 (2d Cir.1998).

At best, Plaintiff's allegations suggest that Nurse Keane turned him away from the clinic because she believed that he was a "nuisance" and that his injury was not serious. The law is clear, however, that misdiagnosis and "the decision not to treat based on an erroneous view that the condition is benign or trivial" do not constitute deliberate indifference to Plaintiff's serious medical needs. *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000); *see also Estelle,* 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). What is missing from Plaintiff's allegations is some basis to suggest that Nurse Keane knew of and disregarded an excessive risk to his safety. For example, there is no suggestion that Nurse Keane "refused to verify underlying facts that [she] strongly suspected to be true, or declined to confirm inferences of risk that [she] strongly suspected to exist." *Farmer,* 511 U.S. at 843.

Plaintiff also fails to satisfy the subjective prong against Dr. Williams. Plaintiff alleges that Dr. Williams delayed in providing him adequate medical care when she did not properly diagnose his broken finger, order an X-ray during his May 24 appointment, or increase his pain medication to adequately address the pain in his finger. (*See* Am. Compl. at 7 ¶¶ 17 20.) Plaintiff acknowledges, however, that Dr. Williams ordered X-rays the following

month and, upon detecting that his finger was broken, applied a splint to his finger and referred him to physical therapy. (*See* Am. Compl. at 7 8 ¶¶ 25 27.) These allegations do not suggest that Dr. Williams was deliberately indifferent to Plaintiff' serious medical needs.

**\*7** At their strongest, Plaintiff's allegations suggest that Dr. Williams negligently misdiagnosed his broken finger during his May 24 visit and that Plaintiff disagreed with the course of treatment that he received from Dr. Williams. [7] Without more, as already noted, allegations of a negligent misdiagnosis do not satisfy the subjective requirement of the deliberate indifference analysis because they do not suggest that the defendant acted with a conscious disregard to inmate health or safety. *See Estelle,* 429 U.S. at 106; *Harris v. Westchester Cnty. Med. Ctr.,* No. 08 CV 1128 (RJH), 2011 WL 2637429, at \*3 (S.D.N.Y. July 6, 2011) ("Allegations of ... misdiagnosis do not state a cause of action under the Eighth Amendment.") (quotation marks and citation omitted). Moreover, courts have consistently held that a disagreement over the course of medical treatment, such as the amount or type of pain medication prescribed, which often turns on issues of medical judgment, is insufficient to demonstrate that a defendant acted with a "sufficiently culpable state of mind" to support an Eighth Amendment claim. *See supra* pp. 11 12.

[7]      Indeed, Plaintiff quite clearly alleges that "Dr. Williams in fact carelessly misdiagnosed his broken finger and serious pain  and that "clearly her actions were] not based on any well establishe d] medical standards.  (Pl. Opp'n at 10.)

Plaintiff also alleges that Dr. Williams demonstrated a "reckless culpable mental state" by failing to note his complaints regarding his finger in his May 24 medical record. (Pl. Opp'n at 11 .) This is similarly insufficient to suggest that Dr. Williams "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin,* 467 F.3d at 280 (*citing Farmer,* 511 U.S. at 836 37). Even though it appears that Dr. Williams did not make any notations in his medical records, Plaintiff does not allege that she completely ignored his complaints about his finger. Rather, he alleges that she responded to his complaint by inquiring about his range of motion and conducting a visual inspection of his finger. (Am. Compl. at 7.) While Plaintiff may have hoped for a different course of treatment, "the essential test is one of medical necessity and not one simply of desirability."

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) (*citing Woodall v. Foti,* 648 F.2d 268, 272 (5th Cir.1981)).

In sum, and without overlooking the difficulty that "intent is rarely susceptible to direct proof," *Nielsen,* 746 F.3d at 63 (*quoting Hayden v. Paterson,* 594 F.3d 150, 163 (2d Cir.2010)), Plaintiff has failed to allege that either Nurse Keane or Dr. Williams acted with the requisite state of mind to satisfy the subjective prong of a deliberate indifference claim.

## IV. CONCLUSION

Although the Court has been mindful to afford Plaintiff' complaint the liberal interpretation that it is due, Plaintiff nevertheless has failed to state a plausible Eighth Amendment claim against Nurse Keane or Dr. Williams because he does not allege facts showing that they were responsible for a "sufficiently serious deprivation of medical care," or that they "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 836 37). Accordingly, Defendants' motions to dismiss Plaintiff's amended complaint are GRANTED. [8] In these circumstances, the Court finds it unnecessary to consider Defendants' arguments concerning qualified immunity.

[8]      In his opposition to Nurse Keane's motion to dismiss, Plaintiff alleges that Nurse Keane violated his rights set forth in the "Patient's Bill of Rights  and the "Health Service Policy Manual  (Pl. Opp'n at 49.) To the extent that this can be construed as an assertion of state law claims against Nurse Keane, the Court declines to exercise supplemental jurisdiction over such claims. *See Marcus v. AT & T Corp., et al.,* 138 F.3d 46, 57 (2d Cir.1998) ("In general, where federal claims are dismissed before trial, the state claims should be dismissed as well.  ).

**\*8** Although, as a general rule, "[a] *pro se* complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (internal brackets and quotation marks omitted), "leave to amend a complaint may be denied when amendment would be futile." *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 491 (2d Cir.2006) (*citing Ellis v.*

2015 WL 568842

*Chao,* 336 F.3d 114, 127 (2d Cir.2003)). Here, Plaintiff has already amended his complaint once in response to Defendants' initial motion to dismiss (*see* Dkt. 46 & 50), and the Court has no basis to conclude that a further opportunity to amend would assist Plaintiff in stating a viable claim. Accordingly, the Court declines to grant leave to amend.

The Clerk of Court is respectfully directed to terminate the motions at Dkt. 59 and 61 and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 568842

---

**End of Document**                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 6747392
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Basheen RUSH, Plaintiff,
v.
Brian FISCHER, et al., Defendants.

No. 09 Civ. 9918(JGK).
|
Dec. 23, 2011.

*MEMORANDUM OPINION AND ORDER*

JOHN G. KOELTL, District Judge.

**\*1** The plaintiff, Basheen Rush, who is currently incarcerated at Sing Sing Correctional Facility ("Sing Sing"), brings this motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a). The plaintiff seeks an injunction enjoining the defendants from denying him an effective course of medical treatment for the chronic wrist and back pain he suffers and ordering the defendants to reinstate his prior medication regimen, which included the prescription of Percocet.

**I.**

The plaintiff, Basheen Rush, is currently incarcerated at Sing Sing. The plaintiff suffers from extreme and chronic pain in his back and wrist. (Aff. of Basheen Rush in Supp. of Pl.'s Mot. for Prelim. Inj. ("Rush Aff.") ¶¶ 2–3.)

The plaintiff arrived at Sing Sing on October 6, 2011, after being transferred from Coxsackie Correctional Facility ("Coxsackie"). (Rush Aff. ¶ 1; Decl. of Razia Ferdous, M.D. in Opp. to Pl.'s Mot. for Prelim. Inj. ("Ferdous Decl.") ¶ 7.) At Coxsackie, the plaintiff had been prescribed Percocet to manage his pain and was taking 5/325 mg twice a day, with instructions that the medication be administered in liquefied form and consumed by the plaintiff in front of medical staff. (Ferdous Decl. ¶ 6.) Upon his transfer to Sing Sing, the plaintiff was initially continued on Percocet. (Ferdous Decl. ¶ 7.) However, on October 11, 2011, the plaintiff had a follow-

up appointment with a medical provider, who explained that the plaintiff would be weaned off Percocet over a two-week period. (Ferdous Decl. ¶ 8.) On October 27, 2011, the plaintiff was discontinued from Percocet. (Ferdous Decl. ¶ 9.)

The defendants submit a declaration from Dr. Razia Ferdous who states that, to replace Percocet, the plaintiff was given Baclofen twice a day in combination with Ibuprofen. (Ferdous Decl. ¶ 8.) Dr. Ferdous states that Baclofen is a non-narcotic pain medication used to treat back pain and muscle strain which is effective in managing pain when used in combination with Ibuprofen. (Ferdous Decl. ¶ 8.) The plaintiff contends that he is no longer receiving the Baclofen and Ibuprofen and that he is currently not being provided with any pain medication. (Letter of Basheen Rush dated Nov. 23, 2011.)

The plaintiff brings this motion for a preliminary injunction enjoining the defendants from denying him an effective course of medical treatment to manage his pain. In particular, the plaintiff seeks to have his prior course of treatment, in which he was prescribed Percocet, reinstated.

**II.**

**A.**

The standards that govern the issuance of a preliminary injunction are well established. Ordinarily, a party seeking a preliminary injunction must show: "(1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008). However, "[w]here a moving party challenges governmental action taken in the public interest pursuant to a statutory or regulatory scheme," as does the plaintiff here, "the moving party cannot resort to the 'fair ground for litigation' standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits." *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996) (internal quotation marks and citations omitted).

**\*2** Moreover, where the plaintiff seeks a mandatory injunction one that "alter[s] the status quo by

Case 9:16-cv-00890-LEK-TWD   Document 117   Filed 06/21/19   Page 80 of 219
Rush v. Fischer, Not Reported in F.Supp.2d (2011)
2011 WL 6747392

commanding some positive act" an even higher standard applies. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 34 (2d Cir.1995). Namely, the plaintiff must make a "clear" or "substantial" showing of likelihood of success on the merits or show that "extreme or very serious damage" would result in the absence of preliminary relief. *Jolly,* 76 F.3d at 473; *Tom Doherty,* 60 F.3d at 33 34; *Cherry River Music Co. v. Simitar Entm't Inc.,* 38 F.Supp.2d 310, 316 (S.D.N.Y.1999). In this case, the relief sought by the plaintiff is properly characterized as a mandatory rather than a prohibitory injunction. The plaintiff seeks an injunction that would alter the status quo by departing from his current course of treatment and ordering the reinstatement of his prior medication regimen which included the prescription of Percocet. *See Jolly,* 76 F.3d at 474 (injunction sought by prisoner was properly characterized as mandatory injunction where relief requested would have required shift in established Department of Correctional Services policy). Accordingly, the plaintiff must meet this more stringent standard.

Because the plaintiff is proceeding pro se, his submissions must be "read liberally and should be interpreted 'to raise the strongest arguments that they suggest.' " *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

### B.

The plaintiff claims that the defendants violated the Eighth Amendment by providing him with inadequate medical treatment. "The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). In order to prevail on a deliberate indifference claim, a prisoner must satisfy a two-part test: first, the "objective" prong requires that the deprivation be "sufficiently serious"; and second, the "subjective" prong requires that the charged official act with a "sufficiently culpable state of mind." *See, e.g., Salahuddin,* 467 F.3d at 279 80; *Johnson v. Wright,* 412

F.3d 398, 403 (2d Cir.2005); *Chance,* 143 F.3d at 702. With respect to this second prong, the prisoner must show more than mere negligence in diagnosis or treatment. *See Estelle,* 429 U.S. at 105 06; *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003). Instead, the prisoner must show that the official "[knew] of and disregard[ed] an excessive risk to inmate health or safety ...." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Chance,* 143 F.3d at 702; *Smith,* 316 F.3d at 184.

**\*3** In this case, the plaintiff asserts that the defendants acted with deliberate indifference to his serious medical needs when they discontinued his course of treatment which had included the prescription of Percocet. However, although the plaintiff was taken off Percocet, he was provided with another medication regimen consisting of Baclofen and Ibuprofen to manage his pain. (Ferdous Decl. ¶ 8.) The decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs. *See, e.g., Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011) (prisoner's claim that Motrin medication was insufficient and that stronger pain medication was required for his wrist injuries did not state a deliberate indifference claim); *Reyes v. Gardener,* 93 F. App'x 283, 285 (2d Cir.2004) (summary order) (defendants' decision to prescribe Tylenol or Motrin to manage prisoner's pain and to administer Demerol or Morphine only when necessary did not constitute deliberate indifference); *Harris v. Westchester Cnty. Med. Ctr.,* No. 08 Civ. 1128, 2011 WL 2637429, at \*3 (S.D.N.Y. July 6, 2011) ("The failure to provide stronger pain medication does not constitute deliberate indifference."); *Wright v. Genovese,* 694 F.Supp.2d 137, 160 (N.D.N.Y.2010) ("Differences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs."); *Veloz v. New York,* 339 F.Supp.2d 505, 525 (S.D.N.Y.2004) (medical providers' decision not to prescribe stronger pain medication than Tylenol to address prisoner's back condition did not state a claim for deliberate indifference); *Ortiz v. Makram,* No. 96 Civ. 3285, 2000 WL 1876667, at \*9 10 (S.D.N.Y. Dec.21, 2000) (doctor's decision to prescribe Motrin in lieu of Percocet for prisoner's medical condition did not amount to deliberate indifference, even when that decision contravened recommendation of specialist).

1    In his reply papers in connection with this motion, the plaintiff asserts that he is no longer receiving the Baclofen and Ibuprofen to treat his pain and that he has been provided with no pain medication at all. (Letter of Basheen Rush dated Nov. 23, 2011 .) However, the plaintiff submits no affidavit or medical records to support this assertion, other than two labels from his prescriptions indicating that there were to be "(0) Refills. (Letter of Basheen Rush dated Nov. 23, Ex. 1.) In contrast, the declaration of Dr. Ferdous indicates that the plaintiff has been and continues to be provided with a nonnarcotic alternative to manage his pain. (Ferdous Decl. ¶¶ 4, 8, 11.) If in fact the plaintiff is denied all pain medication in the future, he can renew his motion for a preliminary injunction at that time.

The plaintiff has made no showing that the decision to prescribe Baclofen and Ibuprofen in lieu of Percocet deviated from reasonable medical practice for the treatment of his pain, much less that the defendants acted with a culpable state of mind in making this decision. To the contrary, Dr. Ferdous asserts that discontinuing the use of Percocet minimizes health risks such as liver damage that can result from prolonged use of Percocet and avoids the possibility of abuse of narcotic pain medication. (Ferdous Decl. ¶ 5.) The plaintiff's allegations demonstrate a "mere disagreement over the proper treatment" of his pain, which "does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703; *see also Veloz,* 339 F.Supp.2d at 525 ("The Eighth Amendment is not implicated by prisoners' complaints over the adequacy of the care they received when those claims amount to disagreement over the appropriateness of a particular prescription plan."). "Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking." *Hill,* 667 F.3d at 123.

**\*4** Thus, the plaintiff has not demonstrated a likelihood of success on the merits, much less a "clear" or "substantial" showing to this effect. Because the plaintiff must demonstrate a likelihood of success on the merits in order to obtain an injunction challenging governmental action, *Jolly,* 76 F.3d at 473, the plaintiff's motion for a preliminary injunction is **denied.** [2] The denial is **without prejudice** because the plaintiff may renew the motion if he is denied adequate medical treatment in the future.

2    The defendants also contend that the motion for a preliminary injunction should be denied because the plaintiff has failed to serve the proper defendants and has failed to allege that the defendants were personally involved in the purported constitutional deprivation. Because the Court denies the motion for a preliminary injunction on the meri ts, it is unnecessary to reach these arguments.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the reasons explained above, the plaintiff's motion for a preliminary injunction is **denied without prejudice.**

## SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2011 WL 6747392

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:16-cv-00890-LEK-TWD    Document 117    Filed 06/21/19    Page 82 of 219
Harris v. Westchester County Medical Center, Not Reported in F.Supp.2d (2011)
2011 WL 2637429

2011 WL 2637429
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Robert HARRIS, Plaintiff,
v.
WESTCHESTER COUNTY MEDICAL
CENTER, Dr. McGill, Westchester County
Department of Corrections, Superintendent
Rocco Pozzi, NP—Maria Taylor and
PA—Norris Nosworthy, Defendants.

No. 08 Civ. 1128(RJH).
|
July 6, 2011.

### MEMORANDUM OPINION AND ORDER

RICHARD J. HOLWELL, District Judge.

**\*1** Plaintiff *pro se* Robert Harris, currently incarcerated at Oneida Correctional Facility, commenced this action on February 4, 2008, alleging deliberate indifference to his medical needs in violation of 42 U.S.C. § 1983. Now before the Court is defendants' motion to dismiss. For the reasons that follow, that motion is GRANTED.

### BACKGROUND

For the purposes of this motion, the following facts are taken as true.

On May 15, 2007, Harris injured his left pinky finger while playing basketball. (Third Amended Complaint ("Compl.") at unnumbered pg. 4.) He was seen that day by the medical staff at Valhalla Correctional Facility ("Valhalla"), where he was then incarcerated, given ibuprofen, and returned to his cell. (Typewritten Attachment to Compl. ("Compl.Attach.") at unnumbered pg. 1.) Every night, Harris was given ibuprofen until May 22, 2007, when he was given an x-ray examination. (*Id.*) Harris alleges that he was in "constant and unbated [sic] pain" during that time. (*Id.*)

On May 22, 2007, Nurse Practitioner Maria Taylor took x-rays of Harris's hand, which showed no broken bones. (*Id.*) She then gave Harris ibuprofen despite his protests that ibuprofen left him in pain. (*Id.*) A day or two later, Harris requested stronger medication, but Taylor denied his request. (*Id.*)

On May 25, 2007, Harris underwent another x-ray exam, and Taylor told him that he had a severe dislocation and torn ligaments in his left pinky finger. (*Id.*) Harris again requested stronger medication, but Taylor denied the request. (*Id.*)

About two months later, Harris was taken to Westchester County Medical Center, where Dr. McGill performed surgery on his left pinky. (*Id.* at 3.) In doing so, McGill inserted a pin in Harris's pinky without informing Harris that he would do so. (*Id.* at 3, 4.) Harris alleges that as a consequence, his finger is permanently bent, and he cannot straighten it out. (*Id.* at 3.) Harris was returned to Valhalla, seen at the infirmary, was sent back to general population "even though [he] was heavily sedated, groggy, and in severe pain." (*Id.*) Harris requested to stay overnight in the infirmary, but that request was denied. (*Id.*) His placement in general population was in the top tier, meaning that he "had to walk down the stairs to get [his] food," and was "bumped into by other inmates which caused [him] severe pain in his left pinky." (*Id.*) When it was time to receive his pain medication, Physician Assistant Norris Nosworthy gave him Tylenol "instead of the Vicodin that Dr. McGill prescribed." (*Id.*)

Harris's pinky was bandaged and tied to his ring finger. (*Id.* at 3, 4.) Harris was told that the bandages would be on for six to eight weeks, but they were on for twelve weeks. (*Id.* at 4.) His ring finger also became stiff during this time. (*Id.*)

The bandages were removed on October 24, 2007, and two weeks later Harris went to physical therapy. (*Id.*) He attended physical therapy at Valhalla two or three times, where the physical therapist informed him that he "should be able to get [his] ring finger back but [his] left pinky will never be the same" and that "form [sic] the looks of your pinky the surgery did'nt [sic] go well." (*Id.*) On February 16, 2008, Harris was transferred to Elmira Correctional Facility ("Elmira"). (*Id.*) While incarcerated there, he underwent physical therapy for about two months at Five Points Correctional Facility, since Elmira did not have

physical therapy. (*Id.* at 5.) Harris's complaint states that he "still cannot bend [his] left pinky or ring finger as of today." (*Id.*)

**\*2** Harris commenced this action on February 4, 2008. By order dated that same day, Judge Kimba M. Wood directed Harris to file an amended complaint within sixty days of the order addressing certain deficiencies in the complaint and advised Harris that failure to do so would result in dismissal. (ECF No. 3.) Specifically, Judge Wood found that Harris's allegations in his original complaint, namely that the initial x-rays showed no broken bones, that a subsequent x-ray showed severe dislocation, and that surgery was not performed until some months later failed to show deliberate indifference. (*Id.* at 3.) Harris did not timely file an amended complaint, and the complaint was dismissed without prejudice on April 11, 2008. (ECF No. 4.) On January 12, 2009, Harris moved to reopen his case, and his motion was granted by Judge Leonard B. Sand on February 6, 2009. (ECF Nos. 6, 7.) Judge Sand directed Harris to file an amended complaint within sixty days of his order, which Harris did on March 31, 2009. (ECF No. 8.) Judge Loretta A. Preska then granted Harris leave to file a second amended complaint on September 30, 2009, which Harris did on November 30, 2009. (ECF Nos. 9, 10.) The case was then reassigned to the undersigned, and Harris requested permission to file a third amended complaint to identify the Jane and John Does in his complaint. (ECF No. 13.) The Court granted him permission to do so, and he did on May 28, 2010. (*See* ECF Nos. 13 15.) On January 3, 2011, defendants brought this motion to dismiss the complaint. Prior to the resolution of this motion, Harris requested appointed counsel on April 26, 2011. (ECF No. 29.) On May 4, 2011, Magistrate Judge Kevin Nathaniel Fox denied the application, finding that Harris's complaint lacked sufficient merit to warrant appointing counsel. (ECF Nos. 29, 30.)

**DISCUSSION**

**I. Standard of Review for Motion to Dismiss**
To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir.2010) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). If the factual averments permit no reasonable inference stronger than the "mere possibility of misconduct," the complaint should be dismissed. *Starr,* 592 F.3d at 321 (quoting *Iqbal,* 129 S.Ct. at 1950). Thus, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 557). In applying this standard of facial plausibility, the Court takes all "factual allegations to be true and draw[s] all reasonable inferences in the plaintiff's favor. *Harris v. Mills,* 572 F.3d 66, 71 (2d Cir.2009). But the Court does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Iqbal,* 129 S.Ct. at 1949.

**\*3** "[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). Accordingly, "the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 475 (2d Cir.2006) (internal quotation marks and emphasis omitted).

**II. Judge Wood's February 4, 2008 Order**
As an initial matter, defendants contend that plaintiff's complaint should be dismissed because he "did not file the third amended complaint until well after the 60 day time limitation established by Judge Wood." (Def.'s Mem. at 5.) But this ignores the procedural history of this case after that order, detailed above. Numerous other court orders authorized Harris's first, second, and third amended complaints, and this argument is therefore unavailing.

**III. Failure To State a Claim**
Harris's action arises under 42 U.S.C. § 1983 and alleges inadequate medical care. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). "The standard of deliberate indifference includes both subjective and objective components." *Id.* "Objectively, the alleged deprivation must be sufficiently

serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (internal quotation marks omitted). "[T]he subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)). "[M]ere allegations of negligent malpractice do not state a claim of deliberate indifference," although "certain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable recklessness." *Id.*

Harris's claim fails to meet this standard. Assuming *arguendo* that the injury to his finger constitutes a sufficiently serious medical condition, the claim of deliberate indifference is based on: (1) Taylor's initial misdiagnosis of his finger injury; (2) Taylor's failure to provide him stronger pain medication; (3) Dr. McGill's surgery on the finger; (4) Nosworthy's disbursement of Tylenol instead of Vicodin; and (5) the failure to provide an overnight stay in the infirmary. None of these allegations, however, rise to the level of deliberate indifference. As for misdiagnosis, without more, "[a]llegations of negligent treatment and misdiagnosis do not state a cause of action under the Eighth Amendment." *Anderson v. Lapolt,* No. 9:07 CV 1 184, 2009 WL 3232418, at *13 (N.D.N.Y. Oct. 1, 2009); *accord Burgess v. Cnty. of Rensselaer,* No. l:03 CV 00652 (NPM RFT), 2006 WL 3729750, at *8 (N.D.N.Y. Dec. 18, 2006) ("[A] claim of misdiagnosis, faulty judgment, or malpractice without more to indicate deliberate indifference, is not cognizable under section 1983."). The failure to provide stronger pain medication does not constitute deliberate indifference. *See Veloz v. New York,* 339 F.Supp.2d 505, 525 (S .D.N.Y.2004) ("Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment."); *Fernandez v. Fed. Bureau of Prisons,* No. 99 Civ. 4944(VM), 2001 WL 913929, at *2 3 (S.D.N.Y. Aug. 13, 2001) (finding that when plaintiff based his claim on defendants' "(1) not choosing to follow the Aftercare Suggestions; (2) ignoring his pleas for medical care for the pain he was experiencing; and (3) failing to provide him with adequate pain medication" that such pleadings "cannot satisfy

both prongs for establishing deliberate indifference to his medical needs"). Harris's allegations regarding the quality of Dr. McGill's surgery, or of adverse consequences from the surgery also do not amount to plausible allegations of deliberate indifference. *See Martinez v. Ravikumar,* 616 F.Supp.2d 455, 459 (S.D.N.Y.2009) ("Martinez does not allege that Ravikumar knew of and disregarded an excessive risk to her health and safety while conducting the surgery .... Rather, she alleges that Ravikumar's treatment and diagnoses were not effective. At most, Martinez alleges that Ravikumar was negligent in his performance of the surgery and subsequent examinations. Such allegations do not give rise to a valid claim of medical mistreatment under the Eighth Amendment."); *see also Middleton v. Falk,* No. 9:06 CV 1461 (GTS/DRH), 2009 WL 666397, at *8 (N.D.N.Y. Mar. 10, 2009) ("Any adverse effects which Middleton suffered as a consequence of the surgery required to attempt to correct his serious retinal detachment are, at best, negligence. As noted, negligence is insufficient to sustain a claim under the Eighth Amendment."). Nor do Harris's allegations that Nosworthy gave him Tylenol instead of Vicodin show deliberate indifference; these allegations state only the bare fact that she took those actions, and give no reason to suspect that Nosworthy acted for reasons that would subject her to Eighth Amendment liability. *See Ravenell v. Van der Steeg,* No. 05 Civ. 4042(WHP), 2007 WL 765716, at *6 (S.D.N.Y. Mar. 14, 2007) ("That Magill disagreed with Foster does not transform Foster's conservative recommendation into cruel and unusual punishment. The question of what diagnostic techniques and treatments should be administered to an inmate is a 'classic example of a matter for medical judgment'; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients." (quoting *Estelle,* 429 U.S. at 107)); *McKenna v. Wright,* No. 01 Civ. 6571(WK), 2002 WL 338375, at *8 (S.D.N.Y. Mar. 4, 2002) ("The mere fact that the defendant physicians may have made a different medical decision with respect to Plaintiff's treatment than that purportedly recommended by Dr. Maliakkal does not indicate that they acted for culpable reasons."). Finally, Harris's complaint cites only his disagreement with the medical judgment of the prison infirmary staff in being transferred from the infirmary to general population after his surgery as a reason to infer deliberate indifference from that decision. (*See* Compl. Attach. at 3 ("What baffles me is that I was placed in the infirmary the night before the surgery, but the actual day of the surgery when I returned,

2011 WL 2637429

I was placed in general population.").) The complaint does not identify any details indicating deliberate indifference apart from plaintiff's own opinion that he was too sedated and groggy to be placed in general population. But the case law is clear that plaintiff's mere disagreement with the medical judgment of the prison's medical staff, even if it amounts to negligence on the staff's part, does not amount to a constitutional violation. *See, e.g., Berry v. Wright,* No. 04 CV 0074 (SR), 2011 WL 231626, at *4 (W.D.N.Y. Jan. 24, 2011) ("While plaintiff may disagree with the decisions made by the defendants in their treatment of him, it is well-settled that an issue of medical judgment is 'precisely the sort of issue that cannot form the basis of a deliberate indifference claim.' " (quoting *Hernandez v. Keane,* 341 F.3d 137, 147 (2d Cir.2003))); *see also Chance,* 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.... Moreover, negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.").

**\*4** Accordingly, Harris has failed to plead a constitutional violation in his complaint. As Harris has already amended his complaint three times after being informed of the deficiencies in his original complaint by Judge Wood, dismissal with prejudice is appropriate at this stage of the litigation. *See, e.g., Denny v. Barber,* 576 F.2d 465, 471 (2d Cir.1978) (plaintiff was not entitled to "a third go-around"); *Treppel v. Biovail Corp.,* No. 03 Civ. 3002 (PKL), 2005 WL 2086339, at *12 (S.D.N.Y. Aug. 30, 2005) ("[T]he Court finds that leave to amend would be futile because plaintiff has already had two bites at the apple and they have proven fruitless.").

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss **[22]** is GRANTED and the action is dismissed with prejudice. The Clerk of the Court is requested to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2637429

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3357171
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Shawn D. THOMAS, Plaintiff,

v.

WESTCHESTER COUNTY, Correct Care
Solutions LLC, Westchester County Correctional
Officer VAL # 1439, Individually and in his
Official Capacity, Dr. Paul Adler, Individually
and in his Official Capacity, and New York
Correct Care Solutions P.C., Defendants.

No. 12–CV–6718 (CS).
|
July 3, 2013.

**Attorneys and Law Firms**

Shawn D. Thomas, pro se.

James C. Freeman, Kent Hazzard, LLP, White Plains,
NY, for Defendants Correct Care Solutions LLC, New
York Correct Care Solutions P.C., and Dr. Paul Adler.

*OPINION AND ORDER*

SEIBEL, District Judge.

**\*1** Before the Court is the Motion to Dismiss of
Defendants Correct Care Solutions LLC ("CCS"), New
York Correct Care Solutions P.C. ("NYCCS"), and
Dr. Paul Adler pursuant to Federal Rule of Civil
Procedure 12(b)(6). (Doc. 16.) For the following reasons,
Defendants' Motion is GRANTED.

**I. Background**
For the purposes of the present Motion, the Court accepts
as true the facts (but not the conclusions) stated in
Plaintiff's Amended Complaint ("AC"), (Doc. 8).

Plaintiff was incarcerated at the Westchester County Jail
("WCJ") in Valhalla, New York on August 9, 2011, (AC
3.1),   at which time he had an open wound in his ankle
from a shooting at close range in April 2010,[2] which
required daily bandage changing to prevent infection, (*id.*

Exs. 4, 20). Prior to his incarceration, Plaintiff had twelve
surgeries on his ankle, faced "life threatening" infections
in his wound, and developed a chronic need for pain
medication. (*Id.* Ex. 20.)

[1]     Page 3.1 refers to the first of the three pages of the
       AC's "Facts  section.

[2]     Plaintiff alleges that he told the nurse at his medical
       screening on August 10, 2011, that he had been shot
       in the heel two months previously, (AC 3.1), but the
       exhibits he attaches to the AC  including medical
       records from North Bronx Healthcare Network, (*id.*
       Exs. 5, 6), and Plaintiff's own statement, (*id.* Ex. 20)
       make clear that the shooting occurred approximately
       fifteen months before his incarceration.

At his initial medical screening, Plaintiff informed the
nurse that he was taking ten milligrams of Percocet
three times daily, which was effective for his "severe
pain." (*Id.* at 3.1.) The nurse responded that "we only give
[M]otrin or [T]ylenol," and put Plaintiff on the list to see
a doctor. (*Id.*) Plaintiff subsequently met with Dr. Paul
Adler,[3] who refused to prescribe him stronger medication
despite Plaintiff's assertion that Motrin was ineffective
in alleviating his pain; Dr. Adler allegedly stated that,
"[T]his department is cheap they'LL [*sic* ] just prolong
so it becomes someone else's problem sorry." (*Id.* at 3.1
3.2.) In response to Plaintiff's concern about the effect
of taking extended doses of Motrin, Dr. Adler explained
that switching between Tylenol and Motrin would avoid
any liver damage. (*Id.* at 3.2.) Plaintiff further informed
Dr. Adler that his injury required at least daily cleaning,
and he alleges that CCS failed to clean the wound on
"numerous occasions," "causing ... an infection which
is now a[n] ulcer on [his] right ankle heel injury." (*Id.*)
Plaintiff also specifically alleges that two nurses refused to
change his bandages on January 3, 2012. (*Id.* Ex. 4.)

[3]     Plaintiff states in his reply brief that Dr. Adler was
       removed as medical director at WCJ for drinking
       alcohol on the job and bringing contraband into
       the facility. (*See* Plaintiff ']s Memorandum of Law
       in Opposition to Defendant s'] Motion to Dismiss,
       (Doc. 21), 8.) This allegation is not contained in the
       AC, but even if it were, it is unsupported by facts and,
       in any event, irrelevant.

On August 21, 2011, Plaintiff alleges that he suffered
further injury to his ankle when a corrections officer closed
a door on him. (*Id.* at 3.2.) He immediately requested

medical attention but did not receive it until thirty minutes later, whereupon he was given Motrin and was scheduled for an X-ray with an outside provider. (*Id.; see id.* Exs. 3, 15.) On August 23, 26, and 29, 2011, Plaintiff received X-rays of his foot, which revealed a previous fracture of the heel bone in the process of healing. (*Id.* Exs. 10, 12, 13.) Plaintiff alleges that he did not receive the X-rays of his chest, lower back, and lower neck that he requested following the door incident. (*Id.* Ex. 18.) Plaintiff also received two orthotic shoes on August 23, 2011, (*id.* Ex. 2), but he alleges that he has not yet received the physical therapy that he requires for his injury, (*id.* at 3.3).

**\*2** Plaintiff brings a claim against CCS, NYCCS, and Dr. Adler under 42 U.S.C. § 1983 for deliberate indifference to his medical needs, as well as a *Monell* claim against CCS and NYCCS for engaging in a pattern or practice of constitutional violations. (*See id.* at 3.3.)

## II. *Legal Standard*

### A. Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929).[4] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal,* 556 U.S. at 678 79.

---

[4] Defendants erroneously cite to a case that relies on the antiquated "no set of facts pleading standard articulated in *Conley v. Gibson,* 355 U.S. 41, 45 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *overruled by Twombly,* 550 U.S. at 563. (Defendant's *sic* ] Memorandum

of Law in Support of Motion to Dismiss Plaintiff's Amended Complaint ("Ds' Mem. ), (Doc. 18), 4.) As the Supreme Court stated in *Twombly,* the "no set of facts standard "has earned its retirement .... and] is best forgotten as an incomplete, negative gloss on an accepted pleading standard.... In the future, Defendants should cite the current legal standard for evaluating Rule 12(b)(6) motions set forth in *Twombly* and *Iqbal.* Indeed, given that the correct standard is more favorable to Defendants than the *Conley* standard, defense counsel's reference to the old standard is baffling.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not 'shown' 'that the pleader is entitled to relief.' " *Id.* (alteration omitted) (quoting Fed.R.Civ.P. 8(a)(2)).

*Pro se* complaints are held to less stringent standards than those drafted by lawyers, even following *Twombly* and *Iqbal. See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam); *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). But while pleadings of a *pro se* party should be read " 'to raise the strongest arguments that they suggest,' " *Kevilly v. New York,* 410 F. App'x 371, 374 (2d Cir.2010) (summary order) (quoting *Brownell v. Krom,* 446 F.3d 305, 310 (2d Cir.2006)), dismissal of a *pro se* complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements, *see Rodriguez v. Weprin,* 116 F.3d 62, 65 (2d Cir.1997); *accord Honig v. Bloomberg,* No. 08 CV 541, 2008 WL 8181103, at \*4 (S.D.N.Y. Dec.8, 2008), *aff'd,* 334 F. App'x 452 (2d Cir.2009).[5]

---

[5] Copies of all unpublished decisions cited herein will be sent to the *pro se* Plaintiff, along with a copy of this Opinion and Order.

### B. Documents Considered on a Motion to Dismiss

**\*3** When deciding a motion to dismiss, the Court's "review is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007); *see Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006). There are limited circumstances, however, when it is appropriate for a court to consider documents outside of the complaint on a motion to dismiss. *See Weiss v. Inc. Vill. of Sag Harbor,* 762 F.Supp.2d 560, 567 (E.D.N.Y.2011) (court may properly consider documents "integral" to complaint, documents relied upon in drafting complaint, public documents, and facts of which judicial notice may be taken). When matters outside the pleadings that do not fall into these limited categories are included in a response to a 12(b)(6) motion, "a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment ... and afford all parties the opportunity to present supporting material." *Friedl v. City of N.Y.,* 210 F.3d 79, 83 (2d Cir.2000) (internal quotation marks omitted).

Here, Defendants submitted the Affidavit of Paul Adler, D.O., (Freeman Decl. Ex. C), [6] with their motion papers, stating only that extrinsic documents that are integral to Plaintiff's claims may be considered on a Rule 12(b)(6) motion. (Ds' Mem. 5 (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 48 (2d Cir.1991).) This is a correct statement of the law, but it has no application to the Adler Affidavit a factual affidavit based on Adler's personal knowledge which is not integral to Plaintiff's claims. *See Bill Diodato Photography LLC v. Avon Prods., Inc.,* No. 12 CV 847, 2012 WL 4335164, at \*3 (S.D.N.Y. Sept. 21, 2012) (document considered "integral" where plaintiff has "(1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint.") (internal quotation marks omitted). I thus cannot consider the facts contained in the Adler Affidavit without converting the instant Motion to one for summary judgment, [7] *see Friedl,* 210 F.3d at 83, which I decline to do. [8] Accordingly, I will consider only the factual allegations in Plaintiff's AC and the exhibits attached thereto in assessing the plausibility of his claims.

[6] "Freeman Decl. refers to the Declaration of James C. Freeman. (Doc. 17.)

[7] Local Rule 12.1 requires that a represented party moving to dismiss a *pro se* complaint under Rules 12(b) or 12(c) provide notice to the *pro se* litigant if the represented party refers to matters outside of the pleadings in its motion, thus making it possible that the Court could convert the motion to one for summary judgment. As far as the Court can tell, defense counsel did not comply with this rule and failed to provide Plaintiff with the required notice set forth in the text of Local Rule 12.1.

[8] Defendants also include in the statement of facts in their Memorandum of Law, (*see* Ds' Mem. 2 4), numerous "facts for which they provide no citation but which apparently come from medical records not provided to the Court (or, presumably, to Plaintiff). Even if I could consider facts outside the AC on a motion to dismiss, which I cannot, I would have to disregard sourceless "facts provided only in a memorandum of law. *See Kulhawik v. Holder,* 571 F.3d 296, 298 (2d Cir.2009) ("An attorney's unsworn statements in a brief are not evidence. ).

## III. *Discussion*

### A. *Deliberate Indifference*

"A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care ... arises from the Eighth Amendment's prohibition of cruel and unusual punishment." *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009) (internal quotation marks omitted).

While prison officials must ensure that prisoners [9] receive adequate medical care, *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), "not every lapse in medical care is a constitutional wrong," *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). "Rather, a prison official violates the Eighth Amendment only when two requirements" one objective and one subjective "are met." *Id.* (internal quotation marks omitted).

[9] The AC does not state whether Plaintiff is a pre trial detainee or a convicted prisoner. I may take judicial notice, however, of the fact that Plaintiff was a federal pre trial detainee at the relevant times. (Indeed, his criminal case is assigned to me. *See United States v. Hardy,* No. 11 CR 629 (CS) (S.D.N.Y. filed Aug. 2, 2011).) Although a deliberate indifference claim must be brought under different constitutional provisions depending on the Plaintiff's status the Eighth Amendment for convicted prisoners and

the Fourteenth Amendment for pre trial detainees the standard for evaluating claims of deliberate indifference is the same under both amendments. *See Caiozzo,* 581 F.3d at 69.

### 1. Objective Prong

**\*4** To satisfy the objective requirement, Plaintiff must allege that he was "actually deprived of adequate medical care," *id.* ("[T]he prison official's duty is only to provide reasonable care."), and "that the alleged deprivation of medical treatment [wa]s ... sufficiently serious that is, the prisoner must prove that his medical need was a condition of urgency, one that may produce death, degeneration, or extreme pain," *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (internal quotation marks omitted); *see Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) ("The standard for Eighth Amendment violations contemplates a condition of urgency that may result in degeneration or extreme pain .") (internal quotation marks omitted). The inquiry is "fact-specific" and "must be tailored to the specific circumstances of each case." *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003). Relevant factors include: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (quoting *Chance,* 143 F.3d at 702).

Where the inadequacy alleged is the medical treatment given, "the seriousness inquiry is narrower.... [I]f the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Goris v. Breslin,* 402 F. App'x 582, 584 85 (2d Cir.2010) (summary order) (internal quotation marks omitted); *see Smith,* 316 F.3d at 186 87 (among other things, court must look at reasons for and effect of delay in treatment); *Ferguson v. Cai,* No. 11 CV 6181, 2012 WL 2865474, at \*4 (S.D.N.Y. July 12, 2012) ("Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness.").

Plaintiff does not allege that Defendants failed to provide any medical treatment. Indeed, Plaintiff's AC details the ongoing medical treatment that he received at WCJ, including over-the-counter medication for his chronic pain, (AC 3.1 3.2), orthotic shoes, (*id.* Ex. 2), and visits to outside providers for X-rays, (*id.* Exs. 10, 12, 13). Plaintiff alleges that interruptions in his treatment specifically, Defendants' failure to consistently change his bandages exacerbated his condition and resulted in an infection and ulcer in the open wound on his foot. "[T]he failure to provide treatment for an otherwise insignificant wound may violate the Eighth Amendment if the wound develops signs of infection, creating a substantial risk of injury in the absence of appropriate medical treatment." *Smith,* 316 F.3d at 186; *accord Chance,* 143 F.3d at 702 ("[I]f prison officials deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment."); *Odom v. Kerns,* No. 99 CV 10668, 2008 WL 2463890, at \*7 (S.D.N.Y. June 18, 2008) (cuts and open wounds that eventually became infected could be serious medical needs, even absent allegations that plaintiff had chronic pain or inhibition of daily activities); *cf. Brock,* 315 F.3d at 163 64 (failure to properly treat a painful scar, which "d[id] not present a risk of serious harm as would an infected wound," was sufficiently serious). Moreover, Plaintiff alleges that the chronic pain resulting from his ankle injury and open wound also constitutes a serious medical condition, and courts have held that injuries causing chronic and extreme pain can be sufficiently serious. *See Johnson,* 412 F.3d at 403; *Chance,* 143 F.3d at 702. Accordingly, Plaintiff's assertions of an infection in his open wound and chronic pain from his ankle injury plausibly allege sufficiently serious medical conditions. [10]

[10]    To the extent that Plaintiff asserts that he experienced pain from the door incident affecting his chest, lower back, and neck, (*see* AC Ex. 18 " O]fficer Val # 1439 closed me up between the sliding doors which causes severe pain to my foot, chest, lower back, and lower neck. And I only receive the x ray for my foot. )), Plaintiff appears only to allege pain in these areas resulting from this specific incident particularly as the AC and its numerous attachments contain no other allegations of chest, back, or neck pain and not the kind of chronic pain courts have found sufficient to allege a serious medical condition. *See Walker v. Dep t of Corr. Serv.,* No. 11 CV 993, 2012 WL 527210, at \*1 (S.D.N.Y. Feb.14, 2012) ("A

determination of whether an incident is sufficiently serious to invoke the Eighth Amendment requires the Court to assess the duration of the condition and the potential for serious physical harm. Where a medical need is at issue, an Eighth Amendment violation may be sustained only where plaintiff proves that it was a condition of urgency, one that may produce death, degeneration, or extreme pain. ) (citation and internal quotation marks omitted).

2. *Subjective Prong*

**\*5** The subjective component requires that the prison official acted with a "sufficiently culpable state of mind." *Salahuddin,* 467 F.3d at 280. Specifically,

> [a] prison official cannot be found liable ... unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837. "This 'deliberate indifference' element is equivalent to the familiar standard of 'recklessness' as used in criminal law." *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002) (citing and quoting *Farmer,* 511 U.S. at 839 40).

Although Plaintiff's infection may be a sufficiently serious medical condition, he also "must demonstrate that the defendants acted or failed to act while actually aware of a substantial risk that serious inmate harm would result." *Farid v. Ellen,* 593 F.3d 233, 248 (2d Cir.2010) (alterations and internal quotation marks omitted). Plaintiff has not set forth any facts plausibly showing that any Defendant's occasional failure to change his bandages was accompanied by the requisite state of mind. Indeed, his sole allegations are that he spoke with prison officials and nurses who refused to change his bandages on January 3, 2012, (AC Ex. 4), and that CCS failed to change his bandages on "numerous occasions," (*id.* at 3.2). Even affording Plaintiff the special solicitude due *pro se* litigants, there are simply no facts rendering it plausible that Defendants acted with a state of mind akin to criminal recklessness. *See Phelps,* 308 F.3d at 186. While not changing Plaintiff's bandages daily may potentially amount to negligence, nothing alleged in the AC makes it plausible that Defendants knew of and consciously disregarded an excessive risk to Plaintiff's health and safety particularly as Plaintiff received ongoing dressing changes and treatment, and admitted to missing clinic visits that may account for some instances when his bandages went unchanged. Accordingly, Plaintiff's allegations are insufficient to state a plausible claim for deliberate indifference. *See Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ( "[A] complaint that a physician has been negligent in ... treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011) ("Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness an act or a failure to act by a prison doctor that evinces a conscious disregard of a substantial risk of serious harm.") (alteration and internal quotation marks omitted).

11   The AC further admits that while " [Plaintiff] ha s] a n] order to go to the clinic every day, he missed going to the clinic for several days prior to and on August 27, 2011. (*Id.* Ex. 18.) Nurse's notes dated August 22, 2011 indicate that he was receiving daily bandage changes. (*Id.* Ex. 15.)

Further, Plaintiff's allegation that Motrin and Tylenol were insufficient to alleviate his chronic pain also does not state a plausible claim for deliberate indifference. The law is clear that a "mere disagreement over the proper treatment" is not actionable, *Chance,* 143 F.3d at 703, and courts have found that treating pain with over-the-counter, as opposed to prescription, medication is a disagreement over treatment that does not rise to the level of deliberate indifference, *see, e.g., Hill,* 657 F.3d at 123 (2d Cir.2011) (prescribing Motrin rather than stronger pain medication to treat broken wrist, with no concomitant allegation of "a culpable state of mind," falls short of claim for deliberate indifference); *Reyes v. Gardener,* 93 F. App'x 283, 284 (2d Cir.2004) (holding that alternative medical plan incorporating weaker pain medication to treat inmate was "mere disagreement over the proper treatment") (internal quotation marks omitted); *Rush v. Fischer,* No. 09 CV 9918, 2011 WL

6747392, at *3 (S.D.N.Y. Dec.23, 2011) ("The decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs."). [2]

[12]    Even if Plaintiff had plausibly alleged chronic chest, lower back, and lower neck pain, the failure to X ray these areas at his request is not actionable as it is also a mere disagreement over proper treatment. See *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (allegation of failure to X ray finger "does not rise to the level of a constitutional violation because "disagreements over medications and) diagnostic techniques (*e.g.,* the need for X rays) ... implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment. ). The same is true of Plaintiff's allegation that he has not received the necessary physical therapy for his ankle injury. See *O Diah v. Mawhir,* No. 08 CV 332, 2012 WL 4482579, at *9 (N.D.N.Y. Sept. 5, 2012) (prisoner's allegation that he required physical therapy was disagreement over proper treatment).

**\*6** Dr. Adler's alleged response to Plaintiff's request for stronger pain medication and provision of his outside doctor's contact information "[T]his department is cheap they'LL [*sic* ] just prolong so it becomes someone else's problem sorry," (AC 3.2) does not plausibly indicate that *Dr. Adler* knew of and disregarded an excessive risk to Plaintiff's health or safety, *see Farmer,* 511 U.S. at 837 particularly in light of Plaintiff's receipt of non-prescription pain medication and ongoing medical attention. Although the Second Circuit has held that allegations of personal financial incentive are sufficient to state a claim for deliberate indifference, *see Chance,* 143 F.3d at 704 (claim survived motion to dismiss where two defendants recommended a treatment option "not on the basis of their medical views, but because of monetary incentives," which, if true "would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment"), *Chance* can be distinguished from the case at bar. First, the claim survived under the previous, more lenient standard for evaluating a motion to dismiss whether the plaintiff could prove "no set of facts" that would entitle him to relief, *see Conley,* 355 U.S. at 45 46 and the *Chance* court noted that dismissal of the plaintiff's claim would be inappropriate there even if "[it] [thought] it highly unlikely that [plaintiff] [would] be able to prove his

allegations" of the defendants' ulterior financial motives, *Chance,* 143 F.3d at 704. Further, the allegation that the treating physician personally had a financial incentive in recommending a particular course of treatment and thus was potentially reckless in treating the plaintiff differs substantially from Plaintiff's allegation here that his treating physician stated only that the Department of Corrections (apparently as opposed to himself) was cheap and would rather have Plaintiff be someone else's problem. Finally, the *Chance* plaintiff alleged that there was legitimate disagreement among physicians about how to treat his condition, whereas Plaintiff has failed to allege that any other medical professional questioned Dr. Adler's decision to treat Plaintiff's pain with over-the-counter medication.

For the reasons stated above, Defendants' Motion is granted with respect to Plaintiff's deliberate indifference claim.

### *B. Monell* Claim

Absent an underlying constitutional violation, a *Monell* claim cannot lie. *See Bolden v. Cnty. of Sullivan,* No. 11 CV 4337, 2013 WL 1859231, at *2 (2d Cir. May 6, 2013) (summary order) ("[B]ecause the district court properly found no underlying constitutional violation, its decision not to address the County defendants' liability under *Monell* was correct."); *Segal v. City of N. Y.,* 459 F.3d 207, 219 (2d Cir.2006) ("*Monell* does not provide a separate cause of action ... it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.") (emphasis in original). Even if the underlying claims had survived, however, Plaintiff has not plausibly alleged a *Monell* claim against CCS and NYCCS. [3] Plaintiff alleges that CCS failed to change his bandages, but there are no allegations that this failure was the result of a formal policy, a widespread practice, or a failure to properly train or supervise employees. Rather, Plaintiff relies exclusively on an investigation report dated November 19, 2009 [4] issued by the Department of Justice ("Investigation Report") detailing in part "Medical Care Deficiencies" found at WCJ specifically in infection control, dental care, mental health care, and the medical grievance process, [5] (AC Ex. 17, at 19 27), without alleging that CCS, NYCCS, or any of its policymakers were the subject of or privy to the results of the Investigation Report. Neither

CCS nor NYCCS is mentioned in the Investigation Report, (*see id.* Ex. 17); Plaintiff's allegations occurred nearly two years after the Investigation Report was issued; and the medical care policies found deficient at WCJ including inadequate treatment of infectious diseases and lack of dental care, (*id.* Ex. 17, at 19 22) are unlike the deprivation of medical care Plaintiff alleges here. [6] Plaintiff's *Monell* claim is accordingly dismissed.

[13] I assume without deciding for the purposes of this Motion that *Monell* would apply to private entities providing care to state inmates, such as CCS or NYCCS. *See Bektic Marrero v. Goldberg,* 850 F.Supp.2d 418, 432 33 (S.D.N.Y.2012) (accepting plaintiff's argument that defendant New York Medical College acted under color of state law by virtue of its agreement to administer medical services to inmates at WCJ).

[14] Defendants argue in their brief that CCS/NYCCS did not become responsible for inmate healthcare until July 26, 2010. (Ds' Mem. 10 .) I must ignore this allegation because it is not in or integral to the AC, and because it appears only in Defendants' Memorandum of Law.

[15] Although Plaintiff alleges that he was unable to file a grievance at WCJ, (*see* AC Exs. 18 19), the grievance in question relates to his claims against Defendant Officer Val # 1439 arising from the incident in which he was caught in a door and does not implicate NYCCS or CCS, (*see id.* Ex. 3).

[16] The Investigation Report notes that a medical intake was performed in an open area within the sight and sound of other inmates and WCJ staff. (AC Ex. 17, at 19 n. 22.) Although Plaintiff alleges that his intake was also performed in an open area where anyone could overhear what was said, (*id.* at 3.1), the Investigation Report found that this "appeared to be an isolated incident, and thus does not constitute a custom or practice sufficient to allege a plausible *Monell* claim. Further, while the Court does not condone such a breach of Plaintiff's privacy and the medical staff's professional obligations, it would not meet either the objective or subjective prongs of the deliberate indifference test.

*C. Leave to Amend*

**\*7** Although *pro se* plaintiffs are generally given leave to amend a deficient complaint, *see Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 96 (2d Cir.1999) (per

curiam), a district court may deny leave to amend when amendment would be futile because the problem with the claim "is substantive ... [and] better pleading will not cure it," *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000). While courts should be more lenient when considering a *pro se* party's motion to amend than when considering that of a represented party, *see In re Sims,* 534 F.3d 117, 133 (2d Cir.2008), leave to amend is properly denied where all indications are that the *pro se* plaintiff will be unable to state a valid claim, *see Valle v. Police Dep't Cnty. of Suffolk Cent. Records,* No. 10 CV 2847, 2010 WL 3958432, at \*2 (E.D .N.Y. Oct. 7, 2010). I find that to be the case here, where Plaintiff's AC and its many attachments contain no factual allegations rendering either of his claims plausible. Further, Plaintiff has neither asked to amend again nor otherwise indicated that he is in possession of facts that could cure the deficiencies identified in this Opinion. Thus, because Plaintiff has already had the opportunity to amend his Complaint, and because it appears to the Court that amendment would be futile, I decline to *sua sponte* grant leave to amend again. *See Coleman v. brokersXpress, LLC,* 375 F. App'x 136, 137 (2d Cir.2010) (summary order) (denial of leave to amend affirmed where *pro se* plaintiff had already had opportunity to amend once and made no specific showing as to how he would remedy defects in complaint); *cf. Ariel (UK) Ltd. v. Reuters Grp., PLC,* 277 F. App'x 43, 45 46 (2d Cir.2008) (summary order) (district court did not exceed its discretion in not *sua sponte* granting leave to amend where Plaintiff had already amended complaint once and amendment would have been futile).

\* \* \*

Although I am granting Defendants' Motion to Dismiss, defense counsel should take no pride in his professional performance in this case. He: (1) cited an outdated legal standard that is less favorable to his clients than the applicable standard; (2) submitted an affidavit that cannot be considered on a motion to dismiss; (3) apparently violated Local Rule 12.1 by not providing (as far as the Court can tell) the notice required to be provided to a *pro se* plaintiff when the moving party refers to matters outside of the pleadings on a Rule 12 motion; (4) referred in his Memorandum of Law to "facts" that cannot be found in the record; and (5) apparently violated Local Rule 7.2 by not providing to Plaintiff (as far as the Court can tell) printed copies of cases cited in his

Memorandum of Law that are unreported or reported only on computerized databases.

#### IV. *Conclusion*

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. The Clerk is respectfully directed to terminate the pending Motion, (Doc. 16), and terminate CCS, NYCCS, and Dr. Adler from the case.

**\*8  SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3357171

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2385948
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

William GONZALEZ, Plaintiff,

v.

Thomas A. COUGHLIN, III, Commissioner
NYS Department of Correctional
Services (DOCS), et al., Defendants.

Nos. 9:94CV1119, 9:97CV320.
|
June 9, 2008.

**Attorneys and Law Firms**

William Gonzalez, Stormville, NY, pro se.

Martin G. Deptula, Boies, Schiller Law Firm, Albany, NY, for Defendants.

MEMORANDUM AND ORDER

LYLE E. STROM, Senior District Judge.

**\*1** This matter is before the Court on defendants' motion for summary judgment (Filing No. 159). Having reviewed the motion, the parties' briefs and evidentiary submissions, and the applicable law, the Court finds defendants' motion should be granted in part and denied in part.

STANDARD OF REVIEW

On a motion for summary judgment, all reasonable factual inferences must be drawn in favor of the non-moving party. *See, e .g., Savino v. City of New York,* 331 F.3d 63, 71 (2d Cir.2003) (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). However, to survive a motion for summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis omitted) (quoting Fed.R.Civ.P. 56(e)) (citation omitted). "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine

issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) (citation omitted). Thus, "statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 452 (2d Cir.1999) (citations omitted), *cert. denied,* 530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000).

"In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Vann v. City of New York,* 72 F.3d 1040, 1048 (2d Cir.1995) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). A party "moving for summary judgment must prevail if the [non-movant] fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo,* 100 F.3d 253, 258 (2d Cir.1996) (citing *Anderson,* 477 U.S. at 247-48).

BACKGROUND

Plaintiff William Gonzalez filed a complaint in the United States District Court for the Northern District of New York on September 6, 1994 (Filing No. 1). Plaintiff named the following defendants in his original complaint: Thomas Coughlin, III; Daniel Senkowski; Donald Selsky; Officer R. Varin; Lieutenant Carey; and Ms. Matos, also known as Ms. Deleon. Plaintiff brought his action pursuant to 42 U.S.C. § 1983, alleging he was deprived of procedural due process in connection with a Tier III disciplinary hearing that took place on August 19-23, 1991. After the Tier III hearing, plaintiff was sentenced to 180 days in keeplock confinement. He served 163 days before the Tier III hearing was administratively reversed and plaintiff's record was expunged. In his complaint, plaintiff also stated that he intended to file another § 1983 action based on an assault on the plaintiff at CCF on February 24, 1994, and based on legal property of plaintiff's that was allegedly lost intentionally by prison official's during plaintiff's transfer to another prison.

**\*2** The defendants filed a motion to dismiss plaintiff's complaint (Filing No. 13). On May 6, 1996, the district court adopted the magistrate judge's report and recommendation and granted defendants' motion to

dismiss the complaint on the ground that plaintiff's 163 day keeplock confinement did not rise to the level of a protected liberty interest (Filing No. 32). The plaintiff appealed the dismissal to the Second Circuit Court of Appeals. The Second Circuit reversed and remanded the case to the district court to make factual determinations as to the actual conditions of plaintiff's keeplock confinement pursuant to *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Plaintiff filed an amended complaint on July 31, 2000, naming thirty-four defendants and asserting several claims (Filing No. 59).

Plaintiff filed a separate § 1983 action on March 10, 1997 (Filing No. 1 in 9:97CV320). However, because plaintiff delivered his complaint to prison officials to forward to the Court on February 24, 1997, the complaint will be deemed filed on February 24, 1997 (Filing No. 4 in 9:97CV320). *See Dory v. Ryan,* 999 F.2d 679 (2d Cir.1993) (holding a pro se prisoner's civil complaint was deemed filed the day the complaint was delivered to prison officials). The district court found that the complaint failed to comply with Fed.R.Civ.P. 8(a) and 10(b) and ordered plaintiff to amend his complaint or the case would be dismissed. Plaintiff filed an amended complaint which added more defendants and claims and still failed to comply with the federal rules. The Court ordered the amended complaint stricken and gave plaintiff one more opportunity to amend his complaint within 30 days. When plaintiff failed to do so, the district court dismissed his complaint. Plaintiff's case was reinstated after he moved to vacate the judgment and appealed to the Second Circuit. On July 31, 2000, plaintiff filed the same amended complaint (Filing No. 34 in 9:97CV320) that he had filed in 9:94CV1119. The district court entered an order to consolidate the two cases on August 10, 2000.

Defendants move for summary judgment on the following grounds: (1) plaintiff's due process claims should be dismissed because plaintiff's keeplock confinement did not rise to the level of a protected liberty interest; (2) various claims in the amended complaint should be dismissed as time-barred because they do not relate back to the original complaints; (3) plaintiff's claims based on inadequate medical treatment should be dismissed because they are without merit; and (4) defendants Rodas, Scales, Fein, Koenigsmann, Zwillinger, Bliden, and Schneider are entitled to qualified immunity.

## DISCUSSION

### I. Due Process Claims

Plaintiff alleges he was denied procedural due process at a Tier III disciplinary hearing that took place on August 19-23, 1991. To state a claim for denial of due process, "a prisoner must allege that he possessed a protected liberty interest, and was not afforded the requisite process before being deprived of that liberty interest ." *Cruz v. Gomez,* 202 F.3d 593 (2d Cir.2000). "Disciplinary confinement does not deprive an inmate of a liberty interest unless the confinement imposes [an] 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Gonzalez v. Coughlin,* No. 96-2494, 1998 WL 2410, at *1 (2d Cir. Jan.6, 1998) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).

**\*3** Plaintiff claims his time keeplock confinement was an atypical and significant hardship for the following reasons: "(a) plaintiff was segregated from the general population for eating, recreation and all other group activities; (b) plaintiff was confined to his cell for 23 hours per day; (c) plaintiff lost privileges including commissary, phone, FRP, law library access, religious services attendance and bathhouse privileges; and (d) plaintiff was subjected to the violent and dangerous conditions then present in Lower Block F" (Filing No. 59 ("Amended Complaint") ¶ 22). In addition, plaintiff claims Lower F Block officers used the loud speaker at "extreme volumes in order to torture plaintiff" resulting in hearing loss (Amended Complaint ¶ 37).

Material issues of fact preclude summary judgment on the issue of whether plaintiff's keeplock confinement imposed an "atypical and significant hardship" such that plaintiff was deprived of a liberty interest without due process. Thus, defendants' summary judgment will be denied with respect to plaintiff's due process claims.

### II. Statue of Limitations

Defendants claim various claims in the amended complaint should be dismissed because they were untimely at the time the amended complaint was filed and they do not relate back to the original complaint. The statute of limitations for claims under § 1983 is a state's statute of limitations for general personal injuries. *Owens v. Okure,*

488 U.S. 235, 237, 251, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). New York's statute of limitations for personal injury claims is three years. N .Y. Civ. Prac. Law § 214(5). The amended complaint was filed on July 31, 2000; thus, any claim that accrued prior to July 31, 1997, that was not timely asserted in a prior complaint and that does not relate back to a original complaint is time-barred. This inquiry is complicated by the fact that there are two original complaints that must be considered: (1) the original complaint in 9:94CV1119 filed on September 6, 1994; and (2) the original complaint in 9:97CV320 filed on March 10, 1997, and submitted to prison officials on February 24, 1997.

1    Defendants allege that both the original complaint in 9:97CV320 (Filing No. 1) and the first attempt at an amended complaint in 9:97CV320 (Filing No. 15) were stricken by the Court for failure to comply with the Federal Rules of Civil Procedure. Defendants are correct that the amended complaint (Filing No. 15) was ordered stricken in an order filed on June 30, 1998 (Filing No. 18); however, after a careful review of the docket, the Court can find no order striking the original complaint (Filing No. 1). Therefore, to determine which of the claims in the amended complaint (Filing No. 34 in 9:97CV320; No. 59 in 9:94CV1119) were timely asserted, the Court must refer to the original complaint in 9:97CV320.

The Court will examine each of the claims in the amended complaint separately to determine when they were first asserted. First, plaintiff asserts a denial of due process claim against defendants Coughlin, Selsky, Senkowski, Varin, Carey and Matos a/k/a Deleon, claiming that while an inmate at Clinton Correctional Facility, plaintiff was denied due process at plaintiff's August 19-23, 1991, Tier III disciplinary hearing, which resulted in plaintiff serving 163 days in keeplock confinement from August 23, 1991 through January 30, 1992, and was subsequently administratively reversed (Filing No. 59 in 9:94CV1119; Filing No. 34 in 9:94CV1119 ("Amended Complaint" ¶¶ 6-27, 29-33). Defendants concede that plaintiff's due process claims relating to the disciplinary hearing are timely as they were first asserted in the original complaint in 9:94CV119.

*4  Second, plaintiff claims he suffered hearing loss as a result of defendant Uhler's misuse of the loudspeaker during plaintiff's keeplock confinement in violation of the Eighth Amendment (Amended Complaint ¶¶ 34-41).

While Uhler's alleged misuse of the loudspeaker occurred during plaintiff's keeplock confinement from August 23, 1991, through January 30, 1992, plaintiff alleges he was not diagnosed with hearing loss until July 22, 1999. Thus, there are material issues of fact precluding summary judgment on the timeliness of this claim.

Third, plaintiff claims defendant Bezio assaulted him on October 29, 1991, in the bath house and subsequently denied him shower privileges, which resulted in a skin rash, in retaliation for plaintiff pursuing his legal and administrative remedies (Amended Complaint ¶¶ 42-49). The Court will grant defendants' summary judgment motion with respect to these claims because plaintiff failed to raise them within the three-year statute of limitations, and the Court finds they do not relate back to the original complaint nor does the continuing violation exception apply.

Fourth, plaintiff claims that while an inmate at Clinton Correctional Facility, he was assaulted by Muslim inmate Letterlough on February 24, 1994, while he was being transported to keeplock confinement following plaintiff's alleged assault of another Muslim inmate, Green, earlier that day. Plaintiff claims that defendants Ricks, Hewston, Bolak, Maynard, Uhler, Longtin, Senecal, Pecore and Bousquet acted unreasonably and intentionally, or in the alternative, with reckless disregard of plaintiff's constitutional rights and failed to protect plaintiff from a known risk of assault (Id. ¶¶ 50-78). Plaintiff raised this claim in his original complaint in 9:97CV320 (Filing No. 1 in 9:97CV320 at ¶¶ 24-81). While that complaint was not filed until March 10, 1997, there is evidence that plaintiff submitted the complaint to prison officials on February 24, 1997, to be forwarded to the Court (Filing No. 6 in 9:97CV320). Based on the reasoning of Dory v. Ryan, 999 F.2d 679 (2d Cir.1993), which held a pro se prisoner's civil complaint was deemed filed the day the complaint was delivered to prison officials, the Court finds defendants' summary judgment motion on statute of limitations grounds will be denied with respect to this claim. In addition, the Court will not address defendants' argument that this claim is barred by the principles of res judicata and collateral estoppel because that argument was raised for the first time in defendants' reply brief and did not give plaintiff a chance to respond. See In re Dobbs, 227 Fed. Appx. 63, 64 (2d Cir.2007) (stating "we think that it was entirely proper for the District Court to decline to consider [an] argument, raised for the first time

in [the] reply brief"); *see also Playboy Enterprises, Inc. v. Dumas,* 960 F.Supp. 710, 720 n. 7 (S.D.N.Y.1997) (stating "[a]rguments made for the first time in a reply brief need not be considered by a court").

**\*5** Fifth, plaintiff claims that while an inmate at Green Haven Correctional Facility, defendants Rodas and Scales were deliberately indifferent to plaintiff's medical needs when they knew he had Hepatitis C on September 19, 1997, but failed to take steps to notify him of his condition and to ensure proper treatment. Plaintiff learned of his test result on November 27, 1998 (Amended Complaint ¶¶ 79-81, 87-89, 93-95). Plaintiff also alleges defendants Fein, Koenigsmann, Zwillinger, Bliden, and Schneider were deliberately indifferent to plaintiff's medical needs when they knew of plaintiff's hearing loss and failed to take steps to ensure proper treatment and to transfer him to an appropriate cell block (*Id.* ¶¶ 79, 82-86, 90-94, 96). Plaintiff was diagnosed with hearing loss on July 22, 1999. Plaintiff's deliberate indifference claims based on denial of medical care were timely asserted in the amended complaint as they accrued after July 31, 1997.

Next, plaintiff asserts several claims of retaliation. Plaintiff alleges the defendants retaliated against him in various ways because he exercised his right to file grievances for inappropriate conduct by prison officials (*Id.* ¶¶ 167-172). First, plaintiff alleges defendant Bezio denied him access to the showers which resulted in a skin rash and filed a false misbehavior report against plaintiff in retaliation for plaintiff filing complaints against Bezio (*Id.* ¶¶ 99-105). The claims against Bezio were not asserted within the three-year statute of limitations. In addition, the Court finds these claims do not relate back to the original complaints, and the continuing violation exception does not apply; thus, defendants' summary judgment motion will be granted with respect to those claims.

Second, plaintiff alleges defendants Senkowski, Babbie, Ricks, and Campbell permitted plaintiff to be transferred from Clinton to Great Meadow in April 1994 despite having written notice that plaintiff was concerned about being in the same facility as his enemy, inmate Gloster (*Id.* ¶¶ 106-115). This claim was timely asserted in the original complaint in 9:97CV320 (Filing No. 1 in 9:97CV320 at ¶¶ 104-123).

Third, plaintiff alleges that during his transfer to Auburn Correctional Facility on April 30, 1994, a bag containing his legal documents and research was intentionally misplaced and never recovered (*Id.* ¶¶ 116-117). This claim was timely asserted in the original complaint in 9:97CV320 (Filing No. 1 in 9:97CV320 at ¶¶ 124-130).

Fourth, plaintiff alleges that in 1995, defendants Burns and Lupo sought to stop plaintiff from assisting other inmates and to have plaintiff fired from his law clerk position, defendant Lupo filed a false misbehavior report against plaintiff, defendant Nelson approved the false misbehavior report, and defendant Duncan acted to make plaintiff ineligible to work in the law library, even though he knew the misbehavior report was false (*Id.* ¶¶ 118-129). These claims were timely asserted in the original complaint in 9:97CV320 (Filing No. 1 in 9:97CV320 at ¶¶ 176-210).

**\*6** Fifth, plaintiff claims that during April 1996, defendants Stanton and Ashby filed a false misbehavior report, which resulted in defendant Ginnerty terminating plaintiff from the Aggression Resolution Treatment ("ART") program, and defendant Nelson affirmed the decision to terminate plaintiff from the program (*Id.* ¶¶ 130-143). These claims were timely asserted in the original complaint in 9:97CV320 (Filing No. 1 in 9:97CV320 at ¶¶ 211-218).

Sixth, plaintiff claims that while an inmate at Auburn between August and September 1996, he had an altercation with defendant Polkavich in the "Wood Z Shop," defendant Carberry told Polkavich that plaintiff filed numerous grievances with the intent to instigate an altercation, defendant Polkavich filed a false mental hygiene unit referral on behalf of plaintiff, defendant Ashby dismissed plaintiff's grievances, and defendant Duncan stated the false mental hygiene referral was not retaliatory (*Id.* ¶¶ 144-153). These claims were timely asserted in the original complaint in 9:97CV320 (Filing No. 1 in 9:97CV320 at ¶¶ 219-239).

Seventh, plaintiff alleges his legal materials were intentionally misplaced during transport to Green Haven and were not returned until February 5, 1997 (*Id.* ¶¶ 154). This claim was not asserted in the original complaint in 9:97CV320, and it was not timely when asserted in the amended complaint; thus the defendants' summary judgment on statute of limitations grounds will be granted with respect to this claim.

Case 9:16-cv-00890-LEK-TWD Document 117 Filed 06/21/19 Page 98 of 219
Gonzalez v. Coughlin, Not Reported in F.Supp.2d (2008)
2008 WL 2385948

Eighth, plaintiff alleges that while an inmate at Green Haven, defendants Rodas and/or Scales learned plaintiff had Hepatitis C in September 1997 but failed to notify defendant until November 1998, and defendants Fein, Koenigsmann, Zwillinger, Bliden and Schneider failed to properly treat plaintiff for hearing loss (*Id.* ¶¶ 155-166). These claims were timely asserted in the amended complaint.

In summary, the defendants' motion for summary judgment on statute of limitations grounds is granted with respect to plaintiff's claims for assault and retaliation against defendant Bezio and with respect to plaintiff's claim of lost property during transfer to Green Haven. The defendants' motion for summary judgment on statute of limitations grounds will be denied in all other respects.

## III. Medical Care Claims

In order to prevail on an Eighth Amendment claim based on prison medical care, a plaintiff must prove the defendants acted with deliberate indifference to plaintiff's serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The "serious medical need' prong is satisfied where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997)). Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104-05. To prove a violation of the Eighth Amendment, a plaintiff must satisfy both objective and subjective inquiries. *See Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003). "[A]n inmate must show (1) that the deprivation alleged is 'objectively sufficiently serious' such that the plaintiff was denied 'the minimal civilized measure of life's necessities,' and (2) that the defendant official possessed a 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain.' " *Id.* An official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct.

1970, 128 L.Ed.2d 811 (1994). "A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle,* 429 U.S. at 106. Further, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.*

**\*7** Here, plaintiff first alleges that defendants Rodas and Scales were deliberately indifferent to plaintiff's serious medical need by failing to timely notify him that he had Hepatitis C. Plaintiff tested positive for Hepatitis C in September 1997 (Filing No. 159, Ex. 19 ("Koenigsmann Decl." ¶ 5). Plaintiff refused an exam with Dr. Scales on October 16, 1997 (Filing Nos. 20-26 ("Medical Records") at 6, 196). He was not seen again by medical staff until November 1998, at which point he requested the results of his Hepatitis C blood test (Koenigsmann Decl. ¶¶ 8-9). On November 27, 1998, plaintiff was seen by defendant Rodas, a physician's assistant, who indicated that plaintiff was asymptomatic and that his Liver Function Tests ("LFT") were normal (Medical Records at 33; Koenigsmann ¶ 10). Plaintiff refused blood work on three occasions in December 1998 before submitting blood in January 1999 (Medical Records at 26, 30, 32). On February 1, 1999, plaintiff was informed that due to his normal LFT results, he was not a candidate for treatment under Department of Correctional Services ("DOCS") guidelines (*Id.* at 26). Plaintiff had gall bladder surgery and a liver biopsy on August 13, 2001 (Medical Records at 257; Koenigsmann Decl. ¶ 20). On December 19, 2001, Dr. Rush noted mild liver disease in plaintiff but stated that no treatment was indicated for Hepatitis C because of the very slow progression of the disease (Medical Records at 309; Koenigsmann Decl. ¶ 24).

The unrefuted evidence indicates that any delay in notifying plaintiff of his positive Hepatitis C results was primarily due to plaintiff's own actions, specifically his refusal of an exam by Dr. Scales on October 16, 1997, and not returning for medical care until November 1998. In addition, four years after plaintiff first tested positive for Hepatitis C and three years after he learned of his diagnosis, plaintiff did not require treatment due to the slow progression of his disease. The Court finds there is no evidence that defendants were deliberately indifferent to plaintiff's serious medical need; thus, defendants' summary judgment is granted with respect to this claim.

Next, plaintiff claims that defendants Fein, Koenigsmann, Zwillinger, Bliden and Schneider were deliberately indifferent to plaintiff's serious medical by failing to properly treat plaintiff's hearing loss. On September 1, 1991, plaintiff complained about noise from the loudspeaker and was given cotton batting for his ears (Medical Records at 74). There is no indication in plaintiff's medical records that he complained of hearing loss or ear pain again until July 1999 (Medical Records at 22; Koenigsmann Decl. ¶¶ 28-29).

Plaintiff was seen by an audiologist on July 22, 1999, who indicated that plaintiff had elevated middle ear pressure in his right ear consistent with eustacian tube dysfunction ("ETD") and significant hearing loss in high frequency consistent with noise exposure in the left ear (Medical Records at 92; Koenigsmann Decl. ¶ 30). Plaintiff requested to be fitted for a hearing aid on August 6, 1999, and again on January 10, 2000 (Medical Records at 20, 21). On January 18, 2000, a medical provider saw plaintiff and requested a consult with an Ear, Nose and Throat doctor to determine whether plaintiff needed a hearing aid and should be placed in a quiet block (Medical Records at 20, 91; Koenigsmann Decl. ¶ 34). Ear, Nose and Throat specialist, Dr. Tran, saw plaintiff on February 18, 2000, and recommended a hearing aid evaluation and indicated plaintiff may benefit from being placed in a quiet block (Medical Records at 91; Koenigsmann Decl. ¶ 35). Dr. Koenigsmann noted on February 28, 2000, that there was no need to move plaintiff to a different cell at that time (Medical Records at 18). Plaintiff was seen by an audiologist on March 6, 2000, who indicated plaintiff was cleared to proceed with the hearing aid (Medical Records at 90; Koenigsmann Decl. ¶ 37).

**\*8** On April 4, 2000, plaintiff was seen at an audiology clinic for a hearing aid fitting; however, the medical provider noted that plaintiff became uncooperative and declined to proceed with the hearing aid fitting (Medical Records at 88; Koenigsmann Decl. ¶ 38). On April 20, 2000, plaintiff again complained of pain in his ears (Medical Records at 17). Plaintiff was scheduled to see an audiologist Serhan on April 25, 2000; however, plaintiff refused to see Serhan (*Id.* at 86, 193). Plaintiff returned to Dr. Fein on May 22, 2000, complaining that he had not received ear plugs and complaining of ear pain and noise sensitivity (*Id.* at 14). Plaintiff was given three pairs of ear plugs on July 18, 2000 (Medical Records at 14; Koenigsmann Decl. ¶ 43).

On August 22, 2000, plaintiff was seen by Dr. Fein, claiming his hearing was getting worse (Medical Records at 9, 80). On September 18, 2000, plaintiff complained of anxiety and threatened "harm to self if not moved from his present location which he states is noisy and causes him harm" (*Id.* at 7). Plaintiff was moved to a different cell, and Dr. Fein requested a psychiatric consult (*Id.* at 6). Plaintiff was seen by another audiologist on October 26, 2000 (*Id.* at 112). She noted mild high-frequency sensorineural loss in the right ear and mild to profound sensorineural loss in the left ear (*Id.*). She noted that plaintiff's word recognition was excellent in the right ear and fair in the left ear (*Id.*). On November 17, 2000, a Ear, Nose and Throat specialist recommended plaintiff undergo an MRI; however, this was not done because plaintiff had pellets in his head (Koenigsmann Decl. ¶¶ 51, 52). Plaintiff underwent a CT scan on September 5, 2001, which demonstrated normal results, and another on February 15, 2002, which indicated no acute findings (*Id.* ¶¶ 55, 59).

Plaintiff failed to respond specifically to defendants' motion for summary judgment with respect to plaintiff's claims relating to treatment of his hearing loss. The unrefuted evidence demonstrates that plaintiff was evaluated and treated for hearing loss and ear pain complaints on numerous occasions. He was offered cotton batting and earplugs to deal with the noise he complained of in his cell. He was also given the opportunity to be fitted for hearing aids; however, plaintiff refused to proceed with the hearing aid fitting on two occasions and refused to see various medical providers. Any delays in plaintiff's treatment for hearing loss were primarily caused by plaintiff's own actions and refusal to cooperate with medical providers. There is no evidence that defendants were deliberately indifferent to plaintiff's medical need; thus, defendants' motion for summary judgment will be granted with respect to this claim.

## IV. Qualified Immunity

"The first step in a qualified immunity inquiry is to determine whether the alleged facts demonstrate that a defendant violated a constitutional right. If the allegations show that a defendant violated a constitutional right, the next step is to determine whether that right was clearly established at the time of the challenged action-that is, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' A

2008 WL 2385948

defendant will be entitled to qualified immunity if either (1) his actions did not violate clearly established law or (2) it was objectively reasonable for him to believe that his actions did not violate clearly established law." *Moore v. Andreno,* 505 F.3d 203, 208 (2d Cir.2007) (quoting *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007)).

**\*9** Because the Court granted defendants' motion for summary judgment on plaintiff's medical care claims, it is unnecessary to address defendants' qualified immunity argument. Accordingly,

IT IS ORDERED that defendants' motion for summary judgment (Filing No. 159) is granted in part and denied in part as follows:

1) Defendants' motion for summary judgment with respect to the due process claims is denied;

2) Defendants' motion for summary judgment on statute of limitations grounds is granted with respect to the claims against defendant Bezio for assault and retaliation and with respect to the claim that plaintiff's property was intentionally lost during the transfer to the Green Haven facility. Defendant Bezio is dismissed as a defendant in this action. Defendants' motion for summary judgment on statute of limitations grounds is denied in all other respects; and

3) Defendants' motion for summary judgment is granted with respect to plaintiff's deliberate indifference claims based on medical care.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2385948

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 342347
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Hector RAMOS, Plaintiff,
v.
Christopher ARTUZ, Superintendent,
Larry Zwillinger, Regional Health Services
Administrator, Dr. Norman H. Selwin,
Medical Director, Dr. Harry Mamis, primary
provider, Byron Rodas, R.P.A. Defendants.

No. 00 Civ. 0149(LTS)(H.
|
Feb. 14, 2003.

**Synopsis**
Inmate brought § 1983 action against state prison
physicians, alleging failure to provide adequate medical
treatment. Defendants moved for summary judgment.
Adopting the report and recommendation of Henry
Pitman, United States Magistrate Judge, the District
Court, Swain, J., held that defendants were not
deliberately indifferent to inmate's back problems.

Motion granted.

West Headnotes (7)

**[1]** **United States Magistrate Judges**
👉 Plain error, clear error, and manifest
injustice review
To accept report and recommendation of
magistrate judge to which no timely objection
has been made, district court need only satisfy
itself that there is no clear error on record. 28
U.S.C.A. § 636(b)(1)(C).

Cases that cite this headnote

**[2]** **Prisons**
👉 Particular Conditions and Treatments
**Sentencing and Punishment**
👉 Medical care and treatment

State prisoner's primary care physician was
not deliberately indifferent to his post-
accident claims of back pain; physician
provided appropriate, though unsuccessful,
treatment, was not required to be empathetic,
and was not responsible for delays in
carrying out his non-critical care instructions.
U.S.C.A. Const. Amend. 8; 42 U.S.C.A. §
1983.

2 Cases that cite this headnote

**[3]** **Prisons**
👉 Particular Conditions and Treatments
**Sentencing and Punishment**
👉 Medical care and treatment

State prison's medical director was not
deliberately indifferent to medical needs
of prisoner suffering from back pain,
though he failed to assign new primary
care physician after current physician's care
proved to be ineffective, absent showing that
current physician was deliberately indifferent.
U.S.C.A. Const. Amend. 8; 42 U.S.C.A. §
1983.

8 Cases that cite this headnote

**[4]** **Prisons**
👉 Particular Conditions and Treatments
**Sentencing and Punishment**
👉 Medical care and treatment

Prison medical director's alleged verbal abuse
or harassment of prisoner for asserting
grievances against inmate's primary care
physician did not constitute deliberate
indifference to prisoner's medical needs.
U.S.C.A. Const. Amend. 8; 42 U.S.C.A. §
1983.

8 Cases that cite this headnote

**[5]** **Civil Rights**
👉 Persons Liable in General
Defendant must be personally involved in
commission of constitutional violation in
order to incur § 1983 liability. 42 U.S.C.A. §
1983.

2 Cases that cite this headnote

**[6]** **Civil Rights**

👉 Criminal law enforcement;prisons

Prison administrator who exercised no supervisory authority over prison physicians could not be held liable under § 1983 for physicians' allegedly deliberate indifference to inmate's medical needs. U.S.C.A. Const. Amend. 8; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[7]** **Civil Rights**

👉 Prisons, jails, and their officers;parole and probation officers

State prison physicians were entitled to qualified immunity from § 1983 liability based on allegedly deliberate indifference to inmate's medical needs; any deficiency in physicians' treatment of inmate's back injury was not so blatant that their putatively illegal conduct should have been obvious to them. U.S.C.A. Const. Amend. 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

*MEMORANDUM ORDER ADOPTING REPORT AND RECOMMENDATION*

SWAIN, J.

**\*1** On August 27, 2002, Magistrate Judge Henry Pitman issued a Report and Recommendation ("Report") recommending that the Court grant the Defendants' motion for summary judgment. No objections to the Report have been filed.

**[1]** In reviewing a report and recommendation, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C.A. § 636(b)(1)(C) (West 2002). To accept the report and recommendation of a magistrate judge to which no timely objection has been made, a district court " 'need only satisfy itself that there is no clear error on

the record.' " *Johnson v. Reno,* 143 F.Supp.2d 389, 391 (S.D.N.Y.2001) (citation omitted). *See also Bryant v. New York State Dep't of Corr. Serv.,* 146 F.Supp.2d 422, 424 25 (S.D.N.Y.2001) (court may accept those portions of report to which no written objection has been made, so long as they are "not facially erroneous").

The Court has reviewed thoroughly Magistrate Judge Pitman's well-reasoned Report and has determined that there is no clear error on the face of the record. The Court adopts the Report for the reasons stated therein. Accordingly, Defendants' motion for summary judgment is granted.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 444, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

Magistrate Judge Pitman's Report follows.

SO ORDERED.

I. *Introduction*

PITMAN, Magistrate J.

Plaintiff *pro se,* an incarcerated inmate in the custody of the New York State Department of Correctional Services, brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants failed to provide him with adequate medical treatment for severe lower back pain, causing him to suffer pain and numbness in his left leg and to have difficulty sleeping.

In a report and recommendation dated March 2, 2001, I recommended that (1) the complaint be dismissed in its entirety to the extent that it could be construed to assert claims against the defendants in their official capacities; (2) the complaint be dismissed to the extent it asserts state law claims against the defendants; (3) the complaint be dismissed in its entirety as to defendant Artuz; (4) plaintiff's claim of deliberate indifference be dismissed against Rodas, and (5) defendants' motion to dismiss as to defendants Dr. Mamis, Dr. Selwin and Mr. Zwillinger be denied. That report and recommendation was subsequently adopted by the Honorable Laura Taylor Swain on July 25, 2001.

The three remaining defendants Dr. Mamis, Dr. Selwin and Mr. Zwillinger now move for summary judgment arguing that (1) there is no evidence in the record that is sufficient to create a genuine issue of fact that they were deliberately indifferent to plaintiff's back problems and (2) they are entitled to qualified immunity. For the reasons set forth below, I respectfully recommend that their motion be granted.

II. *Facts*

**\*2** The record in this case establishes the following facts.

The events giving rise to this action began on February 2, 1997. At that time, plaintiff was working as a porter at Green Haven Correctional Facility (Exhibit A to the Declaration of Assistant Attorney General Melinda Chester Spitzer, dated December 20, 2001 ("Chester Spitzer Dec."), at 41). After mopping an area, plaintiff claims that he bent over to pick up a bucket of water and that as he was lifting the bucket he felt a sharp pain in his lower back (Chester Spitzer Dec., Ex. A at 45 47). Plaintiff states that after the incident, he laid down on his bunk for a while, and that when he later got up, he could not stand up straight (Chester Spitzer Dec., Ex. A at 46).

On the day after the claimed incident, plaintiff consulted with a nurse at the prison infirmary and was told to apply warm compresses to the affected area. Plaintiff testified that he complied with this direction but that the treatment was ineffective (Chester Spitzer Dec., Ex. A at 49, Ex. D at D 131).

Since the treatment prescribed by the nurse did not provide any relief, plaintiff met with Dr. Harry Mamis, a staff physician at Green Haven, on or about February 10, 1997 (Chester Spitzer Dec., Ex. A at 50, Ex. C & 6, Ex. D at D 131). Dr. Mamis performed a physical examination of plaintiff and concluded that plaintiff suffered a "lumbar strain or sprain," a condition which can cause significant discomfort, but does not endanger a patient's health or safety (Chester Spitzer Dec., Ex. C & 7, Ex. D at D 131). In addition to directing plaintiff to return for a follow-up visit, Dr. Mamis prescribed anti-inflammatory pain medication and Percoset, a muscle relaxant. Dr. Mamis also issued a nine-day "no work" permit, as well as permission for plaintiff to receive his meals in his cell so that he would not have to walk to the mess hall (Chester Spitzer Dec ., Ex. A at 50 52, Ex. C & 9). When plaintiff subsequently had an allergic reaction

to the Percoset, Dr. Mamis discontinued the Percoset and instead prescribed Naprosyn and Flexaril; plaintiff claimed that neither medication was effective at reducing his pain (ChesterSpitzer Dec., Ex. A at 50 52, Ex. D at D 131).

Over the following months, Dr. Mamis continued to treat plaintiff for his complaints of back pain. Plaintiff's medical records indicate that he saw Dr. Mamis on February 10, 13, 17, 18, 26 and April 3, 1997 (Chester Spitzer Dec., Ex. D at D 124, 128 31). Dr. Mamis issued plaintiff several permits that allowed him to receive meals in his cell and provided plaintiff with a back brace (Chester Spitzer Dec., Ex. C & 10). Dr. Mamis also referred plaintiff to Dr. Shreedahanan, an "outside" musculoskeletal specialist (Chester Spitzer Dec., Ex. a at 53). Dr. Shreedahanan ordered X Rays of plaintiff's back in March 1997; the radiologist's report concerning those X-rays stated:

> Radiographic examination of the dorsal spine shows normal vertebral body alignment and curvature. The bodies, arches, and pedicles are intact and the intervertebral disc spaces are well maintained. No compression fractures, bone destruction or significant arthritic changes are seen.

**\*3** (Chester Spitzer Dec. Ex. D at D 127). Plaintiff also received physical therapy twice a week during the spring of 1997 (ChesterSpitzer Dec., Ex. A at 55).

Plaintiff complained to the medical staff at Green Haven that none of the foregoing treatments had relieved his pain, and Dr. Mamis arranged for plaintiff to undergo a Magnetic Resonance Imaging ("MRI") on July 14, 1997 (Chester Spitzer Dec., Ex. C & 11). The report of the MRI testing revealed no abnormalities that could account for plaintiff's pain:

> Examination MRI of lumbar spine performed in axial and sagittal imaging planes was performed. The study was performed utilizing multiple imaging sequences.

The examination demonstrated that the lumbar vertebral bodies were of normal size. The intervertebral disc spaces are well maintained. There is no evidence of disc herniation or protrusion. The visualized portions of the conus medularis and the cauda equina were unremarkable. The neural foramina were patent.

CONCLUSION:                    UNREMARKABLE EXAMINATION.

(Chester Spitzer Dec., Ex. D at D 287).

Plaintiff continued to complain of pain during the latter half of 1997, and Dr. Mamis continued to prescribe physical therapy at the rate of two to three sessions per week (Chester Spitzer Dec., Ex. C & 12, Ex. D at D 103 09). Since plaintiff was continuing to complain of severe pain, Dr. Mamis ordered an electromyogram study ("EMG") of plaintiff in December 1997 (Chester Spitzer Dec., Ex. C & 12). The results of the EMG were "normal study" with "no electrical evidence of radiculopathy or neuropathy," *i.e.,* no nerve damage (Chester Spitzer Dec., Ex. C & 12, Ex. D at D 283).

In January 1998, plaintiff fell while descending some stairs at Green Haven (Chester Spitzer Dec., Ex. A at 77 78). He was taken to the infirmary the following day where he was seen by Dr. Selwin (Chester Spitzer Dec., Ex. A at 84 86). This was the only instance that Dr. Selwin saw plaintiff professionally (Chester Spitzer Dec., Ex. E & 10). Dr. Selwin examined plaintiff's neck, provided him with a cervical collar, prescribed Ultram and Flexaril and admitted plaintiff to the infirmary for a twenty-four hour observation period (Chester Spitzer Dec., Ex. A at 87, Ex. E & 11). Plaintiff was discharged the following day after admitting to Dr. Selwin that he was "moving around better" (Chester Spitzer Dec., Ex. D at D 98).

In January 1998, despite a course of treatment that included physical therapy sessions, application of moist heat, ultrasound massages and back exercises, plaintiff was still complaining of severe back pain (Chester Spitzer Dec., Ex. C & 15). As part of his continuing effort to solve the problem, Dr. Mamis then arranged for plaintiff to be seen by Dr. Jonathan Moldover, an outside specialist in pain management and the former Chief Physiatrist at Green Haven (Chester Spitzer Dec., Ex. C & 15, Ex. D at D 281).

Shortly before Dr. Moldover actually examined plaintiff, Dr. Mamis ordered another set of X-rays, this time of plaintiff's pelvic area (Chester Spitzer Dec., Ex. C & 16). The radiologist's report concerning these X-rays states:

**\*4** Radiographic examination of the pelvis shows no fracture, dislocation, or any other bone or joint abnormality.

Normal pelvis.

Exam sacrum in 2 views shows normal alignment and curvature. There is no fracture or other osseous abnormality. The L5 S1 disc space is narrowed.

IMP:    NO    ABNORMALITY    SACRUM. NARROWED

L5 S1 DISC SPACE COULD INDICATE

DEGENERATIVE DISCOGENIC CHANGE AT

LUMBOSACRAL JUNCTION.

NO PRIOR STUDY.

(Chester Spitzer Dec., Ex. D at D 92).

In March 1998, plaintiff complained of problems sleeping due to pain, and Dr. Mamis prescribed Elavil to address the problem (Chester Spitzer Dec., Ex. C & 14).

Dr. Moldover examined plaintiff on or about March 27, 1998. Dr. Moldover recommended that plaintiff continue to be prescribed Elavil, Motrin and Ultram, that plaintiff practice flexion exercises and that plaintiff be provided with a cane [1] (Chester Spitzer Dec ., Ex. C & 17, Ex. D at D 281).

[1]    At his deposition, plaintiff testified that Dr. Moldover also recommended "fluoroscopic surgery  and facet injections (Chester Spitzer Dec., Ex. A at 115). The Consultant Report signed by Dr. Moldover contains no such recommendations (ChesterSpitzer Dec., Ex. D at D 281).

In April 1998, plaintiff requested a wheelchair, claiming that he was in too much pain to walk (Chester Spitzer Dec., Ex. C & 18). After consulting with Drs. Moldover and Selwin, Dr. Mamis denied plaintiff's request, in large part on the recommendation of Dr. Moldover. Dr. Moldover believed, and Dr. Mamis concurred, that if

plaintiff were given a wheelchair and stopped moving under his own power, his condition would actually worsen (Chester Spitzer Dec., Ex. C & 19).

On April 15, 1998, plaintiff saw Dr. Mamis again. Prior to that date, plaintiff had been moved off an "Honor Block" in order to be relocated to housing that would not require him to climb stairs (see Chester Spitzer Dec., Ex. D at D 88). One of the consequences of the move was that plaintiff's new housing had a "spring bed" instead of a flat steel bed; the spring bed aggravated plaintiff's back condition (Complaint at 10, para. 1). When Dr. Mamis first learned of this change during the April 15 visit, he ordered that plaintiff be provided with a flat steel bed (Chester Spitzer Dec., Ex. C & & 31 32). In addition, Dr. Mamis's notes for the April 15, 1998 visit record that plaintiff "states he is slowly improving, doing exercises prescribed by Dr. Moldover" (Chester Spitzer Dec., Ex. D at D 87).

Although Dr. Mamis ordered that plaintiff be provided with a flat steel bed in April 1998, his order was not implemented by Green Haven's Movement and Control Unit until August 1998 (Chester Spitzer Dec., Ex. A at 120, Ex. C & & 32 33). Dr. Mamis has stated that he has no control over the implementation of his orders by the Movement and Control Unit (Chester Spitzer Dec., Ex. C & 33); petitioner has submitted no evidence to the contrary.

Dr. Moldover saw plaintiff again on May 11, 1998 and recommended that plaintiff receive facet injections (ChesterSpitzer Dec., Ex. C & 21, Ex. D at D 277). Facet injection treatment is designed to reduce inflammation in the spine and consists of injecting anti-inflammatory steroidal medication into the area surrounding the spine. Dr. Moldover recommended this course of treatment because none of the other treatments plaintiff had undergone had been successful (Chester Spitzer Dec., Ex. C & 21). Dr. Mamis also consulted with another physician, Dr. Galeno, who concurred in the recommendation that plaintiff be given facet injections (Chester Spitzer Dec., Ex. C & 22).

**\*5** Although facet injections were ordered in May, 1998, plaintiff did not actually receive the injections until April, 1999 (Chester Spitzer Dec., Ex. C & & 21, 29). According to Dr. Mamis, whose statements have not been contradicted by plaintiff, he submitted a request

to Westchester County Medical Center ("WCMC") on June 1, 1998, requesting that they schedule facet injection treatment for plaintiff (Chester Spitzer Dec., Ex. C & 22). WCMC authorized the request on July 15, 1998, but because the treatment was deemed to be "non-urgent," WCMC could not provide a date for an initial consultation prior to October 15, 1998. Dr. Mamis scheduled an initial consultation for plaintiff at WCMC for October 31, 1998 (Chester Spitzer Dec., Ex. C & 22).

In light of the long delay, and in an effort to take steps to alleviate plaintiff's discomfort, Dr. Mamis authorized a wheelchair for plaintiff in October 1998 (Chester Spitzer Dec., Ex. D at D 74 75). Plaintiff used the wheelchair until June, 2000, at which point he returned it stating that he no longer needed it (Chester Spitzer Dec., Ex. C & 23).

Plaintiff was transported to WCMC on October 31, 1998 for an initial consultation (Chester Spitzer Dec., Ex. C & 24).

In early November 1998, Dr. Mamis submitted a second request for a consultation to an entity called Correctional Physicians Service ("CPS"), which appears to be an health management organization that had been newly retained by the Department of Correctional Services. CPS advised Dr. Mamis that the procedure would take place at St. Agnes Hospital Pain Clinic ("St.Agnes") in White Plains and that the first available appointment was not until February 24, 1999. In addition, Dr. Mamis was advised that another "initial consultation" would be required before the treatments could be administered (ChesterSpitzer Dec., Ex. C & 25). Dr. Mamis had no control over when CPS scheduled the treatment (Chester Spitzer Dec., Ex. C & 26).

In an effort to ameliorate plaintiff's pain, Dr. Mamis issued an order in January 1999 permitting plaintiff to have his meals in his cell block, and an additional order in February 1999 permitting plaintiff to have a double mattress (Chester Spitzer Dec., Ex. C & 26).

On February 24, 1999, plaintiff was transported to St. Agnes for a second "initial" consultation, and was evaluated for facet injection treatment. Plaintiff was also advised by staff members of St. Agnes that he would have to undergo a series of blood tests (Chester Spitzer Dec., Ex. C & 27). Plaintiff's blood tests were completed on March 12, 1999, and staff members at

St. Agnes scheduled plaintiff's first treatment for March 24, 1999 (Chester Spitzer Dec., Ex. C & 28). Due to a scheduling conflict on the part of St. Agnes, plaintiff's appointment was rescheduled for April 29, 1999 (Chester Spitzer Dec., Ex. C & 28). Plaintiff subsequently received facet injection treatments on April 29 and May 24, 1999 (Chester Spitzer Dec., Ex. C & 29). The facet injection treatments temporarily relieved plaintiff's pain (Chester Spitzer Dec., Ex. A at 123, Ex. C & 30). Accordingly, Dr. Mamis subsequently ordered additional physical therapy and additional steroidal injections for plaintiff (Chester Spitzer Dec., Ex. C & 30).

 **6 On March 8, 2000, Dr. Mamis ordered another MRI study of plaintiff's spine (Chester Spitzer Dec., Ex. C & 37, Ex. D at D 257). The report of this procedure states:

[A] normal alignment is demonstrated. No compression fractures are identified. The vertebral bodies are of normal height and signal intensity throughout.

The intervertebral discs are of normal height and signal intensity throughout.

Bulging of the disc margin at the L4 5 level is noted.

There is no evidence of spinal stenosis.

The spinal cord ends normally at the L1 level and is of normal signal intensity. The soft tissues are unremarkable.

*IMPRESSION:*

Bulging disc L4 5.

(Chester Spitzer Dec., Ex. D at D 256).

In August 2001, plaintiff was transferred out of Green Haven (Chester Spitzer Dec., Ex. C & 36).

B. *Proceedings to Date*
Plaintiff commenced this action on January 10, 2000. On or about May 15, 2000, defendants moved to dismiss the complaint on various grounds, and on March 2, 2001, I issued a report and recommendation recommending the dismissal of all claims against all defendants except for plaintiff's deliberate indifference claims against Dr. Mamis, Dr. Selwin and Mr. Zwillinger. That report and recommendation was accepted by the Honorable Laura Taylor Swain, United States District Judge, on July 25,

2001. Thus, the pending motion addresses the only claims remaining in this matter.

III. *Analysis*

a. *Summary Judgment Standard*
The standards applicable to a motion for summary judgment are well-settled and require only brief review.

> To prevail on a motion for summary judgment, the moving party must show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). In deciding such a motion, the district court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Giano v. Senkowski,* 54 F.3d 1050, 1052 (2d Cir.1995).

*Hemphill v. Schott,* 141 F.3d 412, 415 (2d Cir.1998). *See also Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000); *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998); *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 559 (2d Cir.1997).

Once the moving party has met its initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party, in order to defeat the motion, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial" in order to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

B. *Deliberate Indifference Claim*

**\*7** The Supreme Court set forth the standard for deliberate indifference claims in *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976): "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' ... proscribed by the Eighth Amendment." *See also Helling v. McKinney,* 509 U.S. 25, 31 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998) (a plaintiff has to establish that the "defendants knew of the health dangers and yet refused to remedy the situation"). "Proof of mere negligence ... will not give rise to a constitutional violation." *Doyle v. Coombe,* 976 F.Supp. 183, 186 (W.D.N.Y.1997), *aff'd without opinion,* 159 F.3d 1346 (2d Cir.1998). *See also Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991).

A claim of deliberate indifference involves an objective component and a subjective component. *Farmer v. Brennan,* 511 U.S. 825, 834 35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 09 (2d Cir.1998). *See generally Garraway v. Artuz,* 01 Civ. 3126(DLC), 2002 WL 221584 at *6 *7 (S.D.N.Y. Feb. 13, 2002).

The objective component is satisfied if the alleged deprivation is "sufficiently serious." *Farmer v. Brennan, supra,* 511 U.S. at 834; *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) ( "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious.") (internal quotation marks omitted). A medical condition is considered serious if it is "a condition of urgency" that may result in "degeneration" or "extreme pain." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). *See also Thomas v. Arevalo,* 95 Civ. 4704(SS), 1998 WL 427623 at *5 (S.D.N.Y. July 28, 1998).

The subjective component of a deliberate indifference claim is satisfied where a plaintiff can show that the defendants acted with "a sufficiently culpable state of mind." *Farmer v. Brennan, supra,* 511 U.S. at 834 35. An official acts with deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837. *See also Wilson v. Seiter,* 501 U.S. 294, 298 302, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Morales v. Mackalm,* 278 F.3d 126, 132 33 (2d Cir.2002); *Hathaway v. Coughlin, supra,* 37 F.3d at 66. "The subjective element requires a state of mind that is the equivalent of criminal recklessness...." *Hathaway v. Coughlin, supra,* 99 F.3d at 553. "In certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan." *Chance v. Armstrong,* 143 F.3d at 703. " ' [M]ere medical malpractice' is not tantamount to deliberate indifference,' but it may rise to the level of deliberate indifference when it 'involves culpable recklessness, i.e., an act or a failure to act ... that evinces "a conscious disregard of a substantial risk of serious harm." ' " *Cuoco v. Moritsugu,* 222 F.3d 99, 107 (2d Cir.2000), *quoting Chance v. Armstrong, supra,* 143 F.3d at 703.

**\*8** The Eighth Amendment does not require prison officials to provide every form of treatment that is theoretically possible or every form of treatment that would be available to an individual who is not incarcerated. *See Hudson v. McMillian, supra,* 503 U.S. at 9.

"At a minimum, there must be at least some allegations of a conscious or callous indifference to a prisoner's rights." *Zaire v. Dalsheim,* 698 F.Supp. 57, 59, *aff'd,* 904 F.2d 33 (2d Cir.1990). Claims based on differences of opinion, however, are not sufficient to constitute "conscious or callous indifference." *Williams v. Coughlin,* 650 F.Supp. 955, 956 (S.D.N.Y.1987). Medical decisions will constitute "indifference" only when they are contrary to accepted medical standards. *Harding [v. Kuhlmann,* 588 F.Supp. 1315, 1316 (S.D.N.Y.1984), *aff'd,* 762 F.2d 990 (2d Cir.1985) ].

*Webb v. Jackson,* 92 Civ. 2149(SS), 1994 WL 86390 at *2 (S.D.N.Y. Mar. 16, 1994), *aff'd without opinion,* 47 F.3d 1158 (2d Cir.1995). *See also Youngberg v. Romeo,* 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (civilly committed patient states a claim for liability under Section 1983 "only when the decision by the [medical] professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment").

For purposes of the present motion, defendants assume that plaintiff has asserted a "serious" medical condition (Defendants' Memorandum of Law, dated December 20, 2001 ("Defendants' Mem."), at 12). Nevertheless, defendants claim that there is insufficient evidence for a reasonable jury to conclude that the subjective component of a deliberate indifference claim has been satisfied and that they are, therefore, entitled to summary judgment.

Judged by the standards set forth above, I conclude that plaintiff's claim of deliberate indifference cannot withstand summary judgment.

### 1. *Dr. Mamis*

**[2]** Dr. Mamis was plaintiff's primary care physician at Green Haven from the time of February 1997 through plaintiff's transfer from Green Haven (Chester Spitzer Dec., Ex. C & 5). Although the handwritten medical records submitted in support of the current motion are, at times, difficult to read, it appears that Dr. Mamis, or members of his staff, saw plaintiff concerning his back pain over 150 times from the date of the accident through the date on which this accident was commenced (ChesterSpitzer Dec., Ex. D at D 34 D 131). In addition to the specific incidents described in Section II, above, plaintiff's medical records indicate that Dr. Mamis renewed plaintiff's prescriptions on an ongoing basis, and issued multiple orders permitting plaintiff to receive meals in his cell and use a cane and a wheelchair.

In addition, there is unrebutted evidence in the record that Dr. Mamis's treatment of plaintiff was appropriate to plaintiff's complaints. Defendants have submitted an affidavit from Dr. Arnold M. Illman, a Board certified orthopedist and Associate Clinical Professor of Orthopedic Surgery at Stony Brook Medical School with over thirty years of experience treating back problems in both private practice and with the United States Air Force (Chester Spitzer Dec., Ex. I at 3). Dr. Illman has reviewed plaintiff's medical records and concluded as follows:

**\*9** I feel that this patient probably sprained his lower back on February 2, 1997 and that the minimal changes of a pre-existing problem of his lower back with diminution of the interspace of L 5 S 1 probably was not significant.

This patient was seen by either the physician, physician's assistant or physical therap[ist], or [an] individual giving

out pain medication a total of approximately 220 times over the period of March 1997 through March 10, 2001 and has ample opportunity to be re-examined and treated and in fact was over this period of time.

All of [plaintiff's] physicians during this period of time diligently and completely had performed all possible pertinent tests in an attempt to treat this individual's complaints and in fact repeated the MRI in order not to leave anything to chance.

I feel this patient was given a very careful, considerate pain management treatment in order to alleviate his pain despite the fact that all his tests were normal. In fact, in order to comply [with] this claimant's symptomatology, which was symptomatic, which was subjective and not borne out by objective medical tests, he was given light duty excuses and the use of a wheelchair. Therefore I feel that in no way were the allegations made by this claimant against the doctors and other medical personnel treating him and the institution reasonable.

(Chester Spitzer Dec., Ex. I at 2).

Against this array of evidence, plaintiff makes four specific complaints. First, plaintiff complains about the fact that the treatments did not successfully cure his pain. Although I assume this claim to be true, it cannot support a finding of deliberate indifference. The fact that a course of treatment is unsuccessful does not even establish medical malpractice. 1A *New York Pattern Jury Instructions Civil,* Instruction 2 150 at 723 24 (3rd Ed.2002). *A fortiori,* it cannot support a finding of deliberate indifference since deliberate indifference requires a level of culpability beyond malpractice. Moreover, when plaintiff was asked at his deposition to identify any form of treatment that he believes was improperly denied to him, he could not identify any such treatment (Chester Spitzer Dec., Ex. A at 128 29).

Plaintiff also complains that he believed Dr. Mamis was not empathetic and did not release him from work (Chester Spitzer Dec., Ex. A at 56 57). As to the former complaint, the Eighth Amendment does not require empathy. If prison officials provide the level of care the Eighth Amendment requires, their alleged lack of empathy is immaterial. As to the alleged failure to release plaintiff from work, plaintiff has no evidence that any physician told him that he should not have been working

(Chester Spitzer Dec., Ex. A at 112 13). Moreover, after his accident, plaintiff admits that his work assignments did not include arduous physical labor (Chester Spitzer Dec., Ex. A at 111 (drafting and working with mentally ill inmates).

To the extent plaintiff complains of delays in his being given a flat steel bed and delays on receiving facet injections, Dr. Mamis has offered uncontradicted evidence that he did all in his power to provide plaintiff with both, and plaintiff has offered no evidence to the contrary. In the absence of some evidence that Dr. Mamis was responsible for the delay, there is no evidence that Dr. Mamis was responsible for a substantial departure from accepted medical standards. In addition, delay in providing non-critical care, in the absence of evidence that the delay was the product of wantonness or other improper motive, will rarely sustain a deliberate indifference claim.

> **\*10** Although a delay in providing necessary medical care may, in some cases, support an inference of deliberate indifference, the Second Circuit has reserved such a classification for cases in which, for example, officials ignored a "life-threatening and fast-degenerating" condition for three days, *Liscio,* 901 F.2d at 277, or delayed major surgery for over two years, *Hathaway v. Coughlin,* 841 F.2d 48 (1988) ...; *see also Archer v. Dutcher,* 733 F.2d 14, 16 17 (2d Cir.1984) (a prisoner must allege that he was intentionally denied needed medical are over a period of time by prison officials, while he was in extreme pain, or that medical care was completely withheld).

*Sully Martinez v. Glover,* 00 Civ. 5997(GEL), 2001 WL 1491278 at \*5 (S.D.N.Y. Nov. 26, 2001).

Finally, to the extent plaintiff bases his claim on his being denied a wheelchair in April, 1998, Dr. Mamis explained in his affidavit that this decision was based on his opinion,

shared by both Drs. Mamis, Moldover and Selwin, that plaintiff's use of a wheelchair would actually aggravate his condition. Again, there is simply no evidence that this decision was incorrect, let alone reached the level of culpability sufficient to constitute deliberate indifference.

In view of the ample evidence that Dr. Mamis provided plaintiff with a substantial amount of care appropriate to plaintiff's condition and the total dearth of evidence that Dr. Mamis departed from accepted medical standards to any degree, I conclude that no reasonable juror could conclude that Dr. Mamis is guilty of deliberate indifference.

### 2. *Dr. Selwin*

**[3]** Dr. Selwin was Green Haven's Acting Medical Director from 1995 through February 1999, and, in that capacity, was responsible for overseeing the doctors and physician's assistants assigned to the facility and the x-ray, physical therapy, laboratory and pharmacy departments (Chester Spitzer Dec., Ex. E & & 3, 5). The record reveals that Dr. Selwin's only clinical contact with plaintiff was the examination and treatment Dr. Selwin rendered to plaintiff after his January 1998 fall (Complaint at 8; Chester Spitzer Dec., Ex. A at 25, Ex. E & & 10 13). Plaintiff claims that during the course of this consultation, Dr. Selwin harassed him about the numerous grievance complaints that he had filed (Complaint at 8, & 1; Chester Spitzer Dec., Ex. A at 87). In addition, plaintiff wrote to Dr. Selwin, as Green Haven's Acting Medical Director, on several occasions to complain about the care that he was receiving from Dr. Mamis (Chester Spitzer Dec., Ex. J).

To the extent plaintiff is asserting a deliberate indifference claim against Dr. Selwin based on the January 1998 visit, there is no evidence in the record establishing deliberate indifference. After the fall plaintiff suffered at that time, Dr. Selwin admitted plaintiff to the infirmary for a twenty-four hour observation period and discharged him at the end of that period, having found no abnormalities (Chester Spitzer Dec., Ex. E & & 11 12). The entry in plaintiff's medical records concerning plaintiff's discharge indicates that plaintiff told Dr. Selwin that he was "moving around better" on the day of his discharge and that plaintiff was given both Ultram and Flexaril upon his discharge (Chester Spitzer Dec., Ex. D at D 98). In view of the facial reasonableness of Dr. Selwin's treatment of plaintiff, the affidavit of Dr. Illman quoted above and the

total absence of any evidence that Dr. Selwin's treatment constituted any type of departure from acceptable medical standards, no reasonable juror could conclude that Dr. Selwin's treatment of plaintiff in January 1998 constituted deliberate indifference.

**\*11** To the extent plaintiff's allegations can be read to assert a deliberate indifference claim against Dr. Selwin based on plaintiff's letters requesting that Dr. Selwin either assign a new doctor to plaintiff or make some other changes in plaintiff's treatment (*see* Chester Spitzer Dec., Ex. J), plaintiff's claim also fails. Although a supervisor's failure to take corrective action in response to a subordinate's violation of constitutional protections can, in some circumstances, be a basis for liability under Section 1983, *Heron v. Dalsheim,* 95 Civ. 2625(JFK), 1999 WL 2871 at \*5 (S.D.N.Y. Jan. 4, 1999) ("Courts have found personal involvement of a supervisory official where a plaintiff has sent letters to or orally informed the official of an ongoing constitutional violation." (citations omitted)); *see also Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (Supervisor may be liable under Section 1983 where "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, ... the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or ... the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring."), [2] plaintiff's claim of supervisory liability cannot survive here because, as discussed above, there was no constitutional violation by Dr. Mamis. If Dr. Mamis did not violate plaintiff's constitutional rights, Dr. Selwin's failure, as his supervisor, to take corrective measures is necessarily immaterial.

[2]    A number of judges in this Circuit have, however, reached a different conclusion based on the facts before them. See *Woods v. Goord,* 97 Civ. 5143(RWS), 1998 WL 740782 at \*6 (S.D.N.Y. Oct. 23, 1998) ("Receiving letters or complaints, however, does not render defendant] personally liable under '1983. ); *Cox v. Colgane,* 94 Civ. 6361(DAB), 1998 WL 148424 at \*9 (S.D.N.Y. Mar. 27, 1998) (" 'It is well established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations. ), quoting *Higgins v. Artuz,* 94 Civ. 4810(SS), 1997 WL 466505 at \*7 (S.D.N .Y

Aug. 14, 1997), *citing Greenwaldt v. Coughlin,* 93 Civ. 6551(LAP), 1995 WL 232736 (S.D.N.Y. Apr. 19, 1995); *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997); *Bolanos v. Coughlin,* 91 Civ. 5330(KC), 1993 WL 762112 at \*25 (S.D.N.Y. Oct. 15, 1993) ("To impose liability under such circumstances would be inconsistent with the purpose of Section 1983 to hold only those responsible for violations liable. ); *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) ( " Defendant's] only alleged connection to this case that he ignored plaintiff's] letter of protest and request for an investigation of the allegations made in this action is insufficient to hold him liable ... for the alleged violations. ).

**[4]**    Finally, to the extent plaintiff alleges that Dr. Selwin verbally abused him or harassed him for asserting grievances against Dr. Mamis, these allegations fail to state a claim on which relief can be granted. *Cuoco v. Moritsugu, supra,* 222 F.3d at 109; *Liner v. Goord,* 196 F.3d 132, 134 35 (2d Cir.1999); *Ivey v. Wilson,* 832 F.2d 950, 955 56 (6th Cir.1987); *Oltarzewski v. Ruggiero,* 830 F.2d 136, 139 (9th Cir.1987); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986).

### 3. *Lawrence Zwillinger*

Since April 1991, Zwillinger has been employed by DOCS as a Regional Health Services Administrator and has been assigned by DOCS to oversee the administrative operations of the medical department at Green Haven (Chester Spitzer Dec., Ex. G & 1). Zwillinger does not himself provide any of the health care services to inmates, nor does he supervise any of the health care providers at Green Haven (Chester Spitzer Dec., Ex. G & 3). Zwillinger's only interaction with plaintiff was his drafting responses to letters plaintiff sent to Dr. Selwin and Christopher Artuz, Green Haven's Superintendent [3] (Chester Spitzer Dec., Ex. G & 4).

[3]    As explained in my March 2, 2001 Report and Recommendation, plaintiff's allegations against Zwillinger are not set forth in the complaint. Rather they are set forth in a putative crossmotion filed in response to defendants' motion to dismiss (Plaintiff's Cross Motion, dated July 21, 2000 ("Cross Motion )). In light of plaintiff's *pro se* status, I consider the allegations contained in his cross motion as if they were asserted in the complaint.

The theory on which plaintiff seeks to hold Zwillinger liable is not entirely clear. In his opposition to the

2003 WL 342347

current motion, plaintiff claims that Zwillinger and Drs. Mamis and Selwin somehow merged together (Plaintiff's Affidavit in Support in Opposition of Summary Judgment [*sic* ], sworn to July 10, 2002 at & 23). Alternatively, plaintiff claims that Zwillinger, even though he did not supervise Drs. Mamis or Selwin, is somehow liable for not correcting their constitutionally deficient care.

**\*12**  **[5]**  With respect to the former theory, there is no legally cognizable "merger" theory under Section 1983. To the contrary, a long line of authority requires that each defendant named in a Section 1983 claim be personally involved in the commission of the constitutional violation. *E.g., Monell v. Department of Soc. Servs.,* 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Leonhard v. United States,* 633 F.2d 599, 621 n. 30 (2d Cir.1980).

 **[6]**  Plaintiff's second theory is also deficient for at least two reasons. First, as explained above, there is no evidence of any deficiency of constitutional magnitude in the care given to plaintiff. In the absence of evidence of an underlying constitutional violation, there was nothing for Zwillinger, or anybody else, to correct. Second, there is uncontradicted evidence in the record that Zwillinger, who is not a health care professional, did not supervise either Dr. Mamis or Selwin (Chester Spitzer Dec., Ex. G & 3). Thus, Zwillinger was never in a position of sufficient authority to take corrective action.

Since plaintiff has not offered any colorable legal theory on which to impose liability on Zwillinger and has not offered any evidence of any facts that could support a theory of liability, Zwillinger is also entitled to summary judgment dismissing the claims against him.

### 4. *Summary*

Plaintiff's dissatisfaction with his situation is understandable; while engaged in the ordinary act of lifting a bucket he did something to his back that has caused him serious pain for more than five years. However, any physician, whether employed by a prison or employed in the private sector, "is not an insurer of a cure nor is he a guarantor of the result of his prescriptive treatment." *McGrady v. United States,* 650 F.Supp. 379, 381 (D.S.C.1986); *accord Orozco v. Children's Hosp.,* 638 F.Supp. 280, 284 (E.D.Pa.1986), *aff'd without opinion.* 813 F.2d 398 (3rd Cir.1987); *see also Harrigan v. United States,* 408 F.Supp. 177, 189 (E.D.Pa.1976) ("[a] physician

is not liable merely because a course of treatment does not produce desired results; [ordinarily] a doctor is neither a warrantor of a cure nor a guarantor of the result of his treatment."). We know from personal injury litigation that sometimes pain and suffering is permanent and that medicine cannot cure all maladies. At most, plaintiff has shown that Drs. Mamis and Selwin have been unsuccessful at treating his back pain. In light of the substantial medical evidence submitted in connection with this motion that all reasonable care was provided to plaintiff, the mere lack of success does not constitute deliberate indifference. Accordingly, I conclude that Drs. Mamis and Selwin and Mr. Zwillinger are all entitled to summary judgment.

### C. *Qualified Immunity*

 **[7]**  Defendants next argue that they are also entitled to summary judgment on the ground of qualified immunity.

 **\*13**  Under certain circumstances, a governmental agent who performs a discretionary function may be entitled to qualified immunity from suit for constitutional violations. The qualified immunity inquiry has two parts. "[T]he first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established," the constitutional right in issue must have been "clearly established" with an adequate level of specificity. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). *Accord Caldarola v. Calabrese,* Docket No. 01 9053, 2002 WL 1759778 at \*3 (2d Cir. July 31, 2002); *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 66 (2d Cir.2002); *Poe v. Leonard,* 282 F.3d 123, 132 33 (2d Cir.2002).

In order to be "clearly established," a right must be established with a level of specificity that goes beyond the statement of a "general proposition." *Saucier v. Katz, supra,* 533 U.S. at 201 02.

[W]e emphasized in *Anderson* "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." [*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ]. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted. *See Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ("[A]s we explained in *Anderson,* the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established").

... If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *See Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

*Saucier v. Katz, supra,* 533 U.S. at 202.

Although some level of specificity beyond the statement of a general proposition is required before a right is "clearly established," " "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ...; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." ' *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002), *quoting Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (inner citations omitted).

In this case, there can be no serious issue that plaintiff has alleged the violation of a constitutional right. Ever since *Estelle v. Gamble, supra,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), there has been no doubt that state prisoners have a right under the Eighth Amendment to be free from deliberate indifference to serious medical conditions.

 **\*14** Whether the right was "clearly established" with the level of specificity required by *Saucier v. Katz, supra,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, presents a more difficult question since *Saucier* establishes that the mere broad statement of a "general proposition ... is not enough" to clearly establish a right. *Saucier v. Katz, supra,* 533 U.S. 201 02.

Defendants here were presented with an inmate complaining of serious back pain for which X-rays, MRI and EMG studies revealed no observable, physical cause. Nevertheless, Dr. Mamis, plaintiff's principal physician, provided plaintiff with ongoing treatment, including pain

medication to ameliorate plaintiff's symptoms. When Dr. Mamis found that he was unable to treat plaintiff's condition successfully, he had plaintiff seen by several outside consultants. Ultimately, plaintiff was provided with facet injections which provided only limited relief.

In *Saucier,* the Supreme Court stated that:

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

> *Graham* does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts. This is the nature of a test which must accommodate limitless factual circumstances. This reality serves to refute respondent's claimed distinction between excessive force and other Fourth Amendment contexts; in both spheres the law must be elaborated from case to case. Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes "hazy border between excessive and acceptable force," *Priester v. Riviera Beach,* 208 F.3d 919, 926 927 (C.A.11 2000), and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.

533 U.S. at 205 07.

In this case, defendants provided plaintiff with a substantial amount of care which, according to the evidence in the record, was entirely appropriate. In light of *Saucier,* in order to defeat defendants' claim of immunity, plaintiff would have to show there was some obvious, effective, risk-free and moderately-priced treatment that defendants refused to provide to plaintiff. Even if there was some treatment defendants wrongfully failed to provide, plaintiff has not shown that that failure was so blatant that defendants' putatively illegal conduct should have been obvious to them. Even if I assume there was some diagnostic technique or modality of treatment

Ramos v. Artuz, Not Reported in F.Supp.2d (2003)

2003 WL 342347

that defendants denied to plaintiff, there is not a shred of evidence that such technique or modality was the clearly preferable and standard choice. Thus, defendants' conduct, at worst, falls into the "hazy" area between proper and improper treatment, and defendants are, therefore, protected by the doctrine of qualified immunity.

## V. *Objections*

 **\*15** Pursuant to 28 U.S.C. '636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from the date of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a) and 6(e). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain, United States District Judge, 40 Centre Street, Room 426, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Swain. FAILURE TO OBJECT WITHIN TEN (10) DAYS *WILL* RESULT IN a WAIVER OF OBJECTIONS AND *WILL* PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57 59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237 38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 342347

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2595194
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tasheem GOLDSTON, Plaintiff,
v.
ALBANY COUNTY SHERIFF
DEPARTMENT, et al., Defendants.

No. 9:02-CV-1004.
|
Sept. 11, 2006.

**Attorneys and Law Firms**

Tasheem Goldston, Beacon, NY, pro se.

Roche Corrigan McCoy & Bush, Robert P. Roche, Esq., of counsel, Albany, NY, for all Defendants other than Gervaish and Laventine.

Phelan, Phelan & Danek, LLP, Marie F. Danek, Timothy S. Brennan, Esq., of counsel, Albany, NY, Law Office Of Jason P. Austin, Jason P. Austin, Esq., of counsel, Scotia, NY, for Defendants Gervaish and Laventine.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. George H. Lowe, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

No objections to the Report-Recommendation dated March 28, 2006 have been raised. Ordinarily, when no objections are raised to a Report-Recommendation, the Court examines the record to determine whether the Report-Recommendation is subject to attack for plain error or manifest injustice. Here, however, the Court's docket sheet entry # 69 indicates that the Report-Recommendation, which was sent to the Plaintiff at his last known address, was returned as undeliverable.

Every litigant is required to keep the Court advised of his or her address so that documents and decisions may be served upon him or her by mail. *See* Local Rules of the United States District Court for the Northern District of New York, 10.1(b). In this case, Plaintiff was advised on 6/21/04 of his responsibility to keep the court and defendants notified of his current address. Failure to keep his address current can greatly delay proceedings and, therefore, can be construed as an abandonment of the action. "While a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them ." *Edwards v. INS,* 59 F.3d 5, 8 (2d Cir.1995)(citing *McNeil v. United States,* 113 S.Ct. 1980, 1984 (1993))("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *see also Faretta v. California,* 95 S.Ct. 2525, 2541 n. 46 (1975)("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law.").

While the Court could infer that the Plaintiff's failure to advise the Court Clerk's Office of his forwarding address is a tacit abandonment of his claims addressed in the Report-Recommendation, the Court will instead exercise its discretion and review this matter as if a general objection has been lodged to the Report-Recommendation. Under such circumstances, the Court reviews the record *de novo. See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Court may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having considered the record *de novo,* the Court adopts the Report-Recommendation in its entirety for the reasons stated therein.

It is therefore,

**ORDERED** that Defendants' motion for summary judgment [dkt. # 66] is **GRANTED,** and all claims brought against Defendants Jill Gervais and Robert Laventure are **DISMISSED.**

**IT IS SO ORDERED**

GEORGE H. LOWE, Magistrate Judge.

### *REPORT-RECOMMENDATION*

**\*2**  This action has been referred to the undersigned for Report and Recommendation by the Honorable Thomas J. McAvoy, United States District Judge, pursuant to Local Rule 72.3(c) and 28 U.S.C. § 636(b). Generally, in this *pro se* civil rights complaint brought under 42 U.S.C. § 1983, Inmate Tasheem Goldston ("Plaintiff") alleges that two dozen corrections officers and two nurses violated Plaintiff's rights under various constitutional amendments and federal statutes while he was incarcerated at the Albany County Correctional Facility ("Albany County C.F.") in 2000. (Dkt. No. 1.) Currently before the Court is a motion for summary judgment filed by the two nurses, Jill Gervais and Robert Laventure ("Nurse Defendants"). (Dkt. No. 66.) Plaintiff has failed to respond to this motion. For the reasons discussed below, I recommend that the Nurse Defendants' motion for summary judgment be granted.

> 1    Apparently, Plaintiff misspelled the named of Nurses Gervais and Laventure as "Gervaish and "Lamentine. (*Compare* Dkt. No. 1 *with* Dkt. No. 66, Part 8  Aff. of R. Laventure], Part 10  Aff. of J. Gervais].)

## I. BACKGROUND

Plaintiff was an inmate at Albany County C.F. from September of 1999 to September of 2000. Before his conviction (for robbery in the second degree) on or about August 13, 2000, Plaintiff was a pre-trial detainee at Albany C.F. During a significant portion of his time at Albany C.F., Plaintiff was incarcerated in the facility's Special Housing Unit (or "S.H.U.") due to various disciplinary issues. For example, on at least two occasions, 2 Plaintiff was involved in physical altercations with other inmates. Plaintiff alleges that, following both of these altercations, and on four other dates, 3 he was assaulted by one or more of the twenty-five corrections officers named as Defendants in this action. Plaintiff also alleges that, following each of these six assaults, he was either provided no medical treatment or inadequate medical treatment by the Nurse Defendants. For example, Plaintiff complains that the Nurse Defendants failed to provide him with sufficient pain medication, failed to send him to an outside hospital, failed to refer him for psychological counseling, and failed to accurately report

(and indeed intentionally misreported) the cause and extent of Plaintiff's injuries. (*See generally* Dkt. Nos. 1, 66.)

> 2    The dates of these two altercations were February 6, 2000, and September 17, 2000.

> 3    These four other dates were March 1, 2000, March 14, 2000, April 2, 2000, and July 26, 2000.

In this way, Plaintiff asserts two different categories of claims: (1) one category of claims alleging that twenty-five corrections officers unjustifiably assaulted him on six separate dates, and/or implemented a policy encouraging such (alleged) unjustifiable assaults, and/or conspired to cover up such (alleged) unjustifiable assaults, in violation of the First, Eighth and Fourteenth Amendments, and three federal statutes; 4 and (2) one category of claims alleging that the Nurse Defendants violated Plaintiff's rights under the Eighth and Fourteenth Amendments 5 by being deliberately indifferent to his serious medical needs arising from certain injuries sustained as a result of the (alleged) unjustifiable assaults by corrections officers, and by making "false written reports and/or fail[ing] to give truthful accounts of the cause and extent of plaintiff's injuries" following each alleged assault. (Dkt. No. 1, ¶¶ 44-62.)

> 4    These three statutes are 42 U.S.C. §§ 1981 and 1983, and the Americans with Disabilities Act.

> 5    It is unclear what federal statutes (if any) Plaintiff is attempting to invoke in asserting his claim that the Nurse Defendants violated his civil rights by falsely reporting the cause and extent of his medical injuries. However, because Plaintiff is proceeding *pro se*, and his action alleges civil rights violations, I liberally construe this claim as attempting to implicitly invoke 42 U.S.C. § 1985 (prohibiting conspiracies to interfere with a person's civil rights).

**\*3**  Generally, the Nurse Defendants move for summary judgment on two grounds. First, they argue that Plaintiff has failed to establish (or even state) a claim under the Eighth Amendment because Plaintiff did not have a serious medical injury, and that, in any event, the treatment they provided Plaintiff was appropriate. (Dkt. No. 66, Part 11 at 11-15.) Second, they argue that Plaintiff has failed to establish (or even state) a claim that is cognizable under any constitutional amendment or federal statute, due to the fact that Plaintiff has adduced

no evidence even suggesting that the Nurse Defendants made false reports and/or failed in any way with regard to their statements concerning Plaintiff's injuries. (*Id.* at 15-16.)

## II. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a fact question exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted). However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

"If the adverse party does not so respond, summary judgment, *if appropriate,* shall be entered against the adverse party." Fed.R.Civ.P. 56(e) (emphasis added). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v.. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). "Such a motion may properly be granted only if the facts as to which there is no genuine dispute 'show that ... the moving party is entitled to a judgment as a matter of law.' " *Champion,* 76 F.3d at 486 (quoting Fed.R.Civ.P. 56[c] ). [6] Therefore, the Court must review the merits of the motion. *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001).

[6]  Local Rule 7.1(b)(3) recognizes this requirement (that the motion have merit) when it provides that "the non moving party's failure to file or serve ... opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown,  only where the motion has been "properly filed  and "the Court determines that the moving party has met its burden to demonstrate entitlement

to the relief requested therein.   N.D.N.Y. L.R. 7.1(b) (3).

Where a plaintiff has failed to respond to a defendant's Rule 7.1 Statement of Material Fact, the facts as set forth in that Rule 7.1 Statement are accepted as true to the extent those facts are supported by the record. [7] A district court has no duty to perform an independent review of the record to find proof of a factual dispute. [8] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should treated as an affidavit. [9]

[7]  *See* Local Rule 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.* ) emphasis in original]; *Vermont Teddy Bear Co., Inc. v. 1 800 Beargram Co.,* 373 F.3d 241, 243 245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... I]n determining whether the moving party has met its burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion. ) citation omitted]; *see, e.g .,* *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case,  the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement. ) emphasis added].

[8]  *See Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute. ) (citations omitted); *accord, Lee v. Alfonso,* No. 04 1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97 CV 1741, 2004 U.S. Dist. LEXIS 20746, at *12 13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04 CV 1144, 2006 U.S. Dist. LEXIS 9147, at *1 4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29,

2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371 372 (N.D.N.Y.2003) (Hurd, J.).

9   *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) (" A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment. ); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on his verified amended complaint] in opposing summary judgment ), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes. ) citations omitted]; *Fed.R.Civ.P. 56(c)* ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact.... ).

**\*4** However, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." [0] An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. In addition, such an affidavit (or verified complaint) must not be conclusory. [2] An affidavit (or verified complaint) is conclusory if, for example, its assertions lack any supporting evidence or are too general. [3]

10   *Fed.R.Civ.P. 56(e)* ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. ); *see also U.S. v. Private Sanitation Indus. Ass n of Nassau Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

11   *See Patterson,* 375 F.3d at 219 (" Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief. ... Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial. ); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) (" Defendant's] affidavit states that it is based on

personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment. ); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay ); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay ), *aff d,* 995 F.2d 1147 (2d Cir.1993).

12   *See Fed.R.Civ.P. 56(e)* (requiring that non movant "set forth specific facts showing that there is a genuine issue for trial ); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions in an affidavit] that are conclusory. ) citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56 e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings ).

13   *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment. ) citations omitted]; *West Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us was conclusory and thus insufficient to satisfy the requirements of Rule 56 e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 (" Plaintiff] has provided the court through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial. ).

Finally, even where an affidavit (or verified complaint) is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake

the suspension of disbelief necessary to credit the allegations made in the complaint." [4]

14    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554 555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence  and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint )  citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence  and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary ); *Allah v. Greiner,* 03 CV 3789, 2006 WL 357824, at *3 4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign ), *aff'd,* 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

## III. ANALYSIS

Plaintiff has not responded to the Nurse Defendants' motion, despite having been given an extension of time in which to do so, and despite having been notified that his failure to file any opposition papers may result in dismissal, as required by *Champion,* 76 F.3d at 486. (Dkt. No. 67.) Furthermore, I find that the factual assertions contained in the Nurse Defendants' Rule 7.1

Statement (Dkt. No. 66, Part 12) are supported by the evidence cited therein (i.e., to the relevant portions of the Nurse Defendants' affidavits and exhibits, and Plaintiff's deposition testimony) (Dkt. No. 66, Parts 2-10). I decline (and I recommend that the district court decline) to perform an independent review of the entire record to find proof of a factual dispute. [5] I therefore accept the facts contained in Defendants' Rule 7.1(a)(3) Statement as true for purposes of this motion.

15    *See, e.g., Lee v. Alfonso,* 97 CV 1741, 2004 U.S. Dist. LEXIS 20746, at *13 & n. 7 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) ("Magistrate Judge Sharpe accepted the facts contained in Defendants' Rule 7.1(a)(3) Statement as true for purposes of these motions  since Plaintiff did not submit a response to that Rule 7.1 Statement in compliance with the Local Rules]. This Court will do likewise. ), *aff'd,* No. 04 1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004); *Fox v. Amtrak,* 04 CV 1144, 2006 U.S. Dist. LEXIS 9147, at *2 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) ("The Court declines to sift through the factual materials that Plaintiff has submitted in an effort to find factual support for his arguments. )  citations omitted].

I note that, even if I were to perform an independent review of the entire record to find proof of a factual dispute, I would conclude that no such factual dispute exists. Granted, Plaintiff has filed a verified Complaint in this matter (Dkt. No. 1). [6] However, the factual assertions contained in that verified Complaint either support Defendants' Rule 7.1 Statement or are of no use in opposing that Rule 7.1 Statement due to some defect in that verified Complaint (e.g., the factual assertions contained therein are not based on personal knowledge and/or are entirely conclusory). [7]

16    Specifically, Plaintiff has inserted the following phrase at the end of his Complaint: "Sworn to under penalty of perjury that the foregoing is true and correct.  (Dkt. No. 1 at 18.) He follows that phrase with his signature. *(Id.)* While this signature is not followed by a stamp of a notary public, the phrase above it does substantially comply with the requirements for an "unsworn declaration,  as set forth in 28 U.S.C. § 1746. Thus, I find that Plaintiff has submitted a verified Complaint.

17    *See, supra,* Part II of this Report Recommendation (discussing the requirements for an affidavit or

verified complaint to create a factual issue on a motion for summary judgment).

Finally, I agree with the legal arguments in favor of summary judgment advanced by the Nurse Defendants in their memorandum of law (Dkt. No. 66, Part 11). As a result, resolving all ambiguities and drawing all reasonable inferences in favor of Plaintiff, I conclude that (1) the Nurse Defendants have met their burden of showing that there is no genuine dispute of material fact to be resolved at trial, (2) Plaintiff has failed to rebut that showing by coming forward with "specific facts showing that there is a genuine issue for trial," and (3) thus, the Nurse Defendants are entitled to a judgment as a matter of law.

 **\*5** While I do not believe it is necessary to repeat in this Report-Recommendation the legal arguments, and evidentiary showing, made by the Nurse Defendants in their motion papers, I do believe that it is appropriate to briefly summarize the applicable law and the undisputed material facts.

### A. Claim of Inadequate Medical Care

The Nurse Defendants generally recite the correct legal standard that governs Plaintiff's claims of inadequate medical care against the Nurse Defendants. Whether those claims arise under the Fourteenth Amendment (applicable to pretrial detainees) or the Eighth Amendment (applicable to prisoners), Plaintiff must show two things: (1) that Plaintiff had a sufficiently serious medical (or psychological) need; and (2) that the Nurse Defendants were deliberately indifferent to that serious medical (or psychological) need. [8]

[18]    *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) citations omitted]; *Bourbon v. Rodney,* 99 CV 0769, 2003 WL 21058177, at *10 (N.D.N.Y. March 6, 2003) (Sharpe, M.J.); *Llorente v. Rozeff,* 99 CV 1799, 2001 WL 474261, at *2 3 (N.D.N.Y. Apr. 12, 2001) (Munson, J.); *Wicks v. Qualtere,* 95 CV 0426, 1997 WL 176338, at *3 (N.D.N.Y. Apr. 4, 1997) (Pooler, J.).

However, I would make one revision to the Nurse Defendants recitation of the law. It appears that there exists a slight difference between claims for deliberate indifference brought under the Eighth Amendment and such claims brought under the Fourteenth Amendment. Specifically, while the standard for assessing deliberate indifference (i.e., the second part of the above two-

part test) under the Eighth Amendment is *subjective,* the standard for assessing deliberate indifference under the Fourteenth Amendment is *objective.* [9]  Under the circumstances of this case, however, I find this distinction to be academic since, regardless of which standard is applied to the second part of the above two-part test, the Nurse Defendants were not "deliberately indifferent" to any serious medical (or psychological) need.

[19]    *See, e.g., Weyant,* 101 F.3d at 856 ("In the context of a claim under the Eighth Amendment, the standard for assessing deliberate indifference is a subjective one, while "this Court has] used an objective standard  for assessing deliberate indifference under the Fourteenth Amendment) citation omitted]; *Wicks,* 1997 WL 176338, at *3 (second prong of two part test for deliberate indifference under Fourteenth Amendment is objective, not subjective) citation omitted]; *but see Bourbon,* 2003 WL 21058177, at * 10 (second prong of Fourteenth Amendment test is subjective), accord, *Llorente,* 2001 WL 474261, at *2 3.

### 1. Serious Medical Need

In support of their argument that all but one (or perhaps two) of Plaintiff's injuries were not "sufficiently serious" for purposes of the Eighth and Fourteenth Amendments, the Nurse Defendants correctly rely on Plaintiff's deposition testimony, Defendant Laventure's affidavit testimony, Defendant Gervais's affidavit testimony, and Plaintiff's medical records. (Dkt. No. 66, Part 11 at 13-16.)

Although the Nurse Defendants generally reference, in their memorandum of law, the factual assertions made by Plaintiff in his verified Complaint about the nature and extent of his injuries, the Nurse Defendants do not appear to treat sworn factual assertions as evidence. As I stated above, even if I were to treat those sworn factual assertions as evidence, I would find that those factual assertions (to the extent they are material to Defendants' motion) either actually support Defendants' Rule 7.1 Statement or are of no use in opposing that Rule 7.1 Statement due to defects in the verified Complaint. Generally, the most common defect that I observe is that the factual assertions are either entirely conclusory or they are so unsubstantiated, self-contradictory, and/or implausible that no reasonable juror would undertake the suspension of disbelief necessary to credit them. [20]

20        (*See generally* Dkt. No. 1, ¶¶ 13, 16, 21, 22, 24, 30, 31, 34, 35, 37, 39, 41, 42.)

**\*6** Briefly, the evidence of record establishes the following undisputed facts:

• Plaintiff's injuries from the alleged assault on **February 6, 2000,** consisted of (1) a swollen nose and a bruised face (which did not involve any fractures or bleeding), and (2) complaints of pain in his jaw, neck, ribs and back; these injuries healed within two weeks of the alleged assault;

• Plaintiff's injuries from the alleged assault on **March 1, 2000,** consisted of (1) some minor lumps and bruises (if any) on his head, face and wrists, (2) some "friction burns" or abrasions on his knees and thighs, and a bloody lip (but no need for stitches), and (3) complaints of pain in his lower neck, the back of his head, and parts of his body; these injuries healed within a month of the alleged assault (although Plaintiff asserts that his wrist still gives him some discomfort);

• Plaintiff's injuries from the alleged assault on **March 14, 2000,** consisted of (1) some minor bruises and/or minor cuts on his face, neck and ear, and (2) complaints of pain in various parts of his body, including his torso, neck, and face; these injuries healed within a few days of the alleged assault (although Plaintiff asserts that his ribs gave him some discomfort for a few weeks thereafter);

• Plaintiff's injuries from the alleged assault on **April 2, 2000,** consisted of (1) a swollen face, (2) a period of unconsciousness, and (3) some headaches;

• Plaintiff's injuries from the alleged assault on **July 26, 2000,** consisted of (1) a two-centimeter deep laceration on his forehead (through or above his left eyebrow), which required six stitches to close, and (2) complaints of pain in his forehead and jaw; Plaintiff's stitches were removed after about a week; and

• Plaintiff's injuries from the alleged assault on **September 17, 2000,** consisted of (1) some bruises and lumps on his head, back and neck, (2) complaints of pain in his back and neck (but no complaints of numbness or tingling), and (3) complaints of blood in his urine (although no such blood was found during a subsequent urine test); Plaintiff's injuries healed within about two months of the alleged assault. [2]

21        I note that two of the medical records that Defendant Laventure submitted (apparently to show the results of Plaintiff's urine test on or about September 18 19, 2000) appear to belong not to Plaintiff but to another person. (Dkt. No. 66, Part 9 at 32 33.)

Among the several conditions that bear on the seriousness of a prisoner's medical condition are the following: "[1] the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; [2] the presence of a medical condition that significantly affects an individual's daily activities; or [3] the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702-703 (2d Cir.1998) [internal quotations and citation omitted].

Here, there is a some evidence (e.g., the notations contained in Plaintiff's medical records) that Plaintiff did not report (nor, consequently, did any medical staff treat) some of his alleged injuries at the time of his medical examinations. Of course, Plaintiff would argue that the lack of notations about certain injuries in his medical records resulted not from his failure to comment on those injuries but from a failure by staff to record those injuries (and indeed a conspiracy among staff to cover up those injuries). More pertinent, I think, in assessing the seriousness of Plaintiff's medical condition are the other two factors stated above. Specifically, there is little or no evidence that these injuries significantly affected at the time (or now) Plaintiff's daily activities. In addition, there is little or no evidence that Plaintiff experienced chronic and substantial pain as a result of these injuries.

**\*7** As a result, I find that the vast majority of the above injuries (e.g., Plaintiff's lumps, bumps, bruises, scratches, minor cuts and temporary pains) are not, when considered either alone or together, sufficiently serious for constitutional purposes. [22] The only injuries that give me pause are (1) the injuries sustained on April 2, 2000, which caused Plaintiff to experience a period of unconsciousness and subsequent headaches, (2) the injuries sustained on July 26, 2000, which included a two-centimeter deep laceration on his forehead that required six stitches to close, and (3) the injury (sustained on September 17, 2000), which (allegedly) led to the presence of blood in Plaintiff's urine. While I find authority suggesting that such injuries may not be sufficiently serious for constitutional

purposes,[23] I also find authority suggesting that they may be sufficiently serious.[24]

[22]    *See Benitez v. Straley,* 01 CV 0181, 2006 U.S. Dist. LEXIS 6382, at *8, 10, 33 (S.D.N.Y. Feb. 16, 2006) (cut on plaintiff's lips, cut on plaintiff's head, and "severe cuts to plaintiff's wrists none of which required stitches did not constitute a medical condition that was sufficiently serious for purposes of Eighth Amendment, even if plaintiff's allegations were assumed to be true); *Rodriguez v. Mercado,* 00 CV 8588, 2002 U.S. Dist. LEXIS 16057, at *8, 24 (S.D.N.Y. Aug. 28, 2002) (bruises to plaintiff's head, back and wrists, accompanied by back pain and migraines but no loss of consciousness, did not constitute a medical condition that was sufficiently serious for purposes of Eighth Amendment); *Montavon v. Town of Southington,* 95 CV 1141, 1997 U.S. Dist. LEXIS 21883, at *10 11 (D.Conn. Sept. 29, 1997) (plaintiff's cuts and scrapes, unaccompanied by profuse bleeding or other conditions, did not constitute a medical condition that was sufficiently serious for purposes of Fourteenth Amendment); *Sanford v. Hayden,* 92 CV 7629, 1994 U.S. Dist. LEXIS 21265, at *3, 21 (S.D.N.Y. Aug. 29, 1994) (cuts, bruises, and abrasions, which were not cleaned, cap for tooth, which was not replaced, and blurred vision and headaches due to fact that glasses were not replaced, did not constitute a medical condition that was sufficiently serious for purposes of either Eighth or Fourteenth Amendment).

[23]    *See, e.g., Rodriguez v. Westchester County Jail Corr. Dept.,* 98 CV 2743, 2003 U.S. Dist. LEXIS 6509, at *2, 15 16 (S.D.N .Y. Apr. 17, 2003) (cut above eye, which cut was three centimeters long and two millimeters deep and required "butterfly stitches, did not constitute a medical condition that was sufficiently serious for purposes of the Eighth Amendment); *Brown v. Picarelli,* 96 CV 1222, 2003 U.S. Dist. LEXIS 6500, at *22 23 (S.D.N.Y. Apr. 15, 2003) ("cut across plaintiff's] right ear, face and the back of his head which wounds were cleaned, stitched up, wrapped in gauze, and stopped from bleeding, and whose swelling was treated with Tylenol] did not constitute a medical condition that was sufficiently serious for purposes of the Eighth Amendment); *Reyes v. Turner,* 93 CV 8951, 1996 U.S. Dist. LEXIS 2504, at *9 10 (S.D.N .Y. March 5, 1996) (the presence of blood in plaintiff's urine did not constitute a medical condition that was sufficiently serious for

purposes of the Eighth Amendment where a nurse determined that plaintiff was "stable, not in acute distress, and not acutely ill ).

[24]    *See, e.g., Ellis v. Guarino,* 03 CV 6562, 2004 U.S. Dist. LEXIS 16748, at *33 34 (S.D.N.Y. Aug. 25, 2004) (" S]welling on plaintiff's] face, contusions on both ears and on his forehead, abrasions on his shoulder, a one millimeter laceration in his right eye, and ... blurred vision, headaches, dizziness and ringing in plaintiff's] ears, the latter of which occurred several days after the attacks in question] constituted a medical condition that was sufficiently serious for purposes of the Eighth Amendment); *Lasher v. City of Schenectady,* 02 CV 1395, 2004 U.S. Dist. LEXIS 14871, at *16 17 (N.D.N.Y. Aug. 3, 2004) (McAvoy, J.) (broken nose that was profusely bleeding for two hours might constitute a medical condition that was sufficiently serious for purposes of the Eighth Amendment) citing, *inter alia, Aldridge v. Montgomery,* 753 F.2d 970, 972 973 (11th Cir.1985), holding that one and a half inch cut over detainee's eye that was bleeding profusely for two and a half hours was a serious medical need]; *Candelaria v. Coughlin,* 91 CV 2978, 1996 U.S. Dist. LEXIS 2298, at *21 23 (S.D.N.Y. March 1, 1996) (the presence of blood in plaintiff's urine, which condition was evidenced by plaintiff's medical records, and which condition resulted in an infection of plaintiff's bladder and kidneys, might constitute a medical condition that was sufficiently serious for purposes of the Eighth Amendment).

As a result, out of an abundance of caution, I will assume for the sake of argument that Plaintiff's injuries sustained on April 2, 2000, July 26, 2000, and September 17, 2000, are sufficiently serious for constitutional purposes. However, I conclude that the other claims asserted by Plaintiff against the Nurse Defendants (i.e ., the claims arising out of the injuries sustained on February 6, 2000, March 6, 2000, and March 14, 2000) should be dismissed.

### 2. Deliberate Indifference

In support of their argument that neither Defendant Laventure nor Defendant Gervais were deliberately indifferent to any of Plaintiff's medical (or psychological) needs, the Nurse Defendants correctly rely on Plaintiff's deposition testimony, Defendant Laventure's affidavit testimony, Defendant Gervais's affidavit testimony, and Plaintiff's medical records. (Dkt. No. 66, Part 11 at 13-16.)

Again, although the Nurse Defendants generally reference, in their memorandum of law, the factual assertions made by Plaintiff in his verified Complaint about the (alleged) neglect and indifference exhibited by the Nurse Defendants (and others) during his medical treatment at Albany C.F. following the aforementioned six (alleged) assaults, the Nurse Defendants do not appear to treat those sworn factual assertions as evidence. As I stated above, even if I were to treat those sworn factual assertions as evidence, I would find that those factual assertions (to the extent they are material to Defendants' motion) either actually support Defendants' Rule 7.1 Statement or are of no use in opposing that Rule 7.1 Statement due to defects in the verified Complaint. Generally, the three most common defects that I observe are that (1) the factual assertions are not based on personal knowledge (but speculation), (2) the factual assertions are entirely conclusory, or (3) the factual assertions are so unsubstantiated, self-contradictory, and/or implausible that no reasonable juror would undertake the suspension of disbelief necessary to credit them. [25]

25    (Dkt. No. 1, ¶¶ 16, 23, 24, 28, 31, 35, 39.)

Briefly, the evidence of record established the following undisputed facts:

  **\*8** • During the hours following the alleged assault on Plaintiff on **February 6, 2000,** [26] Plaintiff was examined in the Albany County C.F. medical unit by Defendant Laventure, who noted the findings of his examination in Plaintiff's medical records, and offered Plaintiff an ice pack to treat his injuries; before this examination, Plaintiff was provided pain medication (Tylenol) by another member of the medical staff, and during the following weeks, Plaintiff was also provided pain medication (Motrin) by another member of the medical staff;

26    It appears from Plaintiff's verified Complaint and medical records (and the uncertain, speculative and self contradictory testimony contained in Plaintiff's deposition transcript) that this examination occurred at about 9:30 a.m. on February 6, 2000 (about thirty minutes following the alleged assault on Plaintiff at about 9:00 a.m.).

• During the hours following the alleged assault on Plaintiff on **March 1, 2000,** [27] Plaintiff was examined in his cell by Defendant Gervais, who noted the findings of her examination in Plaintiff's medical records, and provided

Plaintiff with pain medication (Tylenol) and an ice pack to treat his injuries; during the following days, Plaintiff's wrist was treated by other members of the medical staff;

27    It appears from Plaintiff's verified Complaint, medical records, and deposition testimony that this examination occurred at about 8:40 p.m. on March 1, 2000 (less than two hours following the alleged assault on Plaintiff at about 7:00 p.m.).

• During the hours following the alleged assault on Plaintiff on **March 14, 2000,** Plaintiff was examined by a nurse (other than the two Nurse Defendants) from the Albany County C.F. medical unit;

• During the hours following the alleged assault on Plaintiff on **April 2, 2000,** Plaintiff was examined by a nurse (other than the two Nurse Defendants) from the Albany County C.F. medical unit;

• During the hours following the alleged assault on Plaintiff on **July 26, 2000,** Plaintiff was examined by medical personnel (other than the two Nurse Defendants) from the Albany County C.F. medical unit, and he received an ice pack, pain medication (Tylenol), and six stitches to his forehead; and

• During the hours following the alleged assault on Plaintiff on **September 17, 2000,** [28] Plaintiff was examined in his cell by Nurse Gervais, who noted the findings of her examination in Plaintiff's medical records, and offered Plaintiff an ice pack and pain medication (Motrin) to treat his injuries; on the next day, he was treated by a physician's assistant from the Albany County C.F. medical unit, who ordered a urine test (for the presence of blood), whose results were negative; and on the following day, he was treated by another member of the facility medical staff; he was transferred to another correctional facility on or about September 29, 2000.

28    It appears from Plaintiff's verified Complaint and medical records (and the nonresponsive and vague testimony contained in Plaintiff's deposition transcript) that this examination occurred at about 6:30 p.m. on September 17, 2000 (about ninety minutes following the alleged assault on Plaintiff at about 5:00 p.m., when he was returning from recreation).

Thus, of the six instances of medical treatment about which Plaintiff complains, only three of those instances

of treatment (i.e ., on February 6, 2000, March 1, 2000, and September 17, 2000) involve one of the two Nurse Defendants. However, none of these three instances of medical treatment establish a claim for deliberate indifference against the Nurse Defendants. Rather, the evidence demonstrates that, on each of the three dates in question, one of the two Nurse Defendants examined Plaintiff, recorded the findings of his or her examination in Plaintiff's medical records, and treated Plaintiff (providing Plaintiff with ice packs and/or pain medication), within hours of the alleged assaults. Furthermore, on each of the instances, Plaintiff was treated by other members of the facility medical staff before and/or after being treated by one of the Nurse Defendants. [29] Based on the record before me, I simply cannot find any evidence that the Nurse Defendants exhibited the sort of intentional or reckless disregard that is required to satisfy the second part of the above two-part test. [30] I note that, to the extent that Plaintiff is alleging that the Nurse Defendants were merely careless or neglectful in their care of him (and in their record keeping), such allegations fail to state a claim for deliberate indifference since such *negligence* is not actionable under Section 1983. [3]

[29]    (*See, e.g.,* Dkt. No. 66, Part 5 at 31 39 containing Plaintiff's deposition testimony in which he admits that he received care from "an Indian lady,  who gave him Tylenol, before he received care from Defendant Laventure on 2/6/00]; Dkt. No. 66, Part 6 at 57 58  containing Plaintiff's deposition testimony in which he admits that, about one to three days after 3/1/00, he submitted several sick call requests regarding his wrist, some of which were answered]; Dkt. No. 66, Part 6 at 100 & Part 7 at 101  containing Plaintiff's deposition testimony in which he admits that he received treatment for his complaints of blood in his urine in the weeks after 9/17/00]; Dkt. No. 66, Part 9 at 6 containing notes of such follow up treatment on 9/18/00], 9  containing notes of such follow up treatment on 9/18/00 and 9/19/00], 16  containing notes of such follow up treatment on 2/21/00].)

[30]    *See Rodriguez,* 2002 U.S. Dist. LEXIS 16057, at *24, 29 (no deliberate indifference where nurse treated inmate's bruises to his head, back and wrist with Tylenol within eight or nine hours of his injury)

[31]    *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) (" A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  ).

**\*9**    Even if Plaintiff had established deliberate indifference by the Nurse Defendants during three instances of medical treatment, only one of those instances of medical treatment (i.e., on September 17, 2000) was in response to a medical condition that is *sufficiently serious* for constitutional purposes (i.e., the alleged presence of blood in Plaintiff's urine). As discussed above in Part III.A.1. of this Report-Recommendation, the other two instances of medical treatment (i.e., on February 6, 2000, and March 1, 2000) were not in response to a medical condition that is sufficiently serious for constitutional purposes. With respect to the treatment on September 17, 2000, there is no evidence that Defendant Gervais denied Plaintiff adequate medical care on that date. Rather, again, the evidence shows that, within hours of the alleged assault, Defendant Gervais examined Plaintiff, recorded the findings of her examination in Plaintiff's medical records, and offered Plaintiff an ice pack and pain medication. The adequacy of this treatment is further supported by the fact that Plaintiff's urine subsequently tested negative for the presence of blood. [32] Furthermore, Plaintiff received treatment from other members of the facility medical staff after receiving treatment by Defendant Gervais.

[32]    *See Reyes,* 1996 U.S. Dist. LEXIS 2504, at *3 6, 9 10 (defendant did not exhibit deliberate indifference to plaintiff's complaints about the presence of blood in his urine where defendant examined plaintiff the day after such complaints and did not find anything wrong with plaintiff except for minor scrapes and scratches).

As to the other three instances of medical treatment (i.e., on March 14, 2000, April 2, 2000, and July 26, 2000), none of them establish (or even state) a claim for deliberate indifference against *the Nurse Defendants* (but rather some other, unidentified members of the facility medical staff). Plaintiff's apparent legal theory that the Nurse Defendants are somehow liable due to the fact that they were employed in the same medical unit as these unidentified staff members is unavailing. This is especially true since Plaintiff has not shown that (1) the unidentified "offending" staff members did anything wrong, or (2) the Nurse Defendants even knew of Plaintiff's injuries on the three dates in question. Any deposition testimony or sworn statement that Plaintiff offers to the contrary is

so vague, replete with inconsistencies and improbabilities, unsubstantiated by the record evidence, and indeed flatly contradicted by the entirety of the record evidence that no reasonable juror would undertake the suspension of disbelief necessary to credit that testimony or sworn statement.

Finally, I should say a word about Plaintiff's claim against the Nurse Defendants for denial of adequate psychological care. That claim fails for numerous reasons: (1) Plaintiff has failed to adduce any evidence that, at any time, he has suffered from a serious psychological condition; [33] (2) Plaintiff has failed to adduce any evidence that, at any time, the Nurse Defendants were aware that he had any serious psychological condition; (3) Plaintiff has failed to adduce any evidence that providing psychological treatment (or referrals for psychological treatment) was within the Nurse Defendants' duties or powers; and (4) indeed, Plaintiff admitted in his deposition that he has no evidence (or even any real claim) against the Nurse Defendants for a denial of adequate psychological care. [34]

[33]    (See, e.g., Dkt. No. 66, Part 7 at 103 (containing Plaintiff's deposition transcript, in which he admits that he has never been diagnosed with any psychiatric conditions).

[34]    (See, e.g., Dkt. No. 66, Part 7 at 104 (containing Plaintiff's deposition transcript, in which he admits that any claim for inadequate psychological care "wouldn't be against Nurse Gervaish  sic] or Laventine  sic], but the medical department as a whole.  ).

*10  In light of the foregoing, I recommend that the Court dismiss all of Plaintiff's claims against the Nurse Defendants for deliberate indifference to a serious medical (or psychological) need.

### B. Claim of Conspiracy

Also without any evidentiary support is Plaintiff's claim that the Nurse Defendants engaged in some sort of unlawful conspiracy to cover up the alleged assaults of Plaintiff by falsely reporting (or refusing to report) the cause and extent of Plaintiff's injuries. I agree with the Nurse Defendants' factual assertions, and legal argument, concerning this claim. (Dkt. No. 66, Part 11 at 15-16.) I would only add one point.

I believe that Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should properly be asserted under 42 U.S.C. § 1985. [35] To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." [36] Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. [37]

[35]    See Webb v. Goord, 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights  as Section 1985 claim).

[36]    Webb, 340 F.3d at 110  internal quotation marks and citations omitted].

[37]    Id. (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants  ); Boddie v. Schneider, 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights  is proper).

Here, Plaintiff has adduced no evidence establishing such a meeting of the minds (express or tacit). Specifically, his deposition transcript is bereft of any such evidence and contains, at best, only speculation or conclusory assertions. (See, e.g., Dkt. No. 66, Part 7 at 107 [stating that the Nurse Defendants "were working with the officers, I believe "] [emphasis added].) Furthermore, the Nurse Defendants' affidavits and exhibits contradict the existence of such a meeting of the minds. (See, e.g., Dkt. No. 8, ¶¶ 14-18; Dkt. No. 10, ¶¶ 18-22.)

The main problem with Plaintiff's conspiracy claim is that it is premised on the mistaken assumption that the Nurse Defendants had a duty to record, in Plaintiff's medical records, the cause of Plaintiff's injuries. (See, e.g., Dkt. No. 1, ¶ 17 [Plf's Compl., alleging that Defendant Laventure "failed to give truthful accounts of the cause and extent of plaintiff's injuries following the [February 6, 2000] beating"], ¶ 24 [alleging that Defendant Gervais "omitted that plaintiff told [her] that correction officers assaulted him within the body of the report in plaintiff's medical records"], ¶ 28 [same], ¶ 39 [same].)

As an initial matter, I note that, because the Nurse Defendants did not observe any of the alleged assaults

in question (which fact Plaintiff acknowledges), they did not have any *personal knowledge* of the cause of Plaintiff's injuries, and they would have had to rely solely on Plaintiff's *hearsay* account of the cause of his injuries in recording such information in his medical records. More important, however, is the fact that, because the Nurse Defendants had no *duty* under the law to record such information in medical records (since that information is not necessary for medical treatment), their "failure" to record any such information in this case cannot serve as evidence of any conspiracy.

 **\*11** Finally, I note that I would reach the same conclusion even if I considered Plaintiff's factual assertions on the subject in his verified Complaint, each of which is either not based on personal knowledge or is entirely conclusory. (*See generally* Dkt. No. 1, ¶¶ 1, 17, 24, 28, 39, 40, 60, 61 [Plf's Compl., setting forth assertions regarding this alleged conspiracy, which assertions are either speculative or conclusory].)

**ACCORDINGLY,** it is

**RECOMMENDED** that the Nurse Defendants' motion for summary judgment (Dkt. No. 66) be ***GRANTED.***

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2595194

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1312738
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Damien ADAMS, Plaintiff,

v.

Superintendent D. ROCK et al., Defendants.

No. 9:12–cv–1400 (GLS/ATB).
|
Signed March 24, 2015.

**Attorneys and Law Firms**

Damien Adams, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, The Capitol, Joshua E. Mcmahon, Assistant
Attorney General, of Counsel, Albany, NY, for the
Defendants.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** *Plaintiff pro se* Damien Adams commenced this action
against defendants A. Lashway, D. Rock, T. Zerniak,
R. Bishop, Traver, Cromp, R. Winston, Mitchee, and
Orzech, pursuant to 42 U.S.C. § 1983, alleging violations
of the First, Eighth, and Fourteenth Amendments. [2] (*See
generally* Compl., Dkt. No. 1.)

[1]    Although named in the complaint as "Mitchee, it
       appears that the party's proper name is Mitchell.
       (Dkt. No. 55 at 2 n. 2.) The court will thus refer to
       him as such.

[2]    By Decision and Order dated January 4, 2013, this
       court sua sponte dismissed Adams' due process,
       interference with grievance, and equal protection
       claims, and thus also dismissed Zerniak and Orzech
       as defendants in this action. (Dkt. No. 14.)

On March 7, 2014, defendants moved for summary
judgment. (Dkt. No. 47.) In a Report Recommendation
(R & R) issued on December 9, 2014, Magistrate Judge

Andrew T. Baxter recommended that defendants' motion
for summary judgment be granted in its entirety, and
Adams' complaint be dismissed. (Dkt. No. 55.) Pending
are Adams' objections to the R & R. (Dkt. No. 56.) For the
reasons that follow, the R & R is adopted in its entirety.

### II. *Background*

Adams is an inmate currently in the custody of the New
York State Department of Corrections and Community
Supervision, and, during the time period relevant to
his claims, was housed at Upstate Correctional Facility.
(Defs.' Statement of Material Facts (SMF) ¶¶ 1 2, Dkt.
No. 47, Attach. 1.) Shortly after he arrived at Upstate,
Adams prepared a grievance about the condition of his
cell. (*Id.* ¶ 2.) On May 15, 2012, Adams put his grievance
in the mail, which was collected by Mitchell. (*Id.* ¶¶ 3, 5
6.) Later that same day, Winston issued a misbehavior
report to Adams for failing to return his food tray and
disobeying a direct order. (*Id.* ¶ 11.) Adams alleges that
this misbehavior report was issued in retaliation for his
submission of a grievance earlier that day. (Compl. at 5.)
At the time Winston issued the misbehavior report, he had
no knowledge of Adams' grievance. (Defs.' SMF ¶ 12 .)

Adams alleges that, in anticipation of his disciplinary
hearing, he "was placed on a Pre Hearing Restricted
Diet for seven days total," which caused him to feel ill.
(Compl. at 6.) According to Adams, Traver and Lashway
ignored his complaints and his efforts to secure medical
treatment. (*Id.* at 6, 8.) Adams alleges that he submitted
two additional grievances in June 2012, in which he
complained about the false misbehavior report and the
lack of medical attention provided to him in response
to his complaints. (*Id.* at 8 9.) He contends that these
grievances were never properly processed by the grievance
investigator, Cromp, "in retaliation for filing them at this
point." (*Id.*) Upstate does not have any record of these
grievances ever being filed. (Defs.' SMF ¶ 23.)

### III. *Standard of Review*

Before entering final judgment, this court reviews report
and recommendation orders in cases it has referred to
a magistrate judge. If a party properly objects to a
specific element of the magistrate judge's findings and
recommendations, this court reviews those findings and

recommendations *de novo*. *See Almonte v. N. Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at *3, *5 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at *45.

### IV. *Discussion*

**\*2** In his R & R, Judge Baxter recommended that defendants' motion for summary judgment be granted and all of Adams' claims dismissed. (Dkt. No. 55.) First, with respect to Adams' claim regarding being placed on a restricted diet, Judge Baxter recommended that it be dismissed, noting the caselaw precedent within the Second Circuit dismissing Eighth Amendment claims premised on the imposition of similar dietary restrictions, as not alleging a sufficiently serious deprivation to constitute cruel and unusual punishment. (*Id.* at 5 7 (citing, *inter alia, McEachin v. McGuinnis,* 357 F.3d 197, 199 200 (2d Cir.2004).) Next, with respect to Adams' medical indifference claim, Judge Baxter recommended dismissal because Adams' allegations were not supported by any facts in the record, and because the issues of which Adams complained constipation and minor bleeding during bowel movements were not sufficiently serious to satisfy the objective component of an Eighth Amendment deliberate indifference claim. (*Id.* at 8 13.) Further, Judge Baxter noted that Adams' claim was based merely on his subjective "disagreement with the medical staff's judgment as to appropriate treatment[, which] does not rise to the level of deliberate indifference." (*Id.* at 15 citing *Black v. Fischer,* No. 9:08 CV 0232, 2010 WL 2985081, at *11 (N.D.N.Y. July 1, 2010).)

Judge Baxter also recommended dismissing Adams' First Amendment retaliation claim because he could not establish a causal connection between his protected conduct filing grievances and any adverse action on the part of the defendants against whom this claim is alleged. (*Id.* at 16 26.) Specifically, Adams failed to demonstrate that either Mitchell or Winston, who were alleged to have filed a misbehavior report against him in retaliation for his filing of grievances, even knew about the grievances he had filed. (*Id.* at 19 23.) Further,

Adams could not prove that Cromp declined to process two particular grievances filed by Adams, in retaliation for his filing of those same grievances, because there was no record evidence that Adams ever submitted such grievances, and, in any event, " 'the refusal to process a small number of grievances does not constitute an adverse action' required to support a First Amendment retaliation claim." (*Id.* at 23 (quoting *Hill v. Laird,* No. 06 CV 126, 2014 WL 1315226, at *10 (E.D.N.Y. Mar. 31, 2014).) Finally, as to Rock, Adams failed to demonstrate personal involvement in any of the alleged constitutional violations. (*Id.* at 25 26.)

Here, in his objections, Adams utterly fails to identify errors with any specific portion of the R & R. (*See generally* Dkt. No. 56 .) Instead, he simply states, in a single sentence, that he "wish[es] at this time to make a[n] objection to the decision render[ed] on the date of December 9, 2014." (*Id.*) This "objection" is not sufficient to trigger *de novo* review. Accordingly, consistent with the standards set forth in *Almonte,* 2006 WL 149049, at *3 5, the court has carefully reviewed the record, found no clear error in the R & R, and adopts it in its entirety.

### V. *Conclusion*

**\*3 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's December 9, 2014 Report Recommendation (Dkt. No. 55) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 47) is **GRANTED;** and it is further

**ORDERED** that Adams' complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum Decision and Order to the parties.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt.Nos.47, 50), to which plaintiff has responded (Dkt. No. 51). This matter was referred for Report and Recommendation on March 7, 2014 by Chief U.S. District Judge Gary L. Sharpe, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

## BACKGROUND

Plaintiff filed this civil rights action alleging various violations of his federal constitutional rights while confined by the New York Department of Corrections and Community Supervision ("DOCCS") at the Upstate Correctional Facility ("Upstate") between May and July 2012. (Compl., Dkt. No. 1). By Decision and Order dated January 4, 2013, Chief Judge Sharpe dismissed, sua sponte, some of plaintiff's claims and some of the defendants named in the complaint. (Dkt. No. 14 at 13 14). [1] Plaintiff's surviving claims are: (1) an Eighth Amendment claim alleging that defendants Rock, Bishop, and Lashway subjected plaintiff to cruel and unusual punishment by placing him on a restricted diet for seven days pending a disciplinary hearing; (2) a claim that defendants Lashway, Travers, and Rock violated the Eighth Amendment by their deliberate indifference to plaintiff's serious medical needs, involving constipation and related issues; and (3) First Amendment claims that defendants Winston and Mitchell [2] filed a false misbehavior report against plaintiff in retaliation for a grievance that plaintiff submitted, and that defendants Cromp and Rock retaliated against plaintiff for filing two later grievances by failing to process those grievances.

[1] Some of plaintiff's claims were denied without prejudice, with leave to amend. Plaintiff, however, did not move to amend his complaint.

[2] The complaint spells defendant Mitchell's last name as "Mitchee." The court will use the correct spelling provided in the defense motion papers.

Defendants have moved for summary judgment, arguing that placing plaintiff on a restricted diet for seven days could not constitute cruel and unusual punishment under the Eighth Amendment. Defendants further contend that plaintiff's medical conditions were not sufficiently serious to support his deliberate indifference claims. Finally, defendants argue that plaintiff's retaliation claims should be dismissed because no reasonable fact finder could conclude that there was an adequate causal connection between any protected activity on plaintiff's part and any adverse action by the defendants. (Def.s' Mem. of Law at 1, Dkt. No. 47 9). For these, and other reasons, the court recommends that plaintiff's remaining claims be dismissed. [3]

[3] Defendants also argue that plaintiff's claims should be dismissed for failure to exhaust administrative remedies because the grievances allegedly submitted regarding the incidents relevant to this action were not filed within the time period required by applicable regulations. Because I find that plaintiff's claims are subject to dismissal for other reasons, I need not address the exhaustion issue.

## OVERVIEW OF FACTS

*4 Plaintiff was transferred to Upstate on May 14, 2012, where he was confined in a Special Housing Unit ("SHU"). (Compl., Dkt. No. 1 at 5). [4] The next morning, he and his cell mate submitted grievances complaining about the "filthy" conditions in their cell. (Dkt. No. 47 7 at 5). Defendant Mitchell picked up the mail that morning, including plaintiff's grievance. (Dkt. No. 1 at 5). Later on May 15th, defendant Winston issued a misbehavior report, witnessed by defendant Mitchell, alleging that plaintiff refused to return his "feed up tray." (Winston Decl., Ex. A, Dkt. No. 47 2 at 4). Plaintiff alleges the misbehavior report was false and was issued to retaliate for plaintiff's submission of a grievance earlier that same day. (Dkt. No. 1 at 5).

[4] Because the complaint does not have consistent, consecutive page or paragraph numbers, the court will reference the page number assigned in the header created by our CM ECF electronic docketing system.

Pending plaintiff's disciplinary hearing, defendants Rock, Bishop, and Lashway placed plaintiff on a restricted diet for seven days. (Dkt. No. 1 at 6). Plaintiff claims that the restricted diet left him "weak and dizzy" and that Nurse Travers ignored his efforts to get medical attention. (Id.). He further alleges that Nurse Practitioner Lashway ignored plaintiff's complaints, starting in late June, about

constipation and rectal bleeding. (Dkt. No. 1 at 8). On July 23, 2012, shortly after being transferred from Upstate, plaintiff was taken to a hospital emergency room to address his complaints of pain and anal bleeding. He was diagnosed with an anal fissure and prescribed sitz baths and topical lidocaine. (Dkt. No. 50 at 55 57).

Plaintiff alleges that he submitted two grievances, one dated June 20, 2012, and the other date June 21st, complaining about the allegedly false and retaliatory misbehavior report filed against him, the lack of medical attention he received while on the restricted diet, and irregularities in the subsequent disciplinary proceeding, at which plaintiff was not present. (Dkt. No. 47 7 at 12 15). Plaintiff claims that Grievance Investigator Cromp met with plaintiff about these grievances on June 27, 2012, but never processed the grievances in retaliation for plaintiff's submission of them. (Dkt. No. 1 at 8 9).

Defendants' Memorandum of Law (at 2 5) summarizes the facts they offer by affidavit to oppose plaintiff's surviving claims. Rather than further discussing these facts at the outset, the court will address the details below to the extent they are necessary to address the issue raised in defendants' summary judgment motion.

## DISCUSSION

### I. Summary Judgment
Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; Salahuddin v. Goord, 467 F.3d 263, 272 73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir.1994).

*5 The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. Salahuddin v. Goord, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. See United States v. Diebold, Inc ., 369 U.S. 654, 655 (1962); Salahuddin v. Goord, 467 F.3d at 272.

### II. Eighth Amendment Claim Regarding Restricted Diet
Following the filing of the misbehavior report against plaintiff on May 15, 2012 for refusing to return his feed-up tray, Lt. Bishop recommended that plaintiff be placed on a restricted diet for seven days. (Bishop Decl. ¶¶ 3 6 & Ex. A, Dkt. No. 474). DOCCS regulations provide that an inmate in SHU may be placed on a restricted diet for up to seven days pending the outcome of a disciplinary hearing regarding, *inter alia,* a refusal to obey a direct order to return a food container or utensil at the conclusion of a meal. 7 N.Y. Comp.Codes R. & Regs. § 304.2. After Nurse Practitioner Lashway gave medical approval for plaintiff to be placed on the restricted diet, Supt. Rock approved the imposition of a pre-hearing restricted diet for a period of seven days. (Bishop Decl. ¶¶ 8 9; Lashway Decl. ¶¶ 3 9, Dkt. No. 47 5). The restricted diet, which is required to be "wholesome and nutritious," includes a portion of raw cabbage and a 2# by 6# loaf consisting of bread ingredients, milk, carrots, and potatoes, served three times per day. (Lashway Decl. ¶¶ 5 6).

The Eighth Amendment's protection of prisoners from "cruel and unusual punishment" includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. Farmer v. Brennan, 511 U.S. 825, 837 (1994). Conditions imposed by a prison official violate the Eighth Amendment only when a plaintiff establishes that (1) he was confined under conditions that exposed him to a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. Id. at 834.

With respect to the first prong, "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." Robles v. Coughlin, 725 F.2d 12, 15 16 (2d Cir.1983) (citations omitted). For instance, " 'the Eighth

Amendment prohibition against cruel and unusual punishment does require that prisoners be served nutritionally adequate food ... [that does not] present an immediate danger to health and well being of the inmates who consume it.' " *Id.* at 15 (citation omitted). With respect to the second prong, deliberate indifference to inmate health or safety may be shown where a prison official knew a diet was inadequate and likely to cause pain. *See Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002).

**\*6** Courts in this circuit routinely have dismissed Eighth Amendment claims based on the imposition of a pre-hearing restricted diet for seven days, or similar dietary restrictions, finding that the inmates failed to establish sufficiently "serious" deprivations. *See, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 199 200 (2d Cir.2004) (affirming district court's dismissal of Eighth Amendment claim alleging, *inter alia,* that inmate was placed on a restricted diet consisting of "loaf" for seven days pending a disciplinary hearing); *Smith v. Burge,* No. 9:03 CV 955 (LEK/GHL), 2006 WL 2805242, at *1, 11 & n. 78 (N.D.N.Y. Sept. 28, 2006) ("[a]t most, Plaintiff was deprived of food that tasted good for a period of seven days") (collecting cases); *Willey v. Kirkpatrick,* No. 07 CV 6484, 2013 WL 434188, at *10 (W.D.N.Y. Feb. 4, 2013). Moreover, as discussed further below, no rational fact finder would conclude that defendants Lashway and Travers were deliberately indifferent to any serious medical risk to plaintiff while he was on the restricted diet. Accordingly, this court recommends that plaintiff's Eighth Amendment claim based the seven-day period during which he was on a restricted diet should be dismissed.[5]

---

[5]    To the extent the plaintiff is asserting a due process claim against defendants Rock, Bishop, and Lashway, based on the imposition of a restricted diet for seven days before a disciplinary hearing, that claim should also be dismissed based on the reasoning in Chief Judge Sharpe's January 4, 2013 Decision and Order. (Dkt. No. 14 at 5). Plaintiff was found guilty of the misbehavior report, but was sentenced to a seven day restricted diet, which plaintiff had, by that time, already served. (Bishop Decl. ¶ 11 & Ex. B, Dkt. No. 47 4 at 2, 7 9). To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process.

*Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. Chief Judge Sharpe dismissed the due process claim against former defendant Zerniak relating to the disciplinary proceedings against the plaintiff because the imposition of a restricted diet for seven days did not create an " 'atypical and significant hardship sufficient to implicate due process rights. (*Id.*). The same rationale would preclude a due process claim against anyone involved with the pre hearing imposition of the restricted diet for seven days. *See, e.g., Smith v. Burge,* 2006 WL 2805242, at *1, 12 14 & n. 88 (dismissing substantive and procedural due process claims relating to a pre hearing imposition of a restricted diet for seven days) (*citing, inter alia, McEachin v. McGuinnis,* 357 F.3d at 199, 200, 201).

## III. Eighth Amendment Claim Regarding Medical Care

### A. Applicable Law
In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183 84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184.

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' " *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently

serious." *Smith v. Carpenter,* 316 F.3d at 185 86. When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto,* 248 F. App'x at 236.

**\*7** The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or nonexistent." *Id.* at 844. Thus, the Second Circuit has stated that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d 263, 281 (2d Cir.2006).

A difference of opinion between an inmate and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784

F.Supp. 35, 44 45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

**B. Analysis**

As noted above, Nurse Practitioner Lashway determined that plaintiff was medically eligible before he was placed on a restricted diet. (Lashway Decl. ¶¶ 7 9). On May 16 and 17, 2012, plaintiff made sick call requests, but was not standing by the door with the light on in his cell, as required to be seen by the medical staff. (Travers Decl. ¶¶ 6 7, Dkt. No. 47 6; Ambulatory Health Records ("AHR"), Dkt. No. 50 at 3839). Plaintiff alleges that Nurse Travers took advantage of the policy created by Upstate Superintendent Rock, that SHU inmates were required to have their cell lights on to be seen on sick call, by falsely claiming that plaintiff's cell light was not on to avoid treating plaintiff. (Dkt. No. 1 at 6 7). Plaintiff claims that, although he was weak and dizzy from the restricted diet, he was discouraged by Nurse Travers's efforts to avoid giving him medical attention; so he decided to wait for his disciplinary hearing to address his issues. (*Id.*). However, plaintiff produced, in discovery, medical records confirming that, between and including May 18 and 21, 2012, he was evaluated by other medical staff at Upstate, and displayed no evident medical problems relating to his diet. On two of those days, plaintiff explicitly denied that he had any medical complaints. (Scott Decl. ¶ 3 & Ex. A, Dkt. No. 47 7 at 1, 31 34).

**\*8** Plaintiff also alleges that defendant Lashway ignored his written complaint, on June 22, 2012, of constipation and rectal bleeding when he went to the bathroom. (Dkt. No. 1 at 8, 16 17). Plaintiff's letter to Nurse Practitioner Lashway acknowledges that he was treated for constipation, with a stool softener, by the Upstate Medical staff on June 21st. (Dkt. No. 47 7 at 16; AHR, Dkt. No. 50 at 38; Travers Decl. ¶ 8). Plaintiff's medical records also indicate that he was treated by Nurse Travers and others, based on further complaints of constipation and hard stools (but not rectal bleeding), on June 25th and 28th. (AHR, Dkt. No. 50 at 36 37). On July 29th, plaintiff wrote a letter to DOCCS Chief Medical Officer, Lester Wright, complaining that Nurse Practitioner Lashway should not have approved him for a restricted diet given his history of serious constipation, and that the treatment of his constipation and rectal bleeding with stool softeners

by the Upstate medical staff was not working. (Dkt. No. 47 7 at 20). [6]

[6]     Plaintiff's letter indicates that he copied "Nurse Practitioner but it is not clear whether defendant Lashway ever received a copy.

Plaintiff claims that Nurse Travers saw evidence of plaintiff's rectal bleeding on July 22, 2102, the day before he was transferred out of Upstate; but there are no medical records to corroborate that claim. (Dkt. No. 1 at 13; AHR, Dkt. No. 50 at 3536). In fact, the last entry in plaintiff's medical records from Upstate, made on July 19th by a nurse not named as a defendant in this action, noted that plaintiff had no acute medical problems. (AHR, Dkt. No. 50 at 35).

After his arrival at Coxsackie Correctional Facility on July 23rd, plaintiff was found shaking on the floor of his cell and taken to a hospital emergency room. (AHR, Dkt. No. 50 at 33 34). Plaintiff was found to have an anal fissure, [7] but had normal stools, and no fever, chills, nausea, and vomiting. (Dkt. No. 50 at 55 56). He was prescribed sitz baths and topical lidocaine and released back to DOCCS custody. (Dkt. No. 50 at 32 33, 55 56). Subsequent DOCCS medical records, through January 2013, indicated that plaintiff had recurring issues with constipation, hemorrhoids, minor rectal bleeding, and blood in his stool; but not more serious medical issues. (Dkt. No. 50 at 9 19, 22 23, 25 28). Plaintiff periodically received treatment for these conditions from DOCCS, including stool softeners and hemorrhoid creams and suppositories. (Id.).

[7]     "An anal fissure ... is a small, oval shaped tear in skin that lines the opening of the anus. Fissures typically cause severe pain and bleeding with bowel movements. Fissures are quite common in the general population, but are often confused with other causes of pain and bleeding, such as hemorrhoids. http:// www.fascrs.org/patients/ conditions/analfissure/ (website of the American Society of Colon and Rectal Surgeons).

A noted above, the medical records indicate that plaintiff did not complain of constipation or associated bleeding until June 21 and 22, 2012 well after he completed the seven-day restricted diet. Constipation and minor bleeding while having bowel movements do not constitute "serious" medical conditions necessary to establish the objective component of an Eighth Amendment medical care claim. See, e.g., Black v. Fischer, No. 9:08 CV 232 (FJS/DEP), 2010 WL 2985081, at *10 (N.D.N.Y. July 1, 2010) (constipation and an external hemorrhoid for a period of less than one month, during which plaintiff experienced typical symptoms, including discomfort and minor bleeding, without more, are not sufficiently serious to establish an Eighth Amendment claim) (collecting cases); McGee v. Pallito, 1:10 CV 11, 2014 WL 360289, at *7 (D.Vt. Feb. 3, 2014) (constipation, even with some associated bleeding, has been held to be insufficient for Eighth Amendment purposes). See also Young Flynn v. Wright, No. 05 Civ.1488, 2007 WL 241332, at *18 (S.D.N.Y. Jan. 26, 2007) (in the absence of evidence that rectal bleeding proved to be symptomatic of a more serious condition, such as colon cancer, it was not sufficiently serious to support an Eighth Amendment claim).

*9 It is highly unlikely that a rational fact-finder would conclude that Nurse Travers intentionally avoided giving plaintiff medical attention for a serious medical condition on May 16 and 17, as plaintiff alleges. Medical records show that plaintiff made no complaints of health problems to other Upstate medical staff in the following days, and did not complain of constipation until a month later. [8] In any event, even if there was a brief delay in providing plaintiff medical attention for constipation, the delay did not pose any serious risk to plaintiff's health. [9]

[8]     See, e.g., Brown v. White, 9:08 CV 200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record); Benitez v. Pecenco, 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case )).

[9]     See, e.g., Evans v. Manos, 336 F.Supp.2d 255, 262 (W.D.N.Y.2004) ("Although a delay in medical care

2015 WL 1312738

can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where 'the delay reflects deliberate indifference to a serious risk of health or safety, to a life threatening or fast degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.   )

Plaintiff could not persuade a rational fact finder that defendant Lashway acted with deliberate indifference to his serious medical needs. Plaintiff argues that he should not have been placed on a restricted diet given his history of constipation. (Dkt. No. 1 at 17). Nurse Practitioner Lashway stated that constipation was not a disqualifying medical condition for placing an inmate on the restricted diet, and that the fiber in the loaf, with proper water intake would help address constipation. (Lashway Decl. ¶¶ 6 9). As plaintiff implicitly acknowledges in his complaint, he did not complain of constipation to the medical staff until June 21, 2012, a month after he completed the restricted diet. (Dkt. No. 1 at 8; Travers Decl. ¶ 8). Even if plaintiff's allegations are accepted as true, he is stating, in essence, that he disagrees with Nurse Practitioner Lashway's medical judgment that he was medically fit to be placed on a restricted diet. Even if defendant Lashway's decision reflected medical malpractice, that would not support plaintiff's claim that she was deliberately indifferent to his serious medical needs.

Plaintiff's June 2012 letters to Nurse Practitioner Lashway and Dr. Wright argue that he needed a high-fiber diet, and that stool softeners prescribed by the Upstate medical staff were not meeting his needs. (Dkt. No. 47  7 at 16, 20). Plaintiff's disagreement with the medical staff's judgment as to appropriate treatment does not rise to the level of deliberate indifference. *See, e.g., Black v. Fischer,* 2010 WL 2985081, at *11 ('[p]laintiff's obvious dissatisfaction or disagreement with treatment that he received for his hemorrhoid is patently insufficient to establish an Eighth Amendment violation") (citations omitted).

Plaintiff was diagnosed with an anal fissure shortly after he was transferred from Upstate. The medical records do not support plaintiff's claim that Nurse Travers was aware that plaintiff was suffering from rectal bleeding or severe pain just before his transfer, as plaintiff claims. Even if someone missed a diagnostic clue that plaintiff was suffering from an anal fissure before his transfer, that would be, at most, malpractice and not deliberate indifference. In any event, although plaintiff made a

dramatic show of pain prior to being taken to the emergency room, his anal fissure was apparently resolved with conservative treatment of topical lidocaine and sitz baths, suggesting that it was not a sufficiently serious condition to support a claim that any defendant was deliberately indifferent to a serious medical need. [9]

[10]    Plaintiff also includes Superintendent Rock in his deliberate indifference claim, asserting that he established the policy regarding SITU sick call procedures which allowed Nurse Travers to ignore plaintiff's requests for medical attention on May 16 and 17, 2012. Given that the court found that defendant Travers did not demonstrate deliberate indifference to any serious medical need of plaintiff, defendant Rock could not be vicariously liable because no Eighth Amendment violation could be established.

## IV. Retaliation/Personal Involvement

### A. Applicable Law

#### 1. Retaliation

 **10**  In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677, (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.* Participation in the grievance process by an inmate is clearly protected conduct in the context of a retaliation claim. *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 367 & n. 21 (S.D.N.Y.2011) (collecting cases).

To establish retaliation, the plaintiff must also demonstrate a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close

in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d at 370 (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287 88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03 CV 480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554 55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at *3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

**\*11** A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights may be implicated even if the plaintiff did receive full procedural due process. *Franco*

*v. Kelly,* 854 F.2d 584, 588 90 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

### 2. Personal Involvement

For retaliation claims, as for other section 1983 claims, a plaintiff "must show some tangible connection between the constitutional violation alleged and [a] particular defendant." *Toole v. Connell,* 9:04 CV 724 (LEK/DEP), 2008 WL 4186334, at *6 (N.D.N.Y. Sept. 10, 2008). Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323 24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability: (1) if the supervisor directly participated in the infraction; (2) if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong; (3) if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; or (4) if he or she were grossly negligent in managing subordinates who caused the unlawful condition. *Id.*

### B. Analysis

Defense counsel argues, *inter alia,* that the retaliation claims should be dismissed because there was no causal connection between plaintiff's protected conduct and the alleged adverse actions against him; and it appears that at least one defendants was not personally involved in any adverse action against plaintiff. Thus, my analysis requires a close examination of the record regarding each defendant. *Toole v. Connell,* 2008 WL 4186334, at *6 (analysis of retaliation claims requires careful, case-specific, consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two).

### 1. Defendants Mitchell and Winston

Plaintiff alleges that he mailed the grievance regarding the condition of his SHU cell on May 15, 2014, the day after he arrived at Upstate. (Dkt. No. 1 at 5). Defendant

Mitchell collected the mail from plaintiff, and between 250 and 300 other inmates on the morning of May 15th, placing it in a locked box at the security desk for pick-up and delivery by others. Although Correction Officer ("C.O.") Mitchell is required to check that inmates properly identify themselves on the return address of each envelope, he was "not mindful" of whether plaintiff submitted a grievance on that morning. (Mitchell Decl. ¶¶ 5 9, Dkt. No. 47 3). Plaintiff's grievance was not investigated at Upstate until June 5, 2012. (Cromp Decl. ¶ 5 & Ex. B, Dkt. No. 47 8 at 2, 7).

**\*12**  Defendant Winston, assisted by defendant Mitchell, conducted "feed-up" on plaintiff's cell block on May 15th. C.O. Winston issued plaintiff a misbehavior report for failing to return his feed-up tray and disobeying a direct order; C.O. Mitchell witnessed the misbehavior report. (Winston Decl. ¶¶ 4 5; Mitchell Decl. ¶¶ 11 12). Defendant Winston states that he had no knowledge that plaintiff had submitted a grievance earlier that day, and issued the misbehavior report because plaintiff refused to return his feed-up tray. (Winston Decl. ¶¶ 4 6).

In his response to the summary judgment motion, plaintiff "agree[s]" with the factual allegations of defendants Winston and Mitchell, but states that he "truly believe[s]" that the defendants issued the report in retaliation for plaintiff's filing of a grievance earlier that day. (Dkt. No. 51 at 8, 14). In the absence of any objective corroboration, plaintiff's speculation regarding the retaliatory motivation of defendant Mitchell and Winston is not sufficient to establish a causal connection between plaintiff's grievance and the misbehavior report issued by the defendants. First of all, plaintiff provides no evidentiary support to overcome the sworn statement of the defendants that they did not know that plaintiff had filed a grievance before they issued the misbehavior report. Obviously, there could be no causal connection between plaintiff's grievance and the misbehavior report if the defendants were not aware of the grievance when they initiated disciplinary charges. *See Roseboro v. Gillespie,* 791 F.Supp. at 368 69 (plaintiff's unsupported speculation that C.O. Wingate learned of plaintiff's grievance by speaking to C.O. Gillespie before Wingate initiated an adverse action against plaintiff is not sufficient to establish the required causal connection to overcome a summary judgment motion).

In addressing the requirement of a causal connection between the protected speech and the alleged adverse actions in the context of a summary judgment motion, a court may consider: "(1) any statements made by the defendant concerning his motivation for his conduct; (2) the temporal proximity between the protected activity and the alleged adverse action; (3) the plaintiff's prior good disciplinary record; and (4) whether the plaintiff was vindicated at the subsequent disciplinary hearing." *Roseboro v. Gillespie,* 791 F.Supp.2d at 366, 369 (collecting cases). Even assuming the defendants had knowledge of plaintiff's grievance at the time they issued the misbehavior report, the temporal proximity between the two would not, by itself, suffice to establish causation. *Id.* at 370. It is improbable that either defendant would retaliate against plaintiff for a grievance that did not name either of them. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about an incident involving another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d at 369 (plaintiff has failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in). Moreover, plaintiff does not claim that either defendant made a statement reflecting a retaliatory intent for initiating disciplinary charges against him.

**\*13**  Plaintiff was transferred to Upstate because of disciplinary problems, and did not have a good disciplinary record. (Bishop Dec. ¶ 5; Scott Decl. ¶ 6 & Ex. C, Dkt. No. 47 7 at 2, 154 58). Defendants' documentary evidence indicates that plaintiff declined to attend his disciplinary hearing after acknowledging that he was guilty. (Bishop Decl., Ex. B, Dkt. No. 47 4 at 12, 20 21). While plaintiff alleges that he did not attend his disciplinary hearing because he was misled into thinking the charges against him had been dismissed (Dkt. No. 1 at 7 8; Dkt. No. 47 7 at 14), he can offer no corroboration for his claim that the disciplinary charges against him were false.    Accordingly, this court concludes that no rational fact finder could conclude that defendants Mitchell and Winston issued a misbehavior report against plaintiff in retaliation for plaintiff's submission of a grievance.

11      Defendants argue that, based on the outcome of the disciplinary hearing, it is clear that the defendants

would have filed the misbehavior report against plaintiff even if they had known about his grievance. (Def.s' Mem. of Law at 3, 18 19). See, e .g., *Lowrance v. Achtyl,* 20 F.3d 529, 534 35 (2d Cir.1994) (defendants met their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct because the plaintiff had admitted to engaging in the misconduct that formed the basis of the misbehavior report; plaintiff's retaliation claim was properly dismissed under *Mt. Healthy* and its progeny). Plaintiff's allegations that he was denied the opportunity to attend the disciplinary hearing arguably creates an issue of fact with respect to this issue. Accordingly, this court will not rely on this line of argument to recommend a grant of summary judgment in defendants' favor.

### 2. Defendant Cromp

Plaintiff claims that, after interviewing plaintiff on June 27, 2012, with respect to two grievances plaintiff submitted earlier that month, Grievance Investigator Cromp never processed those grievances, in retaliation for plaintiff's submission of them. (Dkt. No. 1 at 8 9). [2] Defendant Cromp states that there is no record that plaintiff ever submitted the two grievances dated June 21st and 22nd; and he has no recollection of investigating any such grievances. (Cromp Decl. ¶ 8). In any event, even assuming the truth of plaintiff's allegations, "the refusal to process a small number of grievances does not constitute an adverse action" required to support a First Amendment retaliation claim. *Hill v. Laird,* No. 06 CV 126, 2014 WL 1315226, at *10 (E.D.N.Y. Mar. 31, 2014) (*citing Ross v. Westchester,* No. 10 CV 3937, 2012 WL 86467, at *8 (S.D.N.Y. Jan. 11, 2012)).

[12]     Chief Judge Sharpe dismissed plaintiff's claim that defendant Cromp violated plaintiff's procedural due process rights by failing to process plaintiff's two grievances. (Dkt. No. 14 at 6 (*citing, inter alia, Shell v. Brzezniak,* 365 F.Supp.2d 362, 369 70 (W .D.N.Y.2005) (" [i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim )). Chief Judge Sharpe, however, declined to dismiss plaintiff's retaliation claim against defendant Cromp *sua sponte,* based on the standards for dismissal under 28 U.S.C. §§ 1915(e) & 1915A and Fed.R.Crim.P. 12(b)(6), which are clearly more favorable to plaintiff than the summary judgment standards under Rule 56 that

must be applied here. (Dkt. No. 14 at 3 4, 6 7, 9 ("the Court expresses no opinion as to whether plaintiff's surviving] claims can withstand a properly filed motion to dismiss or for summary judgment )).

Moreover, other than the temporal proximity between the alleged filing of the two grievances and defendant Cromp's purported failure to process them, plaintiff offers no evidence to corroborate his claim that Inv. Cromp acted with a retaliatory intent. Based on the authority cited above, the fact that the grievances allegedly submitted to defendant Cromp did not implicate him in any wrongdoing contradicts plaintiff's speculation that Inv. Cromp retaliated against plaintiff because of the grievances. It is particularly unlikely that defendant Cromp would retaliate against an inmate for filing a grievance because his job primarily involved the investigation of grievances. [3] Plaintiff alleges that Inv. Cromp unsuccessfully tried to persuade plaintiff to combine his two grievances because they both complained of the same conduct, but otherwise cites no statements by this defendant that would suggest he harbored a retaliatory intent. (Dkt. No. 1 at 9). Plaintiff's unsupported and speculative conclusion that defendant Cromp's alleged actions were taken to retaliate because plaintiff filed grievances are not sufficient to overcome defendant Cromp's sworn declaration that he never retaliated against an inmate for using the grievance process. (Cromp Decl. ¶ 9). This court concludes that no rational juror would conclude that, even if defendant Cromp failed to process two of plaintiff's grievances, that conduct constituted an "adverse action" or that this defendant acted with a retaliatory intent. [4]

[13]     Indeed, if an inmate could base a retaliation claim for a correction official's failure to process a grievance merely on the fact that the inmate submitted a grievance, that would completely circumvent the clear authority that state law grievance procedures do not create constitutionally protected due process rights. *See, e.g., Cancel v. Goord,* No. 00. CIV.2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983 ).

[14]     Defense counsel also argues that, even if Inv. Cromp failed to process plaintiff's two grievances, he has a defense under *Mount Healthy* and its progeny because the grievances would have been subject to

denial as untimely under DOCCS rules. (Def.s' Mem. of Law at 19.) 7 N.Y. Comp.Codes R. & Regs. § 701.5(a)(1) provides that "An inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence on an inmate grievance complaint form (form # 2131). However, that same regulation provides the Inmate Grievance Program ("IGP ) Supervisor has the power to make exceptions to such time limit. *See, id.* ("Exceptions to this time limit or any appeal time limits may be approved by the IGP supervisor under section 701.6(g) of this Part. ). If, in fact, defendant Cromp failed to process plaintiff's untimely grievances, he deprived plaintiff of an opportunity to persuade an IGP supervisor to consider the grievance. *Smith v. Haag,* No. 08 CV 6360, 2011 WL 6012606, at *5 (W.D.N.Y. Dec. 1, 2011). Accordingly, this court will not rely on *Mount Healthy* in recommending dismissal of the retaliation claim against defendant Cromp.

### 3. Defendant Rock

*14 Plaintiff has named Supt. Rock in his retaliation claim involving defendant Cromp's alleged failure to process plaintiff's two grievances in June 2006. Plaintiff alleges that he twice wrote defendant Rock complaining that his grievances had not been processed, and Supt. Rock took no action, but instead directed plaintiff to submit any inquiries to the IGP office. (Dkt. No. 1 at 10, 12, 20; Dkt. No. 47 7 at 40 42). Given this court's conclusion that plaintiff's constitutional rights were not violated even if defendant Cromp failed to process plaintiff's two grievances, defendant Rock cannot be vicariously liable on plaintiff's retaliation claim. In any event, defendant Rock's failure to follow up on plaintiff's complaint about the handling of his grievances, and the fact that he directed plaintiff to address his complaint to the IGP, would not be sufficient to establish Supt. Rock's personal involvement even if there had been a violation of plaintiff's constitutional rights by defendant

Cromp. *See, e.g., Harnett v. Barr,* 538 F.Supp.2d 511, 525 (N.D.N.Y.2008) (Superintend Woods' referral of plaintiff's letters back to the grievance supervisor or to other staff members for investigation does not make him personally responsible for the alleged violations in those letters); *Smart v. Goord,* 441 F.Supp.2d 631, 642 643 (S.D.N.Y.2006) (the failure of a supervisory official to respond to a letter of complaint is insufficient to create personal responsibility); *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response to the prisoners to advise him of the subordinate's decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 47) be **GRANTED,** and that plaintiff's complaint be **DISMISSED** in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed Dec. 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1312738

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by *Sanders v. City of New York*, S.D.N.Y., March 8, 2016

2013 WL 5354241
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Luis CASTRO, Plaintiff,
v.
Wayne HEATH, Superintendent, Green Correctional Facility, and Jane Doe, Nurse, Greene Correctional Facility, Defendants.

No. 9:12–CV–01250 (MAD/DEP).
|
Sept. 23, 2013.

**Attorneys and Law Firms**

Luis Castro, Wallkill, NY, pro se.

Office of the New York, STate Attorney General, James Seaman, AAG, of Counsel, Albany, NY, for Defendants.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, James Seaman, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** On August 6, 2012, *pro se* Plaintiff Luis Castro commenced this civil rights action pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights under the United States Constitution. Plaintiff's complaint alleges that Defendants failed to provide him with proper treatment for an ear infection while he was an inmate in the custody of the Department of Corrections and Community Supervision ("DOCCS").

Two motions are currently pending before the court. First, Defendant Heath's motion for summary judgment dismissing Plaintiff's claims due to Plaintiff's alleged failure to exhaust available administrative remedies, and on the merits. Second, Plaintiff motion seeking leave to file an amended complaint.

In an August 1, 2013 Report and Recommendation, Magistrate Judge Peebles recommended that both motions be granted and denied in part, and that Plaintiff's amended complaint be accepted for filing only to the extent it asserts an Eight Amendment deliberate medical indifference claim against the named defendants. Specifically, Magistrate Judge Peebles recommended that the Court deny Defendant's motion for summary judgment without prejudice to renew on exhaustion grounds because a genuine dispute of material fact exists as to whether Plaintiff failed to exhaust his administrative remedies. *See* Dkt. No. 29 at 12–13. Next, Magistrate Judge Peebles found that, at the pleading stage, Plaintiff sufficiently alleged Defendant Health's personal involvement in the alleged unconstitutional conduct. *See id.* at 15–16. Magistrate Judge Peebles next recommended that the Court dismiss Plaintiff's negligence claim, since it is not actionable in a section 1983 suit. *See id.* at 16. As to Plaintiff's retaliation claim, the recommendation found that Plaintiff's conclusory allegations that "medical personnel" denied him treatment "due to 'Complaints' he made against [them]" was insufficient to state a claim upon which relief may be granted. *See id.* at 21–22. Finally, Magistrate Judge Peebles found that Plaintiff's deliberate indifference claims, liberally construed, are sufficient to survive Defendant's motion and that Defendant failed to submit any evidence demonstrating that he is entitled to qualified immunity. *See id.* at 24–28.

Regarding Plaintiff's motion for leave to amend, Magistrate Judge Peebles noted that Plaintiff's proposed amended complaint sets forth substantially the same allegations as his original complaint, except that it adds names of two new Defendants, Dr. Caulfield and Nurse Albright, and removes Defendant Jane Doe. *See id.* at 28. Upon review of the proposed amended complaint, Magistrate Judge Peebles recommended that the Court find that (1) it fails to allege sufficient facts plausibly suggesting a retaliation claim against any of the named Defendants; (2) the negligence claim is still not actionable in a section 1983 action; and (3) Plaintiff's claims for damages against Defendants in their official capacities are barred by the Eleventh Amendment. *See id.* at 31. Finally, Magistrate Judge Peebles recommended that the Court accept the proposed amended complaint for filing only as it relates to Plaintiff's Eighth Amendment deliberate medical indifference claim, asserted against Defendants Caufield, Albright, and Heath in their

individual capacities. *See id.* Neither Party objected to Magistrate Judge Peebles' August 1, 2013 Report and Recommendation.

 **\*2**  When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08 CV 322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

Having carefully reviewed the August 1, 2013 Report and Recommendation and the applicable law, the Court finds that Magistrate Judge Peebles correctly recommended that the Court should grant in part and deny in part both Defendant's motion seeking dismissal of all claims and Plaintiff's motion for leave to amend. Magistrate Judge Peebles correctly determined that questions of fact preclude the Court from granting Defendant's as to

whether Plaintiff exhausted his administrated remedies. Moreover, given then special solicitude afforded to *pro se* litigants, the recommendation also correctly found that Plaintiff sufficiently pleaded a plausible Eighth Amendment deliberate indifference claim. Finally, Magistrate Judge Peebles correctly determined that Plaintiff's motion for leave to amend should only be granted as to his deliberate indifference claims against Defendants Caufield, Albright, and Heath in their individual capacities. The remaining claims in the proposed amended complaint would not withstand a motion to dismiss and, therefore, are properly rejected as futile.

 **\*3**  Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Peebles' August 1, 2013 Report and Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 13) is **GRANTED in part and DENIED in part;** and the Court further

**ORDERS** that Plaintiff's claims of retaliation, negligence, and his damage claims against Defendant Heath in his official capacity are **DISMISSED;** and the Court further

**ORDERS** that Plaintiff's motion for leave to amend (Dkt. No. 17) is **GRANTED in part and DENIED in part;**   and the Court further

1       Plaintiff's proposed amended complaint is only accepted for filing to the extent that it asserts an Eighth Amendment deliberate medical indifference claim against Defendants Heath, Albright, and Caufield in their individual capacities.

**ORDERS** that the Clerk of the Court shall serve a copy of the Memorandum  Decision and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

2013 WL 5354241

*Pro se* plaintiff Luis Castro, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights under the United States Constitution. In his complaint, plaintiff alleges that medical personnel at the prison facility in which he was confined at the relevant times failed to provide him with proper treatment for an ear infection.

Currently pending before the court are two motions. Defendant Heath has moved for the entry of summary judgment dismissing plaintiff's claims, based both upon plaintiff's alleged failure to exhaust available administrative remedies before commencing suit, and on the merits. The second pending motion was brought by plaintiff, who seeks leave to file an amended complaint. For the reasons set forth below, I recommend that both motions be granted and denied in part, and that plaintiff's proposed amended complaint be accepted for filing only to the extent it asserts an Eighth Amendment deliberate medical indifference against the named defendants.

## I. *BACKGROUND*

[1] Because, in his motion, defendant has not challenged the factual allegations contained in plaintiff's complaint, the following recitation of the facts in this case is drawn from that initial pleading.

Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Complaint (Dkt. No. 1). Although he is now confined elsewhere, at the times relevant to this action, Castro was confined at the Greene Correctional Facility ("Greene"), located in Coxsackie, New York. *Id.*

On or about March 9, 2012, plaintiff awoke with an ache in his left ear. Complaint (Dkt. No. 1) at § 6, ¶ 1. The next day, he submitted a sick call slip to the facility's nursing staff seeking treatment for the condition; prison medical personnel, however, failed to respond to that request. *Id.* at § 6, ¶¶ 2 3. Plaintiff submitted a second sick call slip form on March 11, 2012, again requesting treatment for his ear condition. *Id.* at § 6, ¶ 4 and Exh. 1. Despite submission of that request, medical staff at the facility persisted in their refusal to provide treatment for plaintiff's earache. *Id.* at § 6, ¶ 4. On or about March 20, 2012, plaintiff filed a grievance with defendant Heath, the Greene superintendent, complaining of the medical staff's alleged failure to treat him. *Id.* at § 6, ¶ 5. Thereafter, it

is alleged that the Greene medical staff denied plaintiff medical treatment as retribution for the grievance that he filed with defendant Heath. *Id.* at § 6, ¶ 6.

**\*4** It is not clear from plaintiff's allegations whether his ear condition was ever treated. Plaintiff's complaint, however, alleges that his condition has progressed to the point of requiring surgery, and defendants' failure to treat him has resulted in pain and a partial loss of hearing. Complaint (Dkt. No. 1) at § 6, ¶¶ 7 9.

## II. *PROCEDURAL HISTORY*

On August 6, 2012, plaintiff commenced this action by the filing of a complaint and accompanying application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Plaintiff's complaint names as defendants the Greene Superintendent, Heath, and a nurse stationed at the facility, identified only as "Jane Doe # 1." Complaint (Dkt. No. 1) at § 3. Liberally construed, the complaint asserts three causes of action, including (1) retaliation, in violation of the First Amendment; (2) deliberate medical indifference, in violation of the Eighth Amendment; and (3) medical negligence under New York state law. *Id.* at § 7. As relief, plaintiff requests awards of $20 million in compensatory damages and $500,000 in punitive damages against each of the defendants. Complaint (Dkt. No. 1) at § 8.

In response to plaintiff's complaint, defendant Heath filed a pre-answer motion for summary judgment, on October 17, 2010, arguing that plaintiff's complaint should be dismissed based on various grounds, including that (1) plaintiff failed to exhaust his available administrative remedies, (2) the claims asserted against him in his official capacity are precluded under the Eleventh Amendment, (3) the complaint fails to allege facts plausibly suggesting the named defendant's personal involvement, (4) the New York state negligence claim is not actionable under section 1983, (5) the allegations contained in plaintiff's complaint are unduly conclusory and insufficient to state a cognizable cause of action, and (6) he is entitled to qualified immunity. [2] Def.'s Memo. of Law (Dkt. No. 13 3). Plaintiff has failed to respond in opposition to defendant's motion.

[2] Unlike its Rule 12(b) dismissal motion counterpart, a summary judgment motion does not have the effect of automatically staying the requirement of answering

a plaintiff's complaint. *Compare* Fed.R.Civ.P. 12(b)(6) *with* Fed.R.Civ.P. 56. This distinction is not significant here, however, because defendant has requested, and been granted, a stay of the deadlines to answer plaintiff's complaint pending disposition of his motion. Dkt. No. 12; Text Order Dated Oct. 18, 2012.

Following the filing of defendant's summary judgment motion, plaintiff submitted a letter to the court requesting leave to file an amended complaint, Dkt. No. 17, accompanied by a proposed amended complaint asserting the same claims as those set forth in his initial complaint, and adding Dr. Caulfield and Nurse Aubright, two DOCCS employees stationed at Greene, as defendants, Dkt. No. 17 1. Defendant Heath has since responded in opposition to plaintiff's motion, arguing that it is futile in light of plaintiff's failure to exhaust available administrative remedies before commencing suit, Dkt. No. 22, and plaintiff has submitted a reply in further support of his motion for leave to amend, Dkt. No. 23.

Both of the pending motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Defendant's Motion for Summary Judgment*

1. *Plaintiff's Failure to Oppose Defendant's Motion*

 **\*5** The court's local rules require a party seeking the entry of summary judgment to submit a statement of material facts that it contends is undisputed by the record evidence. N.D.N.Y. L.R. 7.1(a)(3). The local rules also instruct the non-moving party to respond in opposition to the moving party's statement of material facts by specifically admitting or denying each of the facts listed in that statement. *Id.* The purpose underlying this rule is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment. *Anderson v. Dolgencorp of N.Y.,* Nos. 09 CV 0360, 09 CV 0363, 2011 WL 1770301, at *1 n. 2 (N.D.N.Y. May 9, 2011) (Sharpe, J.). [3] To meaningfully fulfill this purpose, it is essential for the court to have the benefit of both the moving party's statement and an opposition statement from the non-moving party.

[3]     Copies of all unreported decisions cited to in this report have been appended for the convenience of the *pro se* plaintiff. Editor's Note: Attachments of Westlaw case copies deleted for online display.]

In this instance, defendant Heath has complied with local rule 7.1(a)(3), providing a statement setting forth ten facts as to which, he contends, there is no genuine triable issue. Dkt. No. 13 1. Plaintiff has failed to respond either to that statement, or to defendant's motion in general. *See generally* Docket Sheet. Instead, plaintiff has filed a motion for leave to amend his complaint, in support of which he includes evidence related to defendant's argument that he failed to properly exhaust the available administrative remedies. Dkt. No. 23 at 2. Although local rule 7.1 instructs that a court "shall deem admitted any properly supported facts set forth" in a moving party's rule 7.1(a)(3) statement, I find that it is improvident to do so under these circumstances in light of the Second Circuit's oft-repeated warning to district courts that *pro se* litigants are owed a certain amount of special solicitude. Accordingly, I have considered all of the materials submitted by both parties now before the court as it relates to both pending motions.

2. *Exhaustion of Remedies*

Central to both defendant's summary judgment motion and his opposition to plaintiff's request for leave to amend is the contention that, by failing to file and pursue to completion a grievance concerning the alleged failure of prison officials to provide him with adequate medical treatment, plaintiff is now precluded from bringing this action. Def.'s Memo. of Law (Dkt. No. 13 3); Def.'s Memo. of Law (Dkt. No. 22).

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104 134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also* Woodford v. Ngo, 548 U.S. 81, 84, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ( "Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04 CV 4587, 2007 WL 389003,

Case 9:16-cv-00890-LEK-TWD Document 117 Filed 06/21/19 Page 142 of 219
Castro v. Heath, Not Reported in F.Supp.2d (2013)
2013 WL 5354241

at *5 6 (E.D.N.Y. Jan.31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

**\*6** The requirement that inmates exhaust administrative remedies before filing a lawsuit is not a jurisdictional requirement. *Richardson v. Goord*, 347 F.3d 431, 434 (2d Cir.2003). Instead, failure to exhaust is an affirmative defense under the PLRA, and "inmates are not required to specifically plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

In the event a defendant establishes that an inmate-plaintiff has failed to complete the administrative review process prior to commencing the action, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). [4]

[4]    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense, " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697 98 (2d Cir.2004) (emphasis omitted)).

In New York, prisons inmates are subject to a three-step Inmate Grievance Program ("IGP") established by the DOCCS and recognized as an "available" remedy for purposes of the PLRA. *Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing N.Y. Corrs. Law § 139 (McKinney's 2003); 7 N.Y.C.R.R. § 701.7; *Rodriguez v. Hahn*, 209 F.Supp.2d 344, 347 (S.D.N.Y.2002); *Mendoza v. Goord*, No. 00

CV 0146, 2002 WL 31654855, at *2 (S.D.N.Y. Nov.21, 2002)). First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident at issue. [5] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal*, 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner*, No. 00 CV 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)).

[5]    The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances. 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a) (b).

Plaintiff's complaint, which is signed under penalty of perjury, and thus has the same force and effect as an affidavit, [6] alleges that he filed three grievances related to the allegations set forth in his complaint through the grievance procedures available at Greene. [7] Complaint (Dkt. No. 1) at § 4. Additionally, in support of his motion for leave to amend, plaintiff has submitted an affidavit stating that he "pursued [his] complaint through the [g]rievance process towards CORC in Albany, which ... was ignored[.]" Dkt. No. 23 at 2.

[6]    18 U.S.C. § 1746; *see also Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes .] ").

[7]    It is worth noting that plaintiff's proposed amended complaint, which is not signed under penalty of perjury, and thus does not have the same force and effect as an affidavit, alleges precisely the same. Dkt. No. 17 1 at 1 2.

**\*7** In contrast to these allegations, defendant Heath states in his rule 7.1(a)(3) statement that plaintiff "did not appeal to CORC regarding any grievance" related to the facts giving rise to this action. Def.'s L.R. 7.1(a)

(3) Statement (Dkt. No. 13 1) at ¶ 9. Defendant further states that plaintiff "has never appealed the results of any grievance[ ] to CORC." *Id.* at ¶ 10. These assertions are supported by record evidence, including an affidavit from Jeffrey Hale, the Assistant Director of the DOCCS IGP, in which he concludes that, following a search of the relevant CORC database, plaintiff did not appeal any of his grievances to the CORC, including ones related to the facts of this case Hale Decl. (Dkt. No. 13 2) at ¶¶ 10, 11; Hale Decl. Exh. A (Dkt. No. 1302) at 4 6.

As can be seen, the record now before the court demonstrates that a genuine dispute of material fact exists as to whether plaintiff failed to exhaust the available administrative remedies at Greene before commencing suit. Accordingly, I recommend that this portion of defendant's motion be denied without prejudice to renewal following completion of discovery in this case. [8]

[8]    In the event that the same genuine dispute exists following completion of discovery, the court will likely be compelled to hold an evidentiary hearing in accordance with *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011). A recommendation that such a hearing be held at this juncture would be premature because plaintiff has not had the benefit of discovery.

### 3. *Eleventh Amendment Immunity*

Plaintiff's complaint asserts causes of action against defendants in their individual and official capacities. Complaint (Dkt. No. 1) at § 8. In his motion, defendant contends that plaintiff's claims for damages asserted against him in his official capacity are barred based on the immunity conferred upon him by the Eleventh Amendment. Def.'s Memo. of Law (Dkt. No 13 3) at 10.

The Eleventh Amendment protects a state against suits brought in federal court by "private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan,* 415 U.S. 651, 662 63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Cory v. White,* 457 U.S. 85, 90 91, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993). This absolute immunity, which states enjoy under the Eleventh Amendment, extends to both state agencies and state officials sued for damages in their official capacities when the essence of the plaintiff's claim seeks recovery from the state as the real party in interest [9]. *See, e.g., Daisernia v. State of New York,* 582 F.Supp. 792,

798 99 (N.D.N.Y.1984) (McCurn, J.) ("[A] suit which seeks a money judgment 'which must be paid from the state treasury is barred by the Eleventh Amendment,' even though it is nominally asserted against an individual official." (quoting *Edelman,* 415 U.S. at 663)); *see also Richards v. State of New York App. Div., Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing, *inter alia, Cory v. White,* 457 U.S. 85, 89 91, 102 S.Ct. 2325, 72 L.Ed.2d 694, (1982)). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state [10]." *Ying Jing Gan,* 996 F.2d at 529; *see also Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

[9]    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham Cnty.,* 547 U.S. 189, 193, 126 S.Ct. 1689, 164 L.Ed.2d 367 (2006).

[10]    By contrast, the Eleventh Amendment does not preclude lawsuits seeking to impose individual or personal liability on state officials under section 1983. *Hafer v. Melo,* 502 U.S. 21, 30 31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

**\*8** Plaintiff's damage claims in this action against the defendant Heath in his official capacity are, in reality, claims against the State of New York, and therefore are subject to dismissal. *Daisernia,* 582 F.Supp. at 798 99. Accordingly, I recommend that, to the extent that any of the claims asserted in plaintiff's complaint are asserted against defendant Heath in his official capacity, those claims be dismissed with prejudice.

### 3. *Personal Involvement*

Defendant's third argument in support of dismissal is that plaintiff's complaint fails to allege facts plausibly suggesting that he was personally involved in any of alleged constitutional violations. Def.'s Memo. of Law (Dkt. No. 13 3) at 11 12. The only allegation against

Case 9:16-cv-00890-LEK-TWD Document 117 Filed 06/21/19 Page 144 of 219
Castro v. Heath, Not Reported in F.Supp.2d (2013)
2013 WL 5354241

defendant Heath in plaintiff's complaint is that plaintiff sent defendant a grievance complaining that the Greene medical staff was not adequately responding to plaintiff's ear infection. Complaint (Dkt. No. 1) at 5. As recent Second Circuit case law makes clear, at the pleading stage, this is sufficient to allege the personal involvement of a superintendent of a prison facility. *See Grullon v. City of New Haven,* 720 F.3d 133, 2013 WL 3023464, at *7 (2d Cir. June 19, 2013) (finding that the district court erred when it denied the plaintiff leave to file an amended complaint where it was alleged that the plaintiff sent a letter grievance to the warden of the prison facility because the plaintiff "would be entitled to have the court draw the reasonable inference ... that the Warden in fact received the Letter, read it, and thereby became aware of the alleged conditions of which [the plaintiff] complained"). Accordingly, I recommend that this argument be rejected.

### 4. *Plaintiff's Negligence Claim*

Defendant Heath next argues that plaintiff's negligence claim is not actionable in a section 1983 action. Def.'s Memo. of Law. (Dkt. No. 13 3) at 13. The court agrees. *See Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 n. 5 (2d Cir.1991) ("[S]ection 1983 liability may not be premised upon negligence."). Accordingly, to the extent that plaintiff's complaint asserts a negligence claim, I recommend that it be dismissed.

### 5. *Failure to State a Claim*

Defendant also argues that plaintiff's complaint contains wholly conclusory allegations that are insufficient to state a cognizable section 1983 claim. Def.'s Memo. of Law (Dkt. No. 13 3) at 13 15. This argument raises issues typically presented in the context of a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

11  Defendant's motion is grounded in Rule 56, seeking the entry of summary judgment. Motions to dismiss and motions for summary judgment are procedurally distinct, and the burdens cast upon both the movant and opposing parties under the two rules are distinctly different. Nonetheless, because a motion to dismiss tests the sufficiency of a plaintiff's complaint, it does not appear that plaintiff will be prejudiced in the event that the court applies a Rule 12(b)(6) standard to his complaint. *See, e.g., Katz v. Molic,* 128 F.R.D. 35, 38 39 (S.D.N.Y.1989) (" T]hat a summary judgment

motion is being treated as a motion to dismiss for failure to state a claim does not require notice to the parties. ).

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6), calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Iqbal,* 556 U.S. 677 78 (quoting Fed.R.Civ.P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

**\*9** In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citing *Twombly,* 550 U.S. at 555 56); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal,* 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570); *see also Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded

to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 551 U.S. at 94 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008) ("[W]hen a plaintiff proceeds *pro se,* a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.,* 804 F.Supp.2d 100, 104 (N.D.N.Y.2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

Because I have previously recommended dismissal of plaintiff's negligence claim on other grounds, I have analyzed only the retaliation and medical indifference claims below.

### a. *Retaliation*

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) ( "In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action  in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Garrett v. Reynolds,* No. 99 CV 2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct.3, 2003) (Sharpe, M.J.). "[P]rison officials' conduct constitutes an 'adverse action' when it 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.' " *Alicea v. Howell,* 387 F.Supp.2d

227, 237 (W.D.N.Y.2005) (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

**\*10** Plaintiff's complaint in this case alleges that Greene medical personnel denied him medical treatment in retaliation for filing a grievance against them. Complaint (Dkt. No. 1) at 5. It is well-settled that filing a grievance is constitutionally protected conduct. *Johnson v. Eggersdorf,* 8 F. App'x 140, 144 (2d Cir.2001); *Graham v. R.J. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). In addition, courts have found that "denial of medical evaluation, treatment, and adequate pain medication" can suffice to establish adverse action under a First Amendment retaliation analysis. *Burton v. Lynch,* 664 F.Supp.2d 349, 366 (S.D.N.Y.2009). Accordingly, I find that plaintiff's complaint satisfies the first two elements of a retaliation claim.

Plaintiff's complaint, however, alleges only that "medical personnel" denied plaintiff treatment "due to 'Complaints' he made against [them]." Complaint (Dkt. No. 1) at 5. This conclusory statement is insufficient to demonstrate causation. More specifically, the complaint only alleges that he filed a grievance against "medical staff"; there is no indication, aside from this vague allegation, that any of the medical personnel employed at Greene knew about the grievance, or that the grievance served as motivation to deny plaintiff medical treatment. Accordingly, I recommend that plaintiff's retaliation claim be dismissed for failure to state a claim upon which relief may be granted.

### b. *Deliberate Medical Indifference*

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle,* 429 U.S. at 102  03 (quoting *Trop v. Dulles,* 356 U.S. 86, 100  01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169  73, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

"These elementary principles establish the government's obligation to provide medical care for those whom it

2013 WL 5354241

is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y.2010). To satisfy the objective requirement in the context of a medical indifference claim, the Second Circuit has said that

> **\*11** [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care.... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord,* 467 F.3d 263, 279 80 (2d Cir.2006) (internal citations omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional

sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J .) (citing *Farmer* ); *accord, Waldo v. Goord,* No. 97 CV 1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. *adopting report and recommendation by* Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839 40).

Plaintiff's complaint in this case alleges that he submitted two sick-call requests to medical staff at Greene, and that those requests communicated that the pain in his ear, jaw, and cheek prevented him from eating. Complaint (Dkt. No. 1) at 4 5. It is also alleged that, despite their awareness of his pain and inability to eat, defendants ignored his requests for treatment, and that as a result, his infection has progressed so far as to require surgery. *Id.* at 5 6. Mindful of the court's obligation to liberally construe a *pro se* plaintiff's complaint, I find that these allegations are sufficient to satisfy both the objective and subjective elements of an Eighth Amendment deliberate indifference claim. Accordingly, I recommend that this claim survive defendant's motion.

### 6. *Qualified Immunity*

Finally, defendant argues that he is entitled to dismissal in this case based on the doctrine of qualified immunity. Def.'s Memo. of Law (Dkt. No. 13 3) at 15 16.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards,* U.S. , , 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012); *see also Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); *Sudler v. City of New York,* 689 F.3d 159, 174 (2d Cir.2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct.

*Sudler,* 689 F.3d at 174 (citing *Saucier v. Katz,* 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *abrogated on other grounds by Pearson,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565)).

**\*12** Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson,* 555 U.S. at 231 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir.2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a constitutional right, and if so, "whether that right was 'clearly established' at the time of the events at issue." *Nagle v. Marron,* 663 F.3d 100, 114 (2d Cir.2011) (citing *Saucier,* 533 U.S. at 194, 201, 202); *accord, Sira v. Morton,* 380 F.3d 57, 68 69 (2d Cir.2004). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd,* U.S.      ,      , 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (internal quotation marks and alterations omitted). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169 70 (2d Cir.2007) (citations omitted). This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

In this case, the complaint asserts an Eighth Amendment deliberate medical indifference claim against defendant Heath. As was discussed above, the allegations giving rise to this claim, when considered in the light most favorable to plaintiff, are sufficient to give rise to a constitutional violation. In addition, an inmate's Eighth Amendment

right to adequate medical treatment was well established at the time of the alleged violation. Accordingly, the only remaining consideration in this qualified immunity analysis is whether it was objectively reasonable for defendant Heath to believe that his alleged failure to provide plaintiff medical treatment did not violate his constitutional rights under the circumstances. In support of this argument, defendant Heath has submitted no evidence or explanation that might justify his alleged failure to provide treatment. Accordingly, there is no basis from which I may conclude that he reasonably believed his conduct did not violate plaintiff's Eighth Amendment rights, and I am therefore precluded from finding that he is entitled to qualified immunity at this juncture.

### B. *Plaintiff's Motion for Leave to Amend*

**\*13** In his motion, plaintiff seeks leave to file an amended complaint. The proposed amended complaint accompanying his motion sets forth substantially the same allegations as his original complaint, except that it adds names two new defendants, Dr. Caulfield and Nurse Albright, both employed at Greene during the times relevant to this action, and removes defendant Jane Doe # 1. Dkt. No. 17 1 at 1. In opposition to plaintiff's motion, defendant Heath argues that the filing of the proposed amended complaint would be an exercise in futility in light of the fact that plaintiff has failed to exhaust his administrative remedies. Def.'s Memo. of Law (Dkt. No. 22).

Plaintiff's motion for leave to amend in order to add new defendants implicates both Rule 15(a) and Rule 21 of the Federal Rules of Civil Procedure. Rule 21 authorizes a court, "on motion of any party or of its own initiative at any stage of the action and on such terms as are just," to order the addition of parties to an action. Fed.R.Civ.P. 21; *City of Syracuse v. Onondaga Cnty.,* 464 F.3d 297, 308 (2d Cir.2006). That rule permits joinder " 'of a person, who through inadvertence, mistake or for some other reason, had not been made a party and whose presence as a party is later found necessary or desirable.' " *Oneida Indian Nation of New York State v. Cnty. of Oneida,* 199 F.R.D. 61, 72 (N.D.N.Y.2000) (McCurn, S.J.) (quoting, *inter alia, United States v. Hansel,* 999 F.Supp. 694, 697 (N.D.N.Y.1998) (McAvoy, J.)). A decision as to whether to permit joinder under Rule 21 is informed by the same general principles as those governing motions for leave to amend under Rule 15(a). *See, e.g., Oneida Indian Nation of New York State,* 199 F.R.D. at 72 73.

Rule 15(a) of the Federal Rules of Civil Procedure provides, in pertinent part, that unless amendment as a matter of right is permitted   circumstance that is not applicable here   a party may amend its pleading "only with the opposing party's written consent or the court's leave. Fed. Riv. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* Under Rule 15(a), leave to amend ordinarily should be liberally granted absent undue delay, bad faith, dilatory tactics, undue prejudice in being served with the proposed pleading, or futility. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *accord, Elma RT v. Landesmann Int'l Mktg. Corp.,* No. 98 CV 3662, 2000 WL 297197, at *3 (S.D.N.Y. Mar.22, 2000).

Notwithstanding the familiar and well accepted principle that leave to amend should be granted freely, if a claim contained in a proposed amended complaint would be vulnerable in the face of a Rule 12(b)(6) motion, then permitting amendment would be an act of futility that should not be sanctioned. *See, e.g., Saxholm AS v. Dynal, Inc.,* 938 F.Supp. 120, 124 (E.D.N.Y.1996); *In re Boesky Sec. Litig.,* 882 F.Supp. 1371, 1379 (S.D.N.Y.1995). If, on the other hand, a "proposed claim sets forth facts and circumstances which may entitle the plaintiff to relief, then futility is not a proper basis on which to deny amendment." *Saxholm,* 938 F.Supp. at 124 (citing *Allstate Ins. v. Administratia Asigurarilor De Stat,* 875 F.Supp. 1022, 1029 (S.D.N.Y.1995)).

 *14  Because I have already found that there exists a genuine dispute of material fact as to whether plaintiff failed to exhaust the available administrative remedies before commencing this action, I disagree with defendant's argument that accepting plaintiff's proposed amended complaint would be an exercise in futility. The proposed amended complaint, however, fails to allege sufficient facts plausibly suggesting a retaliation claim against any of the named defendants for the same reasons discussed above in Part III.A.5.a. of this report, and the negligence claim asserted against all defendants in the proposed amended complaint fails for the same reasons discussed above in Part III.A.4. of this report. Plaintiff's proposed amended complaint also fails to the extent that it asserts damage claims against all defendants in their official capacities for the same reasons discussed above in Part III .A.3. of this report. Accordingly, I recommend that plaintiff's proposed amended complaint be accepted for filing as it relates only to his Eighth Amendment deliberate medical indifference claim, asserted against defendants Caufield, Albright, and Heath in their individual capacities.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint in this action asserts a claim that is subject to the requirement that, before bringing this action, he must have first filed a grievance and pursued it to completion utilizing the IGP in place and available to DOCCS inmates. Because the record evidence reveals a dispute of fact as to whether plaintiff in fact appealed any grievance related to his claims in this action to the CORC, I am precluded from recommending dismissal of the action on that procedural basis. As it relates to plaintiff's motion for leave to file an amended complaint, the proposed amended complaint should be accepted only to the extent that it asserts an Eighth Amendment claim against the named defendants in their individual capacities.

It is therefore hereby respectfully

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 13) be DENIED in part and GRANTED in part in accordance with this report, and that plaintiff's claims of retaliation and negligence, as well as his damage claims against defendant Heath in his official capacity, be DISMISSED; and it is further

RECOMMENDED that plaintiff's motion for leave to amend (Dkt. No. 17) be GRANTED, only to the extent that his proposed amended complaint asserts an Eighth Amendment deliberate medical indifference claim against defendants Heath, Albright, and Caufield in their individual capacities.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

 *15  It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5354241

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5310245
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Henry BENITEZ, Plaintiff,

v.

William PARMER, et al., Defendants.

Civil Action No. 9:12–CV–0448 (GTS/DEP).
|
July 8, 2013.

**Attorneys and Law Firms**

Henry Benitez, Malone, NY, pro se.

Eric T. Schneiderman, The Capitol, Cathy Sheehan, Esq., Assistant Attorney General, Albany, NY, for Defendant.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Henry Benitez, a New York State prison inmate, has commenced this action, pursuant to 42 U.S.C. § 1983, claiming deprivation of his rights under the First and Eighth Amendments ro the United States Constitution. In his complaint, plaintiff generally alleges that he was denied necessary medical treatment for Hepatitis C by several prison employees in retaliation for filling of several grievances against them.

Defendants have responded to plaintiff's most recent amended complaint by filing a motion to dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that defendants' motion be denied in part and granted in part.

I. BACKGROUND

1    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's second amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (" W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.  (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964).

Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Sec. Am. Compl. (Dkt. No. 30). Although plaintiff's claims arise from the conduct of defendants employed at Upstate Correctional Facility ("Upstate"), before being transferred to Upstate, he was confined in the Auburn Correctional Facility ("Auburn"). *Id.* ¶¶ 4, 16, 19.

On July 26, 2002, plaintiff's primary medical provider at Auburn informed him that a blood test indicated he " 'might' have contracted hepatitis B and C viruses and that a liver biopsy was necessary to verify or refute such conclusion." Sec. Am. Comp. (Dkt. No. 30) at ¶ 16. On September 13, 2002, before plaintiff was given the opportunity to request a liver biopsy, he was transferred to Upstate. *Id.* at ¶ 19.

During the month of September 2002, plaintiff repeatedly asked his primary medical care provider at Upstate, Dr. Richards, who is not a party to this case, to recommend that he be afforded a liver biopsy and antiviral therapy. Sec. Am. Comp. (Dkt. No. 30) at ¶ 20. On April 29, 2003, nearly seven months later, Dr. Richards formally recommended that plaintiff be given medicinal therapy for the Hepatitis C virus. *Id.* at ¶ 21. On July 23, 2003, a liver biopsy was performed at the direction of Upstate's program director at the time, Dr. Weissman. *Id.* at ¶ 23. The biopsy indicated that plaintiff's liver contained "enlarged portal areas containing many chronic inflammatory cells" and "increased connective tissue" due to "chronic hepatitis grade 1." *Id.* at ¶ 24. On August 20, 2003, Dr. Lester Wright, the then-Chief Medical Officer for DOCCS, rejected a recommendation by Dr. Richard that plaintiff be administered antiviral therapy. *Id.* at ¶ 25. Dr. Wright explained that, because plaintiff's liver was "this intact," he need only be monitored every six months. *Id.* Dr. Wright advised that "if there is a significant increase [indicating fibrosis,] treatment could be indicated at that time." *Id.*

Plaintiff's second amended complaint alleges that, over the course of nine years, from 2002 to 2011, he filed numerous formal grievances against Upstate medical staff

members for refusing to provide him with adequate medical treatment for Hepatitis C. Sec. Am. Comp. (Dkt. No. 30) at ¶ 26. Those grievances were investigated and reviewed by defendant Smith, a Nurse Administrator employed at Upstate; defendants Parmer [2] and Lashway, both of whom are Nurse Practitioners employed at Upstate; defendant Powers, an Infection Control Nurse employed at Upstate; defendant Schroyer, a physician employed at Upstate and the Director of Upstate Health and Services; defendant Otis, Deputy Superintendent for Administrative Services at Upstate; defendant Rock, Upstate's Superintendent; and defendant Koenigsmann, the DOCCS Chief Medical Officer. Id. at ¶¶ 5 12, 28.

[2]    From 2008 to March 2012, defendant Parmer acted as plaintiff's primary medical provider. Sec. Am. Compl. (Dkt. No. 30) at ¶ 27.

**\*2**  As a result of their investigation or review of plaintiff's grievances, defendants Parmer, Smith, Lashway, Powers, Schroyer, Otis, Rock, and Koenigsmann were aware of plaintiff's blood test results, which revealed that his alanine aminotransferase level ("ALT") remained elevated. Id. at ¶ 32. Relying on DOCCS's Hepatitis C Practice Guidelines (March 2011) ("DOCCS Hepatitis C Guidelines"), plaintiff alleges that, in light of his elevated ALT levels, he should have been provided a repeat liver biopsy every five years. Id. at ¶ 31. Plaintiff alleges that, despite their awareness of his need for repeat liver biopsies and antiviral therapy, defendants merely monitored his ALT levels, and that the failure to properly assess his condition was in retaliation for the filing of grievances against Upstate medical staff between 2002 and 2011. Id. at ¶ 33.

On September 30, 2011, defendant Parmer recommended that plaintiff be considered for Hepatitis C treatment therapy, but refused to recommend an additional liver biopsy. Sec. Am. Compl. (Dkt. No. 30) at ¶ 38. In October 2011, defendant Schroyer postponed defendant Parmer's recommendation for treatment, but recommended a liver biopsy, which was conducted on November 9, 2011. [3] Id. at ¶¶ 39 40. The report of that biopsy indicated "cirrhosis consistent with Hepatitis C, grade 3/4, stage 4/4." Id. at ¶ 41.

[3]    Plaintiff alleges that when defendant Parmer recommended viral therapy on September 30, 2011, he knew that treatment would be delayed due to

the absence of an updated liver biopsy report. Sec. Am. Compl. (Dkt. No. 30) at ¶ 30. Instead of recommending the biopsy in September, plaintiff alleges that defendant Parmer intentionally delayed the biopsy by recommending viral therapy that he knew would inevitably be denied. Id.

On March 7, 2012, defendant Powers e-mailed defendant Koenigsmann a Hepatitis C consult form that contained, inter alia, a recommendation that plaintiff be considered for antiviral therapy. Sec. Am. Compl. (Dkt. No. 30) at ¶ 44. The e-mail also included a statement that plaintiff has a history of "non-compliance with medical care." Id. On March 8, 2012, defendant Koenigsmann rejected the request for antiviral treatment for plaintiff, explaining that plaintiff had

> an ANC below the recommended tx level of 1000, in addition he has a low plt count in the face of stage 4 dz this likely represents early decompensation of his cirrhosis. You indicate he is noncompliant with medical care. I would regard this as too many contraindications to tx and cannot approve tx.

Id. at ¶ 45. The next day, defendant Parmer informed plaintiff of defendant Koenigsmann's decision. Id. at ¶ 46.

Plaintiff alleges that defendant Power's inclusion of the comment to defendant Koenigsmann that plaintiff had a history of noncompliance with medical treatment was prompted by a conspiracy among defendants Parmer, Schroyer, Smith, Powers, and Lashway to retaliate against him for filing grievances against Upstate medical staff. Sec. Am. Compl. (Dkt. No. 30) at ¶ 43. More specifically, he contends that the inclusion of that particular comment was calculated to provide defendant Koenigsmann justification for denying the recommendation that plaintiff begin antiviral therapy for Hepatitis C. Id. In an effort to corroborate these allegations, plaintiff further alleges that, on March 16, 2012, John Marinelli, an employee from the New York State Office of Mental Health ("OMH"), verbally informed him that, on March 7, he witnessed defendants Parmer and Schroyer, and three apparently unknown "members of Upstate's treatment team" discussing plaintiff's grievances. Id. at

¶ 47. Marinelli also informed plaintiff that he had been asked evaluate plaintiff to determine whether he was suffering from any psychological harm as a result of having been denied therapy. *Id.* at ¶ 48.

**\*3** Plaintiff alleges that, as a result of the lack of treatment provided by defendants, he has experienced extreme fatigue, prolonged abdominal pains, nausea, vomiting, severe dizziness, and severe psychological distress. Sec. Am. Compl. (Dkt. No. 30) at ¶ 34. He claims to have filed several grievances in 2011 complaining that these symptoms were the result of defendant Parmer's refusal to recommend a liver biopsy or Hepatitis C treatment. *Id.* Plaintiff further alleges that, notwithstanding their knowledge of his condition, defendants Rock, Otis, and Koenigsmann failed to refer Benitez to a specialist and instead allowed defendant Parmer to remain as his primary medical care provider. *Id.* at ¶ 36.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on March 13, 2012, by the filing of a complaint and an accompanying application to proceed *in forma pauperis* ("IFP"). Compl. (Dkt. No. 1). On April 10, 2012, plaintiff's initial complaint was superseded through the filing of a first amended complaint. Am. Compl. (Dkt. No. 5). Thereafter, on September 24, 2012, the court accepted for filing plaintiff's second amended complaint, which is now the operative pleading in this matter. Sec. Am. Compl. (Dkt. No. 30). In the meantime, plaintiff was granted permission to proceed IFP, and has twice been denied requests that the court appoint *pro bono* counsel to represent him in the action. Dkt. Nos. 9, 14, 47.

Plaintiff's second amended complaint names eight Upstate employees as defendants, including (1) William Parmer, a Nurse Practitioner; (2) Nancy Smith, a Nurse Administrator; (3) Pauline Powers, an Infection Control Nurse; (4) Amber Lashway, a Nurse Practitioner; (5) Glenn Schroyer, M.D., the Upstate Health Services Director, (6) Carl Koenigsmann, M.D., the DOCCS Chief Medical Officer; (7) Gerald Otis, Upstate's Deputy Superintendent for Administrative Services; and (8) David Rock, the Superintendent at Upstate. Sec. Am. Compl. (Dkt. No. 30) at ¶¶ 5 12. Generally, the second amended complaint asserts four causes of action against defendants, including (1) failure to protect, against defendants Rock, Otis, and Koenigsmann; (2) retaliation,

against defendants Parmer, Smith, Schroyer, Powers, and Lashway; (3) conspiracy to retaliate, against defendants Parmer, Smith, Schroyer, Powers, and Lashway; and (4) deliberate medical indifference, against all eight defendants. *See generally* Sec. Am. Compl. (Dkt. No. 30). Plaintiff seeks a variety of relief, including an injunction that affirmatively directs defendants to provide him with specified medical treatment, compensatory and punitive damages, and attorney's fees. Sec. Am. Compl. (Dkt. No. 30) at 21 23.

On October 25, 2012, in lieu of an answer, defendants filed a motion seeking dismissal of plaintiff's complaint in its entirety.[4] Dkt. No. 32. In support of their motion, defendants argue that (1) plaintiff's second amended complaint fails to state a claim upon which relief may be granted with respect to any of the asserted retaliation, conspiracy, or deliberate medical indifference causes of action; (2) plaintiff's second amended complaint fails to sufficiently allege the personal involvement of defendants Otis and Rock; (3) the court lacks subject matter jurisdiction over plaintiff's state law claims; (4) the claims asserted against defendants Koenigsmann, Otis, and Rock in their official capacities are precluded by Eleventh Amendment; and (5) any claims arising from defendants' conduct occurring more than three years prior to the commencement of this action are barred by the applicable statute of limitations. *See generally* Defs.' Memo. of Law (Dkt. No. 32 1); Defs.' Suppl. Memo. of Law (Dkt. No. 32 5). Plaintiff has since responded in opposition to defendants' motion, addressing all of their arguments. Plf.'s Resp. (Dkt. No. 42); Plf.'s Suppl. Resp. (Dkt. No. 46).

[4]   At the time defendants filed their motion to dismiss, the court had not yet ruled on plaintiff's motion for leave to file a second amended complaint. Upon granting plaintiff's motion and the court's acceptance of that pleading, defendants filed a supplemental memorandum of law in support of their motion. Dkt. Nos. 44, 45. Because the second amended complaint added three additional defendants (Lashway, Powers, and Smith), defendants' supplemental filing joined those additional defendants in the motion, and asserted an additional defense. Defs.' Suppl. Memo. of Law (Dkt. No. 32 5).

**\*4** Defendants' motion, which has been fully briefed is now ripe for determination, has been referred to me for issuance of a report and recommendation, pursuant to 28

U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

### III. DISCUSSION

#### A. Motion to Dismiss Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Iqbal,* 556 U.S. 677 78 (quoting Fed.R.Civ.P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See id* . at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citing *Twombly,* 550 U.S. at 555 56); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal,* 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570); *see also Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.' " *In*

*re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 551 U.S. at 94 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008) ("[W]hen a plaintiff proceeds *pro se,* a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.,* 804 F.Supp.2d 100, 104 (N.D.N.Y.2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

#### B. Personal Involvement

**\*5** In their motion, defendants argue that plaintiff's second amended complaint fails to allege facts plausibly suggesting the personal involvement of some of the named defendants. Defs.' Memo. of Law (Dkt. No. 32 1) at 14 15.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Certain of the defendants named in plaintiff's second amended complaint hold supervisory positions within the DOCCS. It is wellestablished that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on *respondeat superior." Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged

conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152 53 (2d Cir.2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 554 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.

1. Deliberate Medical Indifference

Plaintiff's second amended complaint asserts an Eighth Amendment deliberate medical indifference claim against all eight defendants. *See generally* Sec. Am. Comp. (Dkt. No. 30). The allegations supporting this claim against defendants Smith, Lashway, Powers, Schroyer, Otis, and Rock are insufficient to plausibly suggest their personal involvement. Plaintiff alleges that defendants Smith, Lashway, Powers, Schroyer, Otis, and Rock either investigated or reviewed all of the grievances filed by him against Upstate medical staff between 2002 and 2011, but did nothing in response. *Id.* at ¶ 26, 28. It is also alleged that these defendants knew of the DOCCS Hepatitis C Guidelines, which recommend that inmates with elevated ALT levels be provided repeat liver biopsies, and that plaintiff's blood test results in fact revealed elevated ALT levels from 2008 until 2011. *Id.* at ¶¶ 29 32. These allegations, however, do not plausibly suggest a tangible connection between plaintiff's injury and the defendants' conduct. *Bass,* 790 F.2d at 263. To satisfy the personal involvement requirement of a section 1983 claim, a plaintiff must do more than allege that a prison official ignored or failed to respond to a plaintiff's grievance. *See Parks v. Smith,* No. 08 CV 0586, 2011 WL 4055415, at *14 (N.D.N.Y. Mar.29, 2011) (Lowe, M.J.), *report and recommendation adopted by,* 2011 WL 4055414 (N.D.N.Y. Sept.12, 2011) (McAvoy, J.), ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement."); *Greenwaldt v. Coughlin,* No. 93 CV 6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing, *inter alia, Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against

superintendent of prison where only allegation was that he ignored inmate's request for an investigation)). [5]

5    Copies of all unreported decisions are attached to this report and recommendation for the convenience of the *pro se* plaintiff. Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**\*6** It should also be noted that plaintiff's second amended complaint does not allege that defendant Otis, the Superintendent at Upstate, and defendant Rock, the Deputy Superintendent for Administrative Services at the facility, did anything more than rely on the conclusions provided by the Upstate medical staff in failing to address his grievances. Sec. Am. Compl. (Dkt. No. 30) at ¶¶ 31 37. It is well established that supervisory prison officials are entitled to rely on the opinions of medical professionals concerning the proper course of treatment. *Mercer v. Benson,* No. 08 CV 0537, 2009 WL 3111684, at *4 (N.D.N.Y. Aug. 14, 2009) (Homer, M.J.) (citing *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004)).

Plaintiff's allegations against defendant Parmer, however, are considerably more compelling insofar as his direct involvement in the deprivations alleged by plaintiff are concerned. In his second amended complaint, plaintiff alleges that defendant Parmer was plaintiff's primary medical provider from 2008 until March 2012, and that during that period, he intentionally neglected to provide plaintiff with the treatment recommended in the DOCCS Hepatitis C Guidelines, in retaliation for plaintiff filing grievances against him. Sec. Am. Compl. (Dkt. No. 30) at ¶ 27 34. These allegations are sufficient to implicate defendant Parmer in the constitutional violations asserted. *Compare Johnson v. Wright,* 234 F.Supp.2d 352, 364 (S.D.N.Y.2002) (finding no personal involvement for plaintiff's primary medical provider where it was alleged that the medical provider recommended treatment and took no part in the refusal to provide plaintiff with treatment).

Turning to plaintiff's claims against defendant Koenigsmann, Benitez alleges that he reviewed, and ultimately denied, a recommendation that plaintiff be afforded antiviral treatment in March 2012, after reviewing plaintiff's medical records. *Id.* at ¶ 45. This allegation is also sufficient to allege personal involvement. *See Veloz v. N.Y.,* 339 F.Supp.2d 505, 521 (S.D.N.Y.2004) (finding that the defendant's "alleged involvement in denying plaintiff UPD housing for discriminatory

reasons" was sufficient to establish personal involvement because the defendant was "directly and ultimately responsible for determining who is placed in UPD housing").

In sum, I find that plaintiff's second amended complaint alleges sufficient facts to plausibly suggest that defendants Parmer and Koenigsmann were personally involved in any alleged deliberate medical indifference, but lacks sufficient allegations giving rise to a basis to hold defendants Smith, Lashway, Powers, Schroyer, Otis, and Rock accountable. Therefore, I recommend dismissal of plaintiff's deliberate medical indifference claims against those six defendants.

### 2. Failure to Protect

Plaintiff's second amended complaint also asserts a failure to protect claim against defendants Rock, Otis, and Koenigsmann. Specifically, it is alleged that those three defendants were aware of the possibility that defendant Parmer might retaliate against Benitez for filing a grievance against him, but failed to protect him from that retaliation. Sec. Am. Compl. (Dkt. No. 30) at ¶¶ 36 37. These allegations are insufficient to support a failure to protect claim because, as discussed more completely below,[6] plaintiff's retaliation claim asserted against defendant Parmer, upon which the failure to protect cause of action hinges, is facially deficient. Simply stated, defendants Rock, Otis, and Koenigsmann cannot be liable for failing to protect plaintiff from a non-event.

[6]    See Part III.C.1., post.

**\*7** Even assuming plaintiff's second amended complaint plausibly stated a claim of deliberate indifference against defendant Parmer, defendants Rock, Otis, and Koenigsmann would not necessarily be accountable to the plaintiff under a failure to protect theory. To establish liability on the part of a defendant for failure to protect or intervene, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle,* No. 10 CV 0456, 2011 WL 5975027, at \*4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008)). Here, plaintiff's second amended complaint fails to allege facts that plausibly suggest defendants Rock, Otis, or Koenigsmann had a realistic opportunity to intervene. For example, it fails to allege facts that plausibly suggest awareness on the part of those three defendants as to when, or in what manner, defendant Parmer might retaliate against Benitez. Accordingly, those three defendants should not deemed to have had knowledge that defendant Parmer's unconfirmed, prospective conduct would violate plaintiff's constitutional rights. Moreover, plaintiff's second amended complaint alleges no facts concerning the timing of plaintiff's grievance against defendant Parmer in relation to when defendants Rock, Otis, and Koenigsmann allegedly knew that defendant Parmer might retaliate against him.

For all these reasons, I recommend that plaintiff's failure to protect claim be dismissed as against defendants Rock, Otis, and Koenigsmann.

### C. First Amendment Claims

Among the claims asserted by the plaintiff is a First Amendment retaliation cause of action against defendants Parmer, Smith, Powers, Lashway, Schroyer, and Koenigsmann. *See generally* Sec. Am. Compl. (Dkt. No. 30). Plaintiff also alleges that defendants Parmer, Smith, Powers, Lashway, and Schroyer conspired to retaliate against him, also in violation of the First Amendment. *Id.* In their motion, defendants argue that neither of these causes of action has been sufficiently pleaded. Defs.' Memo. of Law (Dkt. No. 32 1) at 7 10.

### 1. Retaliation

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) ( "In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in other words, that the protected conduct was a "substantial

2013 WL 5310245

or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Garrett v. Reynolds,* No. 99 CV 2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct.3, 2003) (Sharpe, M.J.). "[P]rison officials' conduct constitutes an 'adverse action' when it 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.' " *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

**\*8** Plaintiff's second amended complaint alleges that he submitted numerous grievances related to defendants' failure to provide him with treatment for Hepatitis C, and that defendants retaliated against him for filing those grievances by refusing him medical treatment. Sec. Am. Compl. (Dkt. No. 30) at ¶¶ 26, 31 34, 38, 42 44, 47 49. It is well-settled that filing a grievance is constitutionally protected conduct. *Johnson v. Eggersdorf,* 8 F. App'x 140, 144 (2d Cir.2001); *Graham v. R.J. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). In addition, courts have found that "denial of medical evaluation, treatment, and adequate pain medication" can suffice to establish adverse action under a First Amendment retaliation analysis. *Burton v. Lynch,* 664 F.Supp.2d 349, 366 (S.D.N.Y.2009). Accordingly, I find that plaintiff's second amended complaint satisfies the first two elements of a retaliation claim.

As it relates to the third element of causation, a more careful review of the operative pleading is necessary. Analysis of that element is informed by several relevant factors, including "(1) the temporal proximity between the protected activity and the alleged retaliatory act, (2) the inmate's prior good disciplinary record, (3) vindication at a hearing on the matter, and (4) statements by the defendant concerning his ... motivation." *Jean Laurent v. Lane,* No. 11 CV 0186, 2013 WL 600213, at *8 (N.D.N.Y. Jan. 24, 2013) (Dancks, M.J.), *report and recommendation adopted by* 2013 WL 599893 (N.D.N.Y. Feb.15, 2013) (Mordue, J.).

Plaintiff's second amended complaint alleges only that he specifically filed a grievance against defendant Parmer for neglecting to provide adequate medical treatment. Sec. Am. Compl. (Dkt. No. 30) at ¶¶ 34, 35, 37. Although the second amended complaint contains general allegations

to the effect that, for example, "[f]rom 2002 to 2011, the plaintiff filed numerous grievances against Upstate medical staff members concerning various medical related problems," these vague and conclusory allegations are insufficient to plausibly suggest that (1) plaintiff filed any grievances against defendants Schroyer, Koenigsmann, Powers, Smith, or Lashway; (2) those defendants retaliated against plaintiff for filing a grievance against them (even assuming plaintiff filed grievances against them); or (3) those defendants retaliated against plaintiff for filing grievances against defendant Parmer. [7] Sec. Am. Compl. (Dkt. No. 30) at 26. Stated simply, aside from the conclusory allegations, plaintiff's second amended complaint fails to alleges facts plausibly suggesting that defendants Schroyer, Koenigsmann, Powers, Smith, or Lashway refused plaintiff medical treatment as a result of his exercise of his First Amendment right to file grievances. *See Reed v. Doe,* No. 11 CV 0250, 2012 WL 4486086, at *6 (N.D.N.Y. July 26, 2012) (Peebles, M.J.), *report and recommendation adopted,* 2012 WL 4486085, (N.D.N.Y. Sept.27, 2012) (McAvoy, J.), (recommending that, where plaintiff's complaint lacked factual allegations that would establish a nexus between visiting a prison infirmary (protected activity) and the defendant's issuance of a misbehavior report (adverse action), the defendant's motion to dismiss should be granted). [8]

[7]    As another example of this type of vague allegation, despite his contention that all defendants knew of both plaintiff's elevated ALT blood levels and the DOCCS Hepatitis C Guidelines recommendation that patients with elevated ALT blood levels be afforded " 'repeat liver biops ies], plaintiff alleges that all defendants "deliberately opted merely to test the plaintiff's ALT levels and to allow him to sustain 'liver cirrhosis' in reprisal for his having filed numerous medical related grievances from 2002 to 2012. Sec. Am. Compl. (Dkt. No. 30) at ¶¶ 31 33. Indeed, there are no specific allegations as to who precisely decided to only monitory plaintiff's liver, how that decision was made, or which particular defendants were involved.

[8]    While plaintiff's second amended complaint alleges, in conclusory fashion, that defendant Koenigsmann's refusal to approve antiviral treatment was motivated by the filing of grievances, Sec. Am. Compl. (Dkt. No. 30) at ¶ 49, it also references a medical note authored by that defendant on March 7, 2012, in which he stated that

t]his patient] has an ANC absolute neutrophil count] below the recommended treatment] level of 1000, in addition he has a low platelet] count in the face of stage 4 disease] this likely represents early decompensation of his cirrhosis ... he is non compliant with medical care. I would regard this as too many contraindications to treatment] and cannot approve treatment].

Sec. Am. Compl. (Dkt. No. 30) at ¶ 45. This note suggests that defendant Koenigsmann denied the recommended course of treatment for medically based reasons, which could be enough to avoid liability for any alleged retaliatory conduct. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) ( " Defendant] DOC C]S may evade liability if it demonstrates that it would have engaged in the adverse conduct] even in the absence of the protected conduct. (internal quotation marks omitted)); *accord, Murray v. Hulihan,* No. 08 CV 0912, 2010 WL 1235615, at *3 (N.D.N.Y. Mar. 17, 2010) (Baxter, M.J.), *report and recommendation adopted by* 2010 WL 1260140 (N.D.N.Y. Mar.31, 2010) (Mordue, J.).

**\*9** As it relates to defendant Parmer, although plaintiff's second amended complaint alleges that plaintiff filed specific grievances against defendant Parmer, there are no other allegations to plausibly suggest a causal connection between any of those grievances and defendant Parmer's alleged denial of medical treatment. While it is true that close temporal proximity can be a factor that gives rise to a causal connection, *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009), plaintiff's second amended complaint fails to allege that defendant Parmer's alleged refusal to adequately treat plaintiff arose shortly after plaintiff filed a grievance against him. Moreover, while it is alleged that defendant Parmer treated plaintiff between 2008 and 2012, at least some of plaintiff's allegations in support of his retaliation claim vaguely suggest that defendant Parmer refused medical treatment based on grievances filed by plaintiff prior to 2008. *See* Sec. Am. Compl. (Dkt. No. 3) at ¶ 33 ("[T]he defendants[, including defendant Parmer,] ... deliberately opted merely to test the plaintiff's ALT levels ... in reprisal for his having filed numerous medical grievances from 2002 to 2012."). It is unclear from the allegations why defendant Parmer might be motivated by plaintiff's past grievances against Upstate medical staff to retaliate against him. *See Edwards v. Horn,* No.10 CV 6194, 2012 WL 760172, at *17 (S.D.N.Y. Mar.8, 2012) ("[The plaintiff]'s reliance on temporal proximity does not make his claims plausible, as he fails to differentiate

between his seemingly innumerable grievances or provide specific factual allegations, including but not limited to concrete dates, that might demonstrate any nexus between a specific grievance and a specific adverse action.").

I am mindful of the Second Circuit's admonition that claims of retaliation should be scrutinized with particular care because "virtually any adverse action taken against a prisoner by a prison official ... can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001). "Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims 'with skepticism and particular care.' " *Brobston v. Schult,* No. 10 CV 0242, 2011 WL 5325715, at *9 (N.D.N.Y. Sept. 28, 2011) (Treece, M.J.), *report and recommendation adopted by* 2011 WL 5325778 (N.D.N.Y. Nov.3, 2011) (Sharpe, J.), (quoting *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)). In this case, the allegations contained in plaintiff's second amended complaint merely allege that plaintiff filed grievances against defendant Parmer and that, as a result, defendant Parmer neglected to provide adequate medical treatment to plaintiff. Such conclusory allegations, without more, are insufficient to satisfy the causal connection element necessary to state a claim for retaliation.

To fill this void, plaintiff alleges that an OMH employee, John Marinelli, told plaintiff that he heard defendants Parmer and Schroyer (and three other Upstate medical employees) "vehemently discussing grievances filed by ... [plaintiff]." Sec. Am. Compl. (Dkt. No. 30) at ¶ 47. This allegation, which the court must credit at this procedural juncture, nonetheless fails to enhance the plausibility of plaintiff's retaliation claim. The fact that defendants Parmer and Schroyer discussed plaintiff's grievances does not, alone, provide a basis for the court to infer a causal connection between the grievances and the alleged inadequate treatment. Indeed, there could be any number of reasons why the two defendants were discussing the grievances that would not lead to a conclusion that defendant Parmer denied plaintiff treatment as a result the filing grievances against him. Without more, plaintiff is not entitled to the benefit of an inference that there is a causal link between plaintiff's grievances and defendant Parmer's alleged inadequate medical care.

**\*10** For all of these reasons, I recommend that defendants' motion to dismiss plaintiff's retaliation claim asserted against all defendants be granted.

### 2. Conspiracy to Retaliate

Plaintiff asserts a claim of conspiracy in violation of 42 U.S.C. § 1983 against defendants Parmer, Smith, Powers, Lashway, and Schroyer. [9] Sec. Am. Compl. (Dkt. No. 30) at ¶¶ 42 44. Defendants argue, however, that this claim is not legally cognizable, based upon the intraagency conspiracy doctrine, which precludes such claims against officers, agents, or employees of a single corporate entity. Defs.' Memo of Law (Dkt. No. 32 1) at 5.

[9]     That section provides, in relevant part, that

> e]very person who ... causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress 42 U.S.C. § 1983.

To sustain a conspiracy claim under section 1983, a plaintiff must show "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Benitez v. Ham,* No. 04 CV 1159, 2009 WL 3486379, at \*18, (N.D.N.Y. Oct. 21, 2009) (Mordue, J., *adopting report and recommendation* by Lowe, M.J.). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983. *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983).

In this case, because I have already recommended that plaintiff's conspiracy claim be dismissed for failure to state a cognizable claim, I similarly recommend that his conspiracy to retaliate claim be dismissed. *See O'Bradovich v. Vill. of Tuckahoe,* 325 F.Supp.2d 413, 426 (S.D.N.Y.2004) ("In the absence of any claim establishing a violation of civil rights, the court must also dismiss claims of conspiracy[.]"); *Singer v. Fulton Cnty. Sheriff's Dep't,* No. 92 CV 1561, 1994 WL 549741, at \*5 (N.D.N.Y. Oct.4, 1994) (Hurd, M.J.), *aff'd* 63 F.3d 110 (2d Cir.1995) ("Without a [constitutional] violation, there can be no actionable conspiracy."). Accordingly,

I recommend dismissal of this conspiracy claim asserted against defendants Parmer, Smith, Powers, Lashway, and Schroyer, and find it unnecessary to address defendants' argument that the intracorporate conspiracy doctrine applies in this case.

### D. Eighth Amendment Claim of Medical Indifference

At the heart of plaintiff's second amended complaint in this action are his allegations that defendants violated his Eighth Amendment rights when they denied him the medical treatment that he requested for his Hepatitis C condition. The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102 03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100 01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169 73, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)" (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

**\*11** "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y.2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner

2013 WL 5310245

was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care.... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord,* 467 F.3d 263, 279 80 (2d Cir.2006) (internal citations omitted).

The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter,* 316 F.3d 178, 185 86 (2d Cir.2003). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (internal quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer* ); *accord, Waldo v. Goord,* No. 97 CV 1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. *adopting report and recommendation by* Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839 40).

**\*12** Plaintiff's second amended complaint in this action asserts a deliberate medical indifference claim against all eight named defendants. I have analyzed the sufficiency of plaintiff's deliberate indifference allegations only as they relate to defendants Parmer and Koenigsmann.[10]

10    As was discussed above, I have recommended dismissal of this claim to the extent it is asserted against defendants Smith, Lashway, Powers, Schroyer, Otis, and Rock for lack of personal involvement. *See* Part III.B.1., *ante.*

1. Objective Element

After carefully considering the matter, I find that plaintiff's second amended complaint alleges sufficient facts to satisfy the objective element of the analysis. Plaintiff's allegations plausibly suggest that defendants Parmer and Koenigsmann failed to take even " 'reasonable measures' in response to a medical condition." *Salahuddin,* 467 F.3d at 280. It is alleged, for example, that in 2002, plaintiff's blood tests indicated that he might have Hepatitis B and C, but the diagnosis could not be confirmed without a liver biopsy. Sec. Am. Compl. (Dkt. No. 30) at ¶ 16. Despite repeated requests for a biopsy in September 2002, one was not performed until July 23, 2003. *Id.* at ¶ 23. On August 20, 2003, the thenDOCCS Chief Medical Officer, who is not a party to this action, denied a recommendation from plaintiff's doctor that plaintiff begin antiviral therapy. *Id.* at ¶ 25. Plaintiff alleges that from that point until September 2011, he was not treated for Hepatitis C. *Id.* at ¶ 27. Defendant Parmer acted as plaintiff's primary medical provider from 2008 until 2012. *Id.* at ¶ 26. Between

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2002 and 2011, plaintiff filed several grievances alerting all defendants of the inadequacy of his care, including one alleging that defendant Parmer failed to recommend that Benitez be afforded antiviral treatment or a liver biopsy. *Id.* at ¶¶ 26, 28, 34. Defendant Parmer finally recommended antiviral treatment in September 2011, but treatment was ultimately postponed until after another liver biopsy was performed. *Id.* at ¶ 38 39. Following that biopsy in November 2011, the results of which evinced "cirrhosis consistent with Hepatatis C, grade 3/4, stage 4/4," defendant Koenigsmann denied a recommendation that plaintiff be considered for Hepatitis C therapy. *Id.* at ¶ 44 45. It was determined by Upstate's "treatment team" that plaintiff's condition was too advanced to justify treatment. *Id.* at ¶ 46. Considered together, these allegations plausibly suggest that defendant Parmer, who treated plaintiff, and defendant Koenigsmann, who had been alerted to plaintiff's condition, reviewed plaintiff's case, and ultimately denied recommended treatment, thereby failing to reasonably treat plaintiff's Hepatitis C for at least a period of three-and-a-half years.

In addition, I find that the alleged inadequate treatment was "sufficiently serious" to satisfy the objective element of a medical indifference claim. As was discussed above, plaintiff's second amended complaint alleges that, as a result of the failure of defendants Parmer and Koenigsmann to treat his Hepatitis C, the illness progressed so far that, by 2011, treatment was no longer appropriate. Sec. Am. Compl. (Dkt. No. 30) at ¶ 46. In addition, plaintiff alleges that he has suffered fatigue, prolonged abdominal pain, nausea, vomiting, dizziness, and psychological distress as a result of defendants' inadequate treatment. *Id.* at ¶¶ 34, 50. Plaintiff also remains at "risk for developing many potentially fatal complications." *Id.* at ¶ 51. These allegations are enough to satisfy the "sufficiently serious" prong of the objective inquiry. *See Salahuddin,* 467 F.3d at 281 (finding that a five-month delay in performing a liver biopsy on the plaintiff who had Hepatitis C "caused sufficiently serious harm" because the plaintiff alleged that he "suffered pain" during those five months); *but see Motta v. Wright,* No. 06 CV 1047, 2009 WL 1437589, at *16 (N.D.N.Y. May 20, 2009) (Mordue, J., *adopting report and recommendation by* DiBianco, M.J.) (finding, on a motion for summary judgment, that a three-and-a-half year delay between biopsies of a plaintiff with Hepatitis C was not sufficiently serious where the defendants produced evidence that the virus progresses so slowly that three years was unremarkable); *compare Dabney v. Maddock,* No. 10 CV 0519, 2011 WL 7479164. at *8 (N.D.N.Y. Nov. 29, 2011) (Peebles, M.J.), *report and recommendation adopted by* 2012 WL 760748 (N.D.N.Y. Mar.7, 2012) (Suddaby, J.) (granting defendants' motion to dismiss where the plaintiff merely alleged that the defendant failed to respond to a request for treatment of his Hepatitis C); *Melendez v. Wright,* No. 05 CV 1614, 2008 WL 4757360, at *4 5 (N.D.N.Y. Oct. 29, 2008) (Mordue, J. *adopting report and recommendation by* Treece, M.J.) (finding, on a motion for summary judgment, that the plaintiff had failed to establish that the defendant's alleged inadequate treatment was sufficiently serious where the Hepatitis C was at stage zero fibrosis and the plaintiff failed to demonstrate how the defendants' conduct affected him).

2. Subjective Element

**\*13** As for the second, subjective requirement for stating an Eighth Amendment medical indifference claim, I find that the allegations in plaintiff's second amended complaint are similarly satisfactory. To satisfy the subjective element, a plaintiff's complaint must allege facts that plausibly suggest the defendant knew of or disregarded an excessive risk to inmate health or safety. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted). Although it is true, as defendants argue, that a plaintiff must do more than allege that he disagrees with the treatment provided by medical providers to satisfy this element, *Chance,* 143 F.3d at 703, in this case, plaintiff's second amended complaint does exactly that. Plaintiff alleges, for example, that defendant Parmer was plaintiff's medical provider from 2008 until March 2012. Sec. Am. Compl. (Dkt. No. 3) at ¶ 27. He also asserts that defendants Parmer and Koenigsmann reviewed his blood tests results from 2008 until 2011, revealing that his ALT levels remained elevated. *Id.* at 32. All defendants allegedly were aware of the treatment recommended in the DOCCS Hepatitis C Guidelines, and the significance of elevated ALT levels. *Id.* at ¶¶ 29 31. It is also alleged that defendants Parmer and Koenigsmann ignored the results of plaintiff's blood tests and neglected to follow the recommended Hepatitis C treatment because plaintiff filed grievances against Upstate medical providers for their treatment of plaintiff's Hepatitis C illness. *Id.* at ¶ 33. As a result, plaintiff allegedly suffered serious medical consequences, including liver cirrhosis. *Id.* at 33 34.

Although it may become clear later in this litigation, based upon a more fully developed record, that plaintiff's medical indifference claim cannot be supported, I find that, at this juncture, when considered together, all of these allegations amount to more than mere negligence or an inadvertent failure to provide adequate care. *Estelle,* 429 U.S. at 105 06. They also evince more than just plaintiff's disagreement with medical providers regarding treatment. *See Chance,* 143 F.3d at 703 (finding that, in certain instances, a medical provider may demonstrate deliberate indifference by consciously choosing "an easier and less efficacious" treatment plan). Instead, plaintiff's allegations are adequate to satisfy the subjective element of the deliberate medical indifference analysis because they plausibly suggest defendants Parmer and Koenigsmann knowingly, and out of a motivation to retaliate against plaintiff for filing grievances against Upstate medical staff, denied plaintiff the treatment recommended in the DOCCS Hepatitis C Guidelines, and ignored blood test results in the face of a serious risk to plaintiff's health and safety.

Because I find that plaintiff's second amended complaint has alleged sufficient facts to satisfy both elements of an Eighth Amendment medical indifference claim against defendants Parmer and Koenigsmann, I recommend that defendant's motion to dismiss be denied as it relates to that claim. *See Muniz v. Goord,* No. 04 CV 0479, 2007 WL 2027912, at *9 (N.D.N.Y. July 11, 2007) (McAvoy, J., *adopting report and recommendation by* Lowe, M.J.) (denying the defendants' motion to dismiss where the plaintiff alleged, *inter alia,* that the defendants had denied treatment for Hepatitis C, as well as testing for the progress of the disease).

E. Eleventh Amendment Immunity

**\*14** Plaintiff's second amended complaint asserts causes of action against defendants Rock, Otis, and Koenigsmann in both their individual and official capacities. Sec. Am. Compl. (Dkt. No. 30) at ¶¶ 10 12. In support of their motion to dismiss, defendants argue that a damage claim asserted against any defendant in their official capacity is precluded by the Eleventh Amendment. Defs.' Memo. of Law (Dkt. No. 32 1) at 15 16.

The Eleventh Amendment protects a state against suits brought in federal court by "private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan,* 415 U.S. 651,

662 63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Cory v. White,* 457 U.S. 85, 90 91, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993). This absolute immunity, which states enjoy under the Eleventh Amendment, extends to both state agencies and state officials sued for damages in their official capacities when the essence of the plaintiff's claim seeks recovery from the state as the real party in interest.      *See, e.g., Daisernia v. State of New York,* 582 F.Supp. 792, 798 99 (N.D.N.Y.1984) (McCurn, J.) ("[A] suit which seeks a money judgment 'which must be paid from the state treasury is barred by the Eleventh Amendment,' even though it is nominally asserted against an individual official." (quoting *Edelman,* 415 U.S. at 663)); *see also Richards v. State of New York App. Div., Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing, *inter alia, Cory v. White,* 457 U.S. 85, 89 91, 102 S.Ct. 2325, 72 L.Ed.2d 694, (1982)). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." [2] *Ying Jing Gan,* 996 F.2d at 529; *see also Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

[11]     In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham Cnty.,* 547 U.S. 189, 193, 126 S.Ct. 1689, 164 L.Ed.2d 367 (2006).

[12]     By contrast, the Eleventh Amendment does not preclude lawsuits seeking to impose individual or personal liability on state officials under section 1983. *Hafer v. Melo,* 502 U.S. 21, 30 31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

Plaintiff's damage claims in this action asserted against defendants Otis, Rock, and Koenigsmann in their official capacities are, in reality, claims against the State of New York, and therefore are subject to dismissal. *Daisernia,* 582 F.Supp. at 798 99. Accordingly, I recommend that, to the extent that any of the damage claims contained within plaintiff's second amended complaint are asserted

against any these defendants in their official capacities, those claims be dismissed with prejudice.

### F. Subject Matter Jurisdiction Over State Law Claims

In their motion, defendants argue that the court lacks subject matter jurisdiction over plaintiff's state law claims. Defs.' Memo. of Law (Dkt. No. 32 1) at 18. Their motion, however, fails to identify any state law claims allegedly asserted by the plaintiff in his second amended complaint. *See id.* Similarly, my careful review of plaintiff's second amended complaint, including its preamble and request for relief, fails to reveal the existence of any state common law or statutory claims. Accordingly, I will not address this argument.

### G. Timeliness

**\*15** The final issue raised by defendants in their motion is an argument that plaintiff's Eighth Amendment medical indifference claim is barred by the governing statute of limitations. Defs.' Suppl. Memo. of Law (Dkt. No. 32 5).

The applicable limitations period for a section 1983 action is derived from the general or residual statute of limitations for personal injury actions under the laws of the forum state. *Owens v. Okure,* 488 U.S. 235, 249 50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). Accordingly, in New York, the statute of limitations for a section 1983 action is three years. N.Y. C.P.L.R. § 214(5); *see also Connolly v. McCall,* 254 F.3d 36, 40 41 (2d Cir.2001) ("[The plaintiff's] federal constitutional claims, brought pursuant to 42 U.S.C. § 1983, are governed by New York's three-year statute of limitations for personal injury actions[.]"); *accord, Pinaud v. Cnty. of Suffolk,* 52 F.3d 1138, 1156 (2d Cir.1995). A claim arising under section 1983 accrues "when the plaintiff knows or has reason to know of the harm that he seeks to redress." *Connolly,* 254 F.3d at 41 (internal quotation marks omitted).

In certain circumstances, the continuing violation doctrine has been applied to toll the statute of limitations in the context of section 1983 claims. *See Shomo v. City of N.Y.,* 579 F.3d 176, 182 (2d Cir.2009) (finding the continuing violation doctrine can apply "when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs"); *see also Matthews v. Conn. Dep't of Pub. Safety,* No. 10 CV 0325, 2010 WL 3984645, at \*6 (D.Conn. Oct. 8, 2010) (applying the doctrine to a section

1983 First Amendment retaliation claim). "To assert a continuing violation for statute of limitations purposes [in actions where the plaintiff has asserted an Eighth Amendment deliberate medical indifference claim], the plaintiff must allege both the existence of an ongoing policy of deliberate indifference to his ... serious medical needs and some non-time-barred acts taken in furtherance of that policy." *Shomo,* 579 F.3d at 182 (internal quotation marks and original alterations omitted).

Plaintiff's original complaint in this action is dated March 6, 2012. [3] Compl. (Dkt. No. 1). Accordingly, without consideration of the continuing violation doctrine, any claims accruing prior to March 6, 2009 would be untimely. Although it is true that plaintiff's allegations regarding his medical treatment date back to 2002, when considered as a whole, the allegations contained in the second amended complaint describe a continuing pattern of denying treatment recommended by plaintiff's medical providers, as well as a continuing pattern of ignoring consistent blood test results showing elevated ALT levels, from 2002 through 2012. Sec. Am. Compl. (Dkt. No. 30) at ¶ 25, 31 33, 39, 44. This is precisely the type of circumstances that can give rise to an application of the continuing violation doctrine. *See Shomo,* 579 F.3d at 182 (affirming district court's application of the doctrine where the plaintiff's complaint "allege[d] a policy of doctors and prison staff disregarding treatment recommendations") (citing *Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005) ("[A] deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians.")). Accordingly, I recommend denial of defendants' motion to dismiss plaintiff's claims as untimely.

[13]     Under the prison mailbox rule, a *pro se* inmate's papers are deemed filed as of the date they are given to prison officials. *Tracy v. Freshwater,* No. 01 CV 0500, 2008 WL 850594, at \*1 (N.D.N.Y. Mar.28, 2008) (McCurn, J.). For purposes of the pending motion, I have assumed that plaintiff conveyed his complaint to prison officials on the date it was signed.

### H. Whether to Grant Leave to Amend

**\*16** Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark,* 927 F.2d 698, 704 05 (2d

2013 WL 5310245

Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (permitting leave to replead where the court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). In this instance, given the procedural history of this action, the court must determine whether plaintiff is entitled to the benefit of this general rule.

After carefully considering the matter, I find that defendants would be unfairly prejudiced if plaintiff is permitted to file a third amended complaint in this action. After filing his original complaint in March 2012, plaintiff filed a first amended complaint as of right on April 10, 2012. Dkt. No. 3. Plaintiff then sought, and was granted, leave to file a second amended complaint. Dkt. Nos. 24, 29. In lieu of filing an answer, defendants timely filed the pending motion to dismiss in response to plaintiff's first and second amended complaints. Dkt. Nos. 32, 44. Plaintiff has responded appropriately in opposition to the pending motion. Dkt. No. 42. Were the court to grant plaintiff leave to further amend, significant delay would be occasioned in this action, which is already fifteen months old and has not yet reached discovery.

I also note that, as District Judge Glenn T. Suddaby observed in his initial review of plaintiff's amended complaint, although plaintiff proceeds *pro se* in this action, he may no longer be afforded the benefit of the special solicitude *pro se* litigants normally receive in this circuit due to his demonstrated proficiency at drafting complaints. *See* Memorandum Decision and Order (Dkt. No. 9) at 3 4 (finding that plaintiff has filed "some 33 other *pro se* prisoner civil rights action in district courts within the Second Circuit," and that "as far as the Court can tell, none of those actions has been dismissed for failure to state a claim" (citing *Tracy v. Freshwater,* 623 F.3d 90, 103 (2d Cir.2010)). In light of plaintiff's experience as a *pro se* litigant, the fact that he has now filed two amended complaints in this action, and the age of the case, I recommend that plaintiff not be granted leave to file a third amended complaint.

## IV. SUMMARY AND RECOMMENDATION
Plaintiff's second amended complaint fails to allege sufficient facts to plausibly suggest that defendants Smith, Lashway, Powers, Schroyer, Otis, and Rock were personally involved in the constitutional violations asserted against them. Accordingly, I recommend that those defendants be dismissed from the action.

As it relates to defendants Parmer and Koenigsmann, although plaintiff's second amended complaint fails to allege sufficient facts to state a claim against those defendants for retaliation, in violation of the First Amendment, it does state a cognizable claim against those two defendants for medical indifference, in violation of the Eighth Amendment. In addition, plaintiff's Eighth Amendment claim cannot be dismissed on the basis of the governing statute of limitations at this juncture, in light of the potential applicability of the continuing violation doctrine.

**\*17** Finally, in light of plaintiff's demonstrated competency at drafting complaints as a *pro se* litigant, the fact that he has already filed two amended complaints, and the length of time this action has been pending, I recommend that plaintiff not be granted leave to file a third amended complaint.

It is therefore hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 32) be GRANTED, in part, and that plaintiff's claims asserted against defendants Smith, Lashway, Powers, Schroyer, Otis, and Rock be dismissed, and that plaintiff's retaliation and conspiracy to retaliate claims be dismissed from the action, with prejudice; and it is further

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 32) otherwise be DENIED, and that plaintiff's Eighth Amendment deliberate medical indifference claim asserted against all defendants, except defendants Otis and Rock, survive.

NOTICE: Pursuant to 28 U.S.C. 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with clerk of court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d at 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5310245

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 11480164
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Alonzo ROSS, Plaintiff,
v.
Carl J. KOENIGSMANN, et al., Defendants.

Civ. No. 9:14-CV-1321 (GTS/DJS)
|
Signed 09/08/2016

**Attorneys and Law Firms**

ALONZO ROSS, Plaintiff, Pro Se, 12-B-3789, Wende
Correctional Facility, P.O. Box 1187, Alden, New York
14004.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant
Attorney General, Attorney General of the State of New
York, The Capitol, Albany, New York 12224, Attorney
for Defendants.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

**\*1** On October 29, 2014, *pro se* Plaintiff Alonzo Ross,
an inmate currently incarcerated at Wende Correctional
Facility, commenced this action pursuant to 42 U.S.C.
§ 1983, alleging that Defendants failed to provide him
with adequate medical care in violation of the Eighth
Amendment and retaliated against him in violation of the
First Amendment. Dkt. No. 1, Compl. Presently before
the Court are Defendants' Motion for Summary Judgment
and Plaintiff's Cross-Motion for Summary Judgment,
both filed pursuant to FED. R. CIV. P. 56. Dkt. Nos. 31,
Defs.' Mot. for Summ. J.; 64, Pl.'s Cross-Mot. for Summ.
J. For the reasons that follow, the Court recommends that
Defendants' Motion be **granted in part and denied in part**
and Plaintiff's Cross-Motion be **denied**.

**I. BACKGROUND**

The Court shall set forth the undisputed material facts
and note, where relevant, where they are disputed. The

relevant events of this action occurred when Plaintiff
was incarcerated at Mid-State Correctional Facility ("Mid-
State") in the custody of the New York State Department
of Corrections and Community Supervision ("DOCCS").
Dkt. No. 31-6, Defs.' Rule 7.1 Statement of Material Facts
("Defs.' SMF") at ¶ 1.

Plaintiff arrived at Mid-State from Franklin Correctional
Facility ("Franklin") on April 5, 2013, and was seen
by Defendant Nurse Practitioner Amy Ferguson. *Id.*
at ¶ 64. At that time, Plaintiff had a number of
chronic medical conditions including high cholesterol,
high blood pressure, diabetes, neuropathy, lower-back
pain, and sciatic nerve pain. *Id.* Plaintiff was taking
the following medications, which Ferguson ordered
to be continued: Pravastatin and Gemfirozil for high
cholesterol; Metapropolol and Lisinopril for high blood
pressure; Lantus (long-acting insulin) for diabetes;
entreric-coated aspirin (ECASA) for Plaintiff's heart
on account of his high blood pressure and diabetes;
and Neurontin, 800mg, three times daily, for Plaintiff's
chronic pain. Dkt. No. 32-4, Amy Ferguson Decl., dated
Jan. 27, 2016, at ¶ 6. Plaintiff was also taking MS Contin,
60mg twice daily, which had been prescribed at Franklin
in February 2013 to treat his pain. *Id.*, Ex. A. Ferguson
determined that this was an inappropriate treatment for
Plaintiff's chronic pain because MS Contin, a narcotic
pain reliever, can be addictive and cause serious medical
side effects. *Id.* at ¶ 8. She therefore ordered that Plaintiff's
prescription be tapered off and discontinued. *Id.*, Ex. A.
Plaintiff claims that the reason Ferguson discontinued the
MS Contin was that she remembered that he had been
previously housed at Mid-State in 2009 and his chronic
pain had not been treated with narcotics at that time.
Compl. at ¶ 4; Dkt. No. 31-1, Christopher J. Hummel
Affirm., Ex. A, Dep. of Alonzo Ross, dated Aug. 24, 2015
("Pl.'s Dep."), at p. 89.

On April 8 and April 12, 2013, Plaintiff saw Defendant
Nurse Pamela Reese through sick call. Dkt. No. 32-5,
Pamela Reese Decl., dated Jan. 29, 2016, Ex. A. Reese
noted that Plaintiff was currently being tapered off MS
Contin and advised him to discuss it with Ferguson at
his next appointment. *Id.* Plaintiff also asked about his
eyeglasses, which he had been evaluated for and had been
ordered at Franklin. *Id.* Reese advised Plaintiff that the
eyeglasses would be delivered to Mid-State. *Id.* at ¶ 9.
Plaintiff is blind in his left eye and has floaters in his right

eye. Pl.'s Dep. at pp. 65-66. The eyeglasses ordered at Franklin were for a stronger prescription. *Id.*

**\*2** Plaintiff again saw Ferguson on April 23, 2013, complaining of dizziness, neck and jaw numbness, and lower-back pain. Ferguson Decl., Ex. B. Plaintiff has had lower back pain since 2009 or 2010. Pl.'s Dep. at p. 113. Imaging taken after Plaintiff was transferred out of Mid-State showed that Plaintiff has severe degenerative disc disease at L5-S1 and mild degenerative disc disease at L4-L5. Dkt. No. 1-4, Pl.'s Exs. at A-33. Plaintiff has had neuropathy, which causes numbness and tingling in his arms and legs, since approximately 1995. Pl.'s Dep. at pp. 30-32. According to Ferguson's notes, Plaintiff stated that his cane, which he used for his back, was too short, and he requested a back brace. Ferguson Decl., Ex. B. Ferguson ordered that Plaintiff's cane be discontinued and that he be provided with a back brace. *Id.* Plaintiff claims that he never voiced any complaints about his cane and that Ferguson confiscated it because Plaintiff had not had a cane when he was previously housed at Mid-State in 2009. Dkt. No. 64, Pl.'s Rule 7.1 Counter-Statement of Material Facts ("Pl.'s Counter-SMF") at ¶ 69. Ferguson also recorded that Plaintiff asked about pain medications, but stated that he did not want to be put on MS Contin again. Ferguson Decl., Ex. B. Ferguson prescribed Naproxen, 500mg twice daily, to treat his chronic pain. *Id.* Plaintiff was referred to neurology to evaluate his complaints of dizziness and numbness. *Id.*

1        Citations to Plaintiff s Exhibits are to the pagination
         assigned by Plaintiff.

On May 1, 2013, Plaintiff went to emergency sick call complaining of difficulty breathing. Hummel Affirm., Ex. B at p. 6.[2] Defendant Dr. Ventaka Mannava examined Plaintiff and noted that he was asthmatic. *Id.* Plaintiff was provided with Albuterol. *Id.* On May 8, 2013, Plaintiff was admitted to the infirmary with complaints of chest pain, shortness of breath, abdominal pain, a headache, dizziness, and lightheadness. Hummel Affirm., Ex. B. Plaintiff claims he had had chest pains since 2011. Pl.'s Dep. at p. 25. Plaintiff had an electrocardiogram ("EKG"), which was negative. Hummel Affirm., Ex. B at pp. 4 & 6. On May 9, 2013, Plaintiff saw Defendant Dr. Subbarao Ramineni, who noted that Plaintiff's vital signs were stable and that he was not in acute distress. Dkt. No. 32-2, Subbarao Ramineni Decl., dated Jan. 27, 2016, Ex. A. Plaintiff complained of back pain and

requested narcotic pain relievers. *Id.* Dr. Ramineni states that Plaintiff did not complain of chest pain. *Id.* at ¶ 6. Dr. Ramineni determined that Plaintiff's pain symptoms were controlled on Naproxen and Neurontin and ordered him to be discharged from the infirmary. *Id.* Dr. Ramineni recorded that Plaintiff was "malingering." *Id.*, Ex. A. Plaintiff became highly argumentative with Defendant Reese when he was notified that he was being discharged and correctional officers appeared to return Plaintiff to his cell. Reese Decl., Exs. B & C. Reese filed a misbehavior report against Plaintiff based on the incident. *Id.*, Ex. C. Because Plaintiff was put into the Special Housing Unit ("SHU"), Defendant Ferguson ordered that Plaintiff's Neurontin prescription be reduced from 800mg, three times a day, to 800mg, twice daily. Ferguson Decl., Ex. C. Nurses only make rounds in SHU twice a day and a prescription would therefore be reduced to twice daily, if it could be done safely. *Id.* at ¶ 11.

2        Exhibits E through G to the Hummel Affirmation
         were filed at a separate docket entry, because they
         contain medical records. *See* Dkt. No. 32 1. Citations
         are to the pagination assigned by the Court s Case
         Management Electronic Case Files ("CM/ECF )
         System.

The next day, on May 10, 2013, Plaintiff returned to emergency sick call complaining of body-wide pain from his sciatic nerve as well as shortness of breath. Dkt. No. 32-3, Ventaka Mannava Decl., dated Jan. 27, 2016, Ex. A. Defendant Dr. Mannava determined that Plaintiff should continue to take Naproxen and Neurontin for his chronic pain and Albuterol for his asthma. *Id.* On May 16, 2013, Plaintiff saw Dr. Mannava and requested MS Contin for his lower back pain. *Id.*, Ex. B. Dr. Mannava determined that narcotics were not indicated at that time, and ordered that Plaintiff continue with Naproxen and Neurontin. *Id.*

On May 28, 2013, Defendant Dr. Ramineni discontinued Plaintiff's prescription for Gemfibrizol, because he had been non-compliant in his use. Ramineni Decl., Ex. B. On May 31, 2013, Plaintiff saw Dr. Ramineni for lower-back pain, on both sides of his body, and complained that it was worse on movement. *Id.*, Ex. C. Dr. Ramineni determined that Plaintiff's current course of treatment was appropriate. *Id.* Dr. Ramineni also noted that tests had been performed on Plaintiff for coronary artery disease, which had come back negative for any acute condition. *Id.*

**\*3** On June 10, 2013, Defendant Ferguson ordered an Electroencephalogram ("EEG") and an MRI of Plaintiff's brain on account of his headaches and head pains. Ferguson Decl. at ¶ 70. On June 27, 2013, Plaintiff saw Ferguson and requested that his Neurontin be returned to three times daily and that Ultram be prescribed for his pain symptoms. *Id.*, Ex. E. Ferguson ordered that Plaintiff's Neurontin be returned to three times daily because he was no longer in SHU, but concluded that Ultram was not indicated because of Plaintiff's headaches and possible seizures. *Id.* Plaintiff also requested a larger back brace. *Id.* Ferguson did not have a larger back brace and sent a request to the Nurse Administrator to see if a larger brace could be obtained. *Id.* at ¶ 15.

Plaintiff experienced an episode of syncope on July 1, 2013, and was sent by Defendant Dr. Mannava to an outside hospital for further evaluation. Mannava Decl. at ¶ 7. All tests came back negative and Plaintiff was admitted to the infirmary for observation upon return. *Id.*, Ex. D. On July 3, 2013, Dr. Mannava evaluated Plaintiff and determined that he had recovered from the syncope episode and ordered that he be discharged from the infirmary and resume all current medications. *Id.*

On July 15, 2013, Plaintiff saw Defendant Ferguson with complaints of abdominal pain, kidney pain, nausea, weakness, fatigue, and shortness of breath. Ferguson Decl., Ex. F. Ferguson reviewed Plaintiff's records from when he had been sent to the outside hospital and noted that no specific cause of the episode of syncope had been determined. *Id.* She examined Plaintiff's lungs and found good air movement and no wheezing, although he was out of Albuterol. *Id.* She ordered Albuterol and blood work to determine the cause of Plaintiff's abdominal pain. *Id.* She also referred Plaintiff to mental health for anxiety. *Id.* On July 18, 2013, Plaintiff was seen by Defendant Dr. Mannava for his asthma. Mannava Decl., Ex. E. Dr. Mannava noted that Plaintiff has mild intermittent asthma, which Dr. Mannava directed to continue treating with Albuterol and advised Plaintiff to quit smoking. *Id.*

On August 18, 2013, Plaintiff was brought, with assistance, to emergency sick call complaining of chest pain and a migraine headache with visual disturbances. Hummel Affirm., Ex. D; Reese Decl., Ex. D. Plaintiff was admitted to the infirmary. Reese Decl., Ex. D. The following day, Dr. Mannava saw Plaintiff, who expressed that his symptoms had subsided. Mannava Decl., Ex.

F. Plaintiff again reported headaches, abdominal pain, and leg twitching to Defendant Ferguson on August 30, 2013. Ferguson Decl., Ex. G. She noted that Plaintiff had been referred for neurological tests and bloodwork but no cause had been identified for Plaintiff's symptoms. *Id.* She referred Plaintiff to mental health because he requested Klonopin for anxiety and scheduled a follow-up with Dr. Mannava. *Id.* Plaintiff became argumentative and had to be escorted out by security. *Id.*, Ex. H.

On September 3, 2013, Plaintiff saw Defendant Reese with a headache and claiming that he could not control his leg movement. Reese Decl., Ex. E. Reese observed that Plaintiff did not appear to be in discomfort and noted from his medical records that he had received treatment for similar complaints in the past. *Id.* She further noted that Plaintiff's medical records indicated a history of malingering. *Id.* On September 9, 2013, Plaintiff claimed he was having "jerky movements" in his head and expressed concern that he was having a stroke to Defendant Dr. Mannava. Mannava Decl., Ex. G. Dr. Mannava noted that Plaintiff had received complete neurological testing, with negative results. *Id.* Plaintiff again saw Dr. Mannava on October 3, 2013, with complaints of body-wide pain and foot pain. *Id.*, Ex. H. Plaintiff requested morphine, but Dr. Mannava determined that Plaintiff's pain symptoms were appropriately treated with his then-current medications, Naproxen and Neurontin. *Id.* Plaintiff also complained of blurred vision. *Id.* Dr. Mannava explained that the eyeglasses ordered at Franklin would be delivered to Mid-State. *Id.* at ¶ 44. Plaintiff never received the eyeglasses while he was at Mid-State, although he later received the eyeglasses after he was transferred to a different facility. Pl.'s Dep. at pp. 51-53.

**\*4** On October 21, 2013, Defendant Ferguson discontinued Plaintiff's Neurontin prescription after being informed by another nurse that he was misusing his medication by "cheeking" it. Ferguson Decl., Ex. I. Plaintiff claims that the prescription was discontinued in retaliation for having filed grievances. Compl. at ¶ 45. Plaintiff furthers claims that it would have been impossible for him to "cheek" the Neurontin because it was crushed and diluted in water. Pl.'s Dep. at pp. 137-38. On October 28, 2013, Plaintiff complained of body-wide pain to Dr. Mannava. Mannava Decl., Ex. I. Dr. Mannava discussed the misuse incident with the nurse and agreed that it had been appropriate to discontinue Plaintiff's Neurontin

prescription, and that Plaintiff's pain symptoms could be adequately treated with Naproxen and ibuprofen. *Id.* at ¶ 14. Plaintiff next saw Dr. Mannava on November 14, 2013, and complained of pain in his feet and legs and stated that it was hard to walk. *Id.*, Ex. J. Dr. Mannava examined Plaintiff but did not observe any injury or deformity in his feet or legs, and determined that it was appropriate to continue treating Plaintiff's symptoms with Naproxen and ibuprofen. *Id.* Plaintiff saw Defendant Reese on December 2, 2013, again complaining of pain in his feet. Reese Decl., Ex. F. Plaintiff refused to leave sick call and had to be escorted out. *Id.*, Ex. G. Reese filed a misbehavior report against him. *Id.* The next day, December 3, 2013, Plaintiff saw Dr. Mannava for pain in his feet and "jerky movements." Mannava Decl., Ex. K. Dr. Mannava determined that it was appropriate to continue Plaintiff's current course of treatment. *Id.*

On December 11, 2013, Plaintiff went to emergency sick call with chest pressure. Ferguson Decl., Ex. J. An EKG was conducted, which revealed an atrial flutter. *Id.* Plaintiff was then sent to the emergency room at Faxton-St. Luke's Hospital for further evaluation. Hummel Affirm., Ex. E. At St. Luke's Plaintiff received an echocardiogram, which was negative. *Id.* at p. 18. Based on this and other tests, the physicians at St. Luke's concluded that Plaintiff's symptoms were likely non-cardiac in nature and Plaintiff was therefore discharged on December 13, 2013. *Id.* at pp. 22-23. Back at Mid-State, on December 14, 2013, Plaintiff again experienced chest pain and was returned to St. Luke's for further evaluation. Hummel Affirm., Ex. F. It was noted that Plaintiff's "cardiac risk factors are positive across the board" and Plaintiff consented to receive a cardiac catherization. *Id.* at pp. 53-54. The cardiac catheterization revealed "[s]ignificant multivessel coronary disease with tight lesion in the circumflex" and "moderate disease in the right coronary." *Id.* at pp. 51-52. Angioplasty was recommended and on December 17, 2013, the procedure was performed without complications. *Id.* at p. 63. On discharge, Plaintiff was not experiencing any chest pain and his follow-up lab work was normal. *Id.* at p. 57. Plaintiff was directed to take Plavix and aspirin for at least one year. *Id.* at p. 56. Plaintiff returned to Mid-State on December 18, 2013. Ferguson Decl., Ex. K. Defendant Ferguson noted that the angioplasty had been performed, and ordered that Plaintiff's current medications be resumed and prescribed Plaintiff Plavix, 75mg, twice daily. *Id.*, Exs. K & L. Plaintiff saw Dr. Mannava on December

19, 2013, who noted that Plaintiff was medically stable. Mannava Decl., Ex. L. On December 29, 2013, Plaintiff complained of chest pain to Dr. Mannava. *Id.*, Ex. M. Dr. Mannava determined that the pain was related to the angioplasty, but that Plaintiff was not experiencing an acute cardiac condition. *Id.*

On January 17, 2014, Plaintiff saw Defendant Dr. Ramineni and requested Neurontin for his neuropathy. Ramineni Decl., Ex. D. Based on his evaluation of Plaintiff, Dr. Ramineni prescribed Plaintiff Neurontin, 800mg, twice daily. *Id.* On February 7, 2014, Plaintiff requested that Dr. Ramineni prescribe him Ultram for pain relief. *Id.*, Ex. E. Dr. Ramineni found that Ultram was not indicated for Plaintiff's pain symptoms. *Id.*

In February 2014, Plaintiff was transferred from Mid-State to Upstate Correctional Facility. Pl.'s Dep. at p. 19. Plaintiff commenced this action on October 29, 2014, asserting claims of deliberate medical indifference and retaliation against Defendants Dr. Koenigsmann, Dr. Ramieni, Dr. Mannava, Nurse Practitioner Ferguson, and Nurse Reese. Compl.

## II. LEGAL STANDARD

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) ). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it ... [and] a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d at 1461.

**\*5** Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is

no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations,

unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. DISCUSSION

Defendants seek summary judgment on the following grounds: (1) Plaintiff failed to exhaust his administrative remedies with respect to his medical indifference claims based on his chest pain, chest pressure, and heart disease; (2) Defendants are entitled to judgment as a matter of law on Plaintiff's medical indifference and retaliation claims; (3) Defendant Dr. Koenigsmann was not personally involved in any constitutional violation; and (4) Defendants are entitled to qualified immunity. Dkt. No. 31-4, Defs.' Mem. of Law. Plaintiff opposes Defendants' Motion and requests that summary judgment be entered in his favor. Dkt. No. 64-1, Pl.'s Mem. of Law. In response to Plaintiff's Cross-Motion for Summary Judgment, Defendants argue that Plaintiff's failure to provide a statement of material facts pursuant to Local Rule 7.1(a)(3) should result in denial of his Cross-Motion. Dkt. No. 69, Defs.' Reply.

### A. Defendant Dr. Koenigsmann's Personal Involvement

**\*6** Plaintiff asserts claims against Defendant Dr. Koenigsmann in his capacity as Chief Medical Officer of DOCCS and supervisor of Defendants Dr. Mannava, Dr. Ramineni, Ferguson, and Reese. Compl. at ¶ 73. Plaintiff alleges that Dr. Koenigsmann failed to correct the inadequate medical care provided to Plaintiff after learning of such care through letters and grievances which Plaintiff addressed to Dr. Koenigsmann's office. *Id.* at ¶¶ 42-43 & 73. Plaintiff further alleges that Dr. Koenigsmann failed to adequately train and supervise his subordinates. *Id.* at ¶ 73.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991) ). A supervisory

official may not be held liable merely because he held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). The mere receipt of, without personally investigating, a letter from an inmate is insufficient to establish personal involvement. *Johnson v. Wright*, 234 F. Supp. 2d 352, 363-64 (S.D.N.Y. 2002) (citing cases). However, "[p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews or responds to a prisoner's complaint." *Anderson v. Ford*, 2007 WL 3025292, at *7 (D. Conn. Oct. 16, 2007). "The general rule is that if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter." *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009); *see also Vega v. Artus*, 610 F. Supp. 2d 195, 199 (N.D.N.Y. 2009).

In this case, it is undisputed that all of Plaintiff's correspondence addressed to Dr. Koenigsmann were referred to subordinates and not personally investigated or responded to by Dr. Koenigsmann. *See* Koenigsmann Decl. at ¶¶ 9-24. Between March 17, 2013 and February 18, 2015, Dr. Koenigsmann's office received seventeen letters from Plaintiff. Dkt. No. 31-3, Carl Koenigsmann Decl., dated Jan. 27, 2016, at ¶ 8. Dr. Koenigsmann did not personally review, investigate, or respond to any of these letters. *Id.* at ¶ 26. Instead, each of Plaintiff's letters was referred to a subordinate to investigate and prepare a response. *Id.* at ¶ 25. Therefore, Plaintiff's correspondence addressed to Dr. Koenigsmann is insufficient to establish his personal involvement. Additionally, Plaintiff's conclusory allegations that Dr. Koenigsmann failed to adequately train or supervise his subordinates are insufficient to establish his personal involvement.

Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's claims against Defendant Dr. Koenigsmann for lack of personal involvement should be **GRANTED**.

### B. Plaintiff's Failure to Exhaust

Defendants argue that Plaintiff has failed to exhaust his administrative remedies on his claims based on Defendants' treatment of his chest pain and pressure, heart condition, and care after his angioplasty procedure in December 2013. Defs.' Mem. of Law at pp. 4-5.

### 1. Exhaustion Procedure

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, S. Ct. , 2016 WL 3128839, at *5 (2016) (stating that mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). [3]

[3]    Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert*, 179 F.3d 19, 28 29 (2d Cir. 1999). Defendants properly raised the affirmative defense in their Answer. Dkt. No. 20 at ¶ 13.

**\*7** In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). In addition, an inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* Second, upon appeal of the IGRC decision, the superintendent of

the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia, Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

### 2. *Plaintiff's Failure to Exhaust*

In support of their Motion, Defendants file the Declaration of Jeffery Hale, Assistant Director of the IGP, and the records of the grievances Plaintiff appealed to CORC. Dkt. No. 31-2, Jeffery Hale Decl., dated Jan. 15, 2016. Plaintiff filed three grievances complaining of his medical care at Mid-State: (1) Grievance No. MS-21255-13 (filed Apr. 25, 2013); (2) No. MS-21451-13 (filed Oct. 24, 2013); and (3) No. MS-21504-13 (filed Dec. 3, 2013).[4] *Id.* at ¶¶ 15-17. Defendants argue that none of Plaintiff's grievances raised complaints about Defendants' treatment of Plaintiff's chest pain, heart condition, or care after his angioplasty procedure. Defs.' Mem. of Law at p. 5. Grievance No. MS-21255-13, Defendants argue, complained of Defendant Ferguson's decision to discontinue Plaintiff's MS Contin prescription and use of a cane; No. MS-21451-13 complained of Defendant Ferguson's decision to discontinue Plaintiff's Neurontin prescription; and No. MS-21504-13 complained of Defendant Reese's termination of sick call. *Id.*

---

[4]    The Court notes that in addition to his formal grievances, Plaintiff sent numerous letters complaining of his medical treatment to Defendant Koenigsmann and various outside state agencies. Dkt. Nos. 1 5 & 1 9. " T]he law is well settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA. *Timmons v. Schriro*, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015); *see also Muhammad v. Pico*, 2003 WL 21792158, at *8 (S.D.N.Y. Aug. 5, 2003) ("District court decisions in this circuit have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA s exhaustion requirements. ); *Grey v. Sparhawk*, 2000 WL 815916,

at *2 (S.D.N.Y. June 23, 2000) ("Any complaint ... made directly to the Inspector General s office does not serve to excuse plaintiff from adhering to the available administrative procedures. ).

"The scope of proper exhaustion under the PLRA is determined by reference to the state grievance system's procedural rules." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (citing, *inter alia, Jones v. Bock*, 549 U.S. 199, 218 (2007) ). The IGP regulations direct that a grievance should contain "a concise, specific description of the problem." N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(2). The Second Circuit has stated that this standard does not require a grievant to "lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). However, "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance." *Woodford v. Ngo*, 548 U.S. at 95. "In order to exhaust, therefore, inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d at 697. "While the PLRA does not require a legal theory of liability to be set forth in an inmate's grievance ... the alleged *misconduct* must still be described adequately." *Murray v. Gillani*, 2013 WL 838351, at *7 (N.D.N.Y. Feb. 11, 2013).

 **\*8**  Having carefully reviewed Plaintiff's grievances, the Court agrees with Defendants that Plaintiff did not exhaust administrative remedies on his claims that he was deprived of medical care with respect to his chest pain, heart condition, or care after his angioplasty procedure. Plaintiff's grievances concerning his medical care at Mid-State are as follows:[5]

**MS-21255-13** (Apr. 25, 2013): Plaintiff complained that Defendant Ferguson had discontinued his MS Contin and ignored medical records that indicated that he suffered from chronic pain. Hale Decl., Exs. at p. 32.[6] Plaintiff claimed that Ferguson was refusing to provide treatment out of personal animus towards him. *Id.* Plaintiff requested effective pain medication. *Id.*

**MS-21451-13** (Oct. 24, 2013): Plaintiff complained that his Neurontin prescription had been discontinued based on false accusations that he was cheeking the medication. *Id.* at p. 80. Plaintiff claimed that the

medication was discontinued in retaliation for filing grievances. *Id.* Plaintiff requested that his medication be reinstated. *Id.*

**MS-21504-13** (Dec. 3, 2013): Plaintiff claimed that Defendant Dr. Mannava refused to reinstate Plaintiff's Neurontin prescription. *Id.* at p. 99. Plaintiff claimed that he was being discriminated against due to his race and religion and in retaliation for having filed complaints. *Id.* at pp. 100-01. Plaintiff also alleged that Defendant Reese had refused to listen to his complaints at sick call on December 2, 2013. *Id.* at p. 102. Plaintiff requested to receive his Neurontin. *Id.* at p. 98.

Therefore, none of Plaintiff's grievances complained of the medical care he was receiving for his heart condition at Mid-State and those claims are unexhausted. *See Murray v. Gillani*, 2013 WL 838351, at *8 (the plaintiff's grievances "failed to describe the *conduct* that he is challenging in this action"); *Verley v. Wright*, 2007 WL 2822199, at *7 (S.D.N.Y. Sept. 27, 2007) (same); *Turner v. Goord*, 376 F. Supp. 2d 231, 325 (W.D.N.Y. 2005) (same).

[5]    Plaintiff also filed grievances at Franklin and Great Meadow Correctional Facility. Hale Decl. at ¶¶ 13 & 19 20. None of those grievances concerned his medical care at Mid State.

[6]    Because the pagination assigned by Defendants is not in order, the Court cites to the pagination assigned by the Court s Case Management Electronic Case Files ("CM/ECF") System.

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 2016 WL 3128839, at *7. As the Supreme Court recently stated, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court stated three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end   with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at *7-8. [7] In this case, Plaintiff has pointed to no evidence in the record

that would indicate that administrative remedies were unavailable to him.

[7]    The Second Circuit previously set forth a three part inquiry for when a failure to exhaust may be excused: "(1) administrative remedies are not available to the prisoner; (2) defendants have either wived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner s failure to comply with the exhaustion requirement. *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004) ). The Second Circuit has stated that "*Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate.  *Williams v. Corr. Officer Priatno*,      F.3d     , 2016 WL 3729383, at *4 (2d Cir. July 12, 2016).

**\*9** Accordingly, Plaintiff's claims based on the treatment provided for his chest pain, heart condition, and care after his angioplasty procedure may be dismissed for failure to exhaust. However, because the Court also finds that these claims are subject to dismissal on the merits, the Court will recommend that they be dismissed on merits rather than for failure to exhaust.

### C. Plaintiff's Eighth Amendment Deliberate Medical Indifference Claims

The basis of Plaintiff's deliberate medical indifference claims are (1) that he was denied effective treatment for chronic pain symptoms resulting from several conditions, including neuropathy, a displaced lumbar disc, arthritis, and sciatic nerve damage, (2) Defendants ignored Plaintiff's complaints of shortness of breath and asthma, and (3) Defendants ignored his complaints of chest pain and pressure although he was suffering from heart disease. [8] Compl.

[8]    Plaintiff has alleged that he suffered from a number of conditions   including heart disease, arthritis, high blood pressure, diabetes, neuropathy, sciatic nerve damage, a displaced lumbar disc, asthma, poor vision, and high cholesterol, *see* Compl. at ¶ 1; Pl.'s Dep. at p. 22   which Defendants address individually in their Memorandum of Law. Defs.' Mem. of Law

at pp. 8 22. However, the Complaint does not make any allegations with respect to several of the conditions addressed by Defendants. Specifically, the Complaint does not allege that Defendants failed to treat Plaintiff for high cholesterol, diabetes, high blood pressure, or poor vision. Furthermore, it is undisputed that Plaintiff was prescribed medications for his high blood pressure, high cholesterol, and diabetes which he received continuously throughout his incarceration at Mid State and Plaintiff has not specifically challenged the treatment that he received for those conditions. Defs.' SMF at ¶¶ 65 66; Pl.'s Dep. at pp. 22 23. With respect to Plaintiff s poor vision, Plaintiff complains that he never received eyeglasses that he had ordered at Franklin. Pl.'s Dep. at p. 51. It is undisputed, though, that the Defendants at Mid State had no control over the ordering or shipment of Plaintiff s eyeglasses. Mannava Decl. at ¶ 13. The Court therefore will not separately discuss Plaintiff s high cholesterol, high blood pressure, diabetes, and poor vision. The Court will discuss Plaintiff s neuropathy, displaced lumbar disc, sciatic nerve damage, and arthritis together because Plaintiff s claim based on these conditions is that Defendants failed to adequately treat his chronic pain symptoms.

### 1. Legal Standard

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994).

**\*10** The first prong is an objective standard and considers whether the medical condition is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) ). A court must consider two inquiries in determining whether a deprivation of care is sufficiently serious. *Salahuddin*

*v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). First, the court must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Medical care is adequate where the care provided is a "reasonable" response to the inmate's medical condition. *Id.* The second inquiry is "whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. In cases where there is a failure to provide any treatment, the court examines whether the inmate's medical condition is sufficiently serious. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) ). In cases where medical treatment is given, but is inadequate, "the seriousness inquiry is narrower." *Salahuddin v. Goord*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Id.* (quoting *Smith v. Carpenter*, 316 F.3d at 185).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. at 835). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious

disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir. 1996) ); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

### 2. Analysis

#### a. Chronic Pain

Plaintiff suffers from neuropathy, a displaced lumbar disc, sciatic nerve damage, and arthritis, all of which contribute to his chronic pain symptoms. During his incarceration at Mid-State, Plaintiff was seen in sick call and by his physician for complaints of body-wide pain, lower back pain, pain radiating down his sciatic nerve, abdominal pain, foot pain, headaches, numbness and tingling, and difficulty ambulating and controlling his legs. *See, e.g.*, Mannava Decl. at ¶¶ 5, 12, & 14-15; Reese Decl. at ¶ 13. With respect to his deliberate indifference claims, Plaintiff generally alleges that Defendants ignored his complaints of pain at numerous sick call visits. In particular, Plaintiff alleges that (1) Defendant Ferguson discontinued his prescription for MS Contin and the other Defendants refused to reinstate it or other effective pain medication, (2) Ferguson confiscated his cane and replaced it with a back brace that did not fit, and (3) Defendants suspended, and then discontinued, his Neurontin prescription. *See* Compl. at ¶¶ 4, 11, & 45.

The Court first notes that, contrary to Plaintiff's claims, Defendants did provide Plaintiff with on-going treatment for his pain symptoms. As far as pain medication, Plaintiff was prescribed Neurontin, 800mg, three times daily, when he arrived at Mid-State. He received this prescription until it was discontinued in October 2013. Later, Plaintiff was also prescribed Naproxen, 500mg, twice daily. Plaintiff was also frequently seen for sick call and in the infirmary, and received physical examinations of his feet and legs, bloodwork for his abdominal pain, and neurological testing for his complaints of headaches, numbness, and tingling. As to Plaintiff's back pain, Plaintiff was provided with a back brace. The issue then under the objective prong of the Eighth Amendment analysis is whether Plaintiff was actually deprived of adequate medical care, and if so, whether the inadequacy was sufficiently serious. [9] *See Salahuddin v. Goord*, 467

F.3d at 279. The Court must then consider, under the subjective prong, whether the claimed deprivations evidence deliberate indifference.

[9]    The Court notes that Defendants have not argued in their Memorandum of Law that Plaintiff's neuropathy, sciatic nerve damage, displaced disc, and arthritis did not constitute serious medical conditions. *See* Defs.' Mem. of Law at pp. 7 8.

#### i. MS Contin

**\*11**  First, as to Plaintiff's claim based on Defendants' decision to discontinue his MS Contin prescription and refusal to prescribe Ultram, it is well established that "[d]ifferences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs." *Wright v. Genovese*, 694 F. Supp. 2d 137, 160 (N.D.N.Y. 2010). Here, Defendant Ferguson discontinued Plaintiff's MS Contin prescription because it is a narcotic pain reliever that is used to treat acute episodes of pain. Ferguson Decl. at ¶ 9. In her medical opinion, MS Contin was not an appropriate treatment for Plaintiff's chronic pain symptoms because it could be "highly addictive, habit forming, and cause serious side effects." *Id.* Instead, Ferguson prescribed Plaintiff Neurontin and, on April 23, 2013, Naproxen to treat his chronic pain symptoms. *Id.* at ¶¶ 6 & 10. Plaintiff continuously received those medications while incarcerated at Mid-State, although his Neurontin prescription was later discontinued, which the Court will discuss separately below. *Id.* at ¶ 7; Pl.'s Dep. at p. 108. On June 27, 2013, Ferguson denied Plaintiff's request for Ultram, determining that it was contraindicated due to Plaintiff's previous complaints of headaches and possible seizures. Ferguson Decl. at ¶ 13; *see also* Ramini Decl. at ¶ 15 (explaining that Ultram can lower the threshold for experiencing seizures). Defendants Dr. Mannava and Dr. Remini agreed with Ferguson's determination that Plaintiff's chronic pain was appropriately treated with Neurontin and Naproxen. Mannava Decl. at ¶¶ 5-6, 12, & 14-16; Remini Decl. at ¶ 6 & 8. Defendant Reese had no authority to prescribe medication to inmates. Reese Decl. at ¶ 8.

Defendants evaluated Plaintiff's symptoms and determined that they were appropriately treated with Neurontin and Naproxen, and that MS Contin and

other narcotics were not indicated. Defendants' decision to treat Plaintiff's chronic pain with Neurontin and Naproxen, and to discontinue his prescription for MS Contin and deny his request for Ultram was a medical judgment which does not evidence deliberate indifference. "[D]isagreements over medications ... implicate medical judgments and not the Eighth Amendment." *Wright v. Genovese*, 694 F. Supp. 2d at 155 (citing *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ). The decision not to prescribe stronger pain medication does not evidence deliberate indifference. *Vail v. Lashway*, 2014 WL 4626490, at *14 (N.D.N.Y. Sept. 15, 2014) ("[T]he decision to choose one form of pain medication over another ... is not indicative of deliberate indifference."); *Scott v. Perio*, 2005 WL 711884, at *6 (W.D.N.Y. Mar. 25, 2005); *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (finding that inmate's claim that medical providers should have prescribed stronger pain medication than Tylenol did not state deliberate indifference claim). Furthermore, "concern about prescribing narcotic pain medication, on which inmates ... could become dependent, may inform a medical judgment about what drugs to prescribe." *Wright v. Genovese*, 694 F. Supp. 2d at 160. Accordingly, Plaintiff's disagreement with Defendants' decision to discontinue Plaintiff's MS Contin prescription and to deny Plaintiff's requests for other narcotic pain medications does not establish a claim for deliberate indifference.

### ii. *Neurontin*

However, as to Plaintiff's claim based on Defendants' decision to discontinue his Neurontin prescription, the Court reaches a different outcome. Plaintiff's neuropathy causes tingling, numbness, and sharp pain in his arms and legs. Pl.'s Dep. at pp. 31-32. Plaintiff takes Neurontin to treat his neuropathy; Neurontin helps ease the tingling, numbness and pain. *Id.* at p. 31. Neurontin is also prescribed to relieve Plaintiff's chronic pain from his displaced lumbar disc and sciatic nerve damage. Ferguson Decl. at ¶ 6. Plaintiff was prescribed Neurontin upon his admission to Mid-State. *Id.* On October 21, 2013, Defendant Ferguson discontinued Plaintiff's Neurontin prescription after being informed that Plaintiff had been misusing his Neurontin by cheeking it. *Id.* at ¶ 19. This decision was affirmed by Defendant Dr. Mannava. [9] Mannava Decl. at ¶ 14. Plaintiff suffered withdrawals

and worsening pain. Pl.'s Dep. at p. 134. Plaintiff also claims that he had difficulty walking. *Id.* at pp. 129-32. Plaintiff's medical records show that he appeared at sick call several times after the discontinuance of his Neurontin prescription complaining of body-wide pain, pain and numbness in his feet, and difficulty walking. *See, e.g.*, Mannava Decl., Exs. I, J, & K; Reese Decl., Ex. F. Plaintiff's testimony as to the chronic pain and difficulty ambulating he experienced as a result of the interruption of his Neurontin prescription is sufficient to establish a genuine issue of material fact as to whether the interruption constituted a "sufficiently serious" deprivation of adequate care. *See Chance v. Armstrong*, 143 F.3d at 702.

[10]   Neither Defendant Dr. Ramineni nor Defendant Reese was involved in discontinuing Plaintiff's Neurontin prescription. *See* Ramineni Decl.; Reese Decl. at ¶ 8.

**\*12** Defendants assert that the interruption of Plaintiff's Neurontin prescription does not evidence deliberate indifference because Plaintiff had been caught misusing the prescription. Defs.' Mem. of Law at p. 14. Defendant Ferguson states that she discontinued Plaintiff's prescription for several reasons: (1) a patient's misuse of a medication poses a health risk to the patient; (2) a patient's misuse of a medication poses a risk to the security of the facility and the health of other inmates if the patient were to attempt to sell the medication to other inmates; (3) a patient's misuse of a medication indicates that the patient may not actually need the medication; (4) Ferguson was aware that Plaintiff had a history of cheeking medications; and (5) Plaintiff had been prescribed other medications to treat his chronic pain. Ferguson Decl. at ¶ 19. Defendants therefore argue that the decision to discontinue Plaintiff's Neurontin prescription was a medical judgment and that Plaintiff's claim is nothing more than a non-actionable disagreement over the appropriate course of treatment. Defs.' Mem. of Law at p. 15.

Plaintiff disputes that he cheeked the Neurontin. Specifically, Plaintiff claims that it was impossible for him to cheek the medication because the Neurontin was crushed and dissolved in water. Pl.'s Dep. at pp. 137-38. Plaintiff instead claims that Ferguson discontinued the prescription in retaliation for Plaintiff filing grievances against her. *Id.* at p. 138. The Court agrees with Plaintiff that there is a disputed issue of material fact as to

whether Defendants discontinued Plaintiff's Neurontin prescription pursuant to a medical judgment or based on other, non-medical reasons. In this regard, the Court notes that Plaintiff's medical records support his contention that his Neurontin was crushed and dissolved in water. Ferguson Decl., Exs. C & E; Mannava Decl., Ex. D. Defendants do not address or explain how it was possible for Plaintiff to cheek a medication that was dissolved in water. Therefore, the Court cannot determine whether Defendants' decision "was the product of sound medical judgment, negligence, or deliberate indifference." *Chance v. Armstrong*, 143 F.3d at 703. There is a disputed issue of a material fact as to whether Defendants' decision to discontinue Plaintiff's Neurontin prescription "was an act of retribution rather than a medical judgment" and thus, whether Defendants acted with deliberate indifference. *Funderburke v. Canfield*, 2016 WL 831974, at *8 (W.D.N.Y. Feb. 29, 2016) (finding issues of material fact on both the objective and subjective prongs of the plaintiff's Eighth Amendment where the defendants discontinued the plaintiff's Neurontin prescription due to alleged cheeking).

### ii(a). Qualified Immunity

Defendants have raised qualified immunity as an affirmative defense. Defs.' Mem. of Law at pp. 31-32. In light of its finding that there is a disputed issue of material fact as to whether Defendants acted with deliberate indifference in discontinuing Plaintiff's Neurontin prescription, the Court considers in the alternative whether Defendants would be entitled to qualified immunity on that claim. The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether an official protected by qualified immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Lewis v. Cowan*, 165 F.3d 154, 166 (2d Cir. 1999). In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court set forth a two-pronged approach to the qualified immunity analysis whereby a court must first decide whether the facts alleged, or shown, make out

a violation of a constitutional right. If yes, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194 at 201-02; *but see Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[W]e now hold that the *Saucier* protocol should not be regarded as mandatory in all cases."). To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "(1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her actions were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). Here, the Court finds that Defendants are not entitled to qualified immunity at this stage. First, "the right to be free from deliberate indifference to serious medical needs" was clearly established at the time of the events of this action. *LaBounty v. Coughlin*, 137 F.3d 68, 74 (2d Cir. 1998) (citing *Estelle v. Gamble*, 429 U.S. at 104). Second, due to the factual disputes, the Court cannot conclude as a matter of law that it would have been objectively reasonable for Defendants to believe that they were not violating Plaintiff's rights.

### iii. Remaining Claims

**\*13** The Court finds that Defendants are entitled to summary judgment with respect to Plaintiff's remaining claims based on Defendants' treatment of his chronic pain symptoms. In addition to his claim based on the discontinuation of his Neurontin prescription, Plaintiff also asserts a claim based on an earlier incident where Defendant Ferguson reduced his prescription from 800mg, three times daily, to 800mg, twice daily. Plaintiff's prescription was reduced on May 9, 2013, because he was moved to SHU and nurses only make rounds in SHU twice a day. Ferguson Decl. at ¶ 11. Ferguson determined that Plaintiff's medication could safely be reduced from three times a day to two times a day. *Id.* On June 27, 2013, after Plaintiff was out of SHU, Defendant Ferguson returned Plaintiff's prescription to three times a day. *Id.* at ¶ 13. As to the objective prong, Plaintiff fails to show that the reduction of his Neurontin prescription was sufficiently serious. Plaintiff does not allege any specific harm caused by the reduction of his prescription. *See Price v. Reilly*, 697 F. Supp. 2d 344, 359 (E.D.N.Y. 2010) ("Plaintiff has failed to present any evidence that the

allegedly incorrect medication dosage posed an objectively serious health risk to plaintiff's health."). Furthermore, this claim is a mere disagreement over a course of treatment and does not amount to deliberate indifference. *See id.* at 360 ("[M]ere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference."); *Wright v. Genovese*, 694 F. Supp. 2d at 155.

Plaintiff also asserts a claim based on Defendant Ferguson's decision to replace his cane with a back brace. Plaintiff claims that his cane was the "perfect height" and that he had "no problem" walking with it. Pl.'s Dep. at p. 97. On the other hand, Plaintiff claims that he never received a back brace that fit. *Id.* at p. 95. Here, the record demonstrates that Plaintiff was not actually deprived of adequate medical care. Ferguson recorded that Plaintiff stated his cane was too short and that he requested a back brace. Ferguson Decl., Ex. B. Later, when Plaintiff stated that his back brace was too small, Ferguson noted that she would ask the nurse administrator about ordering a larger back brace. *Id.*, Ex. E. Plaintiff alleges that he requested his cane back, Compl. at ¶¶ 34 & 44, but there is no note of such requests in Plaintiff's medical records, Ferguson Decl., Ex. F; Mannava Decl., Ex. H. Even if Plaintiff could show that replacement of his cane with a back brace was a deprivation of adequate care, he would not be able to show that it evidenced deliberate indifference. Plaintiff's claim based on the replacement of cane is a "mere disagreement over the proper treatment." *Chance v. Armstrong*, 143 F.3d at 703.

Accordingly, as to Plaintiff's claim based on Defendant Ferguson's and Dr. Mannava's discontinuance of his Neurontin, the Court recommends that Defendants' Motion and Plaintiff's Motion be **DENIED** due to disputed issues of material fact. However, as to Plaintiff's other claims based on Defendants' treatment of his chronic pain symptoms, the Court recommends that Defendants' Motion for Summary Judgment be **GRANTED** and Plaintiff's Cross-Motion be **DENIED**.

### b. *Heart Disease*

The Court next considers whether Plaintiff has established a deliberate medical indifference claim as to Defendants' treatment of his heart disease. As revealed by Plaintiff's hospital visit in December 2013, Plaintiff suffers from significant coronary disease. Hummel Affirm., Ex. F. at pp. 51-52. Plaintiff had multiple risk factors for heart disease, including diabetes, hypertension, hyperlipidemia, smoking, and family history. *Id.* at p. 20. Plaintiff claims that he suffered from recurrent chest pain throughout his incarceration at Mid-State which Defendants ignored and attributed to anxiety. Pl.'s Mem. of Law at p. 26.

Plaintiff alleges that he complained to Defendants of chest pain and pressure on numerous occasions from April until December 2013. *See* Compl. Defendants, on the other hand, claim that Plaintiff did not complain to any of them of chest pain or pressure prior to December 11, 2013, the date that Plaintiff was sent to St. Luke's. Defs.' Mem. of Law at p. 19. Plaintiff's medical records support Defendants' assertion. Although Plaintiff's medical records reflect that he saw Defendants numerous times with various complaints, there is no record that Plaintiff complained of chest pains prior to December 11, 2013. Plaintiff alleges that he saw Defendant Ferguson on April 23, June 10, June 27, July 15, and August 30, 2013 and complained of chest pains and pressure on each occasion. Compl. at ¶¶ 11, 25, 28, 34, & 39. However, while Plaintiff's medical records reveal that he saw Ferguson on those dates, there is no mention of any complaint of chest pain on any of those dates. Ferguson Decl., Exs. B, D, E, F, & G. Plaintiff similarly alleges that he complained of chest pain to Defendant Reese on April 8, August 19, and September 3, 2013; and to Defendant Dr. Mannava on May 16, October 3, October 28, and November 14, 2013. Compl. at ¶¶ 5, 19, 38, 41, 44, 52, & 54. Again, Plaintiff's medical records for those dates do not mention any complaint of chest pain to those Defendants. Mannava Decl., Exs. B, H, I, & J; Reese Decl., Exs. A, D, & E.

**\*14** Indeed, the only records of Plaintiff complaining of chest pain prior to December 11, 2013, were made to Mid-State staff who are not Defendants in this action. On May 8, 2013, Plaintiff complained of chest pressure and was admitted to the infirmary. Hummel Affirm., Ex. B. An outside physician was contacted by telemedicine and an EKG was performed, which did not show any signs of acute distress. *Id.* Plaintiff was seen by Defendants Dr. Ramineni and Reese the following day, but did not complain of chest pain at that time, and instead complained of back pain and requested stronger pain medication. Ramineni Decl. at ¶ 6; Reese Decl. at ¶ 10. Plaintiff also complained of chest pain on May 17, May

20, July 12, and August 18, 2013; however, none of those complaints were made to Defendants. Pl.'s Exs. at A-11, A-12, A-14, & A-16. On each occasion, Plaintiff was examined and determined not to be in acute distress. *Id.*

Thus, there is no evidence that Plaintiff complained directly to any of the Defendants of chest pains prior to December 11, 2013. Furthermore, there is nothing that indicates that any of the Defendants were otherwise aware that Plaintiff's chest pains posed a substantial risk to him and disregarded such risk, as would be required to support a deliberate indifference claim.[11]

> [11] Notably, while a diagnosed heart condition may constitute a serious medical condition, *Bruno v. Wright*, 2008 WL 5100278, at *6 (N.D.N.Y. Nov. 26, 2008), district courts in the Second Circuit have held that chest pains alone do not constitute a sufficiently serious medical condition, *Kidkarndee v. Koenigsmann*, 2014 WL 1239319, at *15 (N.D.N.Y. Mar. 25, 2014); *Young Flynn v. Wright*, 2007 WL 241332, at *19 (S.D.N.Y. Jan. 26, 2007); *Hutchinson v. New York State Corr. Officers*, 2003 WL 22056997, at *5 (S.D.N.Y. Sept. 4, 2003).

As to the treatment he received in December 2013, Plaintiff cannot establish either that he was deprived of adequate care, at the objective prong, or that any of Defendants acted with deliberate indifference. On December 11, 2013, Plaintiff complained of chest pain and pressure. Ferguson Decl., Ex. J. Defendant Ferguson ordered that an EKG be performed, which showed an artial flutter, indicating that Plaintiff's heart was functioning abnormally. *Id.* at ¶ 20. Ferguson then ordered that Plaintiff be sent to St. Luke's Hospital for further evaluation. *Id.* At St. Luke's, a stress echocardiogram was performed which was negative for ischemia, and it was thought likely that Plaintiff's symptoms were non-cardiac in origin. Hummel Affirm., Ex. E. On December 13, Plaintiff returned to Mid-State. Ferguson Decl. at ¶ 22. On December 14, Plaintiff again experienced chest pain and was sent back to St. Luke's. Hummel Affirm., Ex. F. None of the Defendants saw Plaintiff on this date or were involved in the decision to return him to St. Luke's. Ferguson Decl. at ¶ 24; Mannava Decl. at ¶ 19; Reese Decl. at ¶ 18; Ramineni Decl. at ¶ 11. At St. Luke's, a cardiac catherization was performed, which revealed significant coronary disease. Hummel Affirm., Ex. G. An angioplasty was recommended, and the procedure was performed on December 17, 2013, with

the placement of two stents in Plaintiff's left coronary artery. *Id.*

Plaintiff returned to Mid-State on December 18 and was seen by Ferguson. Ferguson Decl. at ¶ 26. Consistent with the discharge orders of his physicians at St. Luke's, Ferguson prescribed Plaintiff Plavix, 75mg once a day. *Id.* She also ordered that nursing staff check Plaintiff's vital signs, and examine and clean the site of Plaintiff's wound three times a day for forty-eight hours. *Id.* On December 19, 2013, Plaintiff was evaluated by Defendant Dr. Mannava, who found that the angioplasty had completely relieved Plaintiff's symptoms of chest pain and that he was medically stable. Mannava Decl., Ex. L. Dr. Mannava again saw Plaintiff on December 29, after Plaintiff complained of chest pain. *Id.*, Ex. M. Dr. Mannava examined Plaintiff and determined that the chest pain was non-cardiac and was caused by the placement of the stents. *Id.* at ¶ 22.

**\*15** As these undisputed facts show, neither Defendant Ferguson nor Defendant Dr. Mannava deprived Plaintiff of adequate medical care or acted with deliberate indifference towards Plaintiff's heart condition in December 2013. In addition, it is undisputed that Defendants Ramineni and Reese were not involved in the treatment of Plaintiff's heart condition at that time. Accordingly, the Court recommends that Defendants' Motion for Summary Judgment be **GRANTED** and Plaintiff's Cross-Motion be **DENIED** as to Plaintiff's deliberate indifference claim based on the treatment provided for his complaints of chest pain.

### c. Shortness of Breath/Asthma

Plaintiff alleges that Defendants repeatedly ignored his complaints of shortness of breath. However, the record again shows that the Defendants neither deprived Plaintiff of adequate care nor were deliberately indifferent with regard to Plaintiff's complaints of shortness of breath and asthma.

"Difficulty breathing due to asthma may be a serious medical condition, depending on the severity of the asthma attack." *Flemming v. Velardi*, 2003 WL 21756108, at *2 (S.D.N.Y. July 30, 2003); *see also Patterson v. Cecot*, 2011 WL 4343842, at *4 (N.D.N.Y. Mar. 8, 2011) (noting that courts generally distinguish between

the condition of being asthmatic, which is not a serious medical condition, and suffering an actual asthma attack, which may be a serious medical condition). Plaintiff's medical records indicate that he complained of shortness of breath to Defendants on May 1, May 8, May 10, July 15, and July 18. Pl.'s Exs. at A-7; Reese Decl., Ex. B; Mannava Decl., Exs. A & E; Ferguson Decl., Ex. F. In each instance, contrary to Plaintiff's claims that Defendants ignored his complaints, Defendants provided treatment to Plaintiff. When Plaintiff suffered an attack on May 1, Defendant Dr. Mannava examined Plaintiff and noted difficulty breathing, but no wheezing. Pl.'s Exs. at A-7. Dr. Mannava concluded that Plaintiff had intermittent mild asthma and prescribed him Albuterol. *Id.* During subsequent attacks, Defendants listened to Plaintiff's lungs for air movement and signs of wheezing; at no time was Plaintiff noted to be in distress. Reese Decl., Ex. B; Mannava Decl., Exs. A & E; Ferguson Decl., Ex. F. When Plaintiff ran out of Albuterol, Defendant Ferguson ordered a new supply for him. Ferguson Decl., Ex. F. Plaintiff acknowledges that he was never denied Albuterol while he was at Mid-State. Pl.'s Dep. at p. 55. Plaintiff does not allege any medical treatment that he was denied with respect to his asthma attacks; instead Plaintiff merely claims that his "medical complaints of [his] asthma [were not taken] seriously." *Id.* Plaintiff therefore has not established that he was deprived of adequate treatment at the objective prong.

For the same reasons, the record is insufficient to establish that any Defendant acted with deliberate indifference towards Plaintiff's asthma attacks. To the extent Plaintiff disagrees with Defendants' treatment of his asthma attacks, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim." Chance v. Armstrong, 143 F.3d at 703.

Accordingly, the Court recommends that Defendants' Motion for Summary Judgment be **GRANTED** and Plaintiff's Cross-Motion for Summary Judgment be **DENIED** as to Plaintiff's deliberate indifference claim based on the treatment he received for his asthma.

### D. Plaintiff's Retaliation Claims

Plaintiff asserts retaliation claims against Defendants as follows: (1) Defendant Reese filed misbehavior reports against Plaintiff in retaliation for Plaintiff seeking medical care; (2) Defendant Ferguson discontinued Plaintiff's prescriptions for MS Contin and Neurontin and filed a misbehavior report against Plaintiff in retaliation for Plaintiff filing grievances against her; and (3) Defendants Dr. Mannava and Dr. Ramineni denied Plaintiff medical care in retaliation for Plaintiff filing grievances against other Defendants. Compl. at ¶¶ 75-78 & 82.

### 1. Legal Standard

**\*16** To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (citing Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003) (citing Dawes v. Walker, 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." Dawes v. Walker, 239 F.3d at 493.

The plaintiff bears the initial burden in showing that "that the protected conduct was a substantial or motivating factor" for the defendant's actions. Graham v. Henderson, 89 F.3d at 79. To satisfy the causal connection prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the prisoner's prior good disciplinary record; (3) the prisoner's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline. *See* Colon v. Coughlin, 58 F.3d at 872-73. Direct evidence is not required and a plaintiff may meet this burden by presenting "sufficiently compelling" circumstantial evidence of a retaliatory motive. Bennett v. Goord, 343 F.3d 133, 138-39 (2d Cir. 2003). If the plaintiff carries this initial burden, the burden then shifts to the defendants to show that they would have taken the same action absent

the retaliatory motive. *Graham v. Henderson*, 89 F.3d at 79 (citing, *inter alia, Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) ); *see also Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (stating that a defendant may successfully meet this burden by demonstrating that the "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report").

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d at 872 (citation omitted); *Dawes v. Walker*, 239 F.3d at 491("[V]irtually any adverse action taken against a prisoner by a prison official even those otherwise not rising to the level of a constitutional violation can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

### 2. Defendant Reese

Plaintiff asserts claims against Defendant Reese for allegedly retaliating against him for seeking medical care by filing misbehavior reports on May 9 and December 2, 2013. Compl. at ¶ 77. On December 2, Plaintiff claims that Reese stated that she would file a misbehavior report against him if he complained of his chronic conditions; when Plaintiff continued to complain of chronic conditions, Reese filed a misbehavior report against him. Pl.'s Mem. of Law at pp. 34-35. Plaintiff alleges that he received time in SHU as a result of these misbehavior reports. Compl. at ¶ 77. Defendants argue that Reese has rebutted any inference of retaliatory motive by her explanation that the misbehavior reports were filed against Plaintiff due to his argumentative and threatening behavior during sick call. Defs.' Mem. of Law at pp. 24-25.

**\*17** The Court first notes that it is questionable whether Plaintiff can establish a *prima facie* case of retaliation. As to the first prong, it appears uncertain whether an inmate's request for medical attention is protected conduct under the First Amendment. *See Brown v. White*, 2010 WL 985184, at \*12 (N.D.N.Y. Mar. 15, 2010) (stating that "[t]he court has found no Supreme Court authority as to whether the First Amendment confers upon a prisoner the right to demand necessary medical attention and courts in the Second Circuit have not decided the issue"); *Maxwell v. City of New York*, 272 F. Supp. 2d 285, 299

(S.D.N.Y. July 10, 2003) (stating that an inmate's requests for medical attention are "not the typical protected speech most commonly considered protected"), *aff'd in part, vacated in part on other grounds*, 380 F.3d 106 (2d Cir. 2004); *Benitiz v. Pacenco*, 1995 WL 444352, at \*5 (S.D.N.Y. July 27, 1995) (stating that it is doubtful that "an inmate has a constitutional right to 'repeatedly' complain about his medical aliments"). Second, as to whether Plaintiff suffered an adverse action, the record is undeveloped in several key respects. Specifically, there is nothing that indicates whether the misbehavior reports against Plaintiff were dismissed or whether a disciplinary hearing was held. *See* N.Y. COMP. CODES R. & REGS. tit. 7, § 251-2(b), (c). Furthermore, there is no evidence of whether Plaintiff was found guilty of the misconduct charged and whether a penalty was imposed on Plaintiff, although Plaintiff alleges that he was placed in SHU. Compl. at ¶ 77.

Defendants, however, do not argue that Plaintiff has failed to establish protected conduct or an adverse action. Instead, Defendants' sole argument is that Defendant Reese has rebutted any inference of retaliatory motive in the misbehavior reports she filed against Plaintiff. *See* Defs.' Mem. of Law at pp. 24-25. Therefore, assuming that Plaintiff was engaged in protected conduct and suffered an adverse action, the Court will turn to Defendants' argument that Plaintiff has not established a causal connection between his requests for medical attention and the misbehavior reports issued by Defendant Reese. While the Court agrees with Defendants as to the May 9, 2013 incident, it disagrees as to the December 2, 2013 incident.

With respect to the May 9 incident, Plaintiff's sole evidence that the misbehavior report was issued in retaliation for his requests of medical attention is temporal proximity. Plaintiff does not allege that Reese made any statements regarding her motive for issuing the misbehavior reports, nor is there any evidence that the misbehavior reports were dismissed. A retaliation claim based on such thin evidence may fail at summary judgment. *See Gill v. DeFrank*, 2000 WL 270854, at \*16 (S.D.N.Y. Mar. 9, 2000) ("While the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment."). However, the Court also finds that Reese has rebutted any inference that she acted out of a retaliatory motive. Reese, in her

sworn declaration, states that she did not issue the misbehavior report to retaliate against Plaintiff for seeking medical attention. Reese Decl. at ¶ 10. Rather, according to the misbehavior report, Plaintiff became highly argumentative and threatening when notified that he was being discharged, and only left when a correctional officer responded. *Id.*, Ex. C. The Court therefore agrees with Defendants that Plaintiff has failed to establish that Reese acted out of retaliatory motive in issuing him the May 9 misbehavior report.

As to the December 2 incident, on the other hand, Plaintiff alleges that Defendant Reese stated that she would issue him a misbehavior report if he complained of his chronic conditions; when he sought treatment for those conditions, Reese issued him the misbehavior report. Plaintiff verified his Complaint by attesting under the penalty of perjury that the statements contained therein were true. *Colon v. Coughlin*, 58 F.3d at 872. "A verified complaint is to be treated as an affidavit for summary judgment purposes ... provided it meets the other requirements for an affidavit under Rule 56(e)." *Id.* The Court finds that Plaintiff's allegations are sufficient to create a genuine issue of material fact as to whether Reese was substantially motivated by retaliation in issuing the December 2 misbehavior report against Plaintiff. Reese again states under oath that she issued the misbehavior report because of Plaintiff's argumentative and threatening conduct, not to retaliate against Plaintiff for seeking medical attention. Reese Decl. at ¶ 16. However, while a defendant may meet their burden of justification by demonstrating that the plaintiff "committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report," *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998), here there is no evidence before the Court that Plaintiff committed the misconduct charged. *See Rivera v. Lawrence*, 2009 WL 1734735, at *6 (N.D.N.Y. June 18, 2009) (finding that the defendant "ha[d] not met his burden of establishing that he would have filed the misbehavior report even in the absence of the protected conduct" because it was "disputed whether Plaintiff committed the prohibited conduct"). Indeed, the only evidence relevant to whether retaliation was a substantial motivating factor in Reese's filing of the December 2 misbehavior report are Plaintiff and Reese's sworn statements. The disparity between these statements presents a credibility issue that is not appropriately resolved by the Court on summary judgment. *See Colon v. Coughlin*, 58 F.3d at 873.

**\*18** Nonetheless, the Court finds that Defendant Reese is entitled to summary judgment on the grounds of qualified immunity because there is no "clearly established right" under the First Amendment for inmates to request medical attention. As stated above, the Court is aware of no authority holding that a inmate's request for medical attention is protected conduct under the First Amendment. *See Brown v. White*, 2010 WL 985184, at *12; *Maxwell v. City of New York*, 272 F. Supp. 2d at 300; *Benitiz v. Pacenco*, 1995 WL 444352, at *5; *but see West v. McCaughtry*, 971 F. Supp. 1272, 1277 (E.D. Wisc. 1997) ("If a prisoner were disciplined solely because of his requests for proper medical treatment, it would surely be a constitutional violation."). The Court need not decide whether the First Amendment protects an inmate's requests for medical attention because it is evident that there was no such "clearly established right" when Reese issued Plaintiff the misbehavior report on December 2, 2013. *See Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 429 n.9 (2d Cir. 2009) (stating that after *Pearson v. Callahan*, 555 U.S. 223 (2009), "a district court does not necessarily err in addressing a qualified immunity issue by concluding that a right is not clearly established at the time of a government officials' actions, without first deciding whether those officials could reasonably viewed as violating that right").

To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "(1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her actions were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). Here, neither the Second Circuit nor the Supreme Court has held that the First Amendment protects an inmate's requests for medical attention. *See Brown v. White*, 2010 WL 985184, at *15. Thus, "[a] reasonable state employee in the defendant's position would not have understood that her acts on [December 2, 2013] might have unlawfully abridged the First Amendment rights of [Plaintiff]." *Id.*

The Court therefore recommends that Defendants' Motion for Summary Judgment be **GRANTED** and Plaintiff's Cross-Motion be **DENIED** as to Plaintiff's retaliation claims against Defendant Reese.

### 3. Defendant Ferguson

Plaintiff next asserts claims against Defendant Ferguson alleging that she discontinued his prescriptions for MS Contin, a cane, and Neurontin in retaliation for Plaintiff filing grievances against her. Compl. at ¶ 78. Plaintiff also alleges that Ferguson issued a misbehavior report against him for seeking medical attention on August 30, 2013. *Id.* at ¶ 39.

The Court first discusses Plaintiff's claim that Defendant Ferguson retaliated against him for filing grievances by discontinuing certain of his medications. Plaintiff's contention that Ferguson retaliated against him for filing grievances satisfies the first prong because "[i]t is well-settled that the filing of a prison grievance is a protected activity." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010); *see also Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[Plaintiff] has sufficiently alleged ... participation in a protected activity: the use of the prison grievance system."); *Colon v. Coughlin*, 58 F.3d at 872 ("Prisoners ... have a constitutional right ... to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right.").

As to the second prong, "it is plausible that a denial of medical evaluation, treatment, and adequate pain medication would suffice to deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prisoner doctor." *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. Oct. 13, 2009). The Court found above that there is a genuine issue of material fact as to whether the discontinuation of Plaintiff's Neurontin prescription deprived him of adequate medical care; therefore, to the extent that Plaintiff claims his Neurontin prescription was discontinued in retaliation for filing grievances, he has established that he suffered an adverse action. *See supra* Part II.C.2.a. However, the Court has found above that there is no evidence that Plaintiff was deprived of adequate medical care as to the discontinuation of his MS Contin prescription and use of a cane. *See id.* A retaliation claim that asserts a deprivation of a medical care as the adverse action suffered should be dismissed if it is established that there was no deprivation of medical care. *See Vail v. Lashway*, 2014 WL 4626490, at *19 (N.D.N.Y.

Sept. 15, 2014); *Tatta v. Wright*, 616 F. Supp. 2d 308, 320 (N.D.N.Y. 2007). Therefore, Plaintiff's retaliation claims based on the discontinuation of his MS Contin prescription and use of a cane could be dismissed on this ground.

**\*19** However, Plaintiff's retaliation claims are also subject to dismissal because he has failed to establish a causal connection between the grievances he filed and Defendant Ferguson's decisions to discontinue his MS Contin on April 5, his cane on April 23, and his Neurontin on October 24, 2013. First, Plaintiff cannot establish that Ferguson discontinued his MS Contin and use of cane in retaliation for filing grievances against her because Plaintiff's first grievance filed against her was on April 25, 2013. Hale Decl., Exs. at p. 32. The alleged adverse action cannot be retaliatory where it predated the protected conduct. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 368 (S.D.N.Y. 2011). Second, there is no evidence that Ferguson discontinued Plaintiff's Neurontin prescription on October 21, 2013 in retaliation for the April 25, 2013 grievance, apart from temporal proximity. [2] The Second Circuit has held that a passage of only six months between the protected conduct and the retaliatory action is sufficient to support an inference of a causal connection. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). However, the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and allegedly retaliatory act." *Id.* (quoting *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001) ). Nonetheless, even assuming that the six months between when Plaintiff filed the grievance in April 2013 and Ferguson discontinued his Neurontin in October 2013 created an inference of retaliation, without further evidence of retaliatory motive, Plaintiff's claim is insufficient to survive summary judgment. *See Ayers v. Stewart*, 1996 WL 346049, at *1 (2d Cir. June 25, 1996); *Roseboro v. Gillespie*, 791 F. Supp. 2d at 370; *Williams v. Goord*, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000); *Gill v. DeFrank*, 2000 WL 270854, at *16.

| 12 | In addition to Plaintiff's formal Grievance No. MS 21255 13 filed on April 25, 2013, Plaintiff also sent numerous other letters complaining of his treatment to Defendant Koenigsmann and various state agencies. *See* Dkt. Nos. 15 & 19. However, there is nothing in the record to suggest |
|----|---|

that Defendant Ferguson was aware of these informal letters and complaints, other than Plaintiff s conclusory statements. *See* Pl.'s Dep. at p. 165.

As to Plaintiff's claim that Defendant Ferguson retaliated against him for seeking medical attention on August 30, 2013, for the same reasons discussed above in connection with Plaintiff's retaliation claims against Defendant Reese, the Court finds that Ferguson is entitled to summary judgment on the grounds of qualified immunity because there is no "clearly established right" under the First Amendment for inmate's to request medical attention.

Accordingly, the Court recommends that Defendants' Motion for Summary Judgment be **GRANTED** and Plaintiff's Cross-Motion be **DENIED** as to Plaintiff's retaliation claims against Defendant Ferguson.

### 4. Defendants Dr. Mannava and Dr. Ramineni

Plaintiff asserts claims against Defendants Dr. Mannava and Dr. Ramineni for allegedly denying him medical care in retaliation for filing grievances and making complaints against Mid-State's medical staff. Compl. at ¶ 76.

As discussed above, the filing of grievances is protected conduct. *Mateo v. Fischer*, 682 F. Supp. 2d at 433. With respect to the second prong, Plaintiff's retaliation claims against Defendant Dr. Ramineni should be dismissed because he has not shown that Dr. Ramineni denied him adequate medical care. Thus, Dr. Ramineni did not cause Plaintiff adverse action in any respect. *See Vail v. Lashway*, 2014 WL 4626490, at *19. However, as to Defendant Dr. Mannava, the Court has found above that there is a genuine issue of material fact as to whether Dr. Mannava denied Plaintiff adequate medical care in affirming the discontinuation of his Neurontin prescription. Thus, based on the discontinuation of his Neurontin prescription, Plaintiff has satisfied his burden on the second prong for his retaliation claim against Dr. Mannava. As to the third prong, Plaintiff has not shown any causal connection between his protected activity and the adverse action Dr. Mannava allegedly committed against him. Plaintiff filed a grievance against Defendant Ferguson for discontinuing his Neurontin prescription on October 24, 2013, which was in addition to his earlier grievance filed against her on April 25, 2013 for discontinuing his MS Contin and use of a cane, Hale Decl.,

Exs. at pp. 32 & 80; Defendant Dr. Mannava affirmed the decision to discontinue Plaintiff's Neurontin prescription on October 28, 2013. [3] First, the Court notes that "[a]s a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011); *see also Roseboro v. Gillespie*, 791 F. Supp. 2d at 369 (collecting cases). Plaintiff has offered no basis to find that Dr. Mannava retaliated against Plaintiff for grievances filed against Ferguson other than conclusory statements that they were in a conspiracy together. *See* Pl.'s Dep. at p. 169. Furthermore, the only circumstantial evidence that Dr. Mannava acted with a retaliatory motive is the temporal proximity to when Plaintiff filed his grievances. However, where the only evidence of a retaliatory motive is the temporal proximity to the adverse action, that is insufficient to survive summary judgment. *See Roseboro v. Gillespie*, 791 F. Supp. 2d at 370. Weighing the skepticism with which it is to view retaliation claims, the Court finds that Plaintiff has not met his burden of showing a causal connection between his protected activities and Dr. Mannava's decision to discontinue his Neurontin prescription.

[13]    As with Defendant Ferguson, there is no evidence in the record that Defendant Dr. Mannava was aware of Plaintiff s other informal letters complaining of his medical treatment at Mid State.

**\*20** At his Deposition, Plaintiff also stated that Defendant Dr. Mannava retaliated against him by providing false testimony at a disciplinary hearing. Pl.'s Dep. at pp. 171-72. Plaintiff was charged with urinating in the yard; at the disciplinary hearing, he called Dr. Mannava as a witness to testify that he would have been unable to hold his urine because he was diabetic and was on a medication that caused him to urinate more frequently. *Id.* Dr. Mannava, however, testified that Plaintiff could have held his urine, which caused Plaintiff to be found guilty of the charge. *Id.* This retaliation claim was not raised in Plaintiff's Complaint and need not be considered by the Court. *See Flemming v. Wurzberger*, 490 F. Supp. 2d 320, 324 (W.D.N.Y. June 21, 2007). Nevertheless, Court agrees with Defendants that Plaintiff has offered no basis to find that Dr. Mannava's testimony constitutes an adverse action or was made with a retaliatory motive.

Accordingly, the Court recommends that Defendants' Motion for Summary Judgment be **GRANTED** and

Plaintiff's Cross-Motion be **DENIED** as to Plaintiff's retaliation claims against Defendants Dr. Mannava and Dr. Ramineni.

### E. Summary

In summary, the Court recommends that Defendants' Motion for Summary Judgment be **granted in part** as to all of Plaintiff's claims, with the exception of Plaintiff's Eighth Amendment deliberate indifference claim against Defendants Ferguson and Dr. Mannava based on the discontinuation of Plaintiff's Neurontin prescription. The Court recommends that Plaintiff's Cross-Motion for Summary Judgment be **denied**. [4]

[14]      Because the Court recommends that Plaintiff's Cross Motion for Summary Judgment be denied in its entirety, the Court does not address Defendants' argument that Plaintiff's Cross Motion should be denied on account of his failure to comply with Local Rule 7.1(a)(3).

### IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 31) be **DENIED** as to Plaintiff's Eighth Amendment deliberate indifference claim against Defendants Ferguson and Dr. Mannava

based on the discontinuation of his Neurontin prescription and **GRANTED** in all other respects; and it is further

**RECOMMENDED**, that Plaintiff's Cross-Motion for Summary Judgment (Dkt. No. 64) be **DENIED**; and it is further

**RECOMMENDED**, that if the above recommendations are accepted, Defendants Dr. Carl Koenigsmann, Dr. Subbarao Ramineni, and Pamela Reese be **DISMISSED** from this action and the case be deemed trial ready on the claims that survive; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Slip Copy, 2016 WL 11480164

---

**End of Document**          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4626490
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Timothy A. VAIL, Plaintiff,

v.

Amber LASHWAY, Nurse Practitioner,
Clinton Corr. Facility; Vonda Johnson,
M.D., Facility Health Servs. Dir., Clinton
Corr. Facility; and Dr. Marco Berard, M.D.,
Surgeon Alice Hyde Med. Ctr., Defendants.

No. 9:12–CV–1245 (GTS/RFT).
|
Signed Sept. 15, 2014.

**Attorneys and Law Firms**

Timothy A. Vail, Wallkill, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Gregory J. Rodriquez, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

**Opinion**

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Timothy A. Vail ("Plaintiff")
against the three above-captioned Defendants, are
Defendants' motion for summary judgment and
United States Magistrate Judge Randolph F. Treece's
ReportRecommendation recommending that Defendants'
motion be granted and that Plaintiff's Complaint be
dismissed. (Dkt.Nos.37, 43, 51.) Plaintiff has not filed
an Objection to the Report Recommendation, and the
deadline by which to do so has expired. (*See generally*
Docket Sheet.) For the reasons set forth below, the
Report Recommendation is adopted in its entirety,
Defendants' motion is granted, and Plaintiff's Complaint
is dismissed.

Generally, in his Report Recommendation, Magistrate
Judge Treece rendered the following conclusions: (1)
Plaintiff has failed to establish an Eighth Amendment
medicalindifference claim against (a) Defendants

Lashway, Johnson, and Berard for failing to administer
pain medication, (b) Defendants Lashway and Johnson
for failing to address Plaintiff's withdrawal symptoms
after his Ultram prescription was discontinued, (c)
Defendants Lashway and Johnson for failing to properly
and timely treat Plaintiff's dislocated shoulder and knee
injury, (d) Defendant Berard for failing to timely treat
Plaintiff's shoulder injury, and (e) Defendants Lashway,
Johnson and Berard with respect to a "handful" of
missed appointments during Plaintiff's treatment period;
(2) Plaintiff has failed to establish a First Amendment
retaliation claim alleging that Defendants conspired
to deny him medical care as a result of Plaintiff's
filing grievances concerning his medical treatment; and
(3) Plaintiff has failed to establish a supervisory-
liability claim against Defendant Johnson with regard
to any constitutional violations (allegedly) committed by
Defendants Lashway and/or Berard. (Dkt. No. 51, at
Parts II.B. to II.D.) Familiarity with the factual findings
supporting these conclusions is assumed in this Decision
and Order, which is intended primarily for review by the
parties.

Where, as here, *no* objection is made to a portion of a
report-recommendation, the Court subjects that portion
of the report-recommendation to only a *clear error* review.
Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983
Addition. When performing such a "clear error" review,
"the court need only satisfy itself that there is no clear
error on the face of the record in order to accept the
recommendation." *Id.; see also Batista v. Walker,* 94
CV 2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31,
1995) (Sotomayor, J.) ("I am permitted to adopt those
sections of [a magistrate judge's] report to which no
specific objection is made, so long as those sections are
not facially erroneous.") (internal quotation marks and
citations omitted).

After carefully reviewing the relevant filings in this
action, the Court can find no clear error in the Report
Recommendation: Magistrate Judge Treece employed
the proper standards, accurately recited the facts, and
reasonably applied the law to those facts. As a result, the
Court accepts and adopts the Report Recommendation
for the reasons stated therein. (Dkt. No. 51.)

**\*2 ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report Recommendation (Dkt. No. 51) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED.**

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Timothy Vail brings this Complaint, pursuant to 42 U.S.C. § 1983, alleging that Defendants failed to provide him with constitutionally adequate medical care and retaliated against him for exercising his First Amendment right to file grievances. *See generally* Dkt. No. 1, Compl. Defendants now move, pursuant to Fed.R.Civ.P. 56, for summary judgment. Dkt. No. 37, Defs.' Summ. J. Mot. Plaintiff opposes the Motion. Dkt. No. 43. For the reasons that follow, we recommend that the Defendants' Motion be **GRANTED.**

### I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [FED. R. CIV. P. 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### II. DISCUSSION

#### A. Background

**\*3** Except where noted, the following facts are undisputed.

On July 6, 2003, while attempting to escape from Elmira Correctional Facility, Plaintiff fell thirty to forty feet off of an exterior wall, causing him to injure, *inter alia,* his left shoulder. Dkt. No. 37 1, Defs.' Statement of Material

Facts Pursuant to Local Rule 7.1(a)(3) (hereinafter "Defs.' 7.1 Statement"), at Ex. 1, Elmira Escape R., dated Mar. 19, 2004; Compl. at ¶¶ 1 & 2. Subsequently, while he was incarcerated at Clinton Correctional Facility ("CCF") where nurse practitioner Defendant Amber Lashway acted as Plaintiff's primary care provider ("PCP") from June of 2005 through May of 2010. Dkt. No. 37 5, Amber Lashway Decl., dated Dec. 19, 2013, at ¶¶ 3 & 6.

[1]    Plaintiff's Complaint is comprised of a *pro forma* § 1983 complaint and a handwritten section, both of which contain numbered paragraphs. When referencing the handwritten portion of Plaintiff's Complaint we refer to the paragraphs as numbered by Plaintiff; when referring to the *pro forma* portion of Plaintiff's Complaint we refer to the page numbers automatically assigned by the Court's Case Management Electronic Case Filing system.

On December 15, 2006, in response to Plaintiff's complaints about shoulder pain, Defendant Berard, an orthopedic surgeon at Alice Hyde Medical Center ("AHMC"), ordered an x-ray, MRI, and other diagnostic tests. Dkt. No. 39, Portions of Pl.'s AHMC Med. R., at p. 000026; Dkt. No. 37 7, Marco R. Berard Decl., dated Dec. 23, 2013, at ¶¶ 2 & 5 6. On May 18, 2007, after reviewing the results of Plaintiff's diagnostic tests, Defendant Berard concluded that Plaintiff had a "partial thickness tear of the supraspinatus tendon ." Defendant Berard recommended that Plaintiff receive physical therapy ("PT") for his left shoulder three times a week for two months. Berard Decl. at ¶ 7; AHMC Med. R. at p. 000028.

On May 22, 2007, Defendant Lashway prescribed Motrin for Plaintiff. On May 24, Plaintiff reported that he was unable to take the Motrin because it hurt his stomach, and Defendant Lashway prescribed Celebrex. On July 10, at Plaintiff's request, Defendant Lashway discontinued Plaintiff's Celebrex prescription and prescribed Tylenol. On August 9, Defendant Lashway prescribed Ultram, in crushed form, for treatment of Plaintiff's shoulder pain. Lashway Decl. at ¶¶ 9 12; Dkt. No. 38, Portions of Pl.'s CCF Med. R., at pp. 7 9. [2] On September 14, Defendant Berard recommended that Plaintiff undergo surgery on his left shoulder, and Plaintiff consented. Berard Decl. at ¶ 10; AHMC Med. R. at pp. 000029 30; Compl. at ¶ 13. In his report, Defendant Berard noted that Plaintiff's pain was a "6 to 7 out of 10" and that he was suffering from "daily pain." AHMC Med. R. at p. 000029. "Thereafter,

Plaintiff ... participated in a number of ongoing sessions of physical therapy ... until ... October 31, 2008." Compl. at ¶ 15.

[2]    Plaintiff's CCF Medical Record is comprised of documents from multiple non sequentially numbered sources. Accordingly, we refer to the page numbers automatically assigned by the Court's Case Management Electronic Case Filing system.

On September 20, 2007, Plaintiff was accused of hoarding a dose of Ultram. Nonetheless, on November 5, Defendant Lashway renewed Plaintiff's Ultram prescription. Lashway Decl. at ¶¶ 14 15; CCF Med. R. at pp. 5 6. On December 20, Defendant Berard performed surgery on Plaintiff's left shoulder; in his discharge directions, Dr. Berard recommended that Plaintiff receive Tylenol # 3 [3] every four hours as needed for pain. Berard Decl. at ¶ 12; AHMC Med. R. at pp. 000031 35. On January 30, 2008, Defendant Lashway renewed Plaintiff's Ultram prescription. Lashway Decl. at ¶ 19; CCF Med. R. at p. 3.

[3]    Tylenol # 3 is a narcotic pain reliever which contains codeine, an opioid.

**\*4** On August 14, 2008, Plaintiff complained to a nurse about right knee pain; it was noted that he was already taking Ultram. On August 22, Plaintiff's prescription for acetaminophen (the generic for Tylenol) was renewed to be taken every six hours as needed. On September 23, Plaintiff's prescription for Ultram was renewed. Lashway Decl. at ¶¶ 20 22; CCF Med. R. at pp. 92 94.

On October 2, 2008, Defendant Lashway requested a consultation with an orthopedic surgeon in response to Plaintiff's complaints of pain in his left shoulder. Lashway Decl. at ¶ 23; CCF Med. R. at p. 91. On January 30, 2009, Defendant Berard recommended surgery after examining Plaintiff's left shoulder and Plaintiff consented. Berard Decl. at ¶ 13; AHMC Med. R. at pp. 000035 38. Defendant Berard performed the surgery on March 10, 2009; in his discharge instructions Defendant Berard recommended that Plaintiff be given Tylenol # 3 every four hours as needed for pain. Berard Decl. at ¶ 14; AHMC Med. R. at pp. 000039 41. On March 11, Defendant Doctor Johnson, the Facility Health Services Director at CCF, examined Plaintiff and prescribed Ultram during the two weeks following the surgery. Dkt.

No. 37 6, Vonda Johnson Decl., dated Dec. 18, 2013, at ¶¶ 2 & 8; CCF Med. R. at p. 89.

On March 3, 2009, an MRI of Plaintiff's right knee revealed a medial meniscus tear. Lashway Decl. at ¶ 24; CCF Med. R. at p. 90.

On April 10, 2009, Plaintiff was seen by Defendant Berard's colleague Dr. Macelaru,[4] who initially recommended that Plaintiff undergo a third surgery; however, Plaintiff was weary of more surgery and elected PT instead. Compl. at ¶ 17. Dr. Macelaru recommended that Plaintiff "start/continue physical therapy for shoulder instability and to follow up in two months for possible additional therapy if there was no improvement." Berard Decl. at ¶15; CCF Med. R. at p. 62. On April 7, Defendant Lashway renewed Plaintiff's Ultram prescription for thirty days. Lashway Decl. at ¶ 28; CCF Med. R. at p. 88. On April 14, Defendant Lashway submitted a request for PT for Plaintiff's left shoulder due to instability and pain. Lashway Decl. at ¶ 29; CCF Med. R. at pp. 62 & 64. On April 30, Plaintiff saw the physical therapist who recommended PT twice a week for six weeks. Lashway Decl. at ¶ 31; CCF Med. R. at p. 62; Compl. at ¶ 19.

4      Dr. Macelaru is not a Defendant in this action.

On May 5, 2009, Plaintiff was caught hoarding a dose of Ultram. Compl. at ¶ ¶ 20 22; Lashway Decl. at ¶ 32; CCF Med. R. at p. 87. On May 7, Defendant Lashway ordered that Plaintiff's Ultram prescription be discontinued. Lashway Decl. at ¶ 32; CCF Med. R. at p. 87. Plaintiff received his last dose of Ultram on the evening of May 7. Compl. at ¶ 26. On the morning of May 8, 2009, Nurse Badger[5] came to Plaintiff's cell in the morning and explained that his Ultram Prescription had been discontinued. Plaintiff told Nurse Badger that if he did not receive a dose of Ultram he would begin to go through withdrawal; Nurse Badger agreed to speak with Defendant Johnson regarding the situation. Compl. at ¶¶ 27 28.

5      Nurse Badger is not a Defendant in this action.

**\*5**  Plaintiff also submitted a sick call request on May 8, 2009, claiming that he was still in pain due to his shoulder, but making no mention of withdrawal symptoms. *Id.* at ¶ 28; Dkt. No. 1 1, Pl.'s Exs. to Compl. (hereinafter "Pl.'s Exs."), at p. 13.[6] Additionally, Plaintiff wrote a letter

to Nurse Practitioner Lashway, in which he noted that his Ultram had been taken away and requested that it be reinstated; the letter did not mention withdrawal. Compl. at ¶ 29; Pl.'s Exs. at pp 14 1'. On the morning of May 9, Nurse Badger told Plaintiff that she had spoken to Defendant Johnson about "his situation," but that she would not be reinstating his Ultram and any concerns about medication should be made to Plaintiffs PCP; withdrawal was not mentioned. Compl. at ¶ 31.

6      Although Plaintiff provided a detailed index of the Exhibits attached to his Complaint, he failed to label each individual Exhibit. Therefore, the Court refers to the page numbers automatically assigned by the Court's Case Management Electronic Case Filing system

On May 9, 2009, Plaintiff submitted another sick call request, which stated "Need to see FNP Ms. Lashway  Provider  To address Shoulder and Knee Issues." Compl. at ¶ 31; Pl.'s Exs. at p. 17. Plaintiff submitted an additional request on May 11, 2009, which stated: "Need to see FNP Ms. Lashway  Provider  cannot move due to pain in [sic] pressure on area with tear." Compl. at ¶ 32; Pl.'s Exs. at p. 18. Neither request mentioned withdrawal symptoms. Plaintiff alleges that Defendant Lashway wrote to Plaintiff on May 12 that his Ultram had been discontinued due to the fact that the drug was not medically necessary two months post-surgery, and because he had been caught hoarding the medication. Compl. at ¶33; Pl.'s Exs. at p. 19. Contrariwise, Defendant claims that she actually met with Plaintiff on May 12. Lashway Decl. at ¶ 34.[7] Defendant Lashway noted in Plaintiff's medical record that Plaintiff was two months post-surgery, had no future need for Ultram and had been caught hoarding the drug on May 5. She prescribed Motrin as needed for seven days. Lashway Decl. at ¶ 34; CCF Med. R. at p. 85.

7      Regardless of whether a visit occurred, neither party contends that Plaintiff complained of symptoms of withdrawal on May 12. *See* Compl. at ¶ 33; Lashway Decl. at ¶ 34; CCF Med. R. at p. 85.

On May 13, 2009, Plaintiff wrote a letter to Nurse Administrator B. Lecuyer[8] expressing his desire to reinstate his Ultram prescription. The letter mentions that Plaintiff was experiencing pain and discomfort, trouble sleeping, and that he was not weaned off of Ultram. Plaintiff also explained that his knee problem had not

2014 WL 4626490

been addressed by anyone, and taking ibuprofen caused him to experience side effects, including "rapid heart beat, dizziness, [and] burning in [his] stomach, to name a few." Compl. at ¶ 37; Pl.'s Exs. at pp. 21 22. On May 14, Plaintiff filed a grievance, which noted that his Ultram prescription had been discontinued but does not mention that he was suffering from symptoms of withdrawal. Compl. at ¶ 38; Pl.'s Exs. at pp. 23 24.

8      B. Lecuyer is not a Defendant in this action.

On May 15, 2009, Plaintiff received a response from Nurse Administrator B. Lecuyer noting that his medical records revealed his Ultram prescription was discontinued due to the fact that he was caught "cheeking" his pill. Compl. at ¶ 39; Pl.'s Exs. at p. 25. Plaintiff also received a note from Defendant Lashway on May 15, noting that she had advised him on May 12 that his Ultram prescription had been discontinued, and that the Motrin she prescribed would be effective for his knee pain. Compl. at ¶ 39; Pl.'s Exs. at p. 26.

**6** On May 16, 2009, Plaintiff wrote a letter to a friend, Shireen Dunlop, asking her to intervene on his behalf by writing letters to "the head dept." and Dr. Lester Wright, [9] "the director of health services, central office." Compl. at ¶ 43; Pl.'s Exs. at pp. 28 29. Although Plaintiff relayed to Dunlop that he was in constant pain and experiencing side effects from the new medication, he failed to mention withdrawal at all. *Id.* On May 20, Mrs. Dunlop, wrote to Superintendent of CCF, Dale Artus, [0] and Dr. Wright, noting that Plaintiff should not have been taken off of his medication "abruptly ... due to the withdrawals." Compl. at ¶ 47; Pl.'s Exs. at p. 34; Pl.'s Exs. at pp. 85 89, Shireen M. Dunlop Aff., dated April 19, 2012, at ¶ 10. There is no evidence to suggest that this letter was ever seen by Defendants.

9      Dr. Wright is not a Defendant in this action.

10      Superintendent Artus is not a Defendant in this action.

On May 18, 2009, Plaintiff submitted a sick call request, noting that his "meds" were discontinued on May 7, that he was experiencing difficulty sleeping, pain in his right knee and shoulder, and that he could not take the medicine that was provided due to side effects. Compl. at ¶ 44; Pl.'s Exs. at p. 30. This request did not mention symptoms of withdrawal. That same day, Plaintiff wrote

to Superintendent Artus complaining about being taken off of his Ultram medication abruptly, the side effects he was experiencing from the Motrin and ibuprofen, the pain in his shoulder, and his inability to participate in PT; however, Plaintiff failed to mention any symptoms of withdrawal. Compl. at ¶ 45; CCF Med. R. at pp. 74 75. On May 19, Plaintiff's letter to the Superintendent was forwarded to First Deputy Superintendent Thomas LaValley,    for his review and action. Compl. at ¶ 46; CCF Med. R. at p. 73.

11      Deputy Superintendent LaValley is not a Defendant in this action.

On May 22, 2009, Defendant Johnson responded to the letter Plaintiff wrote to Superintendent Artus, noting:

> You were found to be misusing/ abusing your prescribed medication, to which you admit. It was your provider's decision to discontinue that medicine because she is not obligated nor comfortable continuing to prescribe medication for you to misuse or abuse. If the ibuprofen is upsetting your stomach, you can try taking it with an acid reducer. You can discuss this with Ms. Lashway when you see her    you have been scheduled to see her next week. Until then I have prescribed acetaminophen for you to use ... for pain.

Compl. at ¶ 49; CCF Med. R. at pp. 72 & 78 (noting that T. LaValley forwarded Plaintiff's letter to Defendant Johnson).

Although Plaintiff reported to PT for his shoulder on April 30 and May 13, 2009, he refused to participate on May 15, 20, and 22. CCF Med. R. at pp. 58 62; Compl. at ¶¶ 19 & 42; Lashway Decl. at ¶ 37. On May 22, Plaintiff's physical therapist recommended that Plaintiff's PT be discontinued due to his consistent refusal to attend. Lashway Decl. at ¶ 37; CCF Med. R. at p. 58. Plaintiff's PT was discontinued on May 26. Lashway Decl. at ¶ 38; CCF Med. R. at p. 57. On May 27, Plaintiff requested an

appointment with a specialist regarding his left shoulder. Compl. at ¶ 50; Pl.'s Exs. at p. 36.

**\*7** On May 28, 2009, Defendant Lashway saw Plaintiff. Defendant Lashway explained that Plaintiff was discharged from PT by the provider. Defendant Lashway further advised Plaintiff that she was aware of the results of the MRI on his right knee, and that Motrin was adequate for pain control. Plaintiff requested that his Ultram prescription be reinstated, and told Defendant Lashway that he could not take either Motrin or Tylenol. When Defendant Lashway asked why Plaintiff could not take either drug Plaintiff responded "you know, I just can't, I don't need to tell you." Lashway Decl. at ¶ 39; CCF Med. R. at p. 83. Contrariwise, Plaintiff argues that at this appointment he reminded Defendant Lashway of all the drugs she had prescribed in the past and his history of issues with those drugs. Compl. at ¶ 51. Nonetheless, it is uncontested that after this appointment, Defendant Lashway requested an orthopedic consultation for Plaintiff's right knee. Lashway Decl. at ¶ 39; Compl. at ¶ 51.

On May 28, 2009, after meeting with Defendant Lashway, Plaintiff wrote to Nurse Administrator B. Lecuyer, noting that he attempted to speak to Defendant Lashway about his shoulder but was informed that due to his failure to participate in PT his concerns with his shoulder would not be addressed, and Defendant Lashway would only address Plaintiff's concerns regarding his knee. Additionally, Plaintiff informed B. Lecuyer that "[he] was discontinued on all [his] pain medications by FNP Lashway without acknowledging any protocol procedures in weaning a person off the medication [he] was taking for more than 2yrs continuously [sic], thus [he] had to endure the suffering of withdraw [al.]" Compl. at ¶ 52; Pl.'s Exs. at pp. 38 39. That same day Plaintiff also wrote to Lester Wright, reiterating his concerns regarding his shoulder, his issues with taking Motrin and ibuprofen, and without describing them noting that after his Ultram was discontinued, he suffered "serious" symptoms of withdrawal. Compl. at ¶ 53; Pl.'s Exs. at pp. 40 42.

On May 29, 2009, Plaintiff requested an additional appointment with Defendant Lashway regarding his shoulder pain. Compl. at ¶ 55; Pl.'s Exs. at p. 43. On June 1, Nurse Administrator B. Lecuyer responded to Plaintiff's May 28 letter, noting that Nurse Lashway had already submitted a consultation request for a visit with an outside specialist. Compl. at ¶ 56; Pl.'s Exs. at p. 44. Plaintiff maintains that this referral was for treatment of his knee injury only. Compl. at ¶ 56.

On June 2, Plaintiff submitted a grievance complaining that his shoulder issues were being ignored. Compl. at ¶ 57; Pl.'s Exs. at p. 45. That same day, Plaintiff requested an appointment with a specialist. Compl. at ¶ 58; Pl.'s Exs. at p. 46. On June 8, Plaintiff submitted a sick call request noting that he required attention for his shoulder and that he had not received any medication except for twelve to fourteen Tylenol per day. Compl. at ¶ 60; Pl.'s Exs. at p. 48; Lashway Decl. at ¶ 40; CCF Med. R. at pp. 81 82.

**\*8** On June 11, the Inmate Grievance Resolution Committee ("IGRC") denied Plaintiff's May 14 and June 2, 2009 grievances, noting that his medication had been discontinued due to misuse, and that Plaintiff had been seen by an orthopedic specialist who recommended PT, but that PT was discontinued due to Plaintiff's repeated refusals to attend. Compl. at ¶ 61; Pl.'s Exs. at pp. 49 50. On June 18, Plaintiff complained of his inability to receive care for his shoulder to Thomas LaValley. Compl. at ¶ 64. On June 19, the Superintendent's Office upheld the IGRC's findings with regard to Plaintiff's grievances, noting that Plaintiff had been seen for his left shoulder injury, had been prescribed PT, which was ultimately discontinued due to his failure to participate, and that he had been prescribed Motrin and Tylenol for pain management. Compl. at ¶ 65; Pl.'s Exs. at pp. 54 55.

On June 19, Plaintiff wrote to Nurse Administrator B. Lecuyer asking for additional care for his shoulder, and noting that "I have only [T]ylenol, which I have to take 10 12 for a couple hr. [sic] relief." Compl. at ¶ 67; Pl.'s Exs. at p. 57. On June 23, 2009, Nurse Administrator B. Lecuyer responded to Plaintiff's June 19 letter, noting that the nurse practitioner had advised that he had been prescribed PT, but that it was discontinued due to his own non-compliance. Compl. at ¶ 68; Pl.'s Exs. at p. 58.

On June 25, 2009, Plaintiff received a letter from Superintendent Artus informing him that the Superintendent had spoken to Defendant Johnson regarding his medication issues, and that Defendant Johnson assured him that after his upcoming orthopedic appointment, his need for PT and medication would be evaluated. Compl. at ¶ 70; Pl.'s Exs. at p. 60. On June 26, Defendant Johnson wrote to Plaintiff and informed him

2014 WL 4626490

that "I believe Ms. Lashway has spoken to you recently re: plans to address your orthopedic issue. You will be seeing the orthopedist very soon and we will devise a plan from that point." Johnson Decl. at ¶ 15; CCF Med. R. at p. 71; Compl. at ¶ 71.

On July 3, 2009, Plaintiff was seen by Defendant Berard, who evaluated his right knee and recommended surgery, but refused to examine Plaintiff's shoulder. Compl. at ¶ 72; Pl.'s Exs. at p. 62; CCF Med. R. at pp. 40 42. On July 13, Plaintiff filed a grievance complaining that he had been told by Corrections Officer Martin [2] that he would be seen by his provider on June 9, but that callouts were cancelled due to an emergency, and that he was told he would be seen on July 13, but that no one came to get him. Compl. at ¶ 74; Pl.'s Exs. at p. 64. On July 29, Plaintiff was informed that "a call out with the Physical therapist to address shoulder issues has been scheduled in the near future. On 7/21/09 the Facility Nurse Practitioner ordered Tylenol medication to help the discomfort. A callout with the facility Nurse Practitioner to address the shoulder issue is scheduled in the very near future." Compl. at ¶ 76; Pl.'s Exs. at p. 67.

[12]     Officer Martin is not a Defendant in this action.

**\*9** On July 21, 2009, Defendant Lashway submitted a new request for PT for Plaintiff's left shoulder. Lashway Decl. at ¶ 41; CCF Med. R. at pp. 55 56. Under the section entitled "REASON FOR CONSULTATION," Defendant Lashway noted that "IN PAST HE REFUSED [PHYSICAL THERAPY] SERVICES ... HE HAS SINCE AGREED TO ATTEND PHYSICAL THERAPY SERVICES AND FOLLOW THEIR RECOMMENDATIONS." CCF Med. R. at p. 54. On July 30, 2009, Plaintiff met with a physical therapist, regarding his left shoulder, who recommended that Plaintiff undergo PT twice a week for six weeks. *Id.* Plaintiff received PT for his left shoulder on August 11, 14, 18, and 21. *Id*. at pp. 47 & 49 51; Lashway Decl. at ¶ 42.

On August 25, 2009, Dr. Berard performed surgery on Plaintiff's right knee. In his discharge instructions, Defendant Berard recommended that Plaintiff be given Tylenol # 3 post-operation for pain. Berard Decl. at ¶ 17; AHMC Med. R. at pp. 000044 47. Plaintiff received Tylenol # 3 every four hours, the day after the surgery. Thereafter, Plaintiff was provided with a thirty-day supply of ibuprofen for pain management. [3] Compl. at ¶¶ 81

84. On August 26, 2009, Plaintiff was referred for PT on his right knee. CCF Med. R. at p. 48. Thereafter, Plaintiff received PT on his left shoulder and/or right knee on September 1, 3, 8, 11, 15, 22, 24, and October 1, 2009. *Id.* at pp. 23 25, 27 30, 34, & 38; Lashway Decl. at ¶ 42. On October 8, all of Plaintiff's PT was discontinued by his therapist. Lashway Decl. at 44; CCF Med. R. at p. 22.

[13]     It is unclear who prescribed Plaintiff ibuprofen after his surgery.

On January 7, 2010, Defendant Lashway referred Plaintiff for an orthopedic consultation for his left shoulder and an MRI for his right knee based on his complaints that he had fallen and reinjured his knee. Lashway Decl. at ¶ 46; CCF Med. R. at p. 21. On February 9, 2010, Plaintiff was referred for PT on his right knee. CCF Med. R. at p. 20. On February 18 and March 4, Plaintiff refused to participate in PT for his right knee. *Id.* at pp. 18 19. Nonetheless, Plaintiff was provided PT for his right knee on March 25. *Id.* at p. 16. On March 22, Plaintiff's physical therapist noted that Plaintiff had no new complaints, and that he was making "slow progress" and should continue PT twice a week. Pl.'s Exs. at p. 82. Per Defendant Lashway's January 7 consultation request, Defendant Berard met with Plaintiff regarding his left shoulder on March 26. Defendant Berard found no remaining instability in Plaintiff's shoulder and recommended that he receive PT twice a week for one more month and continue PT on his own thereafter. *Id.* at pp. 17 & 78; Berard Decl. at ¶ 18.

Plaintiff received PT on his right knee on April 6, 2010. CCF Med. R. at pp. 15. On April 9, 13, and 16, Plaintiff refused to participate in PT sessions for his left shoulder, prompting Plaintiff's physical therapist to request that his PT be discontinued on April 16. *Id.* at pp. 12 14. [4] On May 19, 2010, Plaintiff was transferred from CCF to Shawangunk Correctional Facility. *Id.* at p. 76; Compl. at ¶ 96.

[14]     Defendants claim that Plaintiff refused PT for his knee on April 9, 13, & 16, 2010. However, it is not readily apparent from the documents cited by Defendants that these therapy sessions were for anything other than Plaintiff's left shoulder. *See* Pl.'s 7.1 Statement at ¶¶ 66 67 & 69 70; *see also* CCF Med. R. at pp. 12 14.

2014 WL 4626490

## B. Deliberate Medical Indifference

**\*10** To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105 06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834 35 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994).

The seriousness element is an objective test, to determine whether the deprivation of care is sufficiently serious "entails two inquiries." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citations omitted). First, courts must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Medical care is "adequate" where the care provided is a "reasonable" response in light of the "health risk" the inmate faces. *Id.* at pp. 279 80. The second inquiry requires a determination of "whether the inadequacy in medical care is sufficiently serious." *Id.* at p. 280. In cases where medical care is denied, courts focus on the seriousness of the underlying medical condition. *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185 86 (2d Cir.2003). Some of the factors that determine whether a prisoner's medical condition is serious include: "1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, 2) whether the medical condition significantly affects daily activities, and 3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162 63 (2d Cir.2003) (internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is at the limit of human ability to bear, nor [does the court] require a showing that his or her condition will degenerate into a life threatening one").

Whereas, the "seriousness inquiry is narrower" in cases where "the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment." *Salahuddin v. Goord,* 467 F.3d at 280 (citing *Smith v. Carpenter,* 316 F.3d at 185)). In such cases, courts "focus [ ] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.* The question becomes whether delaying treatment subjected Plaintiff to any serious risk of harm. To that end, the Second Circuit has instructed us that "the severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." *Smith v. Carpenter,* 316 F.3d at 187. In this regard, "the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* Determining whether the inadequacy/delay presents a sufficiently serious risk "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* (citing *Helling, v. McKinney,* 509 U.S. 25, 32 33 (1993)).

**\*11** The second element, deliberate indifference, is based on a subjective standard. To establish deliberate indifference a plaintiff must demonstrate that the defendant acted with a culpable mental state, similar to criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301 03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted). Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, such a classification is reserved "for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a lifethreatening and fast degenerating condition for three days; or delayed major surgery for over two years."

*Freeman v. Stack,* 2000 WL 1459782, at *6 (S.D.N.Y. Sep. 29, 2000).

Construed liberally, Plaintiff's Complaint alleges that Defendants provided constitutionally inadequate care for his shoulder, knee, and withdrawal symptoms.

### 1. Denial of Care

#### a. Withdrawal

Plaintiff alleges that Defendants Lashway and Johnson denied him treatment for the symptoms of withdrawal that he experienced after his Ultram medication was discontinued by Defendant Lashway on May 7, 2009. *See* Compl. at ¶¶ 26, 28, & 102 103. According to Plaintiff, for a week and a half to two weeks after the Ultram was discontinued he suffered from withdrawal symptoms, which included: stomach cramps, diarrhea, lack of sleep, aches all over his body, and a migraine headache that would not go away. Compl. at ¶ 35. However, as explained below, even if we accept, *arguendo,* that these injuries were sufficiently serious for purposes of the Eighth Amendment, there is no evidence to suggest that Defendants Lashway and Johnson were aware of Plaintiff's withdrawal symptoms until after they subsided.

As noted above, Plaintiff's Ultram medication was discontinued by Defendant Lashway on May 7, 2009, based on her belief that Plaintiff had been misusing/abusing the drug, and her medical belief that Ultram was no longer necessary to treat Plaintiff's pain two months after his surgery. On May 8, upon being notified that his Ultram prescription had been discontinued, Plaintiff informed Nurse Badger that he would begin to suffer from withdrawal if he did not get his pills; Nurse Badger agreed to speak with Defendant Johnson about Plaintiff's Ultram prescription. Compl. at ¶¶ 26 28. It is unclear whether Defendant Badger actually mentioned Plaintiff's fear of impending withdrawal to Defendant Johnson. However, even if Nurse Badger had told Defendant Johnson that Plaintiff believed he would start to experience symptoms of withdrawal if he did not receive more Ultram, Defendant Johnson cannot be found to have been deliberately indifferent toward a purely speculative condition. *See Alston v. Bendheim,* 672 F.Supp.2d 378, 386 (S.D.N.Y.2009). Even where the doctor allegedly knows that the medication contains

addictive attributes and that the patient has been taking it for an extended period of time, the failure by the doctor to predict the patient's addiction and withdrawal amounts to nothing more than negligence or malpractice; tortious conduct which is not actionable under § 1983. *Id.*

**\*12** Moreover, although Plaintiff and Mrs. Dunlop wrote numerous letters and made multiple sick call requests between May 7 and May 21, 2009, these letters and requests either did not mention withdrawal or Plaintiff's symptoms, or, in the case of the letter written on Plaintiff's behalf by Mrs. Dunlop, were not addressed to Defendants. CCF Med. R. at pp. 74 75; Pl.'s Exs. at pp. 13 15, 17 18, 21 24, 28 30, 34, & 36. At the earliest, Defendants Johnson and Lashway received notice that Plaintiff was suffering severe symptoms of withdrawal on May 28, 2009. On that day, Plaintiff alleges that he met with Defendant Lashway and discussed his medication issues with her; furthermore, the record reflects that he also sent letters to Lester Wright and Nurse Administrator B. Lecuyer in which he mentioned that he had been forced to suffer "severe" symptoms of withdrawal. Lashway Decl. at ¶ 39; CCF Med. R. at p. 83; Compl. at ¶¶ 52 53; Pl.'s Exs. at pp. 38 39 & 40 42.

Crucially, by his own admission, Plaintiff's withdrawal symptoms only lasted between a week and a half and two weeks, and therefore, would have already subsided by May 28, 2009. Compl. at ¶ 35. Thus, it cannot be established that either Defendant Lashway or Johnson knew of, let alone consciously disregarded, Plaintiff's severe symptoms of withdrawal. *See Hathaway v. Coughlin,* 37 F.3d at 66 (to establish deliberate indifference, the defendant must "know[ ] of and disregard [ ] an excessive risk to inmate health or safety").

Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims that Defendants Johnson and Lashway denied him treatment for his symptoms of withdrawal.

#### b. Shoulder

Plaintiff's shoulder injury caused him to suffer from severe pain on a daily basis and interfered with his ability to use his left arm. Moreover, as noted above, Plaintiff's shoulder injury was sufficiently serious enough to warrant, *inter alia,* an MRI and x-ray, visits with specialists, PT, pain

killers, and multiple surgeries. *See supra* Part II. A. Thus, Plaintiff has established that his shoulder injury is an objectively serious medical condition for purposes of the Eighth Amendment. *See Chance v. Armstrong,* 143 F.3d at 702.

Yet, as noted above, Defendants provided or recommended a host of treatments including: consultations with outside specialists, x-rays, MRIs, PT, three surgeries, and pain medications such as cortisone shots, Tylenol, Celebrex, Motrin, Ultram, and Tylenol # 3, *see supra* Part II.A. Documented evidence of such extensive, frequent, and appropriate treatments are in and of themselves sufficient to dispel any notion that these Defendants outright denied Plaintiff adequate medical care for the treatment of his shoulder. *Cf. Buffaloe v. Fein,* 2013 WL 5815371, *8 (S.D.N.Y. Oct. 24, 2013) (collecting cases in support of the proposition that "the high frequency of care could reasonably have assured Dr. Bernstein that there was no denial or delay of care"); *see also Harrington v. Mid State Corr. Facility,* 2010 WL 3522520 (N.D.N.Y. May 21, 2010) (finding that defendant doctors' "actions of referring [plaintiff's] care to a specialist, more familiar with the intricacies of [plaintiff's] subjective symptoms, belies any claims of deliberate indifference. Referring for specialist care, explaining the specialist's findings, and referring for further diagnostic follow-up are all appropriate treatment actions.") (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)).

**\*13** Nonetheless, Plaintiff alleges that he was denied medical care for his shoulder: (i) by Defendants Johnson, [5] Lashway, and Berard for their failure to administer proper pain medication to Plaintiff; and (ii) when Defendant Berard refused to look at Plaintiff's left shoulder during a consultative examination of his right knee on July 3, 2009.

[15]   In addition to allegations that can plausibly be interpreted as alleging that Defendant Johnson was liable for the care she personally provided to Plaintiff, Plaintiff has also alleged that Defendant Johnson was liable in her supervisory capacity for violations, of which she was allegedly aware, committed by Defendants Lashway and/or Berard. *Compare* Compl. at ¶ 105, *with id.* at ¶ 114. We deal first with Plaintiff's direct allegations against

Defendant Johnson, and consider his supervisory claims against her last. *See infra* at Part II.D.

#### i. Pain Medication

Plaintiff's claims that he was denied adequate treatment for his knee and shoulder injuries because each of the Defendants failed to provide him with proper pain medication are unavailing. *See* Compl. at ¶¶ 102 106. Neither Defendant Lashway's decision to discontinue Plaintiff's Ultram prescription on May 7, 2009, nor her or Defendant Johnson's subsequent refusals to reinstate his Ultram prescription, constituted deliberate indifference. *See Wright v. Genovese,* 694 F.Supp.2d 137, 160 (N.D.N.Y.2010) ("Differences in opinion between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's serious medical needs."). This is particularly true in the instant case where Defendants' decisions were supported by Defendant Lashway's medical judgment that Ultram was no longer medically necessary two months post-surgery, and the fact that Plaintiff had twice been disciplined for misusing the medication. *See, e.g.,* Lashway Decl. at ¶¶ 32 & 34; CCF Med. R. at pp. 72 & 87; Pl.'s Exs. at pp. 19, 25, 49, and 69; *see also Josey v. Rock,* 2013 WL 1500435, at *9 (N.D.N.Y. Mar. 19, 2013) (finding no deliberate indifference where doctors discontinued Ultram prescription based on their concerns that plaintiff was seeking Ultram for non-medical reasons and Ultram was not the best treatment for patient's pain); *see also Cole v. Pang Lay Kooi,* 2013 WL 4026842, at *5 (N.D.N.Y. Aug. 6, 2013) (finding a lack of deliberate indifference where prisoner's Ultram prescription was discontinued after he was caught hoarding doses of the drug); *Scott v. Perio,* 2005 WL 711884, at *6 (W.D.N.Y. Mar. 25, 2005) (finding that in the absence of evidence that stronger medication was withheld for non-medical reasons, "[i]t is not for the Court to second guess plaintiff's medical providers as to what medicine or what dosage should have been prescribed to treat the plaintiff.").

Likewise, Plaintiff's claim that Defendant Lashway was deliberately indifferent because she refused to prescribe any pain medication other than NSAID pain relievers, which she allegedly knew he could not tolerate, is patently untrue. Countless entries in the record establish that Plaintiff was continuously provided with Tylenol, a non-NSAID pain medication, that he had tolerated in the past

and admits provided him some relief with regard to his present claims. *See, e.g.,* Lashway Decl. at ¶ 21; CCF Med. R. at pp. 53, 72, & 93; Pl.'s Exs. at pp. 48, 50, 55, 57, & 67. Thus, Plaintiff had access to pain medication other than NSAIDs. [6]

16    Moreover, to the extent that Plaintiff claims Defendant Johnson was deliberately indifferent to his intolerance for NSAIDs, such a claim is unsupported by the record. *See* Compl. at ¶ 105. Indeed, when Defendant Johnson learned about Plaintiff's inability to tolerate the drug *via* his May 18 letter to Superintendent Artus, she advised him to try taking the medication with an acid reducer and prescribed Tylenol as well. Compl. at ¶ 49; CCF Med. R. at p. 72.

**\*14** Moreover, even if Defendants Lashway and/or Johnson had decided to prescribe Motrin or some other NSAID, the decision to choose one form of pain medication over another, even if the medication causes side effects, is not indicative of deliberate indifference. *See Rush v. Fischer,* 2011 WL 6747392, at \*3 (S.D.N.Y. Dec. 23, 2011) ("The decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs.") (citing, *inter alia, Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011), & *Reyes v. Gardener,* 93 F. App'x 283, 285 (2d Cir.2004) (summary order)); *Perez v. Cnty. of Monroe,* 945 F.Supp.2d 413, 415 (W.D.N.Y.2013) (finding that, "at most" plaintiff's allegation that the medicine prescribed by his doctor caused joint pain and arthritis as side effects was a " 'mere disagreement over [his] proper treatment,' which does not give rise to a constitutional violation") (quoting and citing *Chance v.. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998)); *see also Idowu v. Middleton,* 2012 WL 6040742, at \*6 (S.D.N.Y. Dec. 4, 2012) (finding no Eighth Amendment claim stated where nurse ignored plaintiff's complaints, on three separate occasions, that he was experiencing side effects from the medication he was prescribed which included: "stomach pains, vomiting, dizziness, insomnia and other conditions"). [7]

17    Furthermore, Plaintiff's failure to abide by Defendants' instructions, including their instructions to take Motrin and ibuprofen further belie his claims. *See Snyder v. Law,* 2010 WL 5572768, at \*3 (concluding that plaintiff's failure to take the medication prescribed by his doctors   regardless of

the fact that the drugs allegedly caused side effects was fatal to his deliberate medical indifference claim).

Furthermore, with respect to Plaintiff's allegations that Defendant Berard failed to provide adequate pain medication, *see* Compl. at ¶ 106, it is clear from the medical records that after each of Plaintiff's surgeries Defendant Berard provided pain medication to Plaintiff while he remained within the Defendant's care at AHMC. Berard Decl. at ¶¶ 12, 14, & 17; AHMC Med. R. at pp. 000031 34, 000034 38, & 000044 46. Additionally, it is undisputed that Defendant Berard was not Defendant Lashway's nor Defendant Johnson's supervisor, nor possessed the authority to prescribe pain medication to Plaintiff once he left AHMC and returned to CCF. Berard Decl. at ¶ 8, 7, & 19; *also cf.* Compl. at ¶ 72.

### *ii. July 3, 2009*

Plaintiff maintains that he went to see Defendant Berard on July 3, 2009, for treatment of his right knee. At that appointment Plaintiff also requested that Defendant Berard examine his left shoulder. "Defendant Dr. Berard advised Plaintiff he was there to be seen about whether or not he would like to have his R-knee surgically repaired   he had not been told by anyone that he was supposed to examine Plaintiff's L-shoulder, and he said there was nothing written in the file he had for the consult." Compl. at ¶ 72. Dr. Berard's refusal to examine Plaintiff's left shoulder because it was outside of the scope of what care he was authorized to provide does not evince deliberate indifference. [8] Indeed, Plaintiff had been told prior to his July 3 appointment that his shoulder issues would be dealt with after his July 3 appointment for his knee issue. *See* Compl. at ¶¶ 70 71; Pl.'s Exs. at p. 60; CCF Med. R. at p. 71.

18    However, even if Defendant Berard's alleged refusal to provide Plaintiff with treatment for his shoulder on July 3, 2009 did constitute deliberate indifference, Plaintiff is barred by the statute of limitations from bringing an action against Defendant Berard based on this incident. In a § 1983 action, the applicable statute of limitations is the "general or residual statute for personal injury actions, of the state in which the federal court is located. *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002) (quoting *Owens v. Okure,* 488 U.S. 235, 249 50 (1989)) (alterations omitted).

In New York, a three year statute of limitations applies for personal injury actions, and thus to § 1983 actions as well. *Id.; see also* N.Y.C.P.L.R. § 214(5). "While state law supplies the statute of limitations for claims under § 1983, federal law determines when a federal claim accrues. The claim accrues when the plaintiff knows or has reason to know of the harm. *Connolly v. McCall,* 254 F.3d 36, 41 (2d Cir.2001) (citation omitted).

Plaintiff signed his Complaint in the instant action on July 26, 2012. *See* Compl. Thus, Plaintiff is barred from raising any claim against Defendant Berard which he knew or should have known of prior to July 26, 2009. Moreover, and notwithstanding Plaintiff's argument to the contrary, Defendants properly preserved the statute of limitations as an affirmative defense by timely raising it in their Answer. *See* Dkt. No. 15, Answer, at ¶ 15; *see also* Pl.'s Opp'n at pp. 13 14. Defendants did not raise the statute of limitations with regard to any of Plaintiff's other claims.

**\*15** Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims that he was ever denied care for his left shoulder.

### 2. Delay in Care

At best, affording Plaintiff all of the special solicitude and liberality owed to a *pro se* Plaintiff, Plaintiff's remaining allegations are best interpreted as claims that care for his knee and shoulder was unconstitutionally delayed. Specifically, Plaintiff has alleged that: (i) his requests for sick call were not always timely followed; (ii) between May 26 and July 21, 2009, Defendant Lashway discontinued PT on his shoulder, refused his requests for an appointment with a specialist, and provided only pain medication for his shoulder injury; and (iii) that he was provided only pain medication for treatment of his right knee between March 22, 2009, when the injury was discovered, and August 25, 2009, when Dr. Berard performed surgery on his knee. *See generally* Compl.

### a. Sick Call

According to Plaintiff, despite submitting sick call requests on May 8, 9, and 11, 2009, "on the callouts for May 14, 2009 he was not seen when Defendant FNP Lashway came to the SHU, nor did she make a round, as

was normal protocol;" furthermore despite submitting a sick call request on May 18, Plaintiff was not seen until May 28, 2009. Compl. at ¶ 57. Plaintiff also alleges that "on July 13, 2009, Plaintiff was supposed to be seen by his provider, but he was not seen at that time[.]" *Id.* at ¶ 74.

Typically, delays that constitute deliberate indifference occur when " 'officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.' " *Washington v. Farooki,* 2013 WL 3328240, at \*6 (N.D.N .Y. July 2, 2013) (quoting *Brunskill v. Cnty. of Suffolk,* 2012 WL 2921180, at \*3 (E.D.N.Y. July 11, 2012)). As noted above, Plaintiff's shoulder injury was an objectively sufficiently serious injury. Contrariwise, with respect to Plaintiff's knee injury, courts within our Circuit have repeatedly held that a torn medial meniscus is not an objectively sufficiently serious condition for purposes of the Eight Amendment. *See Moody v. Pickles,* 2006 WL 2645124, at \*6 (N.D.N.Y. Sept. 13, 2006) (surveying cases). However, even if both conditions constituted serious injuries, there is no evidence in the record before us to suggest that either injury was life threatening or fast degenerating, or that these appointments were deliberately delayed as a form of punishment. Moreover, it is clear from our discussion of the facts above that Plaintiff received near constant care from Defendant Lashway during the several month period surrounding these incidents including, *inter alia,* pain medication, PT, appointments with specialists, and multiple surgeries. *See supra,* Part II.A.

Accordingly, we recommend that Defendants' Motion be **GRANTED** to the extent that Plaintiff alleges that a handful of missed appointments during a period in which he received near continuous care constituted an unconstitutional delay in treatment. *See Morrison v. Mamis,* 2008 WL 5451639, at \*9 nn. 8 & 23 (S.D.N.Y. Dec. 18, 2008) (surveying cases in support of a similar conclusion).

### b. Delay in Shoulder Treatment

**\*16** Plaintiff alleges that, after his physical therapist recommended that his PT for his leftshoulder be discontinued based on his consistent refusals to attend, Defendants Lashway and Johnson refused to permit him to see a specialist for his shoulder until and unless he

completed the twelve sessions of PT which they had prescribed. *See, e.g.,* Pl.'s Opp'n at pp. 9 10 ("Prior to May 2009, Plaintiff had not been refused any requests by Defendants Lashway or Berard, and Johnson, too, on the one time she seen [sic] me after a surgery. After May 2009, Plaintiff could not get anything for his [shoulder] except the 12 [physical therapy] sessions Defendant Lashway and Johnson told Plaintiff he had to go to in order to receive any further treatment for his shoulder."); *see also* Compl. at ¶ 114 ("Defendants FNP Lashway and Dr. Johnson ... refused to see [him], and no longer would make available adequate treatment for [his] ongoing l-shoulder by discontinuing requests for followup care, then telling [him] that once he took Pt sessions, and seen the orthopedic Doctor, he would be considered for treatment and pain medication.").

Ironically, it was due to Plaintiff's own reluctance to accept a third surgery on April 10, 2009, that Plaintiff was prescribed the twelve PT sessions in the first place. Indeed, Plaintiff declined a third shoulder surgery and elected instead to continue with PT, noting that "he became hesitant because his shoulder seemed more of an experiment, than actual remedies to fix his problem." Compl. at ¶ 17. Accordingly, Dr. Macelaru recommended that Plaintiff undergo two months of PT and then be re-evaluated. Berard Decl. at ¶ 15; CCF Med. R. at p. 62. And, although Plaintiff initially reported for PT on April 30 and May 13, 2009, he failed to report on May 15, 20, and 22, at which time his therapist requested that PT be discontinued. CCF Med. R. at pp. 57 60 & 62. During the so called period of delay, Defendants Lashway and Johnson, as well as other prison officials repeatedly explained to Plaintiff that treatment for his left shoulder was denied during this period because of his own refusal to participate in the PT that had been prescribed for him. CCF Med. R. at pp. 57 60 & 62; Compl. at ¶¶ 61 & 68; Pl.'s Exs. at pp. 55 & 58. Crucially, the record reflects that once Plaintiff agreed to complete PT, PT was re-instated. *See* CCF Med. R. at p. 54.

Plaintiff's allegation that Defendants Lashway and Johnson refused to provide further treatment for his shoulder until he completed the two months of PT that was prescribed does not evince deliberate indifference. Rather, it reflects a reasonable response to Plaintiff's ongoing refusal to adhere to the course of treatment that they prescribed. Stated simply, Plaintiff cannot on the one hand refuse to participate in the treatments

prescribed by his doctors, and on the other claim that the course of treatment was inadequate. *See Buffaloe v. Fein,* 2013 WL 5815371, at *9 (surveying cases for the proposition that in light of plaintiff's "ongoing medication treatment and his history of refusing physical therapy and medication," defendants denial of care did not constitute deliberate indifference); *see also Snyder v. Law,* 2010 WL 5572768, at *3 (N.D.N.Y. Dec. 21, 2010) (surveying cases for the proposition that the "*fait de compli*" in plaintiff's deliberate medical indifference case was his failure to adhere to the course of treatment prescribed by his doctors). Plaintiff's desire to see an orthopedic specialist before completing the course of PT prescribed by Defendants is nothing more than an in-actionable disagreement between a prisoner and his doctors as to the appropriate form of treatment. [9] *Demata v. New York State Corr. Dep't of Health Servs.,* 198 F.3d 233 (2d Cir.1999) (citing *Chance v. Armstrong,* 143 F.3d at 703, for the proposition that "strengthening exercises are in fact a form of medical care. Demata's mere disagreement with this form of treatment does not establish deliberate indifference.").

[19]    The instant case does not compare to that of *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000), where it was held "that (1) outright refusal of any treatment for a degenerative condition that tends to cause acute infection and pain if left untreated *and* (2) imposition of a seriously unreasonable condition on such treatment, both constitute deliberate indifference on the part of prison officials. Unlike that case, here Plaintiff continued to receive pain medication and was asked merely to complete a reasonable, if conservative, form of treatment prior to being evaluated for further surgery.

**\*17** Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims that Defendants Lashway and Johnson unconstitutionally delayed his shoulder treatment.

### c. Delay in Knee Treatment

On March 3, 2009, Plaintiff was diagnosed with a "medial miniscus tear" in his right knee. Lashway Decl. at ¶ 24; CCF Med. R. at p. 90. However, Plaintiff did not receive surgery until August 25, 2009. Compl. at ¶ 39; Pl.'s Exs. at p. 26. Berard Decl. at ¶ 17; AHMC Med. R. at pp. 000044 46. Additionally, it is clear that Plaintiff was receiving pain

Case 9:16-cv-00890-LEK-TWD    Document 117    Filed 06/21/19    Page 198 of 219
Vail v. Lashway, Not Reported in F.Supp.3d (2014)
2014 WL 4626490

medication during the interval between his diagnosis and surgery. At the time of his diagnosis, and up until the medication was discontinued by Defendant Lashway on May 7, Plaintiff was receiving Ultram for pain. Johnson Decl. at ¶ 2 & 8; Lashway Decl. at ¶ 24; CCF Med. R. at pp. 88 89. After the Ultram was discontinued, Plaintiff was informed that the pain medications he had been prescribed, including Tylenol and Motrin were sufficient to manage his knee pain. Compl. at ¶ 39; Pl.'s Exs. at p. 26; Lashway Decl. at ¶ 39. Where such ongoing treatment is evident, it has been held that delaying surgery for the same injury for as long as a year does not amount to deliberate indifference. *See Moody v. Pickles,* 2006 WL 2645124, at *6 (N.D.N.Y. Sept. 13, 2006) (citing *Culp v. Koenigsmann,* 2000 WL 995495, at *4, *9 *10 (S.D.N.Y. July 19, 2000) for the proposition that there was no "Eighth Amendment violation where plaintiff suffered from a torn medial meniscus and experienced a one-year delay from injury to surgery")).

Accordingly, because there are no genuine issues of material fact with respect to whether Defendants Lashway, Johnson, or Berard provided Plaintiff with constitutionally adequate medical care for his knee and shoulder we recommend that Defendants' Motion for Summary Judgment be **GRANTED** with regard to all of Plaintiff's deliberate medical indifference claims.

### C. Retaliation

Plaintiff alleges that Defendants conspired with one another to deprive him of constitutionally adequate medical care in retaliation for grievances and complaints he filed regarding his medical treatment. *See* Compl. at ¶¶ 109 113.

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679 80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589 90 (2d Cir.1988). Claims of retaliation, like those asserted by Plaintiff, find their roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak,* 389 F.3d 379, 381 83 (2d Cir.2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d at 872 (citation omitted); *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

**\*18** To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d at 492); *see also Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

The plaintiff bears the initial burden in showing that the defendant's actions were improperly motivated. To satisfy the second prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon v.. Coughlin,* 58 F.3d 865, 872 73 (2d Cir.1995). A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003) (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d at 493). Otherwise, the retaliatory

act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d at 493. Furthermore, in satisfying the causal connection requirement, also known as temporal proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 492 (internal quotation marks and citations omitted) (cited in *Davis,* 320 F.3d at 353).

In situations where the defendant's actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977)); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (cited in *Carpio v. Walker,* 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15,1997)); *see also Gayle v. Gonyea,* 313 F.3d at 682 (defendant may successfully meet this burden of justification with regard to a particular punishment by demonstrating that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report" (internal quotation marks and citations omitted)).

**\*19** There is no question that filing grievances is a protected activity. Likewise, "it is plausible that a denial of medical evaluation, treatment, and adequate pain medication would suffice to deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prison doctor." *Burton v. Lynch,* 664 F.Supp.2d 349, 367 (S.D.N.Y.2009); *Benitez v. Parmer,* 2013 WL 5310245, at *8 (N.D .N .Y. July 8, 2013) (GTS/DEP) (citing *Burton v. Lynch* ). However, as noted above, here there is no evidence that Plaintiff was ever deprived of adequate medical care. *See infra* Part II.B. Indeed, between May 7, 2009 (when Plaintiff's Ultram prescription was discontinued and he began filing grievances and complaints about his treatment) and May 2010 (when Plaintiff was transferred to Shawangunk), Plaintiff received near continuous treatment, including: four visits with Defendant Lashway who made no less than six referrals for Plaintiff to see specialists, CCF Med. R. at pp. 10, 20, 64, 77 79 & 83; two visits and knee surgery with Defendant Berard, *id.* at p. 17, & AHMC Med. R. at pp. 000041 46; and, twenty-four scheduled appointments for PT for his knee and/or shoulder, CCF Med. R. at pp. 11 16, 18 19, 22 30, 34, 36, 47, 49 51, & 54. Our conclusion

in this regard is, on its own, likely sufficient to grant summary judgment against Plaintiff's medical retaliation claims. *See Cole v. Levitt,* 2009 WL 4571828, at *10 (W.D.N.Y. Dec. 4, 2009) (citing *Goros v. Pearlman,* 2007 WL 1423718, *3 (N.D.N.Y.2007), for the proposition that no medical retaliation occurred where there was no evidence of medical deliberate indifference); *Tatta v. Wright,* 616 F.Supp.2d 308, 320 (N.D.N.Y.2007) (denying plaintiff's claim that he was denied adequate medical care in retaliation for filing grievances where plaintiff failed to establish the denial of adequate medical care).

However, here additional reasons for dismissal also exist. Construed liberally, Plaintiff alleges that Defendants took the following adverse actions: (1) they discontinued and/or refused to reinstate his Ultram prescription; (2) they prescribed ineffective pain medications; (3) refused to provide him with a follow-up appointment with a specialist after he refused to participate in PT; and (4) Defendant Lashway verbally threatened him. *See* Compl. at ¶¶ 109 113.

With respect to the first three alleged adverse actions, Defendants have clearly established that they had legitimate non-retaliatory reasons for taking such actions *i.e.,* Plaintiff's lack of medical need for and history of abusing/misusing Ultram, and his refusal to participate in PT. *See Graham v. Henderson,* 89 F.3d at 79.

Additionally, Plaintiff alleges that "almost immediately after ... [he] filed grievances against the Defendant [Lashway,] Plaintiff was warned by the Defendant that if he continued with complaints and grievances they would only get worse for him concerning his treatment." Compl. at ¶ 109. In some cases, verbal threats have been held to constitute adverse action. *See Mateo v. Fischer,* 682 F.Supp.2d 423, 434 (S.D.N.Y.2010) (surveying cases in support of the proposition that "some verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action"). However, Plaintiff's allegation is deficient in numerous ways. To begin with, Plaintiff does not identify when or where this allegation was made nor which grievance brought about the alleged threats. More importantly, the allegation is too non-specific and indirect to have a chilling effect on a prisoner of ordinary firmness. *See id.* (surveying cases for the proposition that "[t]he less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights"); *Alicea v. Howell,* 387

Case 9:16-cv-00890-LEK-TWD    Document 117    Filed 06/21/19    Page 200 of 219
Vail v. Lashway, Not Reported in F.Supp.3d (2014)
2014 WL 4626490

F.Supp.2d 227, 237 (W.D.N.Y.2005) ("alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance ... do not give rise to a First Amendment retaliation claim.").

**\*20** Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's retaliation claims against Defendants. Likewise, because we have found no evidence of any constitutional violations, to the extent that Plaintiff alleges that the Defendants conspired with one another to deny him adequate medical care in retaliation for exercising his First Amendment rights, we recommend that such claim also be **DISMISSED.** *See Benitez v. Partner,* 2013 WL 5310245, at \* 10 (surveying cases for the proposition that in the absence of any underlying constitutional violations, a plaintiff cannot sustain a § 1983 conspiracy claim).

### D. Supervisory Liability

To the extent that Plaintiff has argued that Defendant Johnson was liable in her supervisory capacity for the alleged underlying constitutional violations committed by Defendant Lashaway and/or Berard, we recommend that such claims be **DISMISSED** in light of the fact that we have found no evidence of any underlying constitutional violations. *See, e.g.,* Compl. at ¶ 105; *see also Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d 801, 808 (S.D.N .Y.2011) (collecting cases for the proposition that "because Plaintiff has not established any underlying

constitutional violation, she cannot state a claim for § 1983 supervisor liability").

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 37) be **GRANTED,** and that the Complaint be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Filed July 16, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4626490

---

Case 9:16-cv-00890-LEK-TWD    Document 117    Filed 06/21/19    Page 201 of 219

Ross v. Koenigsmann, Not Reported in Fed. Supp. (2016)

2016 WL 5408163

2016 WL 5408163
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Alonzo ROSS, Plaintiff,

v.

Carl J. KOENIGSMANN, Deputy Comm'r/
Chief Med. Officer, NYS Doccs; Dr. Subbarao
Ramineni; Dr. Ventaka Mannava; Amy
Ferguson, Nurse Practitioner; and P.
Reese, Registered Nurse, Defendants.

9:14-CV-1321 (GTS/DJS)
|
Signed 09/28/2016

**Attorneys and Law Firms**

ALONZO ROSS, 12-B-3789, Wende Correctional
Facility, P.O. Box 1187, Alden, New York 14004,
Plaintiff, Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General
for the State of New York, The Capitol, OF
COUNSEL: CHRISTOPHER J. HUMMEL, ESQ.,
Assistant Attorney General, Albany, New York 12224,
Counsel for Defendants.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District
Judge

*1 Currently before the Court, in this *pro se* prisoner civil
rights action filed by Alonzo Ross ("Plaintiff") against the
five above-captioned employees of the New York State
Department of Corrections and Community Supervision
at Mid-State Correctional Facility ("Defendants"), are
the following: (1) Defendants' motion for summary
judgment; (2) Plaintiff's cross-motion for summary
judgment; (3) United States Magistrate Judge Daniel
J. Stewart's Report-Recommendation recommending
that Defendants' motion be granted in part and
denied in part, and that Plaintiff's cross-motion be
denied; (4) Defendants' Objection to the Report-
Recommendation; and (5) Plaintiff's Objection to the
Report-Recommendation. (Dkt. Nos. 31, 64, 79, 81,
82.) For the reasons set forth below, the Report-

Recommendation is adopted in its entirety; and
Defendants' motion for summary judgment is granted in
part and denied in part, and Plaintiff's cross-motion for
summary judgment is denied.

**I. RELEVANT BACKGROUND**

**A. Magistrate Judge Stewart's Report-
Recommendation**
Generally, in his Report-Recommendation, Magistrate
Judge Stewart rendered the following recommendations:
(1) that Plaintiff's Eighth Amendment deliberate
indifference claims be dismissed against Defendants
Koenigsmann (based on a lack of personal involvement);
(2) that Plaintiff's Eighth Amendment deliberate
indifference claims based on the other Defendants'
treatment of his chronic pain symptoms be dismissed
(based on a lack of admissible record evidence establishing
that he was recklessly denied adequate medical care
for those symptoms) except for his claim against
Defendants Ferguson and Mannava based on their
discontinuance of his neurontin prescription; (3) that
Plaintiff's Eighth Amendment deliberate indifference
claims based on the other Defendants' treatment of his
heart condition be dismissed (based on a lack of personal
involvement and a lack of admissible record evidence
establishing that he was recklessly denied adequate
medical care for that condition); (4) that Plaintiff's Eighth
Amendment deliberate indifference claims based on the
other Defendants' treatment of his asthma and shortness
of breath be dismissed (based on a lack of admissible
record evidence establishing that he was recklessly denied
adequate medical care for that condition); and (5)
that Plaintiff's First Amendment retaliation claims be
dismissed against (a) Defendants Reese and Ferguson
(based on the doctrine of qualified immunity because
there is no "clearly established right" under the First
Amendment for inmate's to request medical attention),
and (b) Defendants Mannava and Ramineni (based on a
lack of record evidence establishing an adverse action and
a causal connection between protected activity and such
adverse action). (Dkt. No. 79, at Part III.)

**B. Defendants' Objection to the Report-
Recommendation**
Generally, in their Objection, Defendants argue that,
while the bulk of the Report-Recommendation should
be adopted, the portion recommending the survival

Case 9:16-cv-00890-LEK-TWD Document 117 Filed 06/21/19 Page 202 of 219

Ross v. Koenigsmann, Not Reported in Fed. Supp. (2016)

2016 WL 5408163

of Plaintiff's Eighth Amendment deliberate indifference claim against Defendants Ferguson and Mannava (based on their discontinuance of his neurontin prescription) should be rejected for the following two reasons: (1) notations in Plaintiff's medical records that he was prescribed Neurontin medication to be administered in "crushed" form (which is not dissolved in water but requires a patient to drink water after putting the medication in his mouth), a notation that he drank water after putting the Neurontin in his mouth, and a notation that a nurse found a "chalky mush" in Plaintiff's mouth (after he was called back for closer examination) render impossible a factual finding that the medication was dissolved in water before he put it in his mouth (and thus that it could not have been "cheeked" for distribution to other inmates) on October 21, 2013; and (2) even if the impossibility of Plaintiff's assertion is not clear from the record examined by Magistrate Judge Stewart, it is clear from the supplemental declaration of Defendant Ferguson, which the Court may consider under 28 U.S.C. § 636(b)(1), which provides that, upon a party's submission of further evidence along with written objections to a report-recommendation, "[t]he [district] judge may ... receive [such] further evidence or recommit the matter to the magistrate judge with instructions." (Dkt. No. 81, at Parts I and II.)

### C. Plaintiff's Objection to the Report-Recommendation

**\*2** Generally, in his Objection, Plaintiff asserts the following five arguments: (1) that Magistrate Judge Stewart erred in dismissing Plaintiff's deliberate indifference claims for chest pain/heart condition based on Plaintiff's failure to exhaust his administrative remedies, because the records show that his grievances had merit and followed the three-step grievance process; (2) that Magistrate Judge Stewart erred in determining that Defendants' changes to Plaintiff's pain medication did not support a deliberate indifference claim, because he experienced increasing pain and withdrawal symptoms; (3) that Magistrate Judge Stewart erred in determining that Defendants were not aware of Plaintiff's heart and breathing issues prior to December 11, 2013, because Plaintiff's medical records were transferred to Mid-State Correctional and Plaintiff had previously sought medical attention from staff for chest pain/breathing issues; (4) that Plaintiff's deliberate indifference claims should not be dismissed without further development of the record, because, while Plaintiff received some treatment, that fact does not mean the treatment was adequate or effective

or that Defendants had no intent to deprive Plaintiff of proper care; and (5) that Plaintiff's retaliation claims should not be dismissed as against Defendant Reese (because Reese threatened to write a misbehavior report against him), Defendant Ferguson (because Ferguson falsely accused Plaintiff of misusing neurontin), and Defendants Mannava and Ramineni (because they failed to address Plaintiff's grievances). (Dkt. No. 82.)

## II. STANDARD OF REVIEW

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at \*1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

---

[1]     *See also Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny

Ross v. Koenigsmann, Not Reported in Fed. Supp. (2016)

2016 WL 5408163

his motion on the Title VII claim ' f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment. This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim. ).

2      See *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate. ) internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate ); *cf. U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts. ); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo does not indicate that a secondary evidentiary hearing is required. ).

**\*3** When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there

is no clear error on the face of the record in order to accept the recommendation." *Id.* [4]

3      See *Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a) (3). ); *Camardo v. Gen. Motors Hourly Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady*, 09 CV 0924, 2010 WL 3761902, at \*1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue*, 07 CV 1077, 2010 WL 2985968, at \*3 & n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04 CV 0484, 2006 WL 149040, at \*4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

4      See also *Batista v. Walker*, 94 CV 2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous. ) (internal quotation marks and citations omitted).

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## III. ANALYSIS

After carefully reviewing the relevant papers herein, including Magistrate Judge Stewart's thorough Report-Recommendation, the Court can find no error in those parts of the Report-Recommendation to which Plaintiff specifically objected, and no clear error in the remaining parts of the Report-Recommendation: Magistrate Judge Stewart employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons stated therein. To those reasons, the Court adds four points.

First, Plaintiff's arguments for rejecting the Report-Recommendation (described above in Part I.C. of this Decision and Order) consist simply of reiteration of arguments asserted in his opposition memorandum of

Ross v. Koenigsmann, Not Reported in Fed. Supp. (2016)

2016 WL 5408163

law. (*Compare* Dkt. No. 82 [Plf.'s Objection] *with* Dkt. No. 64, Attach. 1, at Points I through III [Plf.'s Opp'n Memo. of Law].) As a result, the portions of the Report-Recommendation "challenged" by Plaintiff are entitled to only a clear-error review, which they easily survive.

Second, even if the Court were to subject the above-referenced portions of the Report-Recommendation to a *de novo* review, those portions would survive that review for the reasons stated by Magistrate Judge Stewart in his thorough and correct Report-Recommendation. The Court notes that Plaintiff's objection regarding Magistrate Judge Stewart's exhaustion-of-administrative-remedies conclusion is flawed for the additional reason that Magistrate Judge Stewart, although concluding that Plaintiff failed to exhaust his administrative remedies, based his decision not on the failure to exhaust but on the merits of Plaintiff's claims. (Dkt. No. 79, at 18.)

**\*4** Third, with regard to the first argument asserted in Defendants' Objection (which is based on the record that was presented to Magistrate Judge Stewart), the Court rejects Defendants' assertion that, despite Plaintiff's deposition testimony, it is an undisputed fact that Neurontin was not dissolved in water when it was given to Plaintiff on October 31, 2013, based on (1) the notations "crush" with regard to Neurontin in Plaintiff's medical records, (2) the notation "while putting it in his mouth then drinking water" in his medical records, and (3) the notation in his medical records that a nurse found a "chalky mush" in Plaintiff's mouth (after he was called back for closer examination). The Court notes that it might reach a different conclusion if Plaintiff's medical records contained a notation "crush dissolve" (suggesting there is a distinction between "crush dissolve" and "crush"). However, after conducting a *sua sponte* review of those medical records, the Court has been unable to find such a notation; rather, it has found only the notation "crush." (Dkt. No. 31, Attach. 2, at 154 [containing notation "crush" with regard to MS Contin]; Dkt. No. 32, Attach. 1, at 5 [containing notation "crush" with regard to Neurontin]; Dkt. No. 32, Attach. 2, at 13 [containing notation "crush before giving" with regard to Neurontin]; Dkt. No. 32, Attach. 3, at 9 [containing notation "crush" with regard to Neurontin]; Dkt. No. 32, Attach. 3, at 15 [containing notation "crush" with regard to Neurontin]; Dkt. No. 32, Attach. 4, at 10 [containing notation "crush" with regard to MS Contin]; Dkt. No. 32, Attach. 4, at 14 [containing notation "crush" with regard to Neurontin];

Dkt. No. 32, Attach. 4, at 18 [containing notation "crush" with regard to Neurontin].)

Fourth, with regard to the second argument asserted in Defendants' Objection (which is based on a supplement to the record that was presented to Magistrate Judge Stewart), while the Court is tempted to consider the new evidence adduced by Defendants during the objection-phase of this action, the Court declines to do so. To succeed in presenting such new evidence, Defendants must submit a persuasive justification for not offering the evidence to Magistrate Judge Stewart. *See, supra,* note 2 (and accompanying text) of this Decision and Order. As a justification for not offering the evidence to Magistrate Judge Stewart, Defendants do not argue that the evidence did not exist at the time, was unknown to them despite their reasonable efforts to discover it, or was known to both them and Plaintiff but was unintentionally omitted from the record. [5] Rather, Defendants argue that, when they filed their motion for summary judgment, they were focused on challenging Plaintiff's "voluminous claims" and were not able to perceive the need for adducing the evidence in question until Magistrate Judge Stewart "narrowed" the scope of this action and identified the issue that the evidence regards. (Dkt. No. 81.) While the Court may be sympathetic with the breadth of the task Defendants faced when filing their motion for summary judgment, the Court finds their justification inadequate.

[5]    The Court expresses no opinion regarding whether any of the three above described excuses would constitute a sufficient justification.

At the time they filed their motion, Defendants knew of Plaintiff's deposition testimony that he could not have "cheeked" the Neurontin because it had been crushed *and diluted in water* before he had swallowed it pursuant to his "crush dilute" prescription rendering the "chalk[y]" residue in his mouth not surprising. (Dkt. No. 31, Attach. 1, at 140-41.) They also knew that Plaintiff's medical records indicated that he had been prescribed Neurontin in "crush[ed]" form, not "crush[ed] [and] dilute[d]" form. (*See, e.g.,* Dkt. No. 32, Attach. 1, at 5; Dkt. No. 32, Attach. 2, at 13; Dkt. No. 32, Attach. 3, at 9; Dkt. No. 32, Attach. 3, at 15; Dkt. No. 32, Attach. 4, at 14; Dkt. No. 32, Attach. 4, at 18.) As a result, it was reasonable for Defendants to conclude, at that time, that evidence was needed to show that (1) a notation of "crush" on Plaintiff's medical records was not the same as a notation of "crush dilute," "crush and dissolve" or "liquefied," and/or (2) a

Case 9:16-cv-00890-LEK-TWD    Document 117    Filed 06/21/19    Page 205 of 219
**Ross v. Koenigsmann, Not Reported in Fed. Supp. (2016)**
2016 WL 5408163

notation of "crush" on Plaintiff's medical records meant that the medication would be followed by a cup of water not placed in a cup of water. The Court notes that, while Defendants requested (and were granted) leave to file an oversized memorandum of law of 40 pages in order to address all of Plaintiff's "far-ranging" claims, Defendants filed one of only 32 pages. (Dkt. No. 28; Text Order of Jan. 27, 2016; Dkt. No. 31, Attach. 4.)

**\*5** Furthermore, the Court must take into account the fact that, if it granted Defendants' request, it would in all fairness have to permit Plaintiff a reasonable opportunity to respond to Defendants' new evidence and Objection (through the submission of a response to Defendants' Objection and/or new evidence of his own). [6] While in certain circumstances the Court might be inclined to follow that route, here, the Court finds it more appropriate to deny Defendants' request and adjudge the partial denial of their motion for summary judgment to be one *without prejudice.* This will permit the parties to clearly identify, support and brief the factual issue in question, and will permit the undersigned to have the much-appreciated analysis and recommendation of Magistrate Judge Stewart.

[6]   The Court notes that Defendants' Objection is dated January 22, 2016, and that Plaintiff s Objection is dated January 21, 2016, rendering it impossible that Plaintiff received Defendants' Objection before he submitted his own. (Dkt. Nos. 81, 82.)

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Stewart's Report-Recommendation (Dkt. No. 79) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 31) is **GRANTED in part** and **DENIED in part without prejudice** such that all of Plaintiff's claims are **DISMISSED except** his Eighth Amendment deliberate indifference claim against Defendants Ferguson and Mannava based on the discontinuation of his Neurontin prescription, which **SURVIVES** Defendants' motion; and it is further

**ORDERED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 64) is **DENIED**; and further

**ORDERED** that Defendants' second motion for summary judgment, should they choose to file one, is due within **THIRTY (30) DAYS** of the date of this Decision and Order. In the event that Defendants do not file a second motion for summary judgment, the Court will appoint pro bono counsel for Plaintiff at that time and schedule a pretrial conference to set a trial date.

Dated: September 28, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5408163

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 1423718
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dimitrios GOROS, Plaintiff,

v.

Kenneth S. PEARLMAN, Superintendent; James
A. Mance, Deputy Superintendent; D. Kelefant,
IGP Supervisor; Riddick, Senior Correction
Counselor; Sgt. Allen; Sgt. C. Kante; C.O. Durante;
C.O. Meacham; Henrich, Inmate Grievance
Resolution Clerk, Five Points Correctional
Facility; Brown, Inmate Grievance Program
Supervisor, Five Points Correctional Facility;
and Gregoire J. Peter, M.D., Medical Director,
Five Points Correctional Facility, Defendant.

No. 9:03-cv-1303.
|
May 10, 2007.

**Attorneys and Law Firms**

Dimitrios Goros, Rome, NY, pro se.

Senta B. Siuda, Office of Attorney General, Syracuse, NY,
for Defendant.

### DECISION and ORDER

THOMAS J. McAVOY, Senior United States District
Judge.

**\*1** Plaintiff, an inmate at Five Points Correctional
Facility, commenced the instant pursuant to 42
U.S.C. § 1983 claiming that Defendants violated
his constitutional rights under the First, Eighth,
and Fourteenth Amendments. Defendants previously
moved for Judgment on the Pleadings. A Report-
Recommendation recommended denying the motion as
to the Eighth Amendment claim against Defendant
Peter, but granting the motion as to all other claims
and defendants. The Court adopted the Report-
Recommendation and also allowed Plaintiff's retaliation
claim to remain. Plaintiff was ordered to file a Second
Amended Complaint. The Second Amended Complaint
named only Dr. Gregoire as a Defendant, claiming that

he acted with deliberate indifference to Plaintiff's serious
medical needs, he retaliated against him for engaging
in protected activity, and placed Plaintiff in keeplock in
violation of his due process rights. Defendant moves for
summary judgment pursuant to Fed.R.Civ.P. 56. Despite
being warned of the potential consequences of failing to
respond to a summary judgment motion, Plaintiff has
failed to file any opposition papers with regard to this
motion.

### I. FACTS

1    Because Plaintiff has failed to file a Statement
     of Material Facts as required by Local Rule
     7.1(a)(3) or otherwise respond to the motion for
     summary judgment, the following facts are taken
     from Defendant's properly supported Statement of
     Material Facts and deemed to be true.

Plaintiff arrived at Five Points Correctional Facility on
September 10, 2003. At that time, Plaintiff had a variety
of medical conditions, including Chronic Obstructive
Pulmonary Disease, coronary artery disease, chronic
gastritis/eso p hag itis, and low back pain. Plaintiff was
first examined by Dr. Gregoire on September 19, 2003.
After several subsequent examinations by Dr. Gregoire,
on November 7, 2003, Plaintiff refused to be examined by
Dr. Gregoire and physically pushed him away. Plaintiff
again refused examination by Dr. Gregoire on December
2, 2003. On December 16, 2003, Dr. Gregoire examined
Plaintiff. At that time, Plaintiff requested a seat for
the shower. Dr Gregoire approved the request. During
the examination, Plaintiff refused to attempt to stand
and requested both a shower seat and a bed table for
his cell. On December 31, 2003, Plaintiff rejected the
shower bench that he previously requested and had been
approved by Dr. Gregoire. On that same day, Plaintiff
requested a wheelchair to use in the shower, a bed table,
and a water pitcher. Those requests were denied by
Dr. Gregoire because he believed those items were not
medically necessary and would be available to Plaintiff in
the handicapped housing for the general population.

On January 13, 2004, Plaintiff refused routine blood work.
On March 11, 2004, Dr. Gregoire wrote a memorandum
to Plaintiff regarding his Prevacid prescription. Plaintiff
was prescribed a 15 mg dose. Plaintiff insisted that the
medication was available in a 10 mg dose. Dr. Gregoire
attempted to explain that a 10 mg dose was not available.

Case 9:16-cv-00890-LEK-TWD   Document 117   Filed 06/21/19   Page 207 of 219
Goros v. Pearlman, Not Reported in F.Supp.2d (2007)

2007 WL 1423718

Plaintiff refused the 15 mg dose of Prevacid and refused alternative medications.

On June 28, 2004, Dr. Gregoire gave Plaintiff instructions on the use of his albuterol inhaler and advised that it could continue to be used while Plaintiff was waiting to receive a new inhaler. Plaintiff refused to be examined. On that same date, Dr. Gregoire wrote a memorandum to Plaintiff explaining that his use of an oxygen concentrator machine necessitated that he be housed in the infirmary rather than the general population. [2] On June 29, 2004, Dr. Gregoire wrote another memorandum to Plaintiff explaining the albuterol inhaler instructions.

[2]   The oxygen concentrator machine is viewed as a security risk in the general population.

## II. STANDARD OF REVIEW

**\*2**  Summary judgment will be granted when there is no genuine material issue of fact and the moving party is entitled to judgment as a mater of law. Fed .R. Civ.P. 56(c). The court must consider the evidence in the light most favorable to the non-moving party. Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir.1999). A fact is considered material if it "might affect the outcome of the suit." Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). A material fact is genuine if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. The court cannot grant summary judgment if "after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party ." Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir.2000). There must be evidence provided by the non-moving party to support its claims. The burden of demonstrating there is no genuine issue of material fact is on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party meets its burden, the burden then shifts to the non-moving party, who must show that there is a genuine issue of material fact requiring a trial. Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-586 (1986).

## III. DISCUSSION

Plaintiff claims that his Eighth Amendment rights were violated because Dr. Gregoire showed a deliberate indifference to his serious medical needs. Plaintiff contends that Dr. Gregoire was indifferent to his need to use a wheel chair for use in the shower, as well as his need for a bed table, a water pitcher, and certain medications.

To succeed on an Eighth Amendment claim, Plaintiff must proffer evidence from which a fair-minded trier of fact reasonably could conclude that Defendants acted with deliberate indifference towards his serious medical needs. Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir.2003). This test encompasses an objective and subjective element. Whether a medical condition is sufficiently serious is an objective test. Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir.2003). Whether defendants acted with deliberate indifference to such a need is governed by a subjective test. Id.

Determining whether a deprivation is sufficiently serious requires inquiry into whether the prisoner was deprived of medical care and whether "the inadequacy in medical care is sufficiently serious." Salahuddin v. Goord, 467 F.3d 263, 280 (2006). To be sufficiently serious, the condition must present a substantial risk of harm. It must be a condition of urgency which, if not adequately treated, would produce death, degeneration or extreme pain. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994). The Court must consider the risk of harm from such deprivation rather than simply the severity of the preexisting medical condition.

For the purposes of the instant motion only, Defendant focuses only on the subjective test of whether Defendant acted with deliberate indifference. A showing of medical malpractice or negligence is insufficient to support a claim of deliberate indifference. Deliberate indifference generally describes a mental state more blameworthy than negligence. See Chance v. Armstrong, 143 F.3d 698 (2d Cir.1998). There must be evidence that Defendants "actually wished [Plaintiff] harm, or at least, [were] totally unconcerned with [his] welfare." Hathaway, 37 F .3d at 69. There must be evidence of a "complete denial of or intentional effort to delay access to medical care, or a reckless and callous indifference to the safety of prisoners." Hogan v. Russ, 890 F.Supp. 146, 149 (N.D.N.Y.1995). The subjective standard for a claim of deliberate indifference to a serious medical need requires a high level of culpability. This mental state in similar to that of recklessness in criminal law. The actor must be "aware of a substantial risk of harm." Salahuddin, 467 F.3d at 280. The belief that a certain course of conduct poses no

2007 WL 1423718

substantial risk of harm "need not be sound so long as it is sincere." *Id.* at 281.

**\*3** In support of his motion for summary judgment, Defendant submitted proof demonstrating that he responded to Plaintiff's requests, provided the proper medication for his condition, approved his request for a shower seat, and that Plaintiff had access to a wheel chair. Defendant also submits evidence that Plaintiff frequently refused treatments and refused to be examined. In response, Plaintiff fails to point to sufficient evidence upon which a fair-minded trier of fact could reasonably conclude that Dr. Gregoire was deliberately indifferent to a serious medical need. Plaintiffs disagreements over the proper dosage of Prevacid or how long a canister of albuterol lasts does not evidence deliberate disregard. Plaintiff's complaints regarding the functioning of his faucet in his cell, the need for a water pitcher, and his other complaints do not implicate any serious medical needs and do not involve Dr. Gregoire. Accordingly, the Eighth Amendment claims are DISMISSED.

Plaintiff also contends that Defendant refused Plaintiff treatment in retaliation for engaging in protected speech. For the reasons discussed, there is insufficient evidence that Plaintiff was denied medical treatment. Accordingly, the First Amendment claim must fail.

Next, Plaintiff alleges that he was placed in keeplock in violation of his due process rights. The undisputed evidence before the Court is that Plaintiff was not placed in keeplock, but was placed in the infirmary because his health necessitated the use of an oxygen concentrator. This machine was deemed a security risk to be allowed into the general population. Plaintiff does not claim that he did not require the use of the oxygen concentrator. There is no evidence that Plaintiff was placed in the infirmary for punitive reasons. There similarly is no evidence that it was Dr. Gregoire's decision whether to allow Plaintiff into the general population with the oxygen concentrator. Plaintiff, therefore, fails to demonstrate that Dr. Gregoire was personally involved in any alleged due process violations, that there were not legitimate reasons for placing him in the infirmary, or that he was otherwise exposed to atypical prison conditions without adequate due process of law. Accordingly, this claim is DISMISSED.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED and the Complaint is DISMISSED IN ITS ENTIRETY. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1423718

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 4571828
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
W.D. New York.

Richard COLE, Plaintiff,

v.

Jacqueline LEVITT, Doctor and Arthur Turnbull, Correctional Officer, Wende Correctional Facility, Defendants.

No. 07-CV-00767(M).
|
Dec. 4, 2009.

**Attorneys and Law Firms**

Richard Cole, Alden, NY, for Plaintiff.

George Michael Zimmermann, Office of the New York State Attorney General, Buffalo, NY, for Defendants.

**DECISION AND ORDER**

JEREMIAH J. McCARTHY, United States Magistrate Judge.

**\*1** In accordance with 28 U.S.C. § 636(c), the parties have consented to jurisdiction by a United States Magistrate Judge [11]. Before me is defendants' motion for summary judgment [26]. For the following reasons, defendants' motion is GRANTED in part and DENIED in part.

1    Bracketed references are to the CM/ECF docket entries.

**BACKGROUND**

Plaintiff commenced this 42 U.S.C. § 1983 action *pro se* by complaint filed November 14, 2007[1]. He alleges that defendant Jacqueline Levitt, M.D., a physician at the Wende Correctional Facility ("Wende"), was deliberately indifferent to his chronic back condition (first cause of action) and that she retaliated against him for

filing grievances. *Id.,* second cause of action. According to plaintiff, defendant Arthur Turnbull, a correctional officer at Wende, also retaliated against him for his grievances. *Id.,* third cause of action.

Following the conclusion of discovery, defendants moved for summary judgment.

**ANALYSIS**

**A. Deliberate Indifference**

Plaintiff argues that Dr. Levitt was deliberately indifferent to his condition by her "fail[ure] to provide medical care recommended by other doctors". Plaintiff's Memorandum of Law [38-6], p. 6. In response, defendants argue that plaintiff was provided with adequate health care while under the treatment of Dr. Levitt, and that plaintiff's arguments amount to a disagreement with Dr. Levitt's medical judgment, which cannot form the basis of a deliberate indifference claim. Defendants' Memorandum of Law [30], p. 5.

In order to establish a violation of the Eighth Amendment arising out of inadequate medical treatment, plaintiff must prove that defendants acted with "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Defendants do not dispute that plaintiff suffers from a serious medical condition. Rather, they focus on whether Dr. Levitt's conduct amounted to deliberate indifference.

The "deliberate indifference" standard consists of both objective and subjective components. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Under the *objective* component, the alleged medical need must be "sufficiently serious." *Id.* A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* "Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). "The medical condition does not have to occur immediately; it suffices if the condition presents itself 'in

the next week or month or year.' " *Moore v. McGinnis,* 2004 WL 2958471, \*6 (W.D.N.Y.2004) (Siragusa, J.).

To satisfy the *subjective* component, plaintiff must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving him of adequate medical treatment. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). "The subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id. See also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003), *cert. denied,* 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005) (likening the necessary state of mind to "the equivalent of criminal recklessness"). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

**\*2** Plaintiff was transferred to Wende in October 1999. Zimmermann Declaration [29], Ex. A, p. 21. At that time he was continued on his prior back pain medications by Drs. Panzel and O'Connell. *Id.,* pp. 23-24. These doctors also continued to provide him with a tens unit, [2] and continued with his prior medical restrictions, which included being fed in his cell, restricted from work, and permitted him to take daily showers, carry a cane and have a double mattress. *Id.,* p. 26. These restrictions were continued by a May 17, 2004 Medical Restriction that ran through May 17, 2005. Levitt Declaration [47], ¶ 6; Ex. A, Bates No. 5. According to plaintiff, Drs. Panzel and O'Connell encouraged him to be physically active to treat his back pain. *Id.,* p. 28.

[2]   "A tens unit provides electronic stimulation and is designed to help with back pain . Levitt Declaration 47], ¶ 6.

Dr. Levitt began treating plaintiff in Spring of 2004. On May 19, 2004, Dr. Levitt and Howard Gerena, M.D., requested that plaintiff receive hot packs and deep massage for six weeks. *Id.,* Bates No. 581. On May 28, 2004, plaintiff requested to be seen by a physician regarding "gym permit & med renewal". *Id.,* Bates No. 563. At that time, plaintiff did not have any difficulty

ambulating, sitting or standing and had no complaints of discomfort. *Id.*

Plaintiff's Percocet prescription ran out on May 31, 2004, and he began requesting a renewal on June 1, 2004. *Id.* At that time, it was observed that plaintiff could get out of his bed and ambulate without apparent difficulty or discomfort. *Id.* Following a renewed request for Percocet on June 3, 2004, Dr. Levitt prescribed plaintiff Motrin and Robaxin as alternative pain medications. *Id.,* ¶ 11, Bates No. 564.

On June 15, 2004, plaintiff was prescribed 30 days of Percocet by another provider. *Id.,* ¶ 13; Bates No. 565. On July 15, 2004, plaintiff complained of "sharp pain" from right knee buckling. *Id.,* Bates No. 567. On July 19, 2004, another provider renewed plaintiff's Percocet prescription for an additional 30 days. *Id.,* ¶ 16; Bates No. 568. On July 22, 2004, a physician assistant requested that plaintiff's need for Percocet be evaluated. Dr. Levitt reviewed the notes and ordered Percocet for plaintiff on July 28, 2004. *Id.,* ¶ 17; Bates No. 568.

On August 10, 2004, plaintiff was seen for complaints of low back pain and Dr. Levitt continued plaintiff on Percocet. *Id.,* ¶ 19; Bates No. 569. As a result of plaintiff's August 18, 2004 complaints of knee pain, an orthopedic consultation and continuation of Percocet were recommended. *Id.,* Bates Nos. 570-571. Dr. Levitt approved these recommendations. *Id.,* ¶ 20; Bates No. 572. On September 20, 2004, Dr. Coniglio performed the orthopedic consultation and recommended arthroscopy of the right knee. *Id.,* Bates No. 575. However, plaintiff later declined undergoing arthroscopy. *Id.,* ¶ 34; Bates No. 580. On October 4, 2004, plaintiff requested to be assigned to the gym program. *Id.,* Bates No. 572.

**\*3** On October 28, 2004, Dr. Levitt examined plaintiff and noted that he subjectively suffered from chronic low back pain and right knee pain. *Id.,* ¶ 31; Bates No. 579. She also noted that there had been no x-ray of plaintiff's back since an October 2003 x-ray, which indicated a mild disc bulge at L3-L4. At that time, Dr. Levitt "decided on a plan was [*sic* ] to decrease the Percocet to two tablets orally twice a day for two weeks. Then one tablet orally twice a day". *Id.,* ¶¶ 3, 31. She also started him on Nasporsyn, a non-narcotic analgesic. *Id.*

Although plaintiff's medical records indicated that he had been prescribed narcotic medications intermittently for the previous ten years, "in [Dr. Levitt's] experience, narcotics are not indicated for long-term use in chronic disease, and are in fact, potentially harmful". *Id.,* ¶ 3. Dr. Levitt "explained this to [plaintiff] at length on a number of occasions". *Id.,* ¶ 3; Zimmermann Declaration [29], Ex. A, p. 37. Dr. Levitt concedes that plaintiff "refused the analgesic medications and claimed that only the narcotics were effective as pain medications." *Id.* However, "[t]his response strongly suggest[ed] to [Dr. Levitt] what is known as drug-seeking behavior". *Id.*

On November 5, 2004, plaintiff complained of problems urinating and on November 16 requested an eye exam and an increase in his pain medication. *Id.,* Bates No. 579. On November 8, 2004, plaintiff filed a grievance alleging that Dr. Levitt had decreased his dosage of Percocet in retaliation for his "recent complaints concerning medication refills". Plaintiff's Declaration [38], Ex. B. Plaintiff was seen by Dr. Levitt on November 18, 2004. Levitt Declaration [47], ¶ 35; Ex. A, Bates No. 582. At that time she noted "Percocet recently ineffective", and prescribed Prosac and Methadone to assist him with the discontinuation of the Percocet. *Id.,* ¶¶ 35, 37. She also ordered an optometry referral. *Id.* Additionally, Dr. Levitt issued a new Medical Restriction, which restricted plaintiff from work and school, required plaintiff to be fed in his cell, and permitted him to carry a cane. *Id.,* Bates No. 966. The Medical Restriction, which ran through November 18, 2005, also scheduled plaintiff for the gym exercise program four times per week. *Id.* It was Dr Levitt's medical judgment that increased physical activity would reduce plaintiff's back pain. *Id.,* ¶ 37.

However, the November 18, 2005 Medical Restriction, which superseded the earlier Medical Restriction, did not include a double mattress or daily showers, as it was Dr. Levitt's "judgment that they were not medically necessary." *Id.,* ¶ 37. On December 3, 2004, plaintiff underwent a complete physical examination. At that time it was noted that his back pain was "status quo". *Id.,* ¶ 38; Bates No. 582. On December 22, 2004 and January 21, 2005, Dr. Levitt continued plaintiff's Methadone prescription for 30 days. *Id.,* ¶¶ 42, 45.

**\*4** Plaintiff was seen by Dr. Levitt on January 28, 2005. *Id.,* ¶ 46, Ex. A, Bates No. 586. At that time, plaintiff indicated that his back pain was partially relieved by the Methadone and that his right knee pain was intermittent. *Id.* Plaintiff was continued on Methadone and prescribed Roboxin, Aspirin and Tylenol. *Id.* On February 8, 2005, plaintiff advised Dr. Levitt that the combination of Methadone and Tylenol she had prescribed was doing "absolutely nothing to alleviate the pain" and asked her to reinstate his prescription for Percocet. Plaintiff's Declaration [38], Ex. C.

Dr. Levitt saw plaintiff on January 28, 2005, and at that time, there was no indication to increase plaintiff's Methadone dosage. Levitt Declaration [47], ¶ 47. Because plaintiff indicated that he was not getting any relief from his daily dosage of Methadone, Dr. Levitt's plan was to refill plaintiff's Methadone prescription for two weeks and she "would then considered [*sic* ] a non-narcotic prescription with tapering off of the Methadone". *Id.,* ¶ 48. Therefore, on March 8, 2005, plaintiff's daily dosage of Methadone was decreased, (*id.,* ¶ 49). On March 10, 2005, plaintiff complained of "incessant pain" and because of the "adverse effects brought about by the [Methadone]", he again requested that he be prescribed Percocet and filed a complaint with the facility. Cole Declaration [38], Ex. D.

On March 16, 2005, plaintiff was seen by Dr. Levitt after he had an allergic reaction to the Methadone, which caused him to lose consciousness. *Id.* at ¶ 9. On that date plaintiff agreed to discontinue his prescription for Methadone. Levitt Declaration [47], ¶ 50, Ex. A, Bates No. 588. On March 17, 2005, Dr. Clemens prescribed plaintiff Ibuprofen and he noted that a pain clinic consultation was scheduled. *Id.,* ¶ 51, Bates No. 588. On March 17, 2005, plaintiff filed a grievance, complaining that "every time I register a complaint concerning my medical treatment, I am subjected to a medical punitive sanction." Plaintiff's Declaration [38], Ex. D. The Inmate Grievance Program Central Office Review Committee ("CORC") denied the grievance finding, *inter alia,* that plaintiff had been scheduled for an appointment with the pain management clinic. *Id.*

On March 18, 2005, plaintiff refused to go to the pain management clinic. Levitt Declaration [47], ¶ 52, Ex. A, Bates No. 589. On March 21, 2005, plaintiff agreed to attend the pain management clinic and was provided with a tens unit. *Id.,* ¶ 53, Bates No. 589. On March 24, 2005, plaintiff went to sick call for pain medication for his back pain and Dr. Levitt prescribed him Aspirin and Roboxin. *Id.,* ¶ 54, Bates No. 590. Plaintiff was next seen by Dr.

Levitt on May 2, 2005 for complaints of back pain. *Id.,* ¶ 56; Bates No. 614. Dr. Levitt referred plaintiff to the pain clinic and noted that the tens unit provided plaintiff some relief. *Id.* She continued plaintiff's prescriptions and started him on Trilisate. *Id.*

**\*5** Dr. Levitt alleges that on May 12, 2005 plaintiff was seen at sick call and requested a renewal of his medical restrictions. *Id.,* ¶ 57, Bates No. 615. However, plaintiff "categorically denies" that he requested cell confinement and disputes that Dr. Levitt had the authority to impose cell confinement without a consultation with plaintiff. Plaintiff's Declaration [38], ¶ 12.

Dr. Levitt issued a Medical Restriction through June 12, 2005 that continued the previous restrictions, but revoked plaintiff's permission to participate in recreation. *Id.,* ¶¶ 58, 59; Bates No. 971. Dr. Levitt alleges that she revoked plaintiff's access to recreation because "gym is a precious resource to be used by all inmates, including those using it for rehabilitation purposes, and Mr. Cole had been given special access to the gym for many months.... I issued the restrictions because Mr. Cole was adamant that he needed to be fed in cell and could not work or go to school due to his back pain. It is not medically sensible to provide him with ambulatory restrictions in some areas but not others." *Id.,* ¶ 59. These restrictions were continued by Dr. Clemens from June 14, 2005 through July 14, 2005. *Id.,* Bates No. 972.

Plaintiff filed a grievance on May 13, 2005 challenging his cell confinement (*id.,* ¶ 13) [3], and on May 16, 2005, he complained to the medical staff about the recreation restriction. Levitt Declaration [47], Ex. A, Bates No. 616. The Inmate Grievance Resolution Committee ("IGRC") recommended "for the grievant to be evaluated a.s.a.p., and for Dr. L. to desist from placing restrictions on individuals without first seeing them." Plaintiff's Declaration [47], Ex. F. However, the Superintendent found no retaliation and "[t]he IGRC does not have the authority to assess and determine medical protocol". *Id.*

[3]    The grievance upon which plaintiff relies (Ex. F) is not legible.

Dr. Levitt saw plaintiff on May 19, 2005, and at that time she questioned plaintiff's need for a cane to ambulate because he indicated that he could walk without it. *Id.,* ¶ 61; Bates No. 616. At that time, plaintiff indicated that he

did not want to continue physical therapy. *Id.* Dr. Levitt's plan was to obtain a copy of the October 13, 2001 MRI and "possibly to get a repeat MRI thereafter". *Id.* She ordered an increase in plaintiff's Trilisate dosage. *Id.*

On June 6, 2005, plaintiff was seen by Chetan Malik, MBBS, at the ECMC Musculoskeletal Pain Clinic, who found that plaintiff had chronic back pain with decreased sensation in his lower left limb. *Id.,* Bates No. 603. Dr. Malik recommended that plaintiff undergo an electromyogram and nerve conduction study of the left leg to rule out radiculopathy, physical therapy, and be prescribed Elavil. *Id.,* Bates No. 604. On June 9, Dr. Levitt reviewed Dr. Malik's report and prescribed Elavil. *Id.,* ¶ 63; Bates No. 616. However, plaintiff refused to take Elavil and the prescription was discontinued by Dr. Levitt. *Id.,* ¶ 64; Bates No. 617.

**\*6** On June 28, 2005, plaintiff was seen by Dr. Levitt for side effects from the Trilisate, which she discontinued, and was prescribed Fioricet. *Id.,* ¶¶ 68, 83, Bates Nos. 624, 681. Plaintiff also requested that the recreation restriction be discontinued. *Id.* Instead, Dr. Levitt issued a Medical Restriction through December 30, 2005 removing all restrictions, except plaintiff's cane permit. *Id.,* Bates No. 969. Dr. Levitt "eliminated feed-in-cell since it was [her] medical opinion that this was actually an impediment to Mr. Cole's rehabilitation. Discontinuing feed-in-cell by definition increases mobility". *Id.,* ¶ 70.

On July 1, 2005, Dr. Levitt continued plaintiff's Robaxin and Aspirin prescriptions for 90 days. *Id.,* ¶ 72; Bates No. 620. On July 13, 2005, plaintiff's electromyogram referral was scheduled for August 26, 2005. *Id.,* ¶ 71; Bates No. 619, 622.

An August 8, 2005, physical therapy consultation recommended that plaintiff undergo physical therapy along with a home exercise program. *Id.,* ¶¶ 76-78. However, on September 26, 2005 plaintiff requested to discontinue physical therapy. *Id.,* Bates No. 623.

On October 28, 2005, Dr. Levitt approved plaintiff's request for a renewal of his Fioricet prescription. *Id.,* ¶ 85; Bates No. 625. At that time, plaintiff was "observed ... carrying cane @ times". *Id.* On December 27, 2005, plaintiff requested a special permit to allow him to attend gym four days per week. *Id.,* ¶ 88, Bates No. 626. Dr. Levitt denied this request because plaintiff's in-cell exercise

program, which he was following regularly, was adequate. *Id.*

Dr. Levitt did not renew plaintiff's cane permit after it lapsed on December 31, 2005. *Id.,* ¶ 89. "In [her] medical opinion the use of the cane was an impediment to Mr. Cole's rehabilitation. Discontinuing the use of the cane helped increase his mobility and movement leading to improved muscle strength and benefits overall health as well. After using a cane for over eight years, he walked without it for over one year once it was discontinued." *Id.*

Plaintiff's cane was confiscated on May 15, 2006. Plaintiff's Declaration [38], ¶ 18. According to plaintiff, ambulating without a cane caused his feet and ankles to swell making it difficult to walk and caused extreme pain. *Id.* He also alleges that in mid-2007 he encountered problems with his left knee as a result of being forced to ambulate without a cane. *Id.,* ¶ 19. Plaintiff's grievance regarding Dr. Levitt's refusal to renew his cane permit was denied because "[t]he investigating Medical Director reviewed grievant's medical record and observed grievant's ability to ambulate at the time of her interview. The Medical Director confirms that the grievant was provided with physical therapy and has received numerous medical tests. The Medical Director includes a statement from the Physical Therapist who reports that physical therapy was discontinued at grievant's request on 09/26/05. At that time the Physical Therapist reported that use of a cane was no longer necessary." *Id.,* Ex. J.

 **\*7** On January 9, 2006 Dr. Levitt renewed plaintiff's prescription for Roboxin and on March 6, 2006 renewed his prescription for Fioricet. Levitt Declaration [47], ¶¶ 90 and 91; Bates No. 627. Dr. Levitt contends that it was her "professional opinion that the problem was being managed satisfactorily" because plaintiff made no mention of back pain when she saw him on December 27, 2005, May 1, 2006, or June 12, 2006. *Id.,* 92, Bates Nos. 626, 1004-1007.

On June 16, 2006, plaintiff was seen by Dr. Levitt. *Id.,* ¶ 93. At that time he was taking Fioricet, Roboxin, and Aspirin. Although Dr. Levitt alleges that she "continued to treat Mr. Cole with non-narcotic pain medicine and muscle relaxants" (*id.* at ¶ 94), plaintiff alleges that "on December 5, 2006 the defendant refused to prescribe plaintiff anything more than inefficacious medications". Plaintiff's Declaration [38], ¶ 20. On December 7, 2006,

plaintiff filed a grievance arising from Dr. Levitt's conduct. *Id.,* Ex. K. The IGRC reached a deadlock on his grievance with two of the four representatives finding that "[g]rievant has been receiving the same medication for degenerative back problems since 1997. The doctor has renewed grievant's medication for several years .... Suddenly the doctor claims the medication is not necessary any longer without meeting with grievant to properly assess his medical condition. Although the IGRC has no authority to recommend medical treatment, this appears to be a pattern of mistreatment and malpractice by the RMU.... Prisoners should not be taken off medication or denied treatment without being properly assessed by medical, just to save the State some money. Prisoners are entitled to adequate medical treatment." *Id.* However, the Superintendent denied the grievance finding that the "[i]nvestigation indicates grievant was assessed for his medical needs and was given the appropriate medication. It is not IGRC practice to second guess the medical staff recommendations as there has been no medical training. There is no evidence of mistreatment or malpractice within the medical staff". *Id.* On January 31, 2007, CORC upheld the Superintendent's determination noting that "grievant was prescribed an alternate pain analgesic, and is approved for consultation with his primary care provider which is pending scheduling". *Id.* [4]

[4]     There do not appear to be any medical progress notes from June 2006 through February 2007. Levitt Declaration 47], Ex.A, Bates Nos. 637, 638. However on February 22, 2007, plaintiff received a prescription for Robaxin from Dr. Levitt. *Id.,* Bates No. 638.

Plaintiff argues that Dr. Levitt deviated from the treatment he received from his prior physicians by discontinuing his prescription for Percocet, a narcotic pain killer, and prescribing less efficacious, non-narcotic, pain medications. Plaintiff's Memorandum of Law [38-6], pp. 6-8. Plaintiff alleges his Percocet prescription was discontinued as the result of a policy-shift following an inmate being found in possession of a large quantity of unprescribed Percocets, rather than concerns for plaintiff's well-being. *Id.* p. 7. In response, Dr. Levitt argues that she weaned plaintiff off of Percocet because "narcotics are not indicated for long-term use in chronic disease, and are in fact, potentially harmful". Levitt Declaration [47], ¶ 3. She also alleges that plaintiff's self-described need for Percocet was consistent with drug-seeking behaviors. *Id.,* ¶ 4.

Cole v. Levitt, Not Reported in F.Supp.2d (2009)

2009 WL 4571828

**\*8** Plaintiff offers little more than speculation for his assertion that Dr. Levitt discontinued his Percocet prescription as a result of a policy decision. While Dr. Levitt's treatment plan for plaintiff may have differed from the treatment he received from his previous physicians, this alone does not raise a triable issue as to whether Dr. Levitt was deliberately indifferent. *See Williams v. Smith,* 2009 WL 2431948, *9 (S.D.N.Y.2009) ("a prison doctor who relies on his medical judgment to modify or disagree with an outside specialist's recommendation of how to treat an inmate is not said to act with deliberate indifference.").

Plaintiff also challenges Dr. Levitt's conduct in issuing seemingly contradictory medical restrictions. For example, she issued a Medical Restriction on November 18, 2004, which restricted plaintiff from work and school, required plaintiff to be fed in his cell, and permitted him to carry a cane, but eliminated his permission to use a double mattress and take daily showers, and permitted him to attend the gym exercise program four times per week. Levitt Declaration [47], Ex. A, Bates No. 966. At that time, it was Dr Levitt's medical judgment that increased physical activity would reduce plaintiff's back pain and it was also her medical judgment that a double mattress and daily showers were unnecessary. *Id.,* ¶ 37. However, approximately six months later Dr. Levitt changed course by restricting plaintiff's participation in recreation, because "gym is a precious resource to be used by all inmates, including those using it for rehabilitation purposes, and Mr. Cole had been given special access to the gym for many months.... I issued the restrictions because Mr. Cole was adamant that he needed to be fed in cell and could not work or go to school due to his back pain. It is not medically sensible to provide him with ambulatory restrictions in some areas but not others." *Id.,* ¶¶ 58, 59, Bates No. 971. Approximately one month later on June 28, 2005, Dr. Levitt changed course again, by lifting all of plaintiff's restrictions, except his cane permit (*id.,* Bates No. 969), because in her "medical opinion [in-cell feeding] was actually an impediment to Mr. Cole's rehabilitation. Discontinuing feed-in-cell by definition increases mobility". *Id .,* ¶ 70. Dr. Levitt also failed to renew plaintiff's cane permit after it lapsed on December 31, 2005. *Id.,* ¶ 89.

Dr. Levitt's determination that increased mobility could assist in plaintiff's rehabilitation appears consistent with plaintiff's own desires to have his recreation restrictions

lifted. It was also consistent with the medical staff's observations of plaintiff on June 21, 2005 that he could sit, stand and ambulate without difficulty and "offers little c/o pain or discomfort". Levitt Declaration [47], ¶ 67; Bates No. 618. Plaintiff was also encouraged by Drs. O'Connell and Panzel-whose conduct is unchallenged by plaintiff-to undertake physical activity to treat his back pain. Zimmermann Declaration [29], Ex. A, pp. 27-28.

**\*9** Rather than suggesting indifference, the record demonstrates that plaintiff's complaints were addressed. "Deliberate indifference [will not] be found when an inmate simply prefers an alternative treatment or feels that he did not get the level of medical attention that he desired." *Shire v. Greiner,* 2007 WL 840472, * 12 (S.D.N.Y.2007). Instead, plaintiff must establish that defendants "acted with a sufficiently culpable state of mind, *i.e .,* deliberate indifference. He must therefore show that prison officials intentionally denied, delayed access to, or intentionally interfered with prescribed treatment." *Tafari v. Stein,* 2009 WL 331378, *6 (W.D.N.Y.2009) (Scott, M.J.), *reconsideration denied,* 2009 WL 1322317, 2004 WL 1579530.

At most, plaintiff has established that Dr. Levitt's treatment plan constituted negligence or malpractice, but do not rise to the level of culpable recklessness. *See Calloway v. Denane,* 2009 WL 3064781, *4 (N.D.N.Y.2009) ( "Allegation of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness"). Dr. Levitt continuously treated plaintiff's condition with pain relievers, referred him to a pain clinic, an orthopedic consultation and physical therapy, provided him with a tens unit, and encouraged physical activity. When plaintiff's prescriptions caused side-effects or were not effective, his medications were changed.

Mindful that "determinations made by medical providers within their discretion are given a 'presumption of correctness' when it concerns the care and safety of patients", *Mendoza v. McGinnis,* 2008 WL 4239760, *11 (N.D.N.Y.2008), I do not find that any deliberate indifference can be inferred from Dr. Levitt's conduct. Although plaintiff may question the propriety of the pain medications prescribed by Dr. Levitt and her decision to lift his medical restrictions, "disagreements over treatment do not rise to the level of a Constitutional violation", *Graham v. Gibson,* 2007 WL 3541613, *5 (W.D.N.Y.2007)

(Siragusa, J.), as "the Constitution does not require that an inmate receive a particular course of treatment". *Tafari, supra,* 2009 WL 331378, at \*7.

Therefore, I order that plaintiff's deliberate indifference claim against Dr. Levitt (first cause of action) be dismissed.

**B. Retaliation Claims**

Because of the "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated", courts shall "examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir .1995). "A finding of sufficient permissible reasons to justify state action is 'readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority.' " *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Thus, "a plaintiff asserting such a claim bears a heightened burden of proof". *Green v. Phillips,* 2006 WL 846272, \*3 (S.D.N.Y.2006).

**\*10** "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009).

"More than conclusory allegations are required to survive a summary judgment motion; the 'types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives.' " *Lane v. Carpinello,* 2009 WL 3074344, \*26 (N.D.N.Y.2009). However, where "circumstantial evidence of a retaliatory motive is sufficiently compelling, direct evidence is not invariably required." *Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003).

**1. Dr. Levitt**

Plaintiff alleges that Dr. Levitt retaliated against him for filing grievances by prescribing pain medications that were ineffective in treating his back pain and by failing to provide him with reasonable accommodations for his condition. Plaintiff's Memorandum of Law [38-6], pp. 8-11.

Having concluded that Dr. Levitt was not deliberately indifferent to plaintiff's medical needs, I likewise conclude that there is no evidentiary basis to conclude that her conduct was retaliatory. *See Goros v. Pearlman,* 2007 WL 1423718, \*3 (N.D.N.Y.2007) (After dismissing the plaintiff's deliberate indifference claim against the plaintiff's doctor, the court also dismissed the plaintiff's retaliation claim against that doctor finding that "plaintiff also contends that defendant refused plaintiff treatment in retaliation for engaging in protected speech. For the reasons discussed there is insufficient evidence that plaintiff was denied medical treatment. Accordingly, the First Amendment claim must fail .").

Therefore, plaintiff's retaliation claim against Dr. Levitt (second cause of action) is dismissed.

**2. Officer Turnbull**

Plaintiff alleges a continuous course of retaliatory conduct by Officer Turnbull for his numerous grievances that began with his grievance against Officer Turnbull for restricting his access to the gym. Complaint [1], ¶¶ 16-21; Plaintiff's Memorandum of Law [38-6], pp. 12-18. Defendants primarily challenge Officer Turnbull's personal involvement in the allegedly retaliatory conduct by arguing that "[p]laintiff's allegations against Officer Turnbull endows him with more power at Wende than he actually possesses." Defendants' Memorandum of Law [30], pp. 8-10. To a lesser degree, defendants argue that plaintiff "can show no facts which support an inference of a casual connection between the adverse actions and the protected conduct". *Id.,* p. 7. However, defendants do not contest the first and second elements necessary to establish a retaliation claim.

**\*11** I have addressed each of Officer Turnbull's alleged retaliatory acts individually.

**a. Gym Callout**

During 2004 and 2005, Officer Turnbull was one of the four hall captains for B-Block, plaintiff's cell block. Turnbull Declaration [27], ¶¶ 1, 4. As discussed earlier, on November 18, Dr. Levitt issued a Medical Restriction

which contained the following handwritten note: "Gym exercise program 4x/wk." Levitt Declaration [47], Ex. A, Bates No, 966; Turnbull Declaration [27], Ex. A.

Plaintiff alleges that on January 6, 2005, he heard Nurse Overman inform Officer Turnbull of the November 18, 2004 Medical Restriction and indicated that she would send him a copy. Prior to this, plaintiff was apparently unaware of the order. Thus, on January 6, 2005, plaintiff filed a grievance for Officer Turnbull's interference with Dr. Levitt's order. Plaintiff's Declaration [38], Ex. M. Plaintiff alleges that before Officer Turnbull became aware of his grievance, he was granted access to the gym on January 8, 2005. *Id.,* ¶ 27. However, when Officer Turnbull learned of the grievance, he refused him further access to the gym. *Id.*

On January 25, 2005, IGRC recommended that "the medical order be adhered to by security staff in housing block" and on February 17, 2005, the Superintendent granted plaintiff's grievance and stated "[a]s of 1/17/05, you have been assigned to Physical Education-A.M." *Id.,* Ex. M. However, plaintiff alleges that these decisions were not honored by Officer Turnbull. *Id.,* ¶ 28.

Officer Turnbull gives a different version of events. He alleges that he was not aware of the gym callout until January 19, 2005, when he was informed by Sal Agro, Wende's Recreation Program Leader, that plaintiff would be called to the gym for exercise in the evening. *Id.,* ¶ 5. [5] Officer Turnbull made a notation of this on B-Block's copy of the Medical Restriction (Ex. A), but did not work the evening shift so he was unaware of whether his notations were being followed. *Id.,* ¶ 6. He alleges that on or about March 17, 2005, he was informed by B-Block Sergeant Lambert that plaintiff would report to the gym in the morning four times per week and made a notion on B-Block's copy of the Medical Restriction. *Id.,* ¶ 7. On March 22, 2005, Helen Dean, the Deputy Superintendent for Programs, sent plaintiff a memorandum advising him that he was assigned to the gym physical education program in the morning and specified the days for his attendance. *Id.,* Ex. B. This memorandum was copied to the B-Block hall captain. *Id.*

[5]    Agro submitted a signed statement in support of plaintiff's opposition stating that "to the best of my recollection and memory never spoke to anyone at anytime concerning Inmate Cole's ... use of the

recreation programs gym weight room during non inmate program time. Plaintiff's Declaration 38], Ex. 4. He also submitted a declaration in support of defendants' motion stating that " a]fter four years I can not recall one way or the other, whether I had such a conversation with Mr. Turnbull . Agro Declaration 43], ¶ 12.

On April 4, 2005, Deputy Superintendent Dean rescinded her March 22, 2005 memorandum stating, "[y]our medical restriction states no work/no school. This includes the Physical Education Program". *Id.,* Ex. C. Because this memorandum was not received by B-Block on April 4, 2005, a misbehavior report was erroneously entered by Officer Croston against plaintiff for his refusal to report to the gym program on April 4, 2005. *Id.,* ¶¶ 13, 14. In contrast, plaintiff alleges that knowing that Deputy Superintendent Dean had rescinded her order, Officer Turnbull instructed Officer Croston to order plaintiff to report to the gym. Plaintiff's Declaration [38], ¶ 34.

**\*12** On May 2, 2005, Deputy Superintendent Dean changed course again stating "[y]ou have a medical restriction and the doctor states gym exercise four times per week. To comply with the doctor's orders, you will be permitted to go to the gym in PM Modules, Monday through Thursday." Levitt Declaration [47], Ex. B, Bates No. 21. However, plaintiff alleges that he was unaware of this memorandum until he was informed by Officer Mann that he had permission to go the gym. Plaintiff's Declaration [38], ¶ 37. At that time, plaintiff heard Officer Turnbull tell Officer Mann that plaintiff could not go to the gym pursuant to Deputy Superintendent Dean's orders. *Id.* Plaintiff filed a grievance as a result of this incident. After investigating the grievance, the IGRC noted that "[t]here is an on-going problem inn [*sic* ] regards to B-block 7 to 3 shift Hall Capt. interfering with Inmate medical issues". *Id.,* Ex. S.

Officer Turnbull alleges that he did not refuse to implement plaintiff's medical order, but rather he lacked authority to send plaintiff to the gym for exercise without a callout for a scheduled time of the day. Turnbull Declaration [27], ¶¶ 4, 11. According to Officer Turnbull, "[t]he Program Civilian, the Gym Rec. Civilians, and the Deputy Supt. of Programs had the authority to initiate inmate Cole's access to the gym" and that "[i]n no way, did [he] stop inmate Cole from going to the gym once the schedule for Inmate Cole was assigned." *Id.* ¶¶ 8, 10; Agro Declaration [45], ¶ 5 ("an inmate is

not allowed out of his cell during program time unless the Hall captain has received a change sheet form the Program Committee, informing him where the inmate is going during a particular program time slot"). In contrast, plaintiff alleges that the normal facility procedure would have been for Turnbull to contact "the Recreation Supervisor (C. Snowden) to arrange to have plaintiff to report to the gym to determine a module schedule (morning or afternoon)." Plaintiff's Declaration [38], ¶ 29. He also offers the declaration of Harry Packer who alleges that he was the subject of a medical request on or about November 8, 2005 from Dr. Levitt to Officer Turnbull to attend the gym five days a week for physical therapy and that Officer Turnbull "caused the same to be implemented without any interference or assignment to the Physical Education Department, via the institutional program committee". *Id.,* Ex. L.

Based on these contradictory accounts, I find that plaintiff has raised a triable issue of fact as to whether Officer Turnbull was personally involved in the alleged failure to provide him access to the gym. As to Officer Turnbull's alleged retaliatory motive, defendants fail to dispute or offer any explanation for why plaintiff was granted access to the gym on January 8, 2005 before Officer Turnbull allegedly became aware of his grievance. Plaintiff's Declaration [38], ¶ 27. They also fail to address or rebut plaintiff's allegation that notwithstanding Deputy Superintendent Dean's memos, every time plaintiff requested to go to physical therapy, he was advised by Officer Mann that "Turnbull said that plaintiff did not have permission to go to the gym" *Id* ., ¶ 33.

**\*13** I am mindful that plaintiff was denied access to the gym prior to plaintiff's January 6, 2005 grievance complaining about this conduct. *See Coleman v. Beale,* 2009 WL 1976044, *4 (W.D.N.Y.2009)* (Larimer, J.) ("The undisputed evidence makes clear that plaintiff's grievances against Beale were a response to, not a cause of, the actions that she took toward him."). However, plaintiff alleges that he was granted access to the gym on January 8, 2005, but was promptly denied any further access when Officer Turnbull learned of his January 6, 2005 grievance. Thus, plaintiff has established a temporal proximity between Officer Turnbull learning of plaintiff's grievance and plaintiff being prohibited from further access to the gym.

Moreover, in response to plaintiff's April 12, 2005 grievance, the IGRC found that "[t]here is an on-going problem inn [*sic* ] regards to B-block 7 to 3 shift Hall Capt. interfering with Inmate medical issues". *Id.,* Ex. S. Thus, plaintiff was partially vindicated in the grievance process. *See Burton v. Lynch,* 2009 WL 3286020, *13 (S.D.N.Y.2009)* ("Plaintiff has not provided any allegations regarding his disciplinary record, but he has alleged other facts which corroborate his claim of retaliation. While all levels of the inmate grievance process determined that there was 'no evidence of malice' on Dr. Supple's part, they all found that Dr. Supple had, by his own admission, prescribed Plaintiff a medication to which he was allergic.... Plaintiff was thus was partially 'vindicated' at a hearing on the matter.").

Giving plaintiff the benefit of every favorable inference, as I must on this motion, I find that plaintiff has raised a triable issue of fact as to whether Officer Turnbull was personally involved in restricting plaintiff's access to the gym and whether this was in retaliation for his grievances against him.

### b. Keep Lock

As discussed earlier, on June 28, 2005, Dr. Levitt issued a Medical Restriction through December 30, 2005 removing all restrictions, except plaintiff's cane permit, which was directed to the "block hall captain". Levitt Declaration [47], Ex. A, Bates No. 969. Plaintiff alleges that Officer Turnbull refused to honor Dr. Levitt's Medical Restriction and kept him confined in his cell for an additional 14 days. Complaint [1], ¶ 20. As a result, plaintiff filed a complaint with Deputy Post on July 4, 2005 that "Turnbull refuses to honor and/pr release me from medical keep-lock status-in short, I am still under 24-hour cell confinement". Levitt Declaration [47], Ex. B, Bates No. 29.

Officer Turnbull alleges that on June 28, 2005, plaintiff and another inmate were "keeplocked" for investigation by the B-Block Sergeant Lambert and released the next day. Turnbull Declaration [27], ¶ 15. According to Officer Turnbull, he did not have the authority to keeplock inmates without the Block Sergeant's approval (*id.*), and "[a]t no time was inmate Cole imprisoned by myself for an additional 14 days in refusal to honor Dr. Levitt's rescission order. The Tier Hearing Officer is in charge of inmate Cole's disposition. Further, the Block Sergeant

authorizes a keep-lock pending, the Hall Captains to do not have authority to do so." *Id.,* ¶ 16.[6]

[6]  Although not addressed by Officer Turnbull on July 16, 2005, he sent a memorandum to Sergeant Lambert in response to plaintiff's July 5, 2005 complaint indicating that he was "not aware of any memo from a Dr. Levitt, and today is my first day returning to work since July 1, 2005 . 15 4], Bates No. 223.

**\*14**  In response, plaintiff alleges that "the cell confinement was not the result of any disciplinary action and did not require a Tier Hearing Officer's decision" and that it was Turnbull's delegated responsibility to release all cell confinements on the morning of their respective expiration dates. Plaintiff's Declaration [38], ¶ 41. According to plaintiff, Officer Turnbull had an assigned inmate clerk to assist him with all cell confinement expiration dates. *Id.,* ¶ 42. He also relies on July 13, 2005 declaration of Harold Pecker, the inmate clerk for B-Block, stating that "[i]n early July of 2005 ... while reviewing inmates medical restrictions in the company of officer Kyle, I pointed to him that according to inmate Richard Cole [*sic* ] latest medical restrictions, he was technically released from his prior medical keep-lock status, yet he was still confined to his cell. Officer Kyle stated 'Well you know the Bull,' referring to B-Block Hall Captain A. Turnbull". *Id.,* Ex. X.

Based upon the conflicting accounts of Turnbull's authority over plaintiff's keeplock status, I find that plaintiff has raised a triable issue of fact as to Officer Turnbull's personal involvement in this incident. Defendants offer no explanation as to why plaintiff remained in keeplock confinement after his medical restrictions were lifted by Dr. Levitt on June 28, 2005. There being at least some evidence presented that Officer Turnbull's conduct was intentional, considering this conduct in conjunction with plaintiff's prior grievances against Officer Turnbull and giving plaintiff every favorable inference, I find that there is a triable issue of fact as to whether Officer Turnbull's conduct was in retaliation for plaintiff's grievances.

### c. Religious Services

Plaintiff alleges that Officer Turnbull refused to permit him to attend a religious service to celebrate Rosh Hashanah on September 14, 2005. Complaint [1], ¶ 38. Officer Turnbull argues that this claim is meritless because

he was not at work on September 20, 2005, the date alleged in plaintiff's grievance,[7] and to the extent plaintiff is referring to Yom Kippur (October 13, 2005), he alleges that the religious callout was not listed on the master callout sheet. Turnbull Declaration [27], ¶ 18; Ex. D, The Superintendent's October 26, 2005 Response to Plaintiff's Grievance ("The Sergeant states that the grievant may have quoted the wrong date on the grievance. October 13th was the date for Yom Kippur. On that date, the Yom Kippur callout was not listed on the master callout sheet. As a result, this problem was not rectified until 2:15 p.m., after the grievant had left or [*sic* ] his afternoon assignment".).

[7]  Plaintiff's grievance dated September 14, 2005 alleged that Turnbull denied him permission to attend Yom Kippur on September 13, 2005 (rather than September 20, 2005). Plaintiff's Declaration  38], Ex. 2.

In contrast to the allegations of his complaint, plaintiff appears to clarify that he is referring to the incident that occurred on Yom Kippur. He alleges that on October 13, 2005 there was a callout over the public address system at 1:35 p.m. for Jewish services. Plaintiff's Declaration [38], ¶ 46. He also relies on the declaration of Douglas Williams dated October 18, 2005 who states that he was permitted to go to Yom Kippur services on October 13, 2005 at approximately 1:30 p.m. *Id.,* [38], Ex. 3.

**\*15**  Based upon the conflicting accounts of what occurred on October 13, 2005 and whether other inmates were permitted to attend Yom Kippur services on that date, I find that plaintiff has raised a triable issue of fact as to Officer Turnbull's personal involvement in this incident. Considering the various grievances and other conduct allegedly undertaken by Officer Turnbull, I also find that there is a triable issue as to whether Officer Turnbull's conduct in prohibiting plaintiff from attending Yom Kippur Services was in retaliation for plaintiff's grievances.

Therefore, I deny defendants' motion insofar as it seeks to dismiss plaintiff's third cause of action against Officer Turnbull for retaliation.

### CONCLUSION

Cole v. Levitt, Not Reported in F.Supp.2d (2009)
Case 9:16-cv-00890-LEK-TWD    Document 117    Filed 06/21/19    Page 219 of 219
2009 WL 4571828

For these reasons, defendants' motion for summary judgment is GRANTED in part and DENIED in part. The parties shall appear on January 6, 2010 at 10:00 a.m. to schedule a trial date. Defendants' counsel shall arrange for plaintiff's telephonic appearance and provide the court with a telephone number where he can be contacted. The court will initiate the call.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 4571828

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.